## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| BEST MATTRESSES INTERNATIONAL COMPANY LIMITED AND ROSE LION FURNITURE INTERNATIONAL COMPANY LIMITED, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br> and <br><br> BROOKLYN BEDDING, LLC ET AL., <br><br> Defendant-Intervenors. | **Consol. Ct. No. 21-00281** <br> **Nonconfidential Version** |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD OF PLAINTIFFS BEST MATTRESSES INTERNATIONAL COMPANY LIMITED AND ROSE LION FURNITURE INTERNATIONAL COMPANY LIMITED

Jeffrey S. Grimson
Kristin H. Mowry
Sarah M. Wyss
Wenhui (Flora) Ji
Jacob M. Reiskin
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610 (ph)
202.595.8968 (fax)
trade@mowrygrimson.com

December 9, 2021

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

ADMINISTRATIVE DETERMINATION UNDER REVIEW ................................. 1

ISSUES PRESENTED ........................................................................................ 2

STATEMENT OF FACTS ................................................................................... 3

SUMMARY OF ARGUMENT ............................................................................. 7

STANDARD OF REVIEW .................................................................................. 9

ARGUMENT .................................................................................................... 11

I.   COMMERCE'S USE OF SURROGATE COUNTRY DATA TO VALUE THE
COP OF BEST MATTRESSES' MAJOR INPUTS WAS UNSUPPORTED BY
SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW ................. 11

   A.   Commerce Acted Contrary to its Statutory Authority by Using Surrogate Data
   to Value the COP of Inputs That Were Sourced from Affiliated Suppliers ................. 13

   B.   Commerce's Use of Surrogate Data to Value the COP of Affiliated Supplier
   Inputs Was an Unauthorized Use of the NME Section of the Act ................................. 20

   C.   Commerce Failed to Follow the Proper Surrogate Value Selection Procedure . 22

   D.   Commerce Violated the Administrative Procedures Act by Conducting
   Rulemaking Without Proper Notice and Comment Procedures .................................... 26

II.   COMMERCE'S CALCULATION OF THE INPUT COP WAS UNSUPPORTED
BY SUBSTANTIAL EVIDENCE ........................................................................ 28

   A.   Commerce's Inclusion of Aberrational GTA Data From Romania Seriously
   Distorted Commerce's Normal Value Calculation .......................................................... 29

   B.   Commerce's Decision to Exclude Mexico Data Was Unsupported by Substantial
   Evidence ............................................................................................................................. 32

III.   COMMERCE'S APPLICATION OF THE TRANSACTIONS DISREGARDED
RULE TO ADJUST BEST MATTRESSES' FIXED ASSET DEPRECIATION WAS
UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE NOT IN
ACCORDANCE WITH LAW ............................................................................. 35

IV.   COMMERCE'S DECISION TO USE EMIRATES' FINANCIAL STATEMENTS
TO CALCULATE BEST MATTRESSES' PROFIT AND SELLING EXPENSE
RATIOS WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE ......................... 40

V.   COMMERCE'S APPLICATION OF THE COHEN'S *D* TEST TO BEST
MATTRESS' U.S. SALES DATA WAS NOT IN ACCORDANCE WITH LAW .......... 52

CONCLUSION ................................................................................................. 56

# TABLE OF AUTHORITIES

## Cases

Ad Hoc Shrimp Trade Action Comm. v. United States, __CIT__, 219 F. Supp. 3d 1286 (2017) 29

Barnhart v. Sigmon Coal Co., 534 U.S. 438 (2002) .................................................................... 15

Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837 ................................................................ 10, 13, 14

Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938) ............................................................ 10

CP Kelco U.S., Inc. v. United States, 949 F.3d 1348 (Fed. Cir. 2020) ...................................... 51

Dalian Meisen Woodworking Co v. United States, No 20-00109, 2021 Ct. Intl. Trade LEXIS 160 (Nov. 8, 2021) ................................................................................................................... 13, 21

Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 391 (2016) ................................................. 30

Final Results of Redetermination Pursuant to Vinh Hoan Corporation et al. v. United States, No. 13 - 00156, 2017 Ct. Intl. Trade LEXIS 175 (2017) .............................................................. 29

Goldlink Indus. Co. v. United States, 30 CIT 616, 431 F. Supp. 2d 1323 (2006) ...................... 28

Grannis v. Ordean, 234 U.S. 385 (1914) ................................................................................... 23

Home Prods. Int'l, Inc. v. United States, 32 CIT 337, 556 F. Supp. 2d 1338 (2008) ................. 48

Huayin Foreign Trade Corp. v. United States, 322 F.3d 1369 (Fed. Cir. 2003) ..................... 9, 10

Ins v. Chadha, 462 U.S. 919 (1983) .......................................................................................... 13

Koyo Seiko Co., Ltd. v. United States, 36 F.3d 1565 (Fed. Cir. 1994) ................................. 24, 33

Lasko Metal Products, Inc. v. United States, 43 F.3d 1442 (Fed. Cir. 1994) ............................. 24

Marmen Inc. v. United States, No. 20-00169, 2021 Ct. Intl. Trade LEXIS 150 (Oct. 22, 2021). 55

Mid Continent Steel & Wire, Inc. v. United States, __ CIT __, 273 F. Supp. 3d 1348 (2017).... 44

Mid Continent Steel & Wire, Inc. v. United States, __ CIT __, 495 F. Supp. 3d 1298 (2021).... 53

Mittal Steel Galati S.A. v. United States, 31 CIT 1121, 502 F. Supp. 2d 1295 (2007) ............... 24

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29 (1983) 10

Nippon Steel Corp. v. United States, 458 F.3d 1345 (Fed. Cir. 2006) .................................. 10, 32

NLRB v. A.P.W. Prods. Co., 316 F.2d 899 (2nd Cir. 1963) ....................................................... 27

NMB Singapore Ltd. v. United States, 557 F.3d 1316 (Fed. Cir. 2009) ................................ 10, 31

Price v. Stevedoring Servs. of Am., 697 F.3d 820 (9th Cir. 2012) .............................................. 27

Rebar Trade Action Coal. v. United States, __ CIT __, 337 F. Supp. 3d 1251 (2018) .......... 36, 37

Rebar Trade Action Coal. v. United States, __ CIT __, 398 F. Supp. 3d 1359 (2019) .... 36, 37, 38

Seah Steel Corp. v. United States, No. 20-00150, 2021 Ct. Intl. Trade LEXIS 148 (Oct. 19, 2021) ........................................................................................................................................ 55

Shakeproof Assembly Components, Div. of Illinois Tool Works, Inc. v. United States, 268 F.3d 1376 (Fed. Cir. 2001) ............................................................................................................ 24

Shenzhen Xinboda Indus. Co. v. United States, No. 16-00116, 2017 Ct. Intl. Trade LEXIS 166 (Dec. 5, 2017) ........................................................................................................................ 23

Sichuan Changhong Elec. Co. v. United States, 30 CIT 1886, 466 F. Supp. 2d 1323 (2006) ..... 23

Since Hardware (Guangzhou) Co., Ltd. v. United States, __ CIT, __, 911 F. Supp. 2d 1362 (2013) ............................................................................................................................... 47, 48

SKF USA Inc. v. United States, 263 F.3d 1369 (Fed. Cir. 2001) .................................... 10, 23, 31

SolarWorld Ams., Inc. v. United States, __CIT__, 320 F. Supp. 3d 1341 (2018) ...................... 29

SolarWorld Ams., Inc. v. United States, 910 F.3d 1216 (Fed. Cir. 2018) ................................... 22

SolarWorld Ams., Inc. v. United States, 962 F.3d 1351 (Fed. Cir. 2020)...................................18
Stupp Corp. v. United States, 5 F.4th 1341, 1347 (Fed. Cir. 2021).......................................54, 55
Swiff-Train Co. v. United States, 793 F.3d 1355 (Fed. Cir. 2015)..............................................10
Taian Ziyang Food Co. v. United States, 33 CIT 828, 875, 637 F. Supp. 2d 1093, 1136 (2009) 44
Taian Ziyang Food Co. v. United States, 35 CIT 863, 783 F. Supp. 2d 1292 (2011) .................24
Tri Union Frozen Prods. v. United States, __ CIT__, 227 F. Supp. 3d 1387 (2017) .................29
U.S. Steel Corp. v. United States, __ CIT __, 953 F. Supp. 2d 1332 (2013) ..............................10
U.S. Steel Corp. v. United States, 36 C.I.T. 613, 844 F. Supp. 2d 1334 (2012) .........................17
Unicatch Indus. Co. v. United States, No. 20-00079, 2021 Ct. Intl. Trade LEXIS 118 (Sep. 14,
    2021)........................................................................................................................................37
Union Flights, Inc. v. Adm'r, Fed. Aviation Admin., 957 F.2d 685 (9th Cir. 1992) ..................27
Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951) .....................................................10, 32
Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States, 716 F.3d 1370 (Fed. Cir. 2013)... 19
Zhejiang DunAn Hetian Metal Co. v. United States, 652 F.3d 1333 (Fed. Cir. 2011) ...............28

**Statutes**

19 U.S.C § 1677b...................................................................................................14, 15, 16, 21
19 U.S.C § 1677b (f)(2) .................................................................................................. passim
19 U.S.C § 1677b(f)(3) .............................................................................................. 5, 8, 16
19 U.S.C. § 1516a .................................................................................................................... 9
19 U.S.C. § 1677b(c) .............................................................................................. 8, 13, 22, 28
19 U.S.C. § 1677b(e) ...................................................................................................... 11, 12
19 U.S.C. § 1677b(e)(2)(B)(iii) ............................................................................................. 41
19 U.S.C. § 1677f-1 .............................................................................................................. 53
5 U.S.C. § 553 .............................................................................................................. 8, 26
5 U.S.C. § 706 ...................................................................................................................... 13

**Other Authorities**

Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,366 (Dep't of Commerce
    May 19, 1997)........................................................................................................................29
Carbon and Certain Alloy Steel Wire Rod From Mexico: Final Results of Antidumping Duty
    Administrative Review, and Final Determination of No Shipments; 2018–2019, 86 Fed. Reg.
    46179 (Dep't of Commerce Aug. 18, 2021) ...........................................................................25
Cast Iron Soil Pipe Fittings From the People's Republic of China: Final Affirmative
    Determination of Sales at Less Than Fair Value and Final Determination of Critical
    Circumstances, in Part, 83 Fed. Reg. 33, 205, (Dep't of Commerce July 17, 2018)...............34
Ceramic Tile From the People's Republic of China: Preliminary Affirmative Determination of
    Sales at Less Than Fair Value, Preliminary Negative Critical Circumstances Determination,
    and Postponement of Final Determination, 84 Fed. Reg. 61,877 (Dep't of Commerce Nov. 14,
    2019)......................................................................................................................................34
Certain Activated Carbon From the People's Republic of China: Preliminary Results of
    Antidumping Duty Administrative Review, and Preliminary Determination of No Shipments;
    2019–2020, 86 Fed. Reg. 33,988 (Dep't of Commerce June 28, 2021) ...................................33

Certain Aluminum Foil From the People's Republic of China: Preliminary Results of
    Antidumping Duty Administrative Review, Partial Rescission of Antidumping Duty
    Administrative Review, and Preliminary Determination of No Shipments; 2019-2020, 86 Fed.
    Reg. 35,747 (Dep't of Commerce July 7, 2021) ........................................................................ 22
Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of
    Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017–
    2018, 85 Fed. Reg. 23,756 (Dept' of Commerce Apr. 29, 2020)........................................ 43, 44
Certain Hardwood Plywood Products From the People's Republic of China: Preliminary Results
    of Antidumping Duty Administrative Review; 2017–2018, 85 Fed. Reg. 7,270 (Dep't of
    Commerce Feb. 7, 2020) ........................................................................................................... 34
Certain Oil Country Tubular Goods From the Republic of Korea: Final Determination of Sales at
    Less Than Fair Value and Negative Final Determination of Critical Circumstances, 79 Fed.
    Reg. 41,983 (Dep't of Commerce July 18, 2014) ..................................................................... 41
Certain Oil Country Tubular Goods From the Socialist Republic of Vietnam: Final Results of
    Antidumping Duty Administrative Review; 2017–2018, 85 Fed. Reg. 41,552 (Dep't of
    Commerce July 10, 2020) ......................................................................................................... 51
Certain Steel Nails From the United Arab Emirates: Preliminary Determination of Sales at Less
    Than Fair Value and Postponement of Final Determination, 76 Fed. Reg 68,129 (Dep't of
    Commerce Nov. 3, 2011) ..................................................................................................... 42, 47
Differential Pricing Analysis; Request for Comments, 79 Fed. Reg. 26,720, 26,722 (Dep't of
    Commerce May 9, 2014)....................................................................................................... 53, 54
Eliminating Global Market Distortions To Protect American Jobs Act of 2021, S. 1187, 117th
    Cong. § 205(b)(2) (2021) ......................................................................................................... 20
Eliminating Global Market Distortions to Protect Americans Jobs Act at 2,
    https://www.brown.senate.gov/imo/media/doc/eliminating_global_market_distortions_to_prot
    ect_americans_jobs_act_section-by-section.pdf (last visited Dec. 5, 2021)............................. 20
Final Determination of Sales at Less Than Fair Value and Final Partial Affirmative
    Determination of Critical Circumstances: Diamond Sawblades and Parts Thereof from the
    People's Republic of China, 71 Fed. Reg. 29,303 (May 22, 2006)........................................... 49
Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof From the People's Republic
    of China: Final Results of Antidumping Duty Administrative Review, 76 Fed. Reg. 15,297
    ((Dep't of Commerce Mar. 21, 2011) ....................................................................................... 49
Utility Scale Wind Towers From Indonesia: Final Determination of Sales at Less Than Fair
    Value and Final Negative Determination of Critical Circumstances, 85 Fed. Reg. 40,231
    ((Dep't of Commerce July, 6, 2020) ......................................................................................... 42

**Regulations**

19 C.F.R. § 351.301 (c)................................................................................................ 13, 23, 26
19 C.F.R. § 351.407 (b) (2021).......................................................................................... passim
19 C.F.R. § 351.408 ........................................................................................... 13, 23, 28, 47

Pursuant to Rule 56.2(c) of the Rules of the U.S. Court of International Trade, Plaintiffs Best Mattresses International Company Limited and Rose Lion Furniture International Company Limited (collectively "Best Mattresses"), hereby move for judgment upon the agency record because the Department of Commerce ("Commerce") acted unlawfully and without substantial evidence in determining the dumping margin for Best Mattresses in the first ever antidumping duty investigation on Cambodia, a market economy country.  Commerce recognized that Cambodia is a market economy country with words alone.  Its actions, on the other hand, reflected a widespread and egregious disregard of Best Mattresses' own costs in an affront to the basic tenants of market economy antidumping law – using a respondent's own books and records or, at minimum, using data from the country under investigation, to calculate cost of production ("COP").  Instead, Commerce used a disparate collection of data from seven other countries with no ties to the actual production of subject merchandise in Cambodia to calculate critical COP variables, resulting in an unrealistic and inflated dumping margin.  In doing so, Commerce treated Best Mattresses the same as, if not worse than, foreign producers in non-market economy ("NME") counties such as China and Vietnam, setting a dangerous precedent in its first Cambodian case.

## ADMINISTRATIVE DETERMINATION UNDER REVIEW

Best Mattresses challenges certain aspects of the final affirmative antidumping duty determination by Commerce with respect to mattresses from Cambodia.  See Mattresses From Cambodia: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances, 86 Fed. Reg. 15,894 (Dep't of Commerce Mar. 25, 2021) ("Final Determination") (P.R. 309), and accompanying Issues and Dec. Mem. ("Final I&D Mem.") (P.R. 301) , as amended by Mattresses From Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Antidumping Duty Orders and

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

<u>Amended Final Affirmative Antidumping Determination for Cambodia</u>, 86 Fed. Reg. 26,460

(Dep't of Commerce May 14, 2021) ("<u>Amended Final Determination</u>") ( P.R. 325).

### ISSUES PRESENTED

I.   **Whether Commerce's use of surrogate country data to value the COP of Best Mattresses' major inputs was supported by substantial evidence and otherwise in accordance with law.**

Commerce's calculation of Best Mattresses' major inputs using a surrogate value methodology was unsupported by substantial evidence and not in accordance with law because (1) Commerce had no statutory basis to use this methodology in a market economy proceeding and (2) even if Commerce had authority under the law to use a surrogate value methodology, Commerce failed to follow its established commenting procedure and deprived Best Mattresses the opportunity to submit factual information and comment in the surrogate selection process.

II.  **Whether Commerce's inclusion of the aberrational Romanian Global Trade Atlas ("GTA") data that seriously distorted the normal value calculation was supported by substantial evidence.**

Commerce's inclusion of Romanian GTA data when valuing the COP of Best Mattresses' [ ███ ] input was unsupported by substantial evidence because Romanian GTA data are aberrational and seriously corrupt Commerce's overall major input COP calculation.

III. **Whether Commerce's rejection of Mexico data for lack of a conversion ratio was supported by substantial evidence.**

Commerce's decision to exclude Mexico's data in valuing the COP of Best Mattresses' [ ███ ] input on the basis that the value was not expressed in kilograms was not supported by substantial evidence because Commerce ignored record evidence that would allow the agency to easily calculate the value in kilograms.

IV.  **Whether Commerce's adjustment of the fixed assets' depreciation expense was supported by substantial evidence or otherwise not in accordance with law.**

Commerce's application of the transactions disregarded rule under 19 U.S.C § 1677b (f)(2)

of the Tariff Act of 1930 (the "Act") to adjust Best Mattresses' fixed asset depreciation expenses was unsupported by substantial evidence and otherwise not in accordance with law because Commerce ignored relevant market price data and, instead, used surrogate price data for material inputs to calculate its adjustment ratio even though raw materials and fixed assets depreciation are different types of expenses that operate differently within Best Mattresses' accounting system.

V.   **Whether Commerce's reliance on Emirates Sleep Systems Private Limited's ("Emirates") financial statements, and rejection of Grand Twins International (Cambodia) Plc's ("GTI") financial statements, to calculate Best Mattresses' profit and selling expenses ratios was supported by substantial evidence.**

Commerce's reliance on Emirates' financial statements, and rejection of GTI's financial statements, to calculate Best Mattresses' profit and selling expenses ratios was unsupported by substantial evidence because Emirates' financial statements are significantly flawed and reflect third country expenses while GTI's financial statements are reliable and reflect the expenses of a producer of comparable product in Cambodia, the country under investigation.

VI.   **Whether Commerce's application of Cohen's *d* test was supported by substantial evidence and otherwise not in accordance with law.**

Commerce's application of the Cohen's *d* test was not supported by substantial evidence and not in accordance with the law because its analysis includes data that violate the assumptions present in the Cohen's *d* test, generates incorrect or misleading results and is inappropriate for application to Best Mattresses' sales.

## STATEMENT OF FACTS

On March 31, 2020 Brooklyn Bedding, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises, Inc., Leggett & Platt, Incorporated, the International Brotherhood of Teamsters, and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO

(collectively "Petitioners") filed a petition for the imposition of antidumping duties on imports of mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, Turkey and Vietnam, as well as the imposition of countervailing duties on subsidized imports of mattresses from China.  See Mattresses From Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations, 85 Fed. Reg. 23,002 (Dep't of Commerce Apr. 24, 2020) (P.R. 45).

This investigation is the first United States antidumping case against imports from the Kingdom of Cambodia.

On April 24, 2020, Commerce published the initiation notice of a less-than-fair value investigation on mattresses from Cambodia, covering imports from the January 1, 2019 to December 31 2019 period of investigation ("POI").  See id.

On May 21, 2020, the International Trade Commission (the "Commission") published notice of its affirmative preliminary injury determination.  See Mattresses From Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam, 85 Fed. Reg. 30,984 (Int'l Trade Comm'n May 21, 2020).

On May 22, 2020, Commerce selected Best Mattresses International Company Limited and Rose Lion Furniture International Company Limited as mandatory respondents.  See Mattresses From Cambodia: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures, 85 Fed. Reg. 69,594 (Dep't of Commerce Nov. 3, 2020) ("Prelim. Determination") (P.R. 244), and accompanying Issues and Dec. Mem. at 2 ("Prelim. I&D Mem.") (P.R. 232).

In June and July 2020, Best Mattresses submitted timely responses to Section A of

Commerce's antidumping questionnaire relating to general information, and to Sections C and D of Commerce's antidumping questionnaire relating to U.S. sales, COP and constructed value ("CV"). See Prelim. I&D Mem. at 3 (P.R. 232). From July through September 2020, Best Mattresses submitted timely responses to Commerce's supplemental questionnaires. See id.

On November 3, 2020, Commerce published its affirmative preliminary determination of sales at less-than-fair-value and also collapsed the two respondents as one entity, which no party contested. See Prelim. Determination at 65,591 (P.R. 244); Prelim. I&D Mem. at 4-5 (P.R. 232). Commerce preliminarily calculated a single dumping margin of 252.74 percent for Best Mattresses. See Prelim. I&D Mem. at 6 (P.R. 232).

In the Preliminary Determination, to calculate Best Mattresses' COP of subject merchandise, Commerce selected various market prices against which it compared Best Mattresses' input purchases from affiliated suppliers pursuant to the transactions disregarded and major input rules codified in 19 U.S.C. § 1677b(f)(2)-(3). See Prelim. Determination, and accompanying Cost Mem. at 2 (Public Version) (P.R. 242).

For Best Mattresses' major inputs purchased from affiliated suppliers, Commerce selected Brazil as a surrogate country and used GTA import data into Brazil to value the COP of Best Mattresses' major inputs, instead of relying on Best Mattresses' own costs. See id. To value Best Mattresses' other inputs from affiliated suppliers, including fixed assets and packing materials, Commerce averaged import prices compiled by GTA for six countries (i.e., Brazil, Malaysia, Mexico, Romania, Russia and Turkey). See id.

In addition, Commerce used the financial statements of an Indian mattress producer, Emirates, to construct Best Mattresses' profit and selling expenses ratios instead of the financial statements of a comparable Cambodian company, GTI. See id.

5

Based on these surrogate market prices, Commerce made significant adjustments to Best Mattresses' reported COP. See id. On January 19, 2021, Best Mattresses filed a case brief disputing Commerce's Preliminary Determination on various grounds. See Final I&D Mem. at 2 (P.R. 301). Best Mattresses challenged Commerce's CV calculation methodology, and, in particular, its application of the transactions disregarded and major input rules and selection of surrogate prices to ascertain the market price and input COP of Best Mattresses' material input purchases. See id. at 5-7. Best Mattresses also urged Commerce to revise its preliminary calculation of Best Mattresses' fixed assets depreciation on the basis that fixed assets are treated differently in Best Mattresses' accounting system than material inputs and, thus, should not be valued using the same methodology. See id. Best Mattresses also pointed out the significant flaws in Emirates' financial statements and argued that Commerce should, instead, use GTI's financial statements in the Final Determination. See id. at 13-14.

On March 25, 2021, Commerce published its affirmative final determination of sales at less-than-fair-value and calculated a dumping margin of 45.34 percent for Best Mattresses. See Final Determination, 86 Fed. Reg. at 15,895 (P.R. 309). Commerce revised its preliminary selection of Brazil as a surrogate country to value Best Mattresses' major inputs and, instead, used the average value of the GTA data from six countries (i.e., Brazil, Malaysia, Mexico, Romania, Russia and Turkey) to calculate affiliated suppliers' COP of major inputs. See Final I&D Mem. at Cmt. 1 (P.R. 301). Commerce, however, included aberrational data from Romania in its final calculation of the COP of major inputs and also wrongfully excluded Mexico data on the basis that Commerce lacked a unit convertor when the record clearly provided Commerce with converting information. See id.; Final Determination, and accompanying Cost Mem. at 2, Attach. 1E (Public Version) ("Final Cost Mem.") (P.R. 307).

6

**NONCONFIDENTIAL DOCUMENT**
**CONFIDENTIAL INFORMATION REMOVED**

Commerce continued to use its preliminary adjustment methodology to adjust fixed asset depreciation expenses despite Best Mattresses' claims in their case brief that material expenses and fixed assets depreciation are distinct and operate differently within Best Mattresses' accounting system. See Final Cost Mem. at 2-3 (Public Version) (P.R. 307).

In addition, Commerce continued to rely on the financial statements of Emirates to construct Best Mattresses' profit and selling expenses ratios. See id.

Between March 29 and April 5, Best Mattresses and Petitioners submitted ministerial error allegations and rebuttal comments regarding clerical errors in Commerce's calculation. See Mem. from John C. McGowan to James Maeder re: Allegations of Ministerial Errors in Final Determination (Apr. 19, 2021) (Public Version) ("Ministerial Error Mem.") (P.R. 315).

On May 14, 2021, the Commission published its affirmative final injury determination in the Federal Register. See Mattresses From Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam, 86 Fed. Reg. 26,545 (Int'l Trade Comm'n May. 14, 2021). On May 14, 2021, Commerce published its amended final determination of sales at less-than-fair-value, which corrected certain clerical errors in Commerce's dumping margin calculation, assigned a dumping margin of 52.41 percent to Best Mattresses and also issued the antidumping duty order on mattresses from Cambodia. Amended Final Determination, 86 Fed. Reg. at 26,462 (P.R. 325). Commerce accepted Petitioners' ministerial error allegation and Best Mattresses' ministerial error allegation on packing cost but refused to correct the error of excluding Mexican data to value Best Mattresses' [ ██ ] input. See Ministerial Error Mem. at 3-4 (Public Version) (P.R. 315).

## SUMMARY OF ARGUMENT

In the underlying investigation on mattresses from Cambodia, Commerce effectuated a brand new treatment of inputs sourced from NME affiliated suppliers used in the production of the

**NONCONFIDENTIAL DOCUMENT**
**CONFIDENTIAL INFORMATION REMOVED**

subject merchandise in a market economy country.   Commerce acted contrary to law in misapplying the major input rule under 19 U.S.C § 1677b(f)(3) by using surrogate values from six unrelated countries to calculate Best Mattresses' input suppliers' COP without adequate statutory or regulatory authority, contrary to its own past practice and without providing parties adequate notice or a full opportunity to comment and provide factual information.   The major input rule allows Commerce to test if a respondent's input purchases from affiliates are at arms-length, but it does not allow Commerce to construct the input COP benchmark using surrogate values, as it did here.   That type of surrogate value methodology is limited to NME proceedings under 19 U.S.C. § 1677b(c).

Even assuming *arguendo* that Commerce was authorized to use surrogate values in calculating the COP of Best Mattresses' major inputs, Commerce failed to follow the proper surrogate value selection procedures under 19 U.S.C. § 1677b(c)(1) and associated implementing regulations.   Commerce also acted contrary to its obligations under the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, by engaging in rulemaking in the form of using surrogate values to construct input COPs without conducting the required notice and comment procedure.

Further, if this Court sustains Commerce's use of surrogate values to calculate major input COP as lawful, Commerce's calculation of the major input COP was still unsupported by substantial evidence for two reasons.   First, Commerce unreasonably included aberrational and distortive data from Romania when calculating the major input COP.   Second, Commerce unreasonably excluded Mexico data when calculating the input COP for [  ] on the basis of different measurement units even though there was conversion factor available on the record.

Moreover, Commerce's adjustment of Best Mattresses' fixed asset depreciation expenses under the transactions disregarded rule, 19 U.S.C § 1677b(f)(2), was unsupported by substantial

evidence and otherwise not in accordance with law because Commerce ignored [ ███████

███████████████████ ] that it could have used to assess the market value of fixed

asset depreciation, but instead used an adjustment ratio based on surrogate raw material prices,

even though fixed asset depreciation and raw materials are different types of expenses that operate

differently within Best Mattresses' accounting system.

Commerce also erred in selecting the financial statements of the Indian company, Emirates,

over those of the Cambodian company, GTI, to calculate Best Mattresses' CV profit and selling

expenses ratios because Emirates' financial statements are significantly flawed and reflect third

country expenses while GTI's financial statements are reliable and reflect the expenses of a

producer of comparable product in Cambodia, the country under investigation.

Lastly, to determine whether a pattern of significant U.S. price differences exists,

Commerce failed to explain whether Best Mattresses' sales data conformed with the underlying

assumptions necessary for the Cohen's $d$ test, specifically whether the test and comparison groups

were normally distributed, equally variable, and equally numerous.   In fact, the test and

comparison groups generated during the Cohen's $d$ test exhibited none of these characteristics.

Commerce's application of the Cohen's $d$ test here, is therefore unsupported by substantial

evidence and otherwise not in accordance with law.

## STANDARD OF REVIEW

"The Court shall hold unlawful any determination, finding or conclusion found . . .  to be

unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19

U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion."  Huayin Foreign Trade Corp. v. United States,

322 F.3d 1369, 1374 (Fed. Cir. 2003) (internal citation omitted).   Substantial evidence requires

"more than a mere scintilla," see, e.g., Swiff-Train Co. v. United States, 793 F.3d 1355, 1359 (Fed. Cir. 2015) (internal citation omitted), and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Huayin, 322 F.3d at 1374 (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

Moreover, substantial evidence supporting an agency determination must be based on the whole record, and the Court shall take into account not only the information that supports the agency's decision but also whatever in the record "fairly detracts from its weight." Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 477-78 (1951)). Disregarding record information with no explanation defies this requirement. Although Commerce does not have to provide perfect explanations, "the path of Commerce's decision must be reasonably discernable." NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009).

Further, "{t}o be in accordance with law, a decision must not be arbitrary and capricious . . . and must be supported by substantial evidence and reasoned explanations." U.S. Steel Corp. v. United States, __ CIT __, __, 953 F. Supp. 2d 1332, 1336 (2013) (citing Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 41-43 (1983)). "{I}t is well-established that 'an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.'" See SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001). In reviewing Commerce's interpretation of statutes, the Court applies the two-prong standard established in Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 842-43 (1984). First, the Court determines whether Congress' intent can be ascertained; if it can, the Court "must give effect to the unambiguously expressed intent of Congress." Id. at 843. Second, the Court determines whether the agency's interpretation of the statute is permissible. See id. at 843-44.

The Court will only uphold agency interpretations that are reasonable. See id. at 844.

## ARGUMENT

I.  **COMMERCE'S USE OF SURROGATE COUNTRY DATA TO VALUE THE COP OF BEST MATTRESSES' MAJOR INPUTS WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW**

In the underlying antidumping proceeding, Commerce investigated a product from Cambodia for the very first time.  Under U.S. antidumping law, including the major input rule codified as Section 773(f)(3) of the Act, 19 U.S.C § 1677b(f)(3), Cambodia should be treated no differently than any other market economy country.  Commerce, however, used this case to create brand new law in the form of a unique treatment of inputs sourced from NME affiliated suppliers used in the production of subject merchandise in the market economy country, Cambodia.

In general, when determining normal value on the basis of CV under 19 U.S.C. § 1677b(e), Commerce may use the major input rule to evaluate if a respondent's purchases of inputs from affiliates are at arms-length and, in doing so, Commerce normally compares three price points: transfer price, market price and COP of the input.  See 19 C.F.R. § 351.407(b) (2021).  At a high level, these rules allow Commerce to determine the value of a respondent's major inputs by comparing the respondent's price paid for the input to other benchmarks, but they do not allow Commerce to go further back in the supply chain and construct the input COP benchmark using surrogate values.  Nothing in the CV statute or Commerce's regulation governing its major input rule application gives Commerce the power to take the action that it did here – using surrogate data in the form of import prices from unrelated countries to estimate Best Mattresses' suppliers' COP.

In the Final Determination, Commerce empowered itself in a new way – it broadly stated that in performing its major input rule analysis, "we cannot rely on the affiliated suppliers' actual

11

cost of production because the affiliates are based in an NME country" and, instead, used surrogate data from six countries that have no ties to Best Mattresses or its affiliated suppliers to estimate the input suppliers' COP.  Final I&D Mem. at 10 (P. R. 301).  Commerce offered not a single citation to a past agency determination, court opinion or direct statutory provision to support its assumed authority to use surrogate value data in this way.

Commerce's application of the major input rule in the Final Determination was not in accordance with law for four reasons.  First, Commerce acted outside of the bounds of the Act when it used surrogate value data to construct Best Mattresses' suppliers' COP.  Congress conferred authority on Commerce to calculate normal value under 19 U.S.C § 1677b in a very specific manner, including detailed provisions for how Commerce may use CV for market economy determinations under 19 U.S.C § 1677b(e) and how Commerce may determine normal value in NME determinations under 19 U.S.C § 1677b(c) by using surrogate value data.  Nowhere did Congress give Commerce authority to alter its normal value calculation methodology in a market economy case when the mandatory respondent purchases inputs from affiliates located in NME countries.  Second, in choosing to use surrogate data to construct Best Mattresses' suppliers' COP, Commerce in effect used the NME methodology to value a respondent's supplier's COP when such methodology is only permitted to value a respondent's COP where "the subject merchandise is exported from a nonmarket economy country," 19 U.S.C § 1677b(c)(1)(A). This is not the case here.  Because Cambodia is a market economy country, Commerce has no authority to use an NME methodology and there is no past precedent to support such action.  Third, Commerce acted unlawfully when it engaged in new rulemaking by using an NME surrogate value methodology in its major input rule application without following the proper procedure set forth in the APA.  Fourth, even assuming *arguendo* that Commerce was permitted to use the NME

methodology to calculate normal value here, Commerce's determination was still contrary to law and unsupported by substantial evidence because it failed to follow the proper surrogate value selection procedures.  See 19 U.S.C. § 1677b(c)(1); 19 C.F.R. § 351.408; see also 19 C.F.R. § 351.301(c).

As explained below, the Court should remand this issue and instruct Commerce to eliminate the flawed input COP variable from its major input analysis.

### A. Commerce Acted Contrary to its Statutory Authority by Using Surrogate Data to Value the COP of Inputs That Were Sourced from Affiliated Suppliers

In the Final Determination, Commerce unlawfully used surrogate country data from six countries to value the COP of the major inputs that Best Mattresses sourced from affiliated suppliers (and yet a seventh country to value the financial ratios, as explained below in Section IV).  Commerce purported to have authority to employ surrogate value data in this way under the major input rule – 19 U.S.C § 1677b (f)(3) – but, in fact, Congress conferred no such authority.

As part of the executive branch, Commerce's authority is limited by statutory delegation from Congress.  See 5 U.S.C. § 706(2)(C) (conferring to courts the authority to strike down agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"); see also Ins v. Chadha, 462 U.S. 919, 953 n16 (1983) ("{T}he Executive's . . . administrative activity cannot reach beyond the limits of the statute.").  Further, to test the legality of Commerce's interpretation of the statutes, the Court determines (1) whether the statute is ambiguous and Congress' intent can be ascertained.  If it can, the Court gives full effect of the "unambiguously expressed intent of Congress." Chevron, 467 U.S. at 843; see also Dalian Meisen Woodworking Co v. United States, No 20-00109, 2021 Ct. Intl. Trade LEXIS 160, at *19 (Nov. 8, 2021) (providing that the Chevron framework "governs judicial review of Commerce's interpretation of the antidumping statute").  Otherwise, the Court moves on to (2) determine

13

whether the agency's interpretation of the statute is permissible.  See Chevron, 467 U.S. at 843-44.  The Court will only uphold agency interpretations that are reasonable. See id. at 844.

Here, Congress authorized Commerce to evaluate respondents' major input purchases from affiliates under the "major input rule," but not to use surrogate value data to estimate the COP to produce these major inputs.  See 19 U.S.C § 1677b (f)(3).  The language of the major input rule is clear:

> If, in the case of a transaction between affiliated persons involving the production by one of such persons of a major input to the merchandise, the administering authority has reasonable grounds to believe or suspect that an amount represented as the value of such input is less than the cost of production of such input, then the administering authority may determine the value of the major input on the basis of the information available regarding such cost of production, if such cost is greater than the amount that would be determined for such input under paragraph (2).

19 U.S.C § 1677b (f)(3).  Commerce promulgated regulations to "determine the value of a major input purchased from an affiliated person based on the higher of:"

> (1) The price paid by the exporter or producer to the affiliated person for the major input; ("transfer price")
> (2) The amount usually reflected in sales of the major input in the market under consideration; ("market value") or
> (3) The cost to the affiliated person of producing the major input ("input COP").

19 C.F.R. § 351.407(b).  In short, Commerce is permitted to select the highest among the three values mentioned above when applying the major input rule to value a respondent's COP.  Nothing in the Act or in Commerce's regulations, however, gives Commerce the authority to use third country surrogate value data to calculate the input COP.  Further, there is no exception to the major input rule framework written into the statute or regulation where the respondent's affiliated supplier is located in an NME country.  Under Chevron, the language of the major input rule under 19 U.S.C § 1677b (f)(3) is not ambiguous, and, even if the section is ambiguous, Commerce' interpretation is unreasonable.

14

In the Final Determination, Commerce stated that "because {the major input} transactions were between Best Mattresses/Rose Lion and NME-based affiliated suppliers, Commerce was unable to rely on the affiliated suppliers' cost of production for use in applying the major input rule." Final I&D Mem. at 9 (P.R. 301).  Commerce then claimed that it "sought to obtain surrogate information that would allow it to fulfill the requirements of sections 773(f)(2) and (3) of the Act" and selected "GTA data for the countries that are currently used by Commerce as potential surrogate sources for the particular NME country (i.e., Brazil, Malaysia, Mexico, Romania, Russia, and Turkey)" as its source.  Id.  Commerce misinterpreted what is required by the Act.  Neither section 773(f)(3) of the Act nor Commerce's regulations require Commerce to obtain a value for the major input COP, as Commerce suggested.  To the contrary, the plain language of section (f)(3) states that "the administering authority may determine the value of the major input on the basis of the information available regarding such cost of production." 19 U.S.C § 1677b (f)(3) (emphasis added).  The unambiguous meaning of the word "may" shows that the use of input COP in the major input rule analysis is completely discretionary.  See Barnhart v. Sigmon Coal Co., 534 U.S. 438, 461-62 (2002) (explaining that "legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete'" (internal citation omitted)).

Similarly, 19 C.F.R. § 351.407(b) provides that Commerce "normally will determine the value of a major input purchased from an affiliated person based on the higher of" transfer price, market price and input COP, and "normally" clearly  means that Commerce is not required to use all three benchmark prices in all instances where one price is unavailable on the record, as it is here with the input COP.

Although Commerce never fully explained which statutory provision gives it the authority

to use surrogate data as it did here, Commerce appeared to claim that Congress contemplated its

use of surrogate data to value input COP, stating: "Recognizing that the affiliated suppliers' actual

COP may not be available, the statute states that 'the administering authority may determine the

value of the major input on the basis of the information available regarding such cost of

production.'" Final I&D Mem. at 10-11 (P.R. 301) (quoting 19 U.S.C. § 1677b(f)(3)). Commerce,

however, misinterpreted the statute. The full statutory language is read as the following:

> If, in the case of a transaction between affiliated persons involving the production
> by one of such persons of a major input to the merchandise, the administering
> authority has reasonable grounds to believe or suspect that an amount represented
> as the value of such input is less than the cost of production of such input, then the
> administering authority may _determine the value of the major input_ on the basis of
> the information available regarding such cost of production, if such cost is greater
> than the amount that would be determined for such input under paragraph (2).

19 U.S.C. § 1677b(f)(3) (emphasis added). First, the Act gives Commerce narrow authority to

"determine the value of the major inputs" from affiliated suppliers, when the agency has reason to

believe that the affiliated purchases were made at less than COP of the input. In other words, the

specific authority relates only to respondent's input value and gives Commerce no authority to

construct respondents' suppliers' COP using outside surrogate data. The mere presence of the

phrase "on the basis of the information available" does not give Commerce *carte blanche* to collect

and use wildly unrelated information, as it did here. Again, to determine Best Mattresses' COP, a

fully cooperative respondent in Cambodia, Commerce used the price of imports into six countries

in which Best Mattresses does not produce and from which Best Mattresses does not source its

raw materials. These data are based on broad HTS codes with no actual connection to mattress

production or mattress input production anywhere in the world.

    Instead of permitting the introduction of third country surrogate data, the Court should read

"the information available" mentioned in 19 U.S.C. § 1677b(f)(3) according to Commerce's

regulation - 19 C.F.R. § 351.407(b)(3) – that was designed specifically to provide three categories of such information: transfer price, market price and input COP.  Importantly, the regulation is restrictive in defining the input COP benchmark – it defines that benchmark as "{t}he cost to the affiliated person of producing the major input."  19 C.F.R. § 351.407(b)(3).  Nothing is ambiguous here – "the cost" means the actual cost to the supplier to produce the input and does not mean estimated cost based on outside surrogate data.  Again, Best Mattresses does not contest Commerce's decision not to request actual COP data from its suppliers, but Commerce's failure to request such data does not justify its use of third country surrogate data outside of the confines of the statute.

Importantly, Commerce had a reasonable alternative here.  Commerce could have completed its major input analysis without the input COP benchmark, by comparing the two other benchmark prices under 19 C.F.R. § 351.407(b): transfer price and market price.  In U.S. Steel Corp. v. United States, the Court sustained Commerce's major input analysis when Commerce compared the transfer price and market price, without input COP.  See Final Results of Redetermination Pursuant to Remand at 7, U.S. Steel Corp. v. United States, No.09-00156 (Ct. Int'l Trade Feb. 15, 2011), ECF 105, sustained by U.S. Steel Corp. v. United States, 36 C.I.T. 613, 844 F. Supp. 2d 1334 (2012). Similarly here, without input COP information, Commerce should compare the market and transfer price in the major input rule analysis.  In fact, that was the only reasonable determination given the factual record and the confines of the statute.

Even assuming arguendo that the statute here is ambiguous, Commerce's interpretation was unreasonable under Chevron step two because Commerce chose information with no relation to Best Mattresses' suppliers' production or actual mattress input production anywhere in the world.  Instead, Commerce used the price of imports into six unrelated countries under broad HTS

codes.  Commerce failed to explain how an average of six countries' import data are a good

benchmark to estimate the COP of major inputs that were used in the production of mattresses in

Cambodia.  Commerce stated that

> to narrow the request and given that the affiliated suppliers are from an NME country, Commerce determined that it was appropriate to solicit GTA data from countries economically similar to the affiliated suppliers' country. Thus, Commerce requested and obtained from the parties GTA data for the countries that are currently used by Commerce as potential surrogate sources for the particular NME country

Final I&D Mem. at 9 (P.R. 301).  In its analysis, Commerce overlooked the most important factor

here: this is not an investigation on [          ] imports.  Commerce chose [                                    ]. See id. at 9.

Then, it averaged the GTA import data of [                               ] from these six countries

and used that to compare Best Mattresses' actual purchase price and market value of these three

inputs. See Final Cost Mem. at  2 (C.R. 276).  Because the surrogate value for the COP of [

] are the higher than transfer price and market value of  these inputs, the surrogate

values for these two inputs were plugged into the margin calculation instead of Best Mattresses'

actual cost of purchasing them.   See id.   In other words, Commerce distorted Best Mattress'

dumping margin by calculating Best Mattresses' COP, in part, as if it were located in [        ].

Notably, Commerce made no finding that imports into Romania, Russia, Malaysia, Turkey,

Mexico and Brazil under the same HTS codes as [                           ] had any reasonable

connection to the inputs actually used by Best Mattresses in its production of mattresses in

Cambodia.

Moreover, the GTA data reflect import prices, which are higher than COP because they

necessarily include profit to the seller.  See SolarWorld Ams., Inc. v. United States, 962 F.3d 1351,

1359  (Fed.  Cir.  2020)  (holding  that  "{t}he  GTA  records  the  import  value  .  .  .  for  import

transactions into a country"); see also NTN Bearing Corp. v. United States, 14 Ct. Int'l Trade 623, 642, 747 F. Supp. 726, 743 (1990) (explaining that Commerce defines COP "to include general administrative and selling expenses," but not profit); 19 U.S.C. § 1677b(b)(3) (providing components of cost of production).  The GTA values are, therefore, distinctly higher than COP input that Commerce intended to estimate.

In sum, Commerce failed to adequately explain how an average of six foreign countries' GTA import data for [ █████████████████ ] accurately reflects these inputs' fair values in Cambodia, and thus, Commerce's decision is an impermissible interpretation of the major input rule.  See Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States, 716 F.3d 1370, 1379 (Fed. Cir. 2013) ("An overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible.").

For all of this discussion of the language of the Act, it is also important to note the elephant in the room that is not written into the Act – that is the use of Chinese-origin inputs in global manufacturing.  The Act does not prohibit foreign producers from manufacturing finished merchandise in their home country using inputs from China or any other NME.  In fact, the Act does not set forth any particular treatment whatsoever of those inputs on the basis of whether or not they are sourced from an NME country.  Commerce itself acknowledged that had Best Mattresses' major inputs been purchased from an unrelated supplier in [ ████ ], the purchase price of those inputs would have been automatically used in the calculation of normal value.  See Final I&D Mem. at 11 (P.R. 301) (noting that "{i}n market economy cases, Commerce relies on the purchase prices paid to unaffiliated suppliers based in these countries.").  The major input adjustment only arises when the purchase is from an affiliated supplier.

Moreover, the introduction into Congress of new legislation that does address NME inputs

further shows that the current statute does not address this.  Senate Bill S.1187 will "amend{} the law to specify that Commerce is authorized to disregard costs for inputs obtained from non-market economies."  Eliminating Global Market Distortions to Protect Americans Jobs Act at 2, https://www.brown.senate.gov/imo/media/doc/eliminating_global_market_distortions_to_protect_americans_jobs_act_section-by-section.pdf (last visited Dec. 5, 2021); Eliminating Global Market Distortions To Protect American Jobs Act of 2021, S. 1187, 117th Cong. § 205(b)(2) (2021) ("If an input for subject merchandise is produced by or acquired from a person or entity described in clause (iii), the administering authority shall disregard such production or acquisition as outside the ordinary course of trade.").  The new bill's inclusion of a provision related to NME inputs clearly shows that the current law governing this investigation does not authorize Commerce to treat NME-sourced inputs differently. If the statute allowed such different treatment already, then this amendment would not be necessary.

Overall, Commerce's application of surrogate value methodology was not in accordance with law because Commerce acted outside of its authority under the major input rule and unreasonably under the circumstances of this case.

### B. Commerce's Use of Surrogate Data to Value the COP of Affiliated Supplier Inputs Was an Unauthorized Use of the NME Section of the Act

Not only is the Act clear in not authorizing Commerce to use surrogate values within the major input rule analysis as explained above, but the Act is clear in establishing when Commerce may use surrogate values within its normal value calculation.  Commerce may only use surrogate values in an NME proceeding.  See 19 U.S.C. 1677b(c).  Commerce itself acknowledged that the Act only allows it to apply surrogate value methodology in an NME proceeding and stated that the Act "does not address a method for determining COP for inputs obtained from NME based suppliers of a market economy based respondent."  Final I&D Mem. at 11 (P.R. 301).  As the

Court has properly held, Commerce may not act "outside the Tariff Act {or} beyond the Department's antidumping jurisdiction." Dalian Meisen, 2021 Ct. Intl. Trade LEXIS 160 at *27-28 (provided, like all CIT cases cited herein, as analogous and persuasive authority). In Dalian Meisen, Commerce used adverse facts available because the respondent engaged in false advertising. The Court found Commerce's determination contrary to law because "{i}n asking Meisen why it lied to its customers, a subject the statute does not address, Commerce exceeded its regulatory writ." Id, at *22. Similarly, here, Commerce' decision was not in accordance with law because it acted outside the Act and beyond Commerce's antidumping jurisdiction by using an NME surrogate value methodology outside of the limited context for which it was authorized under 19 U.S.C. § 1677b(c). The NME section of the Act is explicit in that it may only be used if "the subject merchandise is exported from a nonmarket economy country," which is undoubtedly not the case here as subject merchandise production occurs in Cambodia. 19 U.S.C. § 1677b(c)(1)(A).

Although Commerce claimed that it did "not apply an NME factors of production methodology analysis to inputs the respondent obtained from NME-based affiliated suppliers," Final I&D Mem. at 9 (P.R. 301), its actions show that it unquestionably used an NME surrogate value methodology to value major input COP. In particular, the final selected value for two of the three major inputs were from third country surrogate GTA data. See Final Cost Memo at Attach. 1A (Business Proprietary Document) (C.R. 276). [ █████████████████████████████ █████████████████████████████████████ ] See id.

Further, Commerce clearly drew from the NME statute by using all of the NME surrogate value selection criteria here to support its selection of the GTA data. In the Final Determination, Commerce stated that it selected the GTA data as surrogate value because "the import data for all of the six economically comparable countries as a surrogate COP. This average represents a

broader set of data for use as the information available."   Final I&D Mem. at 9 (P.R. 301) (emphasis added).   Economic comparability and a broad dataset are both surrogate selection criteria in an NME proceeding that came directly from the NME subsection of the statute, established practice and as affirmed by the Court.  See 19 U.S.C. § 1677b(c) (setting economic comparability as one of the surrogate selection criteria in an NME proceeding); SolarWorld Ams., Inc. v. United States, 910 F.3d 1216, 1222 (Fed. Cir. 2018) ("Commerce generally selects, to the extent practicable, surrogate values that are publicly available, are product-specific, reflect a broad market average and are contemporaneous with the period of review."); Certain Aluminum Foil From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Partial Rescission of Antidumping Duty Administrative Review, and Preliminary Determination of No Shipments; 2019-2020, 86 Fed. Reg. 35,747 (Dep't of Commerce July 7, 2021), and accompanying Surrogate Value Mem. at 1-2 ("Commerce shall utilize, to the extent possible, the prices or costs of FOP in one or more market-economy countries that are at a level of economic development comparable . . . In addition to satisfying Commerce's preference for publicly available information, these data represent broad market averages") (emphasis added). Importantly, however, as explained below, even though Commerce ultimately applied NME selection criteria to the input COP surrogate value data, it never announced its intended methodology or provided the same comment opportunity that is customary in NME proceedings.

In sum, contrary to what Commerce claimed in the decision memo, Commerce acted contrary to its statutory authority by using the NME surrogate value methodology to value certain inputs.

### C.  Commerce Failed to Follow the Proper Surrogate Value Selection Procedure

Even assuming *arguendo* that Commerce acted within its statutory authority to apply the

NME methodology, its failure to permit parties the opportunity to participate and supplement the record was unsupported by substantial evidence and not in accordance with law.

Under 19 C.F.R. § 351.408, Commerce sets forth a detailed process for surrogate country and value selection in the NME context. See also 19 C.F.R. § 351.301(c) (providing for rules on surrogate information submission timeline during the selection process). As Commerce used surrogate values here to calculate the major input suppliers' COP and employed the NME selection criteria, as explained above, the only reasonable determination was for Commerce to use the same procedures for collecting surrogate data here as it normally does in an NME case. Commerce, however, failed to do so, rendering its decision arbitrary because it treated a similar situation differently without adequate explanation and factual support on the record. See SKF USA Inc., 263 F.3d at 1382 ("{A}n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.").

In an NME case, Commerce first issues a memorandum and provides a list of surrogate countries that are at the same level of economic development as country under investigation. See 19 C.F.R. § 351.408; see, e.g., Shenzhen Xinboda Indus. Co. v. United States, No. 16-00116, 2017 Ct. Intl. Trade LEXIS 166, at *5-6 (Dec. 5, 2017) (explaining every step in the surrogate value selection process). Then, interested parties have an opportunity to comment on the list of countries and provide affirmative and rebuttal data to support the surrogate country choice. See id. This information gathering and commenting process allows parties to be heard and allows Commerce to select the best available information in determining dumping margins in an NME context. See Sichuan Changhong Elec. Co. v. United States, 30 CIT 1886, 1890, 466 F. Supp. 2d 1323, 1327, (2006) (citing Grannis v. Ordean, 234 U.S. 385, 394 (1914)) (The Court has recognized that "the fundamental requisite of due process of law is the opportunity to be heard."); see also Mittal Steel

23

Galati S.A. v. United States, 31 CIT 1121, 1145, 502 F. Supp. 2d 1295, 1316, (2007) ("{T}he intent behind the antidumping statutory framework was to create a more transparent antidumping review procedure and to further the protection of parties' rights through heightened due process.").

Further, Commerce's established surrogate data collection procedure is inextricably tied to its overarching duty in administering the antidumping statute to determine margins "as accurately as possible." Taian Ziyang Food Co. v. United States, 35 CIT 863, 905, 783 F. Supp. 2d 1292, 1329 (2011) (remanding Commerce's use of Indian import data by noting that "Commerce must 'calculate dumping margins as accurately as possible' by 'making a fair and equal comparison of competing surrogate values.')); Shakeproof Assembly Components, Div. of Illinois Tool Works, Inc. v. United States, 268 F.3d 1376, 1382 (Fed. Cir. 2001); Lasko Metal Products, Inc. v. United States, 43 F.3d 1442, 1446 (Fed. Cir. 1994) (citing Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990)). Commerce also has an obligation to calculate antidumping duties in a way that is "fair and equitable." Koyo Seiko Co., Ltd. v. United States, 36 F.3d 1565, 1573 (Fed. Cir. 1994) ("We begin by noting that one of the purposes of the antidumping laws is to calculate antidumping duties on a fair and equitable basis.").

Here, Commerce provided no such opportunities for the parties to build the record to enable the agency to calculate a margin as accurately as possible. Instead, Commerce merely requested that the respondents submit calculated per-unit GTA import value of the inputs for six countries without explaining why these six countries were selected or how the data would be reviewed or used. See Letter from Dep't of Commerce to Best Mattresses re: Supplemental Section D Questionnaire at 4 (Sept. 1, 2020) (Public Version) ("BM Supp. Section D Questionnaire") (P.R. 156); Letter from Dep't of Commerce to Rose Lion re: Supplemental Section D Questionnaire at

4 (Sept. 1, 2020) (Public Version) ("RL Supp. Section D Questionnaire") (P.R. 157).   In the

Supplemental Section D Questionnaires, Commerce provided the following instructions:

> Provide a schedule that reports all of Best Mattresses' POI affiliated material
> purchases and comparable unaffiliated purchases. The schedule should report POI
> totals by each affiliated and unaffiliated supplier and each material item. Include
> the following:
> . . . .
> the POI per-unit average import value into Cambodia for the item described; and
> repeat the same step (i.e. the POI per-unit average import values) for Romania,
> Russia, Malaysia, Turkey, Mexico and Brazil in separate columns;

Id.   Commerce recognized the importance of requesting information in stating that the statute

"directs Commerce to request information necessary to calculate the constructed value."   Final

I&D Mem. at 12 (P.R. 301).   Commerce, however, acted contrary to its own words and its

overarching duty to conduct a fair and equitable proceeding because it never once explained its

surrogate selection framework nor requested information to build the record that would allow the

agency to calculate a margin as accurately as possible.

Further, the burden was on Commerce to request factual information related to CV because

Best Mattresses was prohibited by Commerce's regulations from submitting unsolicited new

factual information, a barrier Commerce frequently invokes when rejecting information

volunteered by respondents.   See e.g., Carbon and Certain Alloy Steel Wire Rod From Mexico:

Final Results of Antidumping Duty Administrative Review, and Final Determination of No

Shipments; 2018–2019, 86 Fed. Reg. 46179 (Dep't of Commerce Aug. 18, 2021), and

accompanying Dec. Mem. at 2 (Commerce rejecting "unsolicited and untimely-filed new factual

information").   Without Commerce soliciting the information, Best Mattresses had no regulatory

basis to submit new factual information here related to input COP valuation.   Any new factual

information submitted by Best Mattresses would not be in response to Commerce's questionnaire,

as the supplemental questionnaire only made a narrow request for import data.   See 19 C.F.R. §

351.301(c)(1).  Any new factual information related to Commerce's use of surrogates for major input valuation would not have been "factual information submitted in support of allegations" as Best Mattresses is not a petitioner.  Id. at § 351.301 (c)(2).  It is also not "factual information . . . to value factors under § 351.408(c)" because Cambodia is not an NME.  Id. § 351.301 (c)(3).  Finally, any new information would not be rebuttal information.  See id. § 351.301(c) (4).  For these reasons, Best Mattresses had no opportunity to submit surrogate value information related to Commerce's major input rule application.

Overall, Commerce acted arbitrary and contrary to law by failing to follow its established surrogate value selection procedure even though it employed an NME methodology.  Further, even if Commerce was not strictly operating under its NME statutory authority under 19 U.S.C. 1677b(c), its failure to provide parties with a full opportunity to submit factual information related to input COP was unsupported by substantial evidence because it restricted parties' opportunity to be heard and lead to an inaccurate dumping margin calculation.

### D. Commerce Violated the Administrative Procedures Act by Conducting Rulemaking Without Proper Notice and Comment Procedures

Commerce acted unlawfully when it engaged in new rulemaking without following the proper procedure set forth in the APA by (1) applying an NME methodology in a market economy proceeding and (2) setting a "most reasonably available" standard to select surrogate values for the COP of Best Mattresses' major inputs.  See Final I&D Mem. at 10-11 (P.R. 301); 5 U.S.C. § 553 (requiring agency to conduct notice and commenting procedure for proposed rulemaking).

The APA requires an agency to publish general notice of proposed rule and then give interested parties an opportunity to participate in the rulemaking through written submission or other forms of commenting under 5 U.S.C. § 553 (b)-(c).   An agency cannot articulate new principles through adjudication if its action would 1) constitute an abuse of discretion or 2)

26

circumvent the APA's requirement.  See Union Flights, Inc. v. Adm'r, Fed. Aviation Admin., 957 F.2d 685, 688 (9th Cir. 1992).  Court has held that pursuant to 5 U.S.C. § 553 "agencies are held accountable to public through formal rulemaking process.  Where that thorough groundwork has already been completed, the agency's later litigating positions can ordinarily be understood as resting on its earlier research and consideration." Price v. Stevedoring Servs. of Am., 697 F.3d 820, 829 (9th Cir. 2012).  An agency must follow the rule-making procedure under the APA. See NLRB v. A.P.W. Prods. Co., 316 F.2d 899, 905 (2nd Cir. 1963).

In the Final Determination, Commerce stated that

Commerce sought to obtain surrogate information that would allow it to fulfill the requirements of sections 773(f)(2) and (3) of the Act. We determined that the most reasonably available information to the parties for this purpose is the Global Trade Atlas (GTA) data, as these data are readily available and reasonably specific to the voluminous number of affiliated NME inputs.

Final I&D Mem. at 9 (P.R. 301).  This appears to be the first time Commerce selected surrogate data to value affiliate input COP in conducting the major input rule analysis.  In doing so, Commerce violated the APA because it has effectuated a new rule without providing any public notice or giving the public the opportunity to comment.  Best Mattresses raised Commerce's failure to provide notice and comment under the APA in its administrative case brief.  See Letter on Behalf of Best Mattresses to Dep't of Commerce re: Case Brief at 16, 36 (Jan. 21, 2021)  (Public Version) ("Case Brief") (P.R. 288).  In the Final Determination, however, Commerce did not engage with this argument and provided no analysis of its actions under the APA.

To conclude, Commerce acted contrary to law in numerous respects when it used surrogate value data to value the COP of Best Mattresses' major inputs.   Accordingly, this Court should remand this issue to Commerce with instructions to eliminate the use of third country surrogate data to value the affiliate COP of the major input and require Commerce to determine the value of

the relevant major input using either the transfer price or market price consistent with 19 C.F.R. § 351.407(b).

## II.   COMMERCE'S CALCULATION OF THE INPUT COP WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE

If the Court upholds Commerce's use of surrogate values to calculate the input COP within the context of the major input rule despite the arguments in Section I, then the Court must still remand this issue to Commerce because Commerce's input COP calculation was unsupported by substantial evidence for two reasons. First, Commerce unreasonably included aberrational and distortive data from Romania in its input COP calculation. Second, Commerce unreasonably excluded Mexico data from the input COP calculation on the basis of different measurement units even though there was conversion factor on the record available.

As established above, because Commerce used an NME surrogate value methodology in this case, the only reasonable method to calculate the input COP was for Commerce to follow its NME statutory mandate of selecting the best available surrogate value information, which includes eliminating aberrational data and considering the record as a whole (including convertor information) when calculating the surrogate values. In particular, in an NME surrogate value selection process, Commerce is required to calculate a respondent's factors of production "based on the best available information." 19 U.S.C. § 1677b(c)(1), 19 C.F.R. §§ 351.408(a)-(c). Reviewing Commerce's determination as to what constitutes the "best available information" on a particular administrative record, the Court of Appeals for the Federal Circuit ("Federal Circuit") has held that the relevant inquiry is "whether a reasonable mind could conclude that Commerce chose the best available information." Zhejiang DunAn Hetian Metal Co. v. United States, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (quoting Goldlink Indus. Co. v. United States, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006)).

28

**NONCONFIDENTIAL DOCUMENT**
**CONFIDENTIAL INFORMATION REMOVED**

A.  **Commerce's Inclusion of Aberrational GTA Data From Romania Seriously Distorted Commerce's Normal Value Calculation**

Commerce's inclusion of Romanian GTA data when valuing the COP of [ ███ ] was unsupported by substantial evidence because Romanian GTA data are aberrational and seriously corrupt Commerce's overall major input COP calculation.

When calculating surrogate values, Commerce regularly removes aberrational values because such values render the dataset unreliable.  See Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,366 (Dep't of Commerce May 19, 1997) (stating that "'aberrational' surrogate input values should be disregarded"); SolarWorld Ams., Inc. v. United States, __CIT__, __, 320 F. Supp. 3d 1341, 1351 (2018) (noting that "it is Commerce's practice not to use aberrational values as surrogate values");  Ad Hoc Shrimp Trade Action Comm. v. United States, __CIT__, __, 219 F. Supp. 3d 1286, 1299 (2017) ("Commerce has acknowledged that aberrational values should not be used" in order to carry out its statutory directive to determine dumping margins as accurately as possible.).  Further, when the data are unreliable, Commerce risks calculating an unreasonable result, and Commerce has an established practice of rejecting a surrogate value that yields an "unreasonable result."  Final Results of Redetermination v. United States, No. 13 - 00156, 2017 Ct. Intl. Trade LEXIS 175, at *22 (2017).

Commerce considers import data to be aberrationally high if that data are "many times higher than the import values from other countries."  SolarWorld __CIT at __, 320 F. Supp. 3d at 1351.  Commerce also defines "aberrational" to mean an extreme outlier, distorted or misrepresentative, or somehow incorrect.  Tri Union Frozen Prods. v. United States, __ CIT__, __, 227 F. Supp. 3d 1387, 1394-95 (2017).  This is exactly the situation here because Romania's data within the [ ██ ] input COP calculation is an extreme outlier, distorted and misrepresentative.

As shown in the table below, Romania's [ ███ ] data are clearly an outlier among the other data and "many times higher" than the values from other countries.

| Item Description | HTS Code | Turkey | Malaysia | Brazil | Mexico | Romania | Russia |
|---|---|---|---|---|---|---|---|
| [ ███ ███ ] | ███ | ███ | ███ | ███ | | ███ | ███ ] |

Final Cost Mem. at Attach. 1E (Business Proprietary Document) (C.R. 276).  Romania's [ ███ ] data meet Commerce's definition of "aberrational" in all aspects, and yet, Commerce still included this value in its calculation in the Final Determination.  In doing so, Commerce departed from its existing policy without explanation.  See Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 391 (2016) (Agencies may "change their existing policies as long as they provide a reasoned explanation for the change.").

Also, Commerce's decision not to exclude the aberrational Romanian data was unsupported by substantial evidence and arbitrary because it is directly at odds with its preliminary determination to exclude aberrational data from Malaysia in its calculation of the [ ███ ] COP.[1] Prelim. Determination, and accompanying Cost Mem. at Attach. 2C (Business Proprietary Document) (C.R. 241).  The surrogate data for Best Mattresses' [ ███ ] input are as follows:

| Item Description | HTS Code | Turkey | Malaysia | Brazil | Mexico | Romania | Russia |
|---|---|---|---|---|---|---|---|
| [ ███ ███ ███ ███ ] | | ███ | ███ | ███ | ███ | ███ | ███ ] |

---

[1] In the Final Determination, Commerce abandoned its use of a multi-country surrogate value data for minor inputs such as [ ███ ], but Commerce did not amend its preliminary determination to exclude aberrational data.

**NONCONFIDENTIAL DOCUMENT**
**CONFIDENTIAL INFORMATION REMOVED**

Prelim. Determination, and accompanying Cost Mem. at Attach. 2C (Business Proprietary

Document) ("Prelim. Cost Mem.") (C.R. 241) (the data source shows that the value for Malaysia

is [ ███ ]) (citing data source Letter on Behalf of Rose Lion to Dep't of Commerce re: Third

Supplemental Questionnaire Response at Ex. SD1-1 (Sept. 22, 2020) (Business Proprietary

Document) ("RL Third Supp. QR") (C.R. 180-223); Letter on Behalf of Best Mattresses to Dep't

of Commerce re: Third Supplemental Questionnaire Response at Ex. SD1-1 (Sept. 22, 2020)

(Business Proprietary Document) ("BM Third Supp. QR") (C.R. 139-179)).   Given that the

Malaysian value was many times higher than data from the rest of the countries and clearly an

outlier among the other values, Commerce properly "{e}xcluded the GTA rate of Malaysia in the

calculation of the average because the rate is aberrational." See Prelim. Cost Mem. at Attach. 2C

Note 1 (Public Version) (P.R. 242).  In the Final Determination, even though Romania's [ ███ ]

data is similarly aberrational, Commerce arbitrarily included this aberrational value in its

calculation.  See SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("An

agency action is arbitrary when the agency offers insufficient reasons for treating similar situations

differently.").

Further, even though Best Mattresses raised this issue in its case brief, Commerce failed to

provide any explanation or discernable path for its divergent treatment of these two inputs. See

Case Brief at 35-36 (Public Version) (P.R 288); see also NMB Singapore, 557 F.3d at 1319 (Fed.

Cir. 2009) (noting that "the path of Commerce's decision must be reasonably discernable.").

In sum, Commerce deviated from its past practice when it included the Romanian

aberrational data in valuing Best Mattresses COP of [ ███ ] that inflated the final calculated

margin.  Without adequate explanation, Commerce's decision is arbitrary and capricious and

unsupported by substantial evidence because the aberrational data distorted Best Mattresses' CV

and resulted in inaccurate calculated margin. This Court should remand this issue and instruct Commerce to recalculate Best Mattresses' margin by excluding Romania's [ ██ ] data.

### B. Commerce's Decision to Exclude Mexico Data Was Unsupported by Substantial Evidence

Commerce's decision to exclude Mexico's data in valuing Best Mattresses' [ ██ ] input on the basis that the value was not expressed in kilograms is not supported by substantial evidence because Commerce ignored record evidence that would allow the agency to easily calculate the value in kilograms.

Substantial evidence supporting an agency determination must be based on the whole record, and the Court shall take into account not only the information that supports the agency's decision but also whatever in the record "fairly detracts from its weight." Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 477-78 (1951)). Disregarding record information with no explanation defies this requirement.

In the Final Determination, Commerce stated that it determined surrogate input COP by averaging GTA data for six countries: Brazil, Malaysia, Mexico, Romania, Russia and Turkey (including all non-market economy countries and countries with export subsidies). See Final Cost Mem. at 2 (Public Version) (P.R. 2307). In Attachment 1E to the cost memorandum, however, Commerce included no Mexican data for the [ ██ ] COP value because "no data was submitted by both the Respondents and the Petitioners for Mexico that were in expressed in kilograms." Id. at Attach. 1E Note 1 (Business Proprietary Document) (C.R. 276). Commerce's statement is inaccurate because Best Mattresses put on the record information enabling Commerce to easily convert the Mexican [ ██ ] data from square meters to kilograms. Specifically, in the respondents' supplemental section D questionnaire response submission, Best Mattresses reported

[ █ ] purchase quantities in both [ ███████████████ ] from which Commerce can

calculate a square meters to kilogram conversion ratio — [ ████████████████████

████████████ ], depending on the respondent.  See  RL Third Supp. QR at Ex. SD1-1.1

(Business Proprietary Document) (C.R. 180-223); BM Third Supp. QR at Ex. SD1-1.1 (Business

Proprietary Document)  (C.R. 139-179).   Using this conversion ratio already on the record,

Commerce should have converted the average GTA [ ████ ] value for Mexico from square meters

to kilograms and included the Mexican [ ████ ] value in its GTA average.  Commerce ignored the

clear evidence on the record and a conversion ratio by which to express the data in kilograms and

erroneously excluded Mexican GTA data on the record.  This error resulted in an inaccurate and

inflated percentage increase to respondents' major input costs, which has seriously distorted the

final margin calculation.   Commerce's decision to ignore record evidence clearly defies the

substantial evidence requirements to consider the whole record in reaching its decision.

In addition, excluding Mexico's data here also contradicts Commerce's overarching duty

in administering the antidumping statute to determine margins as accurately as possible because

final calculated margin is distorted by the inflated adjustment to Best Mattresses' [ ████ ] purchases

See Koyo Seiko, 36 F.3d at 1573.

Commerce claimed that it was unable to convert the data because "Kg is a unit of weight,

while a m2 is a unit of area. Converting m2 to kg would require the density of the material on a

m2 basis." Ministerial Error Mem. at 4 (Public Version) (P.R. 315).  On the contrary, Commerce

has frequently converted different units of measurement.   See Certain Activated Carbon From the

People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review,

and Preliminary Determination of No Shipments; 2019–2020, 86 Fed. Reg. 33,988 (Dep't of

Commerce June 28, 2021), and accompanying Surrogate Value Mem. at 7 (converting data from

kilogram to cubic meter to); Certain Hardwood Plywood Products From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2017–2018, 85 Fed. Reg. 7,270 (Dep't of Commerce Feb. 7, 2020), and accompanying Surrogate Value Mem. at 3 (valuing water by converting the surrogate value from kilogram to cubic meters and valuing natural gas by converting the surrogate value from kilogram to cubic meters); Cast Iron Soil Pipe Fittings From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Determination of Critical Circumstances, in Part, 83 Fed. Reg. 33, 205, (Dep't of Commerce July 17, 2018), and accompanying Surrogate Mem. at 4 (valuing wooden strips and cradle by converting the data from piece to kilogram).

Commerce also stated that it could not convert the Mexican [ ▮ ] data from square meters to kilograms because "there is no universal conversion factor to convert m2 to kg" and "{t}he conversion factor used by Best Mattresses/Rose Lion, which is based on their own records, cannot be applied to all other countries' GTA data." Ministerial Error Mem. at 4 (Proprietary Document) (C.R. 285). Commerce's argument is misplaced. As Commerce is well aware, surrogate values are inherently imperfect, but Commerce still must calculate Best Mattresses' margin fairly and accurately. To do so, the only reasonable method is to use Best Mattresses own conversion rate, as Commerce has done in other NME cases, in order to align the resulting cost with the manner and form by which the respondent consumes the input. See e.g., Ceramic Tile From the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Critical Circumstances Determination, and Postponement of Final Determination, 84 Fed. Reg. 61,877 (Dep't of Commerce Nov. 14, 2019), and accompanying Surrogate Value Mem. at 6 (where the dataset was measured on a USD/meters squared basis,

**NONCONFIDENTIAL DOCUMENT**
**CONFIDENTIAL INFORMATION REMOVED**

Commerce converted it into USD/kilogram by using a conversion factor based on the respondents'

own data).

In sum, Commerce's decision to exclude Mexico GTA data from measuring the COP of

Best Mattresses' [ ███ ] input was unsupported by substantial evidence because it ignored

convertor information on the record.   This Court must remand the calculation back to Commerce

with instructions to correct the adjustment to [ ███ ] purchases and recalculate Best Mattresses'

dumping margin based on this correction.

**III.   COMMERCE'S APPLICATION OF THE TRANSACTIONS DISREGARDED RULE TO ADJUST BEST MATTRESSES' FIXED ASSET DEPRECIATION WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE NOT IN ACCORDANCE WITH LAW**

Commerce's application of the transactions disregarded rule under 19 U.S.C § 1677b(f)(2)

of the Act to adjust Best Mattresses' fixed asset depreciation expenses is unsupported by

substantial evidence and otherwise not in accordance with law because Commerce ignored Best

Mattresses' [ ██████ ] market-rate Cambodian purchases and, instead, used Cambodian

Trademap data to determine the market price.  <u>See</u> Final I&D Mem. at 10 (P.R. 301).  In doing so,

Commerce used the same surrogate price data to value fixed asset depreciation as raw materials

even though these are different types of expenses that operate differently within Best Mattresses'

accounting system.

The transactions disregarded rule allows Commerce to disregard purchase values between

a respondent and affiliates if the value "does not fairly reflect the amount usually reflected in sales

of merchandise under consideration in the market under consideration."  19 U.S.C § 1677b(f)(2).

Once Commerce disregards a transaction, it values the disregarded transaction by "{f}irst . . .

look{ing} at whether respondent purchased the input from an unaffiliated supplier; if unavailable,

it looks to sales of the input between an affiliate supplier and an unaffiliated party, and as a final

resort, to a reasonable source for market value available on the record." <u>Rebar Trade Action Coal.</u>

<u>v. United States</u>, __ CIT __, __, 398 F. Supp. 3d 1359, 1372 (2019) ("<u>Rebar II</u>").

In the Final Determination, Commerce declined to use information available as to what

Best Mattresses' fixed asset depreciation cost would have been when it rejected Best Mattresses'

reported  [ ███████████████████████████████████████████

███████████████████████████████████████████ ] <u>See</u> BM

Third Supp. QR at Ex. SD1-3 (Business Proprietary Document) (C.R. 137-179); RL Third Supp.

QR at Ex. SD1-3 (Business Proprietary Document) (C.R. 180-223).  In rejecting these actual prices,

Commerce claimed that "purported market prices appear to relate to the general category of

'construction materials,' not to specific assets, which makes impossible a proper comparison

between similar fixed assets."  Final I&D Mem. at 12 (P.R. 301).  It then determined that it could

not test the "affiliated fixed asset purchases because no reasonable market price information is

available."  <u>Id.</u>

Commerce's decision to decline to use [ ████████████████████████████ ]

in its transactions disregarded analysis violated the plain language of the statute, which states that

"{i}f a transaction is disregarded . . . the determination of the amount shall be <u>based on the</u>

<u>information available</u> as to what the amount would have been if the transaction had occurred

between persons who are not affiliated." 19 U.S.C § 1677b(f)(2) (emphasis added).  The Court's

well-reasoned decision in the Rebar Trade Action Coalition cases provide helpful interpretation of

what best constitutes "information available" in this context.  <u>See</u> <u>Rebar Trade Action Coal. v.</u>

<u>United States</u>, __ CIT __, __ , 337 F. Supp. 3d 1251, 1259-62 (2018) (remanding Commerce's

calculation for the costs of collapsed fixed asset owning companies) ("<u>Rebar</u> <u>I</u>"); <u>Rebar II</u>, __ CIT

at __, 398 F. Supp. 3d at 1371-73 (sustaining Commerce's remand determination regarding its

transaction disregarded methodology).  In the proceeding underlying the Rebar cases, Commerce

determined that non-collapsed fixed-asset holding companies provided services to the respondent

at below-market rates, and therefore revised the costs using the financial expense ratios from

collapsed fixed-asset holding companies.  Rebar I at 1260.  Ultimately sustaining Commerce's

remand determination, the Court affirmed Commerce's use of actual costs of the non-collapsed

companies in its transactions disregarded analysis and restated Commerce's practice is to use

actual costs on the record as opposed to fictious, market values when possible.  See id.

(recognizing that "as a final resort, {Commerce's practice is to turn} to a reasonable source for

market value available on the record"); see also Unicatch Indus. Co. v. United States, No. 20-

00079, 2021 Ct. Intl. Trade LEXIS 118, at *37-38 (Sep. 14, 2021) (sustaining Commerce's

determination to use actual prices paid by respondents to value the disregarded transactions).

Similarly, Commerce here was faced with a decision between [ ████████████ ]

████████████ ] or attenuated market data.  Like Rebar and Unicatch cases, this Court

should remand to Commerce to recognize its clear preference for actual data when selecting

"information available" under 19 U.S.C § 1677b(f)(2).

Commerce's claim that the [ ██████ ] prices were not specific enough because they

relate to "construction materials, not specific assets" is inconsistent with law because Commerce

has no statutory or regulatory requirement to only use respondent data that narrowly cover the

affiliated input in question when applying the transactions disregarded rule.  Instead, the statute

plainly instructs Commerce to use "available information" to value what an affiliated transaction

would have been valued at had the transaction occurred at arms-length, and Commerce's practice

is to "{f}irst . . . look" at whether respondent purchased the input from an unaffiliated supplier."

Rebar II, __ CIT at __, 398 F. Supp. at 1372.  That is precisely the type of market information that

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

was available to Commerce here.  Best Mattresses provided [ ███████████████

████████████████████████████████████████████████████████████████

████████████████████████ ] that Commerce could have used to value affiliated

transactions.  See BM Third Supp. QR at SD-3, Ex. SD1-3. (Business Proprietary Document) (C.R.

137-179); RL Third Supp. QR at SD-3, Ex. SD1-3 (Business Proprietary Document) (C.R. 180-

223).   Best Mattresses then paired each of Best Mattresses fixed asset price with a range of

categories of market data; for example, [ █████████████████████████████████

███████████████████████████████████████████ ]  See BM Third Supp. QR

at SD-3, Ex. SD1-3. (Business Proprietary Document) (C.R. 137-179); RL Third Supp. QR at SD-

3, Ex. SD1-3 (Business Proprietary Document) (C.R. 180-223).   Commerce has in the past

preferred respondents' actual market data on the record because using third-party market data is a

last resort.  See Rebar II at 1372-73.  Yet Commerce invented a specificity requirement that is not

found in statute and is inconsistent with its past practice, claiming that it "was without a market

price against which to test the affiliated party purchases."   See Final I&D Mem. at 12 (P.R. 301).

Commerce's expressed concern for a high degree of specificity as a reason to reject the

[ ██████████████ ] is entirely disingenuous considering that Commerce opted to use raw

material input prices to value fixed asset depreciation, two expenses that could hardly be more

different from each other.  See id.  Commerce acknowledged that fixed asset depreciation and

minor inputs are different expenses, and yet it inexplicably and unreasonably used outside data on

minor input to value Best Mattresses' fixed asset deprecation.  Commerce claims that it "agree{s}

with {Best Mattresses} that purchases of fixed assets and raw material inputs are different in that

one relates to the current year while the other benefits multiple years," as a result it "applied the

adjustment only to the current year's depreciation expense, not to the entire fixed assets."   Id.

Commerce's logic is flawed, however, because while it is true "that one relates to the current year while the other benefits multiple years," minor inputs data and fixed asset depreciation data are completely distinct COP components with different values.  Id.

Even if Commerce was right to not use Best Mattresses' fixed asset purchase data, its calculation was still unreasonable because it did not give interested parties the opportunity to provide market data specific to fixed asset depreciation. Commerce asked Best Mattresses

> if there are no purchases from an unaffiliated supplier for a given material, but your affiliated supplier sells the same input to unaffiliated customers in the market under consideration, in a separate schedule provide the POI total purchase 'quantity and value (and average per unit price) paid for the input by unaffiliated purchasers.'

BM Supp. Section D Questionnaire at 4 (P.R. 156); RL Supp. Section D Questionnaire at 4 (P.R. 257).  Best Mattresses responded that affiliated suppliers "did not have sales of the same input to unaffiliated customers" in Cambodia, but Best Mattresses submitted its own record of [ ██████████████████████ ].  See BM Third Supp. QR at SD-3, Ex. SD1-3 (Business Proprietary Document) (C.R. 137-179); RL Third Supp. QR at SD-3. Ex. SD1-3 (Business Proprietary Document) (C.R. 180-223).  Best Mattresses was given no opportunity to provide data specific to fixed asset depreciation.  See BM Supp. Section D Questionnaire at 4 (P.R. 156); RL Supp. Section D Questionnaire at 4 (P.R. 257).  As such, Commerce's decision to use minor input data was arbitrary and capricious and not supported by substantial evidence.

Commerce further violated the plain language of the statute by adjusting Best Mattresses'

[ ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ ].  See BM Third Supp. QR at Ex. SD1-3 (Business Proprietary Document) (C.R. 137-179); RL Third Supp. QR at SD-3, Ex. SD1-3 (Business Proprietary Document) (C.R. 180-223) [ ████████████████████████████████

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

██████████████████████████████████████████████████ ].
The transactions disregarded rule only applies when affiliated transactions are below market value in the market under consideration.  See 19 U.S.C. § 1677b(f)(2).  Had Commerce sufficiently evaluated [ ██████████████████████████████████████████ ██████████████████████ ].

Commerce's application of the transactions disregarded rule was contrary to law and not supported by substantial evidence because Commerce wrongly rejected data on [ ██████ ] transactions that best valued Best Mattress' fixed asset depreciation and improperly valued certain [ ██████████████ ].  The Court must remand the case back to Commerce to correct its calculation of Best Mattresses' fixed asset depreciation costs and, accordingly, recalculate the Best Mattresses' dumping margin.

## IV.  COMMERCE'S DECISION TO USE EMIRATES' FINANCIAL STATEMENTS TO CALCULATE BEST MATTRESSES' PROFIT AND SELLING EXPENSE RATIOS WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE

Commerce's reliance on Emirates' financial statements, and rejection of GTI's financial statements, to calculate Best Mattresses' profit and selling expenses ratios was unsupported by substantial evidence because Emirates' financial statements are significantly flawed and reflect third country expenses while GTI's financial statements are reliable and reflect the expenses of a producer of comparable product in Cambodia, the country under investigation. GTI's financial statements offered the only reasonable method for calculating Best Mattresses' profit and selling expenses.

In the underlying investigation, Commerce used CV and calculated surrogate profit and selling expense ratios for Best Mattresses.  See Final I&D Mem. at 15 (P.R. 301).  Commerce chose to use financial statements from Emirates, a minor Indian mattress producer, to value Best

Mattresses' profit and selling expense ratios.  Id. at 17-18.

In calculating CV under 19 U.S.C. § 1677b(e)(2)(B)(iii), Commerce may use CV to determine the value of imported merchandise if the actual values are unavailable, and as long as the sum of the production is reflective of "the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method . . . in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise."  19 U.S.C. § 1677b(e)(2)(B)(iii) (emphasis added).

Commerce uses four criteria for choosing among CV data under section 773(e)(2)(B)(iii) of the Act:

1) the similarity of the potential surrogate companies' business operations and products to the respondent's business operations and products;

2) the extent to which the financial data of the surrogate company reflects sales in the home market and does not reflect sales to the United States;

3) the contemporaneity of the data to the POI;

4) of the extent to which the customer base of the surrogate and the respondent were similar (e.g., original equipment manufacturers versus retailers).

See Certain Oil Country Tubular Goods From the Republic of Korea: Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances, 79 Fed. Reg. 41,983 (Dep't of Commerce July 18, 2014), and accompanying Issues and Dec. Mem. at Cmt. 1. Under each of these criteria, the overwhelming evidence on the record is that GTI's financial statements are superior to Emirates and no reasonable mind could find differently.

In addition, Commerce prefers financial statements that are both publicly available and complete.  See e.g., Certain Steel Nails From the United Arab Emirates: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination, 76 Fed. Reg 68,129,

68,134 (Dep't of Commerce Nov. 3, 2011) ("Steel Nails from UAE") (using "the profit rate derived from the publicly available financial statements for the fiscal year most contemporaneous with the POI" that "satisfies sufficiently the criteria of section 773(e)"). In this proceeding, Commerce instructed that "{e}ach of the surrogate financial statements {that are submitted} must be complete." Letter from Dep't of Commerce to All Interested Parties re: Request for CV Profit and Selling Expense Comments and Information at 1 (July 23, 2020) (Public Document) (P.R. 116) (emphasis added); see also Utility Scale Wind Towers From Indonesia: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances, 85 Fed. Reg. 40,231 (Dep't of Commerce July, 6, 2020), and accompanying Issues and Dec. Mem. at Cmt. 7 (showing that Commerce prefers "completeness (i.e., complete and fully translated audited financial statements and accompanying notes").

As explained below, Commerce failed to calculate Best Mattresses' CV "based on any other reasonable method" as required under §1677b(e)(2)(B)(iii) by using the flawed financial statements of a dissimilar producer in a foreign market instead of the reliable financial statements of producer in the market under consideration, rendering Commerce's determination unsupported by substantial evidence.

### A. Emirates' Financial Statements Are Not Contemporaneous with the POI

GTI's 2019 financial statements are contemporaneous with the entire POI, while Emirates' financial statements only overlap by three months, yet Commerce ignored its preference for selecting contemporaneous financial statements. Emirates' financial statements present "the Annual Report on the business and operations of the Company for the year ended 31 March 2019." Letter on Behalf of the Pet'rs re: Mattress Pet'rs' Submission Concerning CV Profit and Selling Expenses at Attach. 2 (Aug.17, 2020) (Public Document) ("Pet'rs' CV Information") (P.R 142).

The POI is January 1, 2019 through December 31, 2019. Emirate's financial statements are, therefore, only contemporaneous with the first three months of the POI.  In contrast, GTI's 2019 financial statements represent the company's performance for the financial year ending on December 31, 2019, encompassing the entire POI. See Letter on Behalf of Rose Lion and Best Mattresses re: CV Profit and Selling Expense Cmts. and Info. at Ex. CV-1 (Public Document) ("Resp'ts' CV Info") (P.R. 143-144).   Commerce explained that it "regularly accepts as contemporaneous a financial statement that overlaps the POI by some amount" and that it does not reject a financial statement for the sole reason that the statement is not completely contemporaneous with the POI.  Final I&D Mem. at 18-19 (P.R. 301).

Commerce's failure to select the contemporaneous GTI financial statements was unsupported by substantial evidence for several reasons.  First, despite Commerce's general claim that periods of review don't often align with a company's fiscal year, that is definitively not the case here for GTI.  GTI's financial statement year perfectly aligns with the 2019 POI.  Second, Commerce's decision here to disregard perfectly contemporaneous financial statements runs directly contrary to its established past practice.  See e.g., Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017–2018, 85 Fed. Reg. 23,756 (Dept' of Commerce Apr. 29, 2020), and accompanying Issues and Dec. Mem at Cmt. 2 (stating that "as other contemporaneous . . . financial statements are on the record, Commerce will no longer consider . . . non-contemporaneous 2016-2017 financial statements").  In Certain Frozen Fish Fillets, Commerce explicitly rejected alternative financial statements on the record because completely contemporaneous surrogate financial statements were available, which is markedly inconsistent with Commerce's decision here to disregard the fact that Emirates statements were not

contemporaneous with the POI.  See id.; see also Final I&D Mem. at 18-19 (P.R. 301).

Commerce's well-established practice clashes with its statement in the Final Determination that it "regularly accepts as contemporaneous a financial statement that overlaps the POI by some amount."  Final I&D Mem. at 18-19 (P.R. 301).

### B.  Emirates Has Different Business Operations from Best Mattresses

In comparing the business operations of Best Mattresses and Emirates, Commerce overlooked significant discrepancies between Emirates and Best Mattresses that did not exist between GTI and Best Mattresses, producers both based in Cambodia.  GTI is not a mattress producer, however, it is a Cambodian apparel and garment producer with business operations similar to Best Mattresses in that they both manufacture products that require synthetic fabric sourcing, cutting and sewing.  See Letter from Mattresses Pet'rs to Dep't of Commerce re: Resp. to Pet. Supplemental Questionnaires at Ex. I-Supp-5 pp. 7-8 (Apr. 8, 2020) (Public Version) (P.R. 25-26).  Commerce should consider a respondent's production experience in selecting surrogate values and "prioritize{} the data on the record that best reflected the respondent's production experience."  Mid Continent Steel & Wire, Inc. v. United States, __ CIT __, __, 273 F. Supp. 3d 1348, 1352 (2017). [2]  "Commerce is tasked with choosing a surrogate representative of respondents' production experience, and is essentially required to create a 'hypothetical' market value to approximate the production experience in the NME country."  Taian Ziyang Food Co. v. United States, 33 CIT 828, 875, 637 F. Supp. 2d 1093, 1136 (2009).

Commerce argued that while it "prefers to rely on a producer of the subject merchandise based in the market under consideration, {it must also consider} both the market and the product

---

[2] Cambodia is a market country, but NME investigations are analogous here because Commerce uses similar selection criteria in NME and CV calculations.

produced{}." Final I&D Mem. at 17 (P.R. 301).  Commerce determined that it "does not typically use relative production quantities or sales as a criterion," so the fact that GTI was not a mattress producer was important.  See id. at 18. Commerce disagreed that GTI, a Cambodian apparel and garment producer with a size similar to Best Mattresses' had similar business operations. See id. at 17.  Additionally, Commerce disagreed with Best Mattresses' analysis that only 76.71% of Emirates' activities included manufacturing, while the balance was made up of marketing.  See id. at 18. Commerce determined those were "appropriate activities."  Id.  Commerce also disagreed with Best Mattresses that Emirates' "low percentage of property, plant, and equipment reinforces that physical production of goods is not the sole focus of its company" because "significant depreciation" was recognized on Emirates' financial statements.  Id.

Despite the length of Commerce's analysis, Commerce did not engage with the facts on major differences in the business operations of Emirates and Best Mattresses, which undermined its rational to discard GTI's financial statements.  First, Emirates' and Best Mattresses have business of very different scale.  Note 14 of Emirates' financial statements shows a revenue from sales of products of 47.4 million rupees, or roughly 600,000 USD.  See Pet'rs' CV Information. at Attach. 2 (Public Document) (P.R 142).   In contrast, GTI's reported revenue in 2019 is 169,254,312 USD, which is significantly larger that Emirates' and more comparable to the respondents.  See Resp'ts' CV Info. at Ex. CV-1 (Public Document) (P.R. 143-144).   Best Mattresses' total U.S. sales revenue [ ██████████████████ ], and Rose lion's total U.S. sales revenue [ ██████████████ ] during the POI. See Letter on Behalf of Best Mattresses to Dep't of Commerce re: Section A Questionnaire Resp. at Ex. A-1 (June 15, 2020) (Business Proprietary Document) (C.R. 40); Letter on behalf of Rose Lion to Dep't of Commerce re: Section A Questionnaire Response at Ex. A-1 (June 15, 2020) (Business Proprietary Document) (C.R. 41).

The scale of the business has significant effects on the comparability of the operations of the companies.

Second, Emirates has a totally different business model from Best Mattresses because Emirates appears to be a franchise operator and has a large sales operation.  <u>See</u> Letter on Behalf of Rose Lion and Best Mattresses to Dep't of Commerce re: Rebuttal Cmts. on Pet'rs' CV Info. at Ex. CVR-1 (Aug. 24, 2020) (Public Version) ("Resp'ts' CV Rebuttal") (P.R. 152).  It was "initially established {as} a franchise business model for retail franchise operations in India with opening of 16 outlets in past two years in all major cities like Mumbai, Delhi, Gurgaon, Ghaziabad Pune, Surat, Ahmedabad and Hyderabad" unlike Best Mattresses, which is just a manufacturer, not a retailer.  <u>Id.</u>  Emirates had 23% of its revenues from marketing services whereas GTI and Best Mattresses produced [ ▮ ] their revenue from [ ▮▮▮▮ ].  <u>Compare</u> Pet'rs' CV Information at Attach. 2 (P.R. 142) <u>with</u> Letter on Behalf of Best Mattresses to Dep't of Commerce re: Section C and D QR at Ex. C-4 (Business Proprietary Document) ("Best Mattresses Section C and D QR") (C.R. 47-55); Rose Lion Section C and D Questionnaire Resp. at Ex. C-4 (Business Proprietary Document) ("Rose Lion Section C and D QR") (C.R. 56-67); Resp'ts' CV Information at Ex. CV-1 (Public Document) (P.R. 143-144).

In sum, Emirates was basically a franchise company, which is backed up by the meager physical assets on its financial statements.  <u>See</u> Case Br. at 42-43 (Public Version) (P.R. 288).  Notably, Emirates has significant advertising expenses as a proportion of its total expenses, while GTI and Best Mattresses report [ ▮▮▮▮▮▮ ] associated with U.S. sales (thereby imputing distortive costs the respondent did not incur).  <u>See</u> Best Mattresses Section C and D QR at C-47 (Business Proprietary Document) (C.R. 47-55); Rose Lion Section C and D QR at C-45

(Business Proprietary Document) (C.R. 56-67) ; Resp'ts' CV Info. at Ex. CV-1 (Public Document) (detailing administrative expenses in Note 17) (P.R. 143-144).

Although GTI is not be a mattress producer, its business operation is more similar to Best Mattresses, while Emirates' business model and operations are vastly different from Best Mattresses.

### C.  Emirates' Financial Statements Are Not Publicly Available

Despite Commerce's well-documented preference to use public statements, Commerce wrongly selected Emirates' non-public financial statements over GTI's financial statements that are publicly available.  Commerce claims that because it is not performing an NME investigation, its NME investigation practices are irrelevant.  See Final I&D Mem. at 19 (P.R. 301).  It also determined that it is irrelevant that Best Mattresses it not publicly traded because the financial statements are available from a fee-based service. See id. at 20.  Commerce also disregarded that Emirates is registered at a private company in India as opposed to GTI which is public in Cambodia, the country of investigation. See id.

Commerce has a long-established practice of preferring publicly available information in the CV context because the best available information is generally publicly available information. See 19 C.F.R. § 351.408(c)(1)-(4).  "{P}ublicly available information addresses the concern that a lack of transparency about the source of the data could lead to proposed data sources that lack integrity or reliability." Since Hardware (Guangzhou) Co., Ltd. v. United States, __ CIT, __, __, 911 F. Supp. 2d 1362, 1367 (2013) (quotation marks omitted); see also Steel Nails from UAE, 76 Fed. Reg. at 68,134 (Commerce used "the profit rate derived from the publicly available financial statements for the fiscal year most contemporaneous with the POI.").

The Court has repeatedly emphasized the importance of public availability of financial statements that are used for calculating financial ratios.  See, e.g., Home Prods. Int'l, Inc. v. United States, 32 CIT 337, 342, 556 F. Supp. 2d 1338, 1342-43 (2008); Since Hardware , __ CIT at __, 911 F. Supp. 2d 1366.  In Since Hardware, for example, the Court found Commerce's reliance on financial statements that were not available to respondent parties to be unreasonable because Commerce's rigorous standard for public availability of surrogate financial statements.  See Since Hardware, __ CIT at __, 911 F. Supp. 2d at 1366-69.  First, Commerce requires a detailed step-by-step explanation by the submitter of how the financial statements were obtained so "any party would be able to replicate these steps" in acquiring the financial statements.  Id.  Second, if the step-by-step explanation is not provided, Commerce required the submitter to "provide a detailed explanation as to the reason they believed the financial statements were described as publicly available and . . . to indicate if the financial statements were required under Indian law to be filed publicly with any government authority." Id.  Thus, when public availability of a set of surrogate financial statements is at issue, Commerce's practice is to require the submitter to provide a detailed explanation on how it obtained the financial statements.  Commerce failed to do so in this case.

Although Commerce claimed that its "publicly available" standard is limited to NME proceedings, the only reasonable determination was for Commerce to incorporate that standard in the CV context here because the benefits to using a publicly available information is both obvious and universally applicable across antidumping proceedings.  In particular, Commerce values publicly available financial statements because they can be verified and are easy to view online and in public reports.  See e.g., Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof From the People's Republic of China: Final Results of Antidumping Duty Administrative

<u>Review</u>, 76 Fed. Reg. 15,297, 15,299 (Dep't of Commerce Mar. 21, 2011), <u>Final Determination</u> <u>of Sales at Less Than Fair Value and Final Partial Affirmative Determination of Critical</u> <u>Circumstances: Diamond Sawblades and Parts Thereof from the People's Republic of China</u>, 71 Fed. Reg. 29,303, 29,310 (Dep't of Commerce May 22, 2006).  Put simply, public availability allows for public accountability.

Here, the record establishes that the Emirates financial statements are not publicly available. Commerce speculates - without any citation - that the statements are publicly available because they were attainable through "fee-based subscription service."  Final I&D Memo. at 20 (P.R. 301). This statement is simply not supported by any information on the record.  Petitioners failed to include any cover letter, narrative explanation or website search path that could indicate the source of Emirates' financial statements.  In fact, Petitioners' counsel acknowledged at the administrative hearing that the record does not establish the source of Emirates financial statements, by stating that "{t}o tell you where it came from I think would be new information on the factual record, but I will say this: We've represented it as a publicly available financial statement."  Mattresses from Cambodia, Hr'g Tr. at 53 (J. Levy) (Mar. 5, 2021) (Prelim) (P.R. 299).  Further, Emirates maintains no website and does not publish its financial statements.  <u>See</u> Resp'ts' CV Rebuttal at Ex. CVR-2 (Public Version) (P.R. 152).  Without any context or explanation, neither Commerce nor the respondents can verify the veracity and source of Emirates' financial statements.

Finally, Commerce's dismissal of the non-public nature of Emirates' financial statements was even more unreasonable given that it had the GTI statements as a complete, publicly available alternative.

### D.  Emirates' Financial Statements Are Not Entirely Legible or Complete

In addition to all the problems listed above, Emirates' financial statements are also illegible

in several places, and Commerce has a practice of rejecting financial statements that are not legible. First, the last three pages that reflect a detailed breakout of Note 9 are illegible even at the highest zoom level, and text on other pages are also questionable.  See Pet'rs' CV Information at Attach. 2 (Public Document) (P.R 142).  Next, the financial statements of Emirates are incomplete because they are missing five "annexures" that are specifically referenced in the auditors' note, so they are integrated parts of the audit report:

> Note 6 – Trade Payables: "a) Sundry Creditors – Expenses (Refer Annexure – 1)"
> Note 8 – Short Term Provisions: "b) Other Provisions: Salaries Payable (Refer Annexure
> – 2)"
> Note 12 – Cash and Bank Balances: "- Cash in Hand (Refer Annexure – 3)"
> "-Fixed Deposits (Refer Annexure – 4)"
> Note 13 – Short-term loans and advances: "(b) Balances with government authorities (Refer Annexure – 5)"

See id.

Commerce acknowledged that "three pages out of a 40-page financial statement are difficult to read," but excused this because "these pages were shrunk down in order to fit onto individual pages."  Final I&D Memo. at 20 (P.R. 301).  Commerce dismissed missing annexures, claiming they were not important to the investigation.  See id. at 21.

Commerce's willing ignorance is entirely unjustified given that potentially key information is missing.  Notably, Emirates' auditors discuss annexures that are not included in the financial statements.  Additionally, Emirates reported the amount of "balances with government authorities" in Note 13 of 7,518,007 Rupees, which equates to more than 12 percent of Emirates' revenue.[3] Pet'rs' CV Info. at Attach. 2 (P.R. 142).  This explicit statement confirming massive loan balances

---

[3] Emirates reported 62,425,671 Rupees of total revenue in its profit and loss statement.  The balances with government authorities in the missing annexure 5 total 7,518,007 Rupees. Therefore, 7,518,007 Rupees / 62,425,671 Rupees = 12 percent.

with government authorities provides Commerce with a reason to believe or suspect that Emirates received an amount of government support that would be significantly distortive, but further information on this line item cannot be known because Petitioners withheld the missing Annexure 5 of Emirates' financial statements. Annexure 5 was specifically referenced as an integrated schedule detailing the loan.

Commerce has a longstanding practice of discarding incomplete financial statements, yet it acted arbitrarily and capriciously by making excuses for the incomplete and eligible statements in this case. See, e.g., CP Kelco U.S., Inc. v. United States, 949 F.3d 1348, 1359 (Fed. Cir. 2020) (Commerce rejected the respondent's financial statements because they were "missing information in the untranslated financial statement {that} was vital information and of 'critical importance.'"); Certain Oil Country Tubular Goods From the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review; 2017–2018, 85 Fed. Reg. 41,552 (Dep't of Commerce July 10, 2020), accompanying Issue and Dec. Mem at Cmt. 4 ("{B}ecause it is Commerce's practice not to use illegible financial statements, and because we have other usable financial statements on the record, we have not used {the illegible} financial statement in these final results of review."). Commerce has a practice for disregarding incomplete financial statements because any missing information "can provide vital information" relevant to Commerce's calculations. CP Kelco, 949 F.3d at 1359 (2020). Commerce's explanation that missing and eligible sections are not essential is inconsistent with its past practice, especially since GTI's financial statements contained none of the same deficiencies.

### E. GTI's Statements Were the Only Reasonable Source for Determining the CV Profit and Selling Expense Ratios

As demonstrated in each of the four subsections above, GTI's financial statements were the only reasonable information for determining CV profit and selling expense ratios. In particular,

GTI's statements contained no missing information and were contemporaneous with the entire POI.  GTI also has similar business operation and scale to Best Mattresses, as GTI is a manufacturing company (not a franchising company).  Even Petitioners stated: "GTI's financial statement is the best information reasonably available because it is audited, covers a complete year period, is publicly available, and the company produces apparel products by cutting and sewing textiles (mattresses are also produced using cut and sewn textiles, i.e., ticking and flanges)."  Letter on Behalf of Pet'rs' to Dep't of Commerce and Int'l Trade Comm'n re: Antidumping and Countervailing Duty Petitions Vol. II at 4-5 (Public Version) (P.R. 3-9).  Commerce also relied on GTI's financial statements when it initiated the investigation.  See Antidumping Duty Investigation Initiation Checklist at 8 (Public Version) (P.R. 42).  Commerce should, therefore, have accepted GTI's financial statements of 2019 as the only reasonable source to calculate the Best Mattresses' selling expenses and profit.

Commerce's decision to use Emirates' financial statements was unsupported by substantial evidence because Commerce did not properly apply the four factors to establish "other reasonable method."  This Court should remand Commerce's determination so that the agency can recalculate Best Mattresses' CV data using GTI's financial statements.

## V.   COMMERCE'S APPLICATION OF THE COHEN'S *D* TEST TO BEST MATTRESS' U.S. SALES DATA WAS NOT IN ACCORDANCE WITH LAW

The results of Commerce's Cohen's *d* test are unreasonable as applied to Best Mattresses' sales data.  Commerce found that "{b}ased on the results of the differential pricing analysis . . . 62.51 percent of the value of Best Mattresses/Rose Lion's U.S. sales pass the Cohen's *d* test and confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods." Mem. from Preston N. Cox to the File re: Amended Final Determination Analysis Memorandum for Best Mattresses and Rose Lion at 3 (Apr. 19, 2021) (Public Version) (P.R. 316).

Commerce's analysis, however, includes data which violate the assumptions present in the Cohen's *d* test, generates incorrect or misleading results, and is thus inappropriate for application to the Best Mattresses' sales.

The statute prioritizes use of the average-to-average ("A-A") method to calculate dumping margins. See 19 U.S.C. § 1677f-1(d)(1)(A).  Commerce may resort to the statutory exception and use the average-to-transaction method only if "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time." 19 U.S.C. § 1677f-1(d)(1)(B)(i).

To determine whether a pattern of significant U.S. price differences exists, Commerce applied its "differential pricing" analysis known as the Cohen's *d* test.  See Mem. from Preston N. Cox to the File re: Final Determination Analysis Mem. for Best Mattresses and Rose Lion Furniture at 3 (Mar. 18, 2021) (Public Version) (P.R. 304).  The Cohen's *d* test is "a generally recognized statistical measure of the extent of the difference between the mean of a test group and the mean of a comparison group."  Differential Pricing Analysis; Request for Comments, 79 Fed. Reg. 26,720, 26,722 (Dep't of Commerce May 9, 2014) ("Differential Pricing Analysis").

To begin the Cohen's *d* test, Commerce segments a respondent's sales by CONNUM, region, purchaser category and time period.  See id.  Commerce then undertakes a two-part test. In the initial phase of the test, Commerce separates for each CONNUM a "test group" of sales (for example, sales to one region) and compares the mean sales value of this CONNUM test group to the remaining sales from this CONNUM category (for example, sales to all other regions), or the "comparison group."  See id.  Commerce uses the simple average standard deviation of the entire category to generate a coefficient.  See Mid Continent Steel & Wire, Inc. v. United States, __ CIT __, __, 495 F. Supp. 3d 1298, 1304-08 (2021).  If the Cohen's *d* coefficient is 0.8 or greater, the

sales in the test group are said to "pass," indicating the existence of a significant difference in pricing among purchasers, regions or time periods. See id., __ CIT at __, 495 F. Supp. 3d at 1304. Commerce conducts this test for each CONNUM across all regions, purchaser categories, and time periods, to determine the total number of "passing" sales groups. Commerce then assesses the number of "passing" sales and compares this to the total number of sales, generating a ratio evaluated by Commerce in the following manner:

- 0% to 33% passing transactions – Average-to-average method.
- 33% to 66% passing transactions – Hybrid method (average-to-transaction for passing sales, average-to-average for all other sales).
- 66% to 100% passing transactions – Average-to-transaction method.

See Stupp Corp. v. United States, 5 F.4th 1341, 1347 (Fed. Cir. 2021) (citing Differential Pricing Analysis, 79 Fed. Reg. at 26,72-23). Commerce then assesses the results of the Cohen's $d$ analysis to determine if a "meaningful difference" exists between the average-to-average and tentatively selected method. Commerce performs this analysis by calculating the weighted-average dumping margin using the average-to-average method as well as the tentatively selected method. If the tentatively selected margin moves above the *de minimis* threshold or results in a margin at least 25 percent greater, Commerce determines there is a meaningful difference between methods and utilizes the method indicated in the "ratio test" rather than the average-to-average method.

The Federal Circuit has confirmed that Commerce's differential pricing analysis rests on assumptions which, if violated, can produce misleading or incorrect results. In Stupp, the Federal Circuit acknowledged that the Cohen's $d$ test relies on assumptions that the data groups being compared are normally distributed, have equal variability, and are equally numerous. Stupp, 5 F.4th at 1357. The Federal Circuit found that the violation of these assumptions "can subvert the usefulness of the interpretive cutoffs, transforming what might be a conservative cutoff into a meaningless comparator." Id. at 1360. Specifically, the Federal Circuit found that Cohen's $d$ "was

**NONCONFIDENTIAL DOCUMENT**
**CONFIDENTIAL INFORMATION REMOVED**

not robust to mixed-normal distributions," "may produce an upward bias" in test groups with very few observations, and "tend{} to artificially inflate the dumping margins for a set of export sales prices that has minimal variance." Id. at 1358-59.  The Federal Circuit ultimately remanded the decision to Commerce "to explain whether the limits on the use of the Cohen's *d* test . . . were satisfied in this case." Stupp, 5 F.4th at 1360.  The Stupp decision is binding authority.  See Marmen Inc. v. United States, No. 20-00169, 2021 Ct. Intl. Trade LEXIS 150, at *26 (Oct. 22, 2021); Seah Steel Corp. v. United States, No. 20-00150, 2021 Ct. Intl. Trade LEXIS 148, at *16 (Oct. 19, 2021).  The Court must apply the Stupp determination in this case.

As in Stupp, Commerce failed to explain whether the Best Mattresses' sales data conformed with the underlying assumptions necessary for the Cohen's *d* test, specifically whether the test and comparison groups were normally distributed, equally variable, and equally numerous.  In fact, the test and comparison groups generated during the Cohen's *d* test exhibited none of these characteristics.  For CONNUM [ █████████████████████████ ], for instance, [ ████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ].  See Final Margin-Calculation Program, Log, and Output at 33.  (Business Proprietary Document) (C.R. 287).  The standard deviation for the test group price for several test groups registers as [ ██████ ] in the SAS output, exactly the type of "minimal variance" which Stupp warned could "artificially inflate dumping margins." See id. at 46; see also Stupp, 5 F.4th at 1359.  The data in the SAS output for the Best Mattresses violate the assumptions of the Cohen's *d* test and likely generate false positives above the 0.8 threshold, invalidating the entire test.

The Federal Circuit in Stupp warned that examples of exactly these types of data could "produce an upward bias," "artificially inflate the dumping margins," and generally render the

Cohen's *d* test a "meaningless comparator."  <u>Stupp</u>, 5 F.4th at 1359-60.   Commerce's determination to apply the Cohen's *d* test to Best Mattresses was, therefore, unreasonable and not in accordance with law.

## CONCLUSION

For the foregoing reasons, Best Mattresses requests that the Court grant its Motion for Judgment Upon the Agency Record because the Final Determination was unsupported by substantial record evidence and not in accordance with law. To remedy these errors, Best Mattresses requests that the Court remand the Final Determination to Commerce for a determination in accordance with the points of law discussed above and with the specific declarations and instructions enumerated in Best Mattresses Motion for Judgment Upon the Agency Record.

Respectfully submitted,

<u>Dated</u>: December 9, 2021

/s/ Jeffrey S. Grimson

Jeffrey S. Grimson
Kristin H. Mowry
Sarah M. Wyss
Wenhui (Flora) Ji
Jacob M. Reiskin

Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW, Suite 810
Washington, D.C. 20015
202-688-3610
trade@mowrygrimson.com
*Counsel to Best Mattresses International*
*Company Limited and Rose Lion Furniture*
*International Company Limited*

**CERTIFICATE OF COMPLIANCE**

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Jeffrey S. Grimson, hereby certify that this brief complies with the word limitations set forth in Paragraph 2(B) of the Standard Chamber Procedures, as modified by the order granting Plaintiffs' Consent Motion For Enlargement of Word Count Limit in the Court's September 23, 2021 Scheduling Order, ECF No. 38.  Excluding the table of contents, table of authorities, signature block and any certificates of counsel, the word count for this brief is 17,415 words.

Dated: <u>December 9, 2021</u>

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW, Suite 810
Washington, D.C. 20015
202-688-3610
trade@mowrygrimson.com
*Counsel to Best Mattresses International*
*Company Limited and Rose Lion Furniture*
*International Company Limited*