**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| BEST MATTRESSES INTERNATIONAL COMPANY LIMITED AND ROSE LION FURNITURE INTERNATIONAL COMPANY LIMITED, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| THE UNITED STATES, | ) Consol. Court No. 21-00281 |
| Defendant, | ) PUBLIC  VERSION ) |
| and | ) ) |
| BROOKLYN BEDDING, LLC, CORSICANA MATTRESS COMPANY, ELITE COMFORT SOLUTIONS; FXI, INC., INNOCOR, INC., KOLCRAFT ENTERPRISES INC., LEGGETT & PLATT, INCORPORATED, THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, and UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendant-Intervenors. | ) ) |

**DEFENDANT'S MOTION TO PARTIALLY DISMISS AND RESPONSE TO
PLAINTIFFS' MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

L. MISHA PREHEIM
Assistant Director

OF COUNSEL
PAUL K. KEITH
Attorney
Office of the Chief Counsel
  For Trade Enforcement and Compliance
U.S. Department of Commerce
Washingyon, D.C.

KARA M. WESTERCAMP
Trial Counsel
U.S. Department of Justice
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Tel:  (202) 305-7571
Fax: (202) 514-8264
Email: kara.m.westercamp@usdoj.gov

Attorneys for Defendant

March 11, 2022

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................ iv

STATEMENT PURSUANT TO RULE 56.2 ...........................................................2

    I.    Administrative Determination Under Review .........................................2

    II.    Issues Presented For Review ..................................................................3

STATEMENT OF FACTS ....................................................................................4

    I.    Initiation Of Investigation ......................................................................4

    II.    Preliminary Determination......................................................................4

    III.    Final Determination ...............................................................................6

SUMMARY OF ARGUMENT .............................................................................8

ARGUMENT .......................................................................................................9

    I.    Applicable Legal Framework .................................................................9

        A.    Standard Of Review ...................................................................9

        B.    Legal Framework For Transactions Between Affiliated Parties ..............12

    II.    Commerce's Decision To Use The Average Of GTA Import Data From Six Economically Comparable Countries To Determine The Cost Of Production Of Major Inputs Is Supported By Substantial Evidence And In Accordance With Law .......................................................................................................... 13

        A.    Commerce's Use Of The Averaged GTA Data To Value Cost Of Production Is Consistent With Commerce's Statutory Authority To Value Major Inputs On The Basis Of The Information Available Regarding Cost Of Production ...........................................................................15

        B.    Substantial Evidence Supports Commerce's Cost Of Production Calculation For Major Inputs From Affiliated Non-Market Economy Suppliers ...................................................................................21

            1.    Commerce Reasonably Included Romanian GTA Data Because The Data Were Not Aberrational ................................................22

2.      Commerce Reasonably Excluded Mexican GTA Data Because The Data Were Not Expressed In Kilograms .......................................23

III.    Substantial Evidence Supports Commerce's Reliance On Cambodian Trademap Export Data To Determine A Market Price Pursuant To The Transactions Disregarded Rule ...................................................................................24

    A.      Substantial Evidence Supports Commerce's Decision That Cambodian Trademap Data Were The Best Available Source Of Information For Valuing The Minor Inputs Purchased From Non-Market Economy Affiliates ...................................................................................24

    B.      The Court Should Reject Brooklyn Bedding's Various Arguments Challenging Commerce's Selection Of Cambodian Trademap Data .......26

IV.    Substantial Evidence Supports Commerce's Application Of The Transactions Disregarded Rule To Best Mattresses's Fixed Asset Purchases Because The Record Did Not Contain Market Prices For The Fixed Assets ............................31

V.     Commerce's Selection Of The Emirates Sleep Financial Statements Is Supported By Substantial Evidence .....................................................................................36

    A.      Legal Framework ...................................................................................36

    B.      Commerce's Determination That The Emirates Sleep Financial Statements Were The Best Available Information To Calculate Profit And Selling Expenses Is Supported By Substantial Evidence ......................................37

    C.      The Court Should Reject Best Mattresses's Various Arguments Challenging The Emirates Sleep Financial Statements ...........................40

        1.      Emirates Sleep's Financial Statements Were Complete And Reliable Enough To Use To Calculate Financial Ratios ..............40

        2.      Emirates Sleep's Financial Statements Reflect The Business Operations Of Best Mattresses .......................................43

        3.      Emirates Sleep's Financial Statements Were Publicly Available..45

III.    Count VI Of Plaintiffs' Second Amended Complaint Should Be Dismissed, Or, Alternatively, The Court Should Find Failure To Exhaust Administrative Remedies ...................................................................................47

    A.      Standard Of Review ...................................................................................47

    B.      Differential Pricing Framework ...................................................................48

C.      Because There Is No "Injury-in-Fact" With The Differential Pricing
        Analysis, Best Mattresses Lacks Standing To Bring This Claim .............50

        1.      Relevant Factual Background ....................................................50

        2.      Best Mattresses Has Not Alleged An "Injury-In-Fact" ...............51

D.      Alternatively, Best Mattresses Failed To Exhaust Administrative
        Remedies ..................................................................................................53

CONCLUSION ......................................................................................................56

## TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGES**

*Am. Silicon Techs. v. United States*,
    261 F.3d 1371 (Fed. Cir. 2001)........................................................................ 43, 46

*Apex Frozen Foods Private Ltd. v. United States*,
    862 F.3d 1337 (Fed. Cir. 2017)........................................................................ 49

*Ass'n of Am. Sch. Paper Suppliers, v. United States*,
    791 F. Supp. 2d 1292 (Ct. Int'l Trade 2011) .................................................. 42

*Atl. Sugar, Ltd., v. United States*,
    744 F.2d 1556 (Fed. Cir. 1984)........................................................................ 11

*Boomerang Tube LLC v. United States*,
    856 F.3d 908 (Fed. Cir. 2017).......................................................................... 53

*Camreta v. Greene*,
    131 S. Ct. 2020 (2011)...................................................................................... 52

*Catfish Farmers of Am. v. United States*,
    641 F. Supp. 2d 1362 (Ct. Int'l Trade 2009) .............................................. 40, 41

*Celta Agencies, Inc. v. United States*,
    865 F. Supp. 2d 1348 (Ct. Int'l Trade 2012) .................................................. 47

*Changzhou Trina Solar Energy Co. v. United States*,
    352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) .................................................. 26

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
    467 U.S. 837 (1984).......................................................................................... 11

*Cleo Inc. v. United States*,
    501 F.3d 1291 (Fed. Cir. 2007)........................................................................ 10

*Consol. Edison Co. of N.Y. v. NLRB*,
    305 U.S. 197 (1938).......................................................................................... 10

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966).......................................................................................... 10

*Corus Staal BV v. United States*,
    502 F.3d 1370 (Fed. Cir. 2007).................................................................... 53, 55

*CP Kelco U.S., Inc. v. United States*,
    949 F.3d 1348 (Fed. Cir. 2020)................................................................. 42, 47

*Downhole Pipe & Equip., L.P. v. United States*,
    776 F.3d 1369 (Fed. Cir. 2015)........................................................ 43, 44, 45

*Fujitsu Gen. Ltd. v. United States*,
    88 F.3d 1034 (Fed. Cir. 1996)............................................................... passim

*Gerber Food (Yunnan) Co. v. United States*,
    601 F. Supp. 2d 1370 (Ct. Int'l Trade 2009) ............................................. 55

*Goldlink Indus. Co. v. United States*,
    431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ............................................. 10

*Henke v. United States*,
    60 F.3d 795 (Fed. Cir. 1995)...................................................................... 47

*Hormel v. Helvering*,
    312 U.S. 552 (1941).................................................................................... 55

*Inland Steel Indus., Inc. v. United States*,
    188 F.3d 1349 (Fed. Cir. 1999)............................................................. 26, 27

*INS v. Elias-Zacarias*,
    502 U.S. 478 (1992).................................................................................... 10

*Itochu Bldg. Prods. v. United States*,
    733 F.3d 1140 (Fed. Cir. 2013)................................................................... 54

*JBF RAK LLC v. United States*,
    790 F.3d 1358 (Fed. Cir. 2015)................................................................... 11

*Jubail Energy Servs. Co. v. United States*,
    125 F. Supp. 3d 1352 (Ct. Int'l Trade 2015) ............................................. 48

*Juice Farms, Inc. v. United States*,
    68 F.3d 1344 (Fed. Cir. 1995)..................................................................... 47

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)............................................................................. 48, 52

*McCarthy v. Madigan*,
    503 U.S. 140 (1992)............................................................................. 53, 54

*Mittal Steel Point Lisas Ltd. v. United States*,
   548 F.3d 1375 (Fed. Cir. 2008)........................................................... 54

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006)........................................................... 10

*NSK Ltd. v. United States*,
   510 F.3d 1375 (Fed. Cir. 2007)...................................................... 24, 25

*PAO Severstal v. United States*,
   219 F. Supp. 3d 1411 (Ct. Int'l Trade 2017) ...................................... 51

*POSCO v. United States*,
   296 F. Supp. 3d 1320 (Ct. Int'l Trade 2018) ...................................... 53

*QVD Food Co. v. United States*,
   658 F.3d 1318 (Fed. Cir. 2011)........................................................... 19

*Rebar Trade Action Coal. v. United States*,
   337 F. Supp. 3d 1251 (Ct. Int'l Trade 2018) ................................. 32, 33

*Rebar Trade Action Coal. v. United States*,
   398 F. Supp. 3d 1359 (Ct. Int'l Trade 2019) ...................................... 33

*Shandong Rongxin Imp. & Exp. Co. v. United States*,
   203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017) ...................................... 10

*Simon v. E. Ky. Welfare Rights Org.*,
   426 U.S. 26 (1976)............................................................................... 48

*Since Hardware (Guangzhou) Co. v. United States*,
   977 F. Supp. 2d 1347 (Ct. Int'l Trade 2014) ...................................... 46

*SKF USA, Inc. v. United States*,
   537 F.3d 1373 (Fed. Cir. 2008)........................................................... 29

*Thai Plastic Bags Indus. Co. v. United States*,
   746 F.3d 1358 (Fed. Cir. 2014)........................................................... 31

*Thai Plastic Bags Indus. Co. v. United States*,
   895 F. Supp. 2d 1337 (Ct. Int'l Trade 2013) ...................................... 29

*Timken Co. v. United States*,
   354 F.3d 1334 (Fed. Cir. 2004)........................................................... 11

*Torrington Co. v. United States*,
    68 F.3d 1347 (Fed. Cir. 1995)............................................................................ 11

*Union Steel v. United States*,
    713 F.3d 1101 (Fed. Cir. 2013)................................................................ 49, 50, 51

*United States v. Eurodif S.A.*,
    555 U.S. 305 (2009)................................................................................ passim

*United States v. L.A. Tucker Truck Lines, Inc.*,
    344 U.S. 33 (1952) ........................................................................................... 54

*Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*,
    28 C.I.T. 1185 (2004) ..................................................................................... 21

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
    716 F.3d 1370 (Fed. Cir. 2013)....................................................................... 27

*Zenith Radio Corp. v. United States*,
    437 U.S. 443 (1978)......................................................................................... 25

*Zhanjiang Guolian Aquatic Prods. Co. v. United States*,
    991 F. Supp. 2d 1339 (Ct. Int'l Trade 2014) ............................................ 51, 52

*Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*,
    652 F.3d 1333 (Fed. Cir. 2011)............................................................ 17, 28, 29

## STATUTES

5 U.S.C. § 553(b)-(c) ......................................................................................... 21

19 U.S.C. § 1516a(b)(1)(B) ............................................................................... 10

19 U.S.C. § 1675(a)(2)(A) ................................................................................. 48

19 U.S.C. § 1677b .......................................................................................... passim

19 U.S.C. § 1677f ............................................................................................... 49

28 U.S.C. § 2637(d) ........................................................................................... 53

## REGULATIONS

19 C.F.R. § 351.309(c)(2) ............................................................................ 53, 54

19 C.F.R. § 351.401(b) ...................................................................................... 24

19 C.F.R. § 351.408(c) ........................................................................................... 30

19 C.F.R. § 351.408(c)(2) ...................................................................................... 20

19 C.F.R. § 351.414(c)(1) ...................................................................................... 49

19 C.F.R. § 351.414(c)(2) ...................................................................................... 49

19 C.F.R § 351.407(b) ........................................................................................... 13

## OTHER AUTHORITIES

*Pure Magnesium from Israel*,
    66 Fed. Reg. 49,349 (Dep't of Commerce Sept. 27, 2001). ...................................... 38, 39

*Certain Color Television Receivers from Malaysia*,
    69 Fed. Reg. 20,592 (Dep't of Commerce Apr. 16, 2004). ............................................. 38

*Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam*,
    85 Fed. Reg. 23,002 (Dep't of Commerce Apr. 24, 2020) ................................... 4, 13, 28

*Mattresses from Cambodia*,
    85 Fed. Reg. 69,594 (Dep't Commerce Nov. 3, 2020) ...................................................... 4

*Mattresses from Cambodia*,
    86 Fed. Reg. 15,894 (Dep't of Commerce Mar. 25, 2021) 2, 7

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea*,
    86 Fed. Reg. 35,060 (Dep't of Commerce July 1, 2021) .................................................. 28

*Welded Line Pipe From the Republic of Korea*,
    86 Fed. Reg. 58,253 (Dep't of Commerce Oct. 21, 2021) ................................................ 52

## OTHER AUTHORITIES

H.R. Conf. Rep. No. 100–576 (1988) ............................................................................. 16

Eliminating Global Market Distortions To Protect American Jobs Act of 2021,
    S. 1187, 117th Cong. § 205(b)(2) (2021) .................................................................. 16, 17

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| _____ ) | |
| BEST MATTRESSES INTERNATIONAL ) | |
| COMPANY LIMITED AND ROSE LION ) | |
| FURNITURE INTERNATIONAL COMPANY ) | |
| LIMITED, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| THE UNITED STATES, ) | Consol. Court No. 21-00281 |
| ) | **PUBLIC** |
| Defendant, ) | **VERSION** |
| ) | |
| and ) | |
| ) | |
| BROOKLYN BEDDING, LLC, CORSICANA ) | |
| MATTRESS COMPANY, ELITE COMFORT ) | |
| SOLUTIONS; FXI, INC., INNOCOR, INC., ) | |
| KOLCRAFT ENTERPRISES INC., LEGGETT & ) | |
| PLATT, INCORPORATED, THE ) | |
| INTERNATIONAL BROTHERHOOD OF ) | |
| TEAMSTERS, and UNITED STEEL, PAPER AND) | |
| FORESTRY, RUBBER, MANUFACTURING, ) | |
| ENERGY, ALLIED INDUSTRIAL AND ) | |
| SERVICE WORKERS INTERNATIONAL ) | |
| UNION, AFL-CIO, ) | |
| ) | |
| Defendant-Intervenors. ) | |
| _____ ) | |

**DEFENDANT'S MOTION TO PARTIALLY DISMISS AND RESPONSE TO
PLAINTIFFS' MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the United States Court of International Trade, defendant, the

United States, respectfully submits this motion to partially dismiss and response to the motions

for judgment on the agency record filed by plaintiffs, Best Mattresses International Company

Limited (Best Mattresses International) and Rose Lion Furniture International Company Limited

(Rose Lion) (collectively, Best Mattresses), Best Mattresses Br., ECF No. 43, and defendant-intervenors and consolidated plaintiffs, Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO (collectively, Brooklyn Bedding), Brooklyn Bedding Br., ECF No. 45.

Because the final determination of the United States Department of Commerce (Commerce) in the antidumping duty investigation covering mattresses from Cambodia is supported by substantial evidence and otherwise in accordance with law, we respectfully request that the Court sustain Commerce's final determination. In addition, because of a lack of injury-in-fact, Best Mattresses does not possess standing and the Court should dismiss Count VI of the second amended complaint.

## STATEMENT PURSUANT TO RULE 56.2

### I.    Administrative Determination Under Review

The administrative determination under review is Commerce's antidumping duty investigation covering mattresses from Cambodia. *Mattresses from Cambodia*, 86 Fed. Reg. 15,894 (Dep't of Commerce Mar. 25, 2021) (*Final Determination*) (P.R. 309), and accompanying Issues and Decision Memorandum (IDM) (P.R. 301), as amended by *Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam*, 86 Fed. Reg. 26,460 (Dep't of Commerce May 14, 2021) (amended final LTFV determ.) (P.R. 325). The period of investigation is January 1, 2019, through December 31, 2019.

II.   **Issues Presented For Review**

1.      Whether substantial evidence supports Commerce's use of Global Trade Atlas (GTA) import data for third countries as the information available to estimate the cost of production for Best Mattresses's affiliated suppliers of major inputs, where the affiliated suppliers were located in a non-market economy country.

2.      Whether Commerce reasonably included Romanian GTA data in the average of import data used to determine the cost of production for the [   ] major input.

3.      Whether Commerce reasonably excluded Mexico GTA data because the data were not expressed in kilograms and Commerce did not have a conversion ratio for the Mexican data.

4.       Whether Commerce reasonably relied on Cambodian Trademap data to determine a market price in applying the transactions disregarded rule.

5.      Whether Commerce reasonably determined not to exclude import data from non-market economy countries or from allegedly subsidized market economy countries from the Trademap and GTA data used in applying the transactions disregarded and major input rules.

6.      Whether substantial evidence supports Commerce's adjustment to Best Mattresses's fixed asset depreciation costs pursuant to the transactions disregarded rule, based on the results of the transactions disregarded rule for other transactions, because a market price for the fixed asset purchases was unavailable.

7.      Whether Commerce's selection of the Emirates Sleep Systems Private Limited's (Emirates Sleep) financial statements as the source of constructed value profit and selling expenses is supported by substantial evidence and is otherwise in accordance with law.

8.    Whether the Court should dismiss Count VI of Best Mattresses's second amended complaint because it failed to allege an injury-in-fact with respect to the differential pricing analysis.

9.    Whether, alternatively, Best Mattresses failed to exhaust its administrative remedies regarding Commerce's differential pricing analysis.

## STATEMENT OF FACTS

### I.    Initiation Of Investigation

In March 2020, Brooklyn Bedding filed an antidumping duty petition concerning imports of mattresses from several countries, including Cambodia.  WTTC Antidumping and Countervailing Duty Petitions, Vol I. at 1-2 (Mar. 31, 2020) (P.R. 1; C.R. 1).  One month later, Commerce initiated an antidumping duty investigation covering those imports.  *Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam*, 85 Fed. Reg. 23,002 (Dep't of Commerce Apr. 24, 2020) (initiation notice) (P.R. 45).  Commerce selected Best Mattresses International and Rose Lion as mandatory respondents because they were the two largest exporters of subject merchandise by volume to the United States during the period of investigation.  Respondent Selection Memo at 4-5 (May 8, 2020) (P.R. 52; C.R. 33).

### II.    Preliminary Determination

In October 2020, Commerce issued an affirmative preliminary determination in which it collapsed Best Mattresses International and Rose Lion and calculated an estimated weighted-average dumping margin of 252.74 percent for the collapsed entity (Best Mattresses).  *See* Affiliation and Collapsing Memo (Oct. 29, 2020) (P.R. 237, C.R. 235); *Mattresses from Cambodia*, 85 Fed. Reg. 69,594 (Dep't Commerce Nov. 3, 2020) (prelim. affirm. LTFV determ.)

(P.R. 244), and accompanying preliminary decision memorandum (PDM) (P.R. 232). Because Best Mattresses had no viable home market or third-country market, Commerce used constructed value as the basis for calculating normal value. PDM at 13. Commerce preliminarily made certain adjustments to Best Mattresses's cost of production and constructed value information. *See* Cost Memo (Oct. 27, 2020) (P.R. 242, C.R. 241). Specifically, because Best Mattresses purchased certain major inputs from affiliated parties located in a non-market economy country, Commerce determined the cost of production for the affiliates using Brazilian GTA data as a surrogate for the non-market economy costs. *See id.* at 1-2.

Additionally, in comparing affiliated party purchases for various minor inputs to a market price, where a market price based on unaffiliated party purchases was unavailable, Commerce determined a market price using the average of GTA data for six countries: Brazil, Malaysia, Mexico, Romania, Russia, and Turkey. *Id.* at 2. For depreciation costs associated with the purchase of various fixed assets from non-market economy affiliated parties for which a market price was also unavailable, Commerce adjusted the costs based on the adjustment it determined for the minor input purchases. *Id.* Finally, to determine the constructed value profit, Commerce used the financial statements of Emirates Sleep. *See* PDM at 13.

Following the preliminary determination, Commerce requested certain additional or supporting documentation in lieu of performing an on-site verification. *See* Verification Questionnaire (Dec. 16, 2020) (P.R. 275). Best Mattresses provided the requested documentation in its verification response on December 23, 2020. *See* Verification Questionnaire Response (Dec. 23, 2020) (P.R. 280).

In January 2021, Best Mattresses and Dorel Home Furnishings, an interested party, filed administrative case briefs, and in February 2021 Brooklyn Bedding filed a rebuttal brief. Dorel

Case Br. (Jan. 1, 2021) (P.R. 287, C.R. 270); Best Mattresses Case Br. (Jan. 21, 2021) (P.R. C.R. 271); Brooklyn Bedding Rebuttal Br. (Feb. 2, 2021) (P.R. 292, C.R. 272).

### III.   <u>Final Determination</u>

In March 2021, Commerce issued its affirmative final determination. *See Final Determination.* Commerce continued to find that the financial statements of Emirates Sleep were the best available information to determine constructed value profit. *See* IDM at 15-22. However, Commerce revised certain other decisions from the preliminary determination. *See id.* at 8-13.

Specifically, to determine a market price for the transactions disregarded rule for minor purchases, Commerce relied on Cambodian Trademap data rather than the six-country average of GTA data. *See id.* at 10. Commerce explained that, pursuant to 19 U.S.C. § 1677b(f)(2), "the item being tested should reflect a market price in the country under consideration, which is Cambodia in this case." *Id.* And while the averaged GTA data "represents imports into a given country, by source export country," the Cambodian Trademap data "represent country-specific export data into a particular country (*e.g.*, Cambodia)." *Id.* Commerce also determined that the Cambodian Trademap data were a "reliable source" and "robust" because it "include{d} prices for all the necessary affiliated inputs." *Id.*

Commerce likewise determined that its transactions disregarded adjustment for fixed asset purchases was appropriate. *Id.* at 12. Commerce explained that it was "not able to directly test the affiliated fixed asset purchases because no reasonable market price information is available," but for the final determination, it modified the "adjustment to make it specific to each affiliated supplier of the given fixed asset." *Id.* In other words, "Commerce compared the overall difference between the transfer price and market price, for each affiliated supplier, on

minor input transactions, and applied, if applicable, the resulting adjustment percentage to the depreciation expense of the fixed assets supplied by that same affiliated supplier." *Id.*

To determine the cost of production when applying the major input rule, Commerce relied on the six-country average of GTA data rather than the Brazilian GTA data alone, as it had done in the preliminary determination. *See id.* at 10-11. Commerce explained that, under the major input rule, it "has more flexibility" when selecting "an appropriate surrogate for {costs of production}" and it "consider{ed} it reasonable in this case to rely on the imports into countries that are economically comparable to the country of the affiliated {non-market economy} suppliers as the {cost of production} for those suppliers, as information reasonably available." *Id.* at 11. Moreover, Commerce explained that it was "simply trying to fill the gaps in applying the major input rule" and that an average of the six countries "represents a broader set of data for use as the information available." *Id.* Commensurate with the major input and transactions disregarded rules, Commerce did not exclude imports from non-market economy countries or countries maintaining broadly available export subsidies. *See id.* at 10-11.

Consistent with these determinations, Commerce calculated a final estimated weighted average dumping margin of 45.34 percent. *Final Determination*, 86 Fed. Reg. at 15,895. Following the correction of certain ministerial errors, Commerce published the antidumping duty order and the final amended estimated weighted-average dumping margin of 52.41 percent. *Amended Final and Order*, 86 Fed. Reg. at 26,462. This action followed.

## SUMMARY OF ARGUMENT

First, Commerce reasonably used a six-country average of GTA import data to value the cost of production for Best Mattresses's affiliated suppliers because the suppliers are located in a non-market economy country. Contrary to Best Mattresses's arguments, Commerce has the

authority to rely on alternate sources to value the cost of production pursuant to the major input rule, which permits Commerce to rely on the information available.  *See* 19 U.S.C. § 1677b(f)(3).

Moreover, in using the GTA data, Commerce reasonably used a six-country average and did not exclude allegedly aberrational data for [█████] from Romania.  Although the Romanian value in question was higher than the other sources, Commerce explained that a value being on the high end of a set of values does not by itself make the value aberrational.  Commerce also reasonably determined to exclude Mexican GTA data for [█████] because the data were expressed in square meters rather than kilograms.  Substantial evidence supports this decision because any conversion would not be specific to the Mexican [█████] and would not therefore necessarily lead to a more accurate dumping margin.

Second, for minor inputs, Commerce's application of the transactions disregarded rule and use of Cambodian Trademap data to determine market value is supported by substantial evidence and otherwise in accordance with law because the transactions disregarded rule specifies that Commerce should compare the transfer price with the price the respondent would pay in the market under consideration.  *See* 19 U.S.C. § 1677b(f)(2).  With respect to Best Mattresses's fixed asset purchases, substantial evidence supports Commerce's application of an adjustment ratio to the transfer price costs, based on the adjustment derived from minor input purchases, because Best Mattresses did not have fixed asset purchases of the same assets from unaffiliated suppliers.  Commerce's methodology was reasonable as information available because Best Mattresses's proposed alternative of comparing the purchases with other fixed assets would involve comparing dissimilar products, and Commerce's approach applied a supplier-specific adjustment.

Third, Commerce's selection of the Emirates Sleep financial statements to calculate profit and selling expense ratios is supported by substantial evidence because they were the best information available.  Commerce's determination that selecting a non-Cambodian mattress producing company was more important that selecting a Cambodian apparel company was a reasonable conclusion based on Commerce's preference that financial statements reflect the production of comparable merchandise.

Finally, this Court should dismiss Best Mattresses's claim challenging Commerce's application of its differential pricing methodology for lack of standing because Commerce applied the average-to-average comparison methodology after determining there was no meaningful difference between that methodology and the average-to-transaction methodology. Alternatively, Best Mattresses failed to exhaust its administrative remedies regarding the issue because it did not raise the issue in its administrative case briefs and, although there was an intervening judicial opinion, the opinion does not bear on this case because it would not impact Commerce's calculations using the average-to-average comparison method.

## ARGUMENT

## I.   **Applicable Legal Framework**

### A.   **Standard Of Review**

This Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence on the record, or otherwise unlawful.  *See Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)). "Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938).  Substantial evidence may be "less than the weight of the evidence," and the possibility

of drawing inconsistent conclusions from the record does not render Commerce's findings

unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Indeed, when Congress entrusts an agency to administer a statute that demands inherently

fact-intensive inquiries, agency conclusions may be set aside only if the record is "so compelling

that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S.

478, 483-84 (1992); *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327,

1338 (Ct. Int'l Trade 2017) (recognizing tremendous deference to Commerce's factual findings).

It is thus improper to overturn a determination "simply because the reviewing court would have

reached a different conclusion based on the same record," *Cleo Inc. v. United States*, 501 F.3d

1291, 1296 (Fed. Cir. 2007) (citations omitted), and the Court will not substitute its judgment for

Commerce in choosing between two fairly conflicting views, even if it could justifiably have

made a different choice had the matter been before it *de novo*. *Goldlink Indus. Co. v. United

States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006). Hence, a party challenging

Commerce's determination under the substantial evidence standard "has chosen a course with a

high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir.

2006) (citation omitted), and the Court sustains Commerce's factual determinations if they are

reasonable and supported by the record as a whole, even if evidence detracts from them. *See Atl.

Sugar, Ltd., v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

When the Court examines Commerce's interpretations of the statute that it administers,

the Court employs the two-pronged test established in *Chevron, U.S.A., Inc. v. Natural Res. Def.

Council, Inc.*, 467 U.S. 837 (1984). First, the Court examines "whether Congress has directly

spoken to the precise question at issue," and if it has, the agency and Court must comply with

Congress's clear intent. *Id*. at 842-43. If, however, "the statute is silent or ambiguous with

respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.  If so, "{a}ny reasonable construction of the statute is a permissible construction," *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (citation and quotation marks omitted), and Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous."  *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (citation omitted).  Indeed, "the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency."  *Id.* (citation omitted); *see also Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995) (recognizing Commerce as "master" of antidumping laws).

Finally, the Court affords Commerce especially great deference "when a statute fails to make clear any Congressionally mandated procedure or methodology for assessment of the statutory tests."  *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (citation and quotation marks omitted).  In that circumstance, "Commerce may perform its duties in the way it believes most suitable."  *Id.*  Consequently, Commerce receives "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when it exercises its technical expertise to select and to apply methodologies to implement the trade statute.  *Fujitsu*, 88 F.3d at 1039.

## B.   Legal Framework For Transactions Between Affiliated Parties

Commerce determines whether subject merchandise is being sold at less than fair value by comparing a respondent's U.S. price with normal value.  *See* 19 U.S.C. § 1677b.  Because Best Mattresses did not have a viable home market or third country market to serve as the basis for normal value, Commerce used constructed value as the basis for normal value pursuant to 19

U.S.C. § 1677b(a)(4).  *See* PDM at 12.  The antidumping statute provides special rules for the

calculation of cost of production and constructed value.  *See* 19 U.S.C. § 1677b(f).  In particular,

the statue provides the transactions disregarded rule and the major input rule for addressing

transactions between affiliated parties.  The transactions disregarded rule states:

> A transaction directly or indirectly between affiliated persons may be
> disregarded if, in the case of any element of value required to be considered,
> the amount representing that element does not fairly reflect the amount
> usually reflected in sales of merchandise under consideration in the *market
> under consideration*.  If a transaction is disregarded under the preceding
> sentence and no other transactions are available for consideration, the
> determination of the amount shall be based on the information available as
> to what the amount would have been if the transaction had occurred between
> persons who are not affiliated.

*Id.* § 1677b(f)(2) (emphasis added).  The major input rule states:

> If, in the case of a transaction between affiliated persons involving the
> production by one of such persons of a major input to the merchandise, the
> administering authority has reasonable grounds to believe or suspect that an
> amount represented as the value of such input is less than the cost of
> production of such input, then the administering authority may determine
> the value of the major input on the basis of the *information available*
> regarding such cost of production, if such cost is greater than the amount
> that would be determined for such input under paragraph (2).

*Id.* § 1677b(f)(3) (emphasis added).  Commerce's regulations provide that, under the major input

rule, Commerce "normally will determine the value of a major input purchased from an affiliated

person based on the higher of:  (1) The price paid by the exporter or producer to the affiliated

person for the major input; (2) The amount usually reflected in sales of the major input in the

market under consideration; or (3) The cost to the affiliated person of producing the major

input."  19 C.F.R § 351.407(b).

**II.      Commerce's Decision To Use The Average Of GTA Import Data From Six Economically Comparable Countries To Determine The Cost Of Production Of Major Inputs Is Supported By Substantial Evidence And In Accordance With Law**

In the final determination, Commerce applied both the transactions disregarded and major input rules because Best Mattresses reported that it purchased many items from non-market economy affiliated suppliers, and Commerce was without a market price against which to test the affiliated party purchases.  *See* IDM at 8-13.  Specifically, with respect to the cost of production for three major inputs, Commerce used the GTA import data for all of the six economically comparable countries as a surrogate cost of production, because "[t]his average represents a broader set of data for use as the information available."  *Id.* at 8, 10-11.

Best Mattresses argues, however, that Commerce acted contrary to its statutory authority by using surrogate data to value the cost of production of inputs that were sourced from affiliated suppliers, and, in doing so, failed to follow the proper surrogate value selection procedure.  *See* Best Mattresses Br. at 13-26.  It also argues that Commerce's calculation of the cost of production is not supported by substantial evidence because Commerce included some allegedly aberrational data from Romania while also improperly excluding data from Mexico.  *See id.* at 28-34.  As we demonstrate below, these arguments are meritless.

Here, Best Mattresses had purchases of three major inputs from affiliated producers located in [    ], which Commerce considers a non-market economy country.  *See* Cost Memo at 1-2; IDM at 8.  Commerce explained in the final determination that it could not "rely on the affiliated suppliers' cost of production for use in applying the major input rule or as a substitute for the market price" because the costs of production would have occurred in the non-market economy country.  *See* IDM at 9-10.  Pursuant to the major input rule, Commerce may then

"determine the value of the major input on the basis of the *information available* regarding such cost of production{.}"  19 U.S.C. § 1677b(f)(3) (emphasis added); *see also* IDM at 10-11.

Accordingly, to determine the costs of production for the affiliated major input producers, Commerce solicited import data on the record for countries economically comparable to [███]—where the production occurred.  *See* IDM at 10; Cost Memo at 1-2.  Specifically, Commerce solicited GTA data for Brazil, Malaysia, Mexico, Romania, Russia, and Turkey, which are the "countries that are currently used by Commerce as potential surrogate sources for the particular {non-market economy} country" for the Harmonized Tariff Schedule (HTS) numbers associated with the purchased inputs.  IDM at 9; *see also* Cost Memo at 2.  Commerce explained that it "consider{ed} it reasonable in this case to rely on the imports into countries that are economically comparable to the country of the affiliated {non-market economy} suppliers as the {cost of production} for those suppliers, as information reasonably available."  IDM at 11.

Although Commerce had "relied solely on Brazilian GTA data" in the preliminary determination, Commerce explained that, for the final determination, it was "simply trying to fill the gaps in applying the major input rule" and instead determined to rely on an average of the data for the six countries to represent a "broader set of data for use as the information available." *Id.*  Commerce included in that average "all {non-market economy} countries and countries with export subsidies."  Cost Memo at 2.

Accordingly, Commerce valued major inputs that Best Mattresses had purchased from the non-market economy-based affiliates using the averaged six-country GTA data as a proxy for cost of production information, if the value exceeded the transfer price and market price.  IDM at 10-11.

**A.**     **Commerce's Use Of The Averaged GTA Data To Value Cost Of Production Is Consistent With Commerce's Statutory Authority To Value Major Inputs On The Basis Of The Information Available Regarding Cost Of Production**

Best Mattresses makes numerous meritless arguments contesting Commerce's use of the averaged six-country GTA data for valuing the cost of production for major inputs.  First, Best Mattresses argues that Commerce acted contrary to its statutory authority by using GTA data as a surrogate for the cost of production information of Best Mattresses's affiliated suppliers.  Best Mattresses Br. at 13.  Specifically, Best Mattresses asserts that Commerce is not authorized to use surrogate value data to estimate the cost of production for the non-market economy affiliates to produce the major inputs, and that there is no exception in the major input rule framework for suppliers located in a non-market economy country.  *Id.* at 14.  Because Commerce acted within its authority under the statute, these arguments are without merit.

The antidumping statute does not explicitly define how Commerce is permitted to determine the cost of production under the major input rule.  Instead, the statute states that Commerce may determine the value of the major input "on the basis of the *information available regarding such cost of production*."  19 U.S.C. § 1677b(f)(3) (emphasis added).  Consistent with this statutory language, Commerce explained that it was using the average of the GTA data "as information reasonably available."  IDM at 11.

Best Mattresses wrongly asserts that Commerce's "specific authority relates only to *respondent's* input value and gives Commerce no authority to construct respondents' suppliers' {cost of production} using outside surrogate data."  Best Mattresses Br. at 16 (emphasis in original).  To the contrary, the reference to "information available" contemplates that Commerce may need to resort to outside information to determine a supplier's cost of production.  There is nothing in the statute that prohibits Commerce from using third-country information as the

"information available," provided use of the information is reasonable.  *See* IDM at 11.  Here, Commerce used information from countries economically comparable to [███████], a point Best Mattresses does not contest, to evaluate the cost of production.  *Id.* at 9.  Moreover, Commerce averaged the information from the six countries so as to provide a broader dataset.  *Id.* at 11.  Accordingly, Commerce used a reasonable alternative where it determined that cost of production information from a non-market economy was not usable.

Second, Best Mattresses asserts that Congress never intended to give Commerce the authority to resort to third-country information for determining cost of production, and that Senate Bill S.1187 supports its argument that Commerce is not currently authorized to treat non-market economy inputs differently.  Best Mattresses Br. at 14-16, 20.  Specifically, Best Mattresses provides that the proposed bill will "amend{} the law to specify that Commerce is authorized to disregard costs for inputs obtained from non-market economies."  *Id.* at 20.

However, the legislative history of the major input rule undermines this assertion.  Specifically, the conference report for the rule states that, if Commerce has reasonable grounds to suspect that the transfer price is less than the cost of production, "then Commerce may base the value of such input on the *best evidence available* as to its costs of production when such costs are greater than the price that would be used as a result of the application of paragraph (2) ('arms-length price')."  H.R. Conf. Rep. No. 100–576, at 595 (1988) (emphasis added).  The report also states that, "{if the related party seller does not provide reliable data on its cost of production, and Commerce has reasonable grounds to believe or suspect that the transfer price and also the arms-length price would be less than costs of production, then Commerce should use *best information* to establish a *reasonable estimate* of the related party's costs of production for such input."  *Id.* (emphasis added).

Moreover, with respect to Senate Bill S.1187, the proposed amended language does not mean that Commerce does not *currently* have the authority under the major input rule to use other information to determine cost of production.  The language of the bill also concerns disregarding inputs produced by or acquired from non-market economies as being outside the ordinary course of trade:  it does not concern the cost of production of those inputs or apply only to transactions between affiliates.  *See* Eliminating Global Market Distortions To Protect American Jobs Act of 2021, S. 1187, 117th Cong. § 205(b)(2) (2021) ("If an input for subject merchandise is produced by or acquired from a person or entity described in clause (iii), the administering authority shall disregard such production or acquisition as outside the ordinary course of trade.").

Here, Commerce explained that it could not use the affiliated suppliers' own data because they were located in a non-market economy country, which is a reasonable reason to find that data concerning cost of production from such suppliers would not be reliable.  *See* IDM at 9.  Moreover, although the GTA import data are not direct cost of production data, they constitute a reasonable estimate of the cost of production.  *Id.*; *see also Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (explaining a reviewing court determines not whether "the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information.").  Therefore, Commerce's determination that the six-country average of GTA data was the best available information is supported by substantial evidence and is also within Commerce's authority under the statute as contemplated by Congress.  *See* IDM at 11.

Third, Best Mattresses argues that, even if the statute is ambiguous, Commerce's interpretation was unreasonable under *Chevron* step two because Commerce chose information

with "no relation to Best Mattresses' suppliers' production or actual mattress input production anywhere in the world." Best Mattresses Br. at 17. In other words, Best Mattresses asserts that Commerce "failed to explain how an average of six countries' import data are a good benchmark to estimate the {cost of production} of major inputs that were used in the production of mattresses in Cambodia." *Id.* at 18.

However, Best Mattresses's arguments ignore the nature of Commerce's determination. It does not matter that Commerce used import data for countries other than Cambodia because Commerce was not using the information as a market price in Cambodia, but rather as a substitute for the cost of production *in* [▮]. *See* IDM at 9, 11; Cost Memo at 1-2. Moreover, Commerce used data for HTS codes that covered the inputs that Best Mattresses used in its mattress production. *See* IDM at 9 ("{T}hese data are readily available and reasonably specific to the voluminous number of affiliated {non-market economy} inputs."). Best Mattresses offers no support for its assertion that these "broad HTS codes" have "no actual connection to mattress production or mattress input production anywhere in the world." *See* Best Mattresses Br. at 16. Although the HTS codes do not cover products that are specific *only* to mattress production, it was Best Mattresses itself that provided the HTS codes corresponding to its inputs—pursuant to Commerce's request. *See* Rose Lion Supplemental Section D Response at Exhibit SD1-1.1 (Sept. 22, 2020) (C.R. 181); Best Mattresses Supplemental Section D Response at Exhibit SD1-1.1 (Sept. 22, 2020) (C.R. 141); *see, e.g.*, *QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011) ("Moreover, QVD is in an awkward position to argue that Commerce abused its discretion by not relying on evidence that QVD itself failed to introduce into the record.").

Best Mattresses further argues that the GTA data reflect import prices and are therefore inappropriate to value cost of production because they include profit to the seller. *See* Best

Mattresses Br. at 18-19.  As explained above, however, Commerce selected the GTA data as the information available, and there is nothing in the major input rule prohibiting Commerce from relying on import data as the information available.  *See* 19 U.S.C. § 1677b(f)(3); IDM at 8-11; *see also Eurodif*, 555 U.S. at 316 (holding Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

Fourth, Best Mattresses argues that Commerce used a non-market economy surrogate value methodology "outside the limited context for which it was authorized under 19 U.S.C. § 1677b(b)," because Commerce may only use the non-market economy surrogate value methodology for subject merchandise exported from a non-market economy country.  Best Mattresses Br. at 21.  Because Commerce did not invoke or follow its surrogate value methodology, Best Mattresses' argument is without merit.

As we explained above, Commerce acted within its authority under the major input rule to use the information available to value the input suppliers' cost of production.  Whether Commerce's method for determining the information to use resembled Commerce's non-market economy surrogate value practice is irrelevant to whether Commerce reasonably relied on the information.  *See* IDM at 11.  Moreover, Commerce explained that it was *not* following its surrogate value methodology, which is plain from Commerce's decision to use an average of the six countries' GTA data.  *See id.* at 10-11.  Typically, in a non-market economy country proceeding Commerce will rely on a single surrogate country to value all inputs.  *See* 19 C.F.R. § 351.408(c)(2).  Although Commerce used economic comparability to select the six countries in this case, which is a consideration in valuing the factors of production in a non-market economy country, Commerce's determination to average the GTA data of six economically comparable

countries was reasonable here because Commerce was determining the suppliers' cost of
production in [█████], a non-market economy country.  *See* IDM at 9-11.  In short, the fact that
the antidumping statute and Commerce's regulations provide a surrogate value methodology for
non-market economy countries does *not* mean that Commerce is prohibited from using similar
considerations when selecting information reasonably available under the major input rule.  *See*
19 U.S.C. § 1677b(f)(3); IDM at 10-11.

Likewise, because Commerce was not operating under its surrogate value methodology,
but rather selecting the information to use under the major input rule, Best Mattresses's argument
that Commerce failed to follow the proper surrogate value selection procedure to build the record
also fails.  *See* Best Mattresses Br. at 22-23.  Nevertheless, in the final determination, Commerce
explained that, "{i}n accordance with Commerce's regulations concerning the submission of
factual information, parties were afforded an opportunity to comment on the data provided by
other parties and the comments made by other parties."  IDM at 10.  "Further, the parties were
able to provide pre-preliminary comments on how the collected data might be used and through
the briefing process for the final determination were afforded the opportunity to comment on
Commerce's *Preliminary Determination*."  *Id.*  Best Mattresses cites no authority, and nor are we
aware of any, that Commerce was obligated to somehow solicit even more factual information
pursuant to the major input rule.

Finally, Best Mattresses contends that Commerce violated the Administrative Procedure
Act (APA) by "(1) applying {a non-market economy} methodology in a market economy
proceeding and (2) setting a 'most reasonably available' standard to select surrogate values for
the {cost of production} of Best Mattresses' major inputs."  Best Mattresses Br. at 26 (citing 5
U.S.C. § 553(b)-(c)).  These arguments lack merit because Commerce applied the major input

rule in order to determine constructed value.  *See* IDM at 10; 19 U.S.C. § 1677b(f)(3).

Specifically, the rule contemplates that Commerce may use the information available to

determine cost of production, so Commerce was not "effectuating a new rule" as Best Mattresses

claims.  Rather, because Commerce acted pursuant to its existing authority and selected

information available to value cost of production, consistent with the major input rule, such a

choice was not "rulemaking" pursuant to the APA.  *See* IDM at 8-11; *see, e.g.*, *Hebei Metals &*

*Minerals Imp. & Exp. Corp. v. United States*, 28 C.I.T. 1185, 1191 (2004) (explaining

Commerce's surrogate value choice is supported by substantial evidence if the data bears "a

rational and reasonable relationship to the factor of production it represents.").

### B.  Substantial Evidence Supports Commerce's Cost Of Production Calculation For Major Inputs From Affiliated Non-Market Economy Suppliers

Best Mattresses argues that, even if Commerce's resort to third country import data was

permitted under the statute, Commerce's calculation of the cost of production based on the GTA

import data was unsupported by substantial evidence because:  (1) Commerce included allegedly

aberrational GTA data from Romania for [ ▮ ], and (2) Commerce excluded Mexican data for

[ ▮ ] because the value was not expressed in kilograms.  Best Mattresses Br. at 28-35.  Both of

these arguments fail.

### 1.  Commerce Reasonably Included Romanian GTA Data Because The Data Were Not Aberrational

To determine the cost of production for [ ▮ ] for Best Mattresses's affiliated non-market

economy suppliers, Commerce averaged import data for five countries economically comparable

to [ ▮ ].  *See* Cost Memo at Attachment 1E.  Best Mattresses asserts that the Romanian data

are aberrational and that Commerce should have excluded the data from the average.  Best
Mattresses Br. at 28.

While the Romanian [████] per unit value is slightly more than [████████████████

████████████████████████████████████████████████████████████

████████████████████████████] Best Mattresses Br. at 30; Cost Memo at Attachment

1E, Commerce explained that merely being on the high or low end of a spectrum of prices does

not necessarily mean a value is aberrational.  IDM at 11.  In other words, "{w}hen one analyzes

either the highest or lowest price values in a dataset, it is unsurprising that some are higher than

the average and some are lower{,}" {h}owever, this is no reason, in and of itself, to exclude any

of the data."  *Id.*  Here, Commerce also determined that "using the average of the six countries'

GTA data helps to smooth out any unusually high or low values that may exist, resulting in a

more representative figure to use in the affiliated purchase analysis."  *Id.*  Accordingly,

Commerce considered whether the Romanian data were aberrational and reasonably concluded

that it was appropriate to continue including the Romanian data in the average.  *See id.*

## 2.   Commerce Reasonably Excluded Mexican GTA Data Because The Data Were Not Expressed In Kilograms

For the final determination, Commerce excluded Mexican GTA data on [████] in its cost

of production average because the data were not expressed in kilograms, which was the unit of

measurement Commerce used for the rest of the data.  *See* Ministerial Error Memo at 4 (Apr. 19,

2021) (P.R. 315, C.R. 285).  Best Mattresses argues that Commerce should have included the

Mexican data because Commerce could have calculated a conversion ratio using other data on

the record that were expressed in both square meters and kilograms.  *See* Best Mattresses Br. at

32-33.

22

As Commerce explained, however, "there is no universal conversion factor to convert {square meters} to {kilograms}," because kilograms are units of weight whereas square meters are units of area.  Ministerial Error Memo at 4.  Thus, "{c}onverting {square meters} to {kilograms} would require the density of the material on a {square meter} basis," but that information was not available for Mexico.  *Id.*  Moreover, the conversion factor Best Mattresses sought was "based on {its} own records, {which} cannot be applied to all other countries' GTA data."  *Id.*  Commerce therefore reasonably declined to use the information on the record to create a conversion ratio because "{t}he density relied on by Best Mattresses{} is different from that inherent in the data of other countries."  *Id.*

Best Mattresses nevertheless argues that Commerce should have used a conversion ratio based on its own data because "surrogate values are inherently imperfect, but Commerce still must calculate Best Mattresses' margin fairly and accurately."  Best Mattresses Br. at 34.  But following this approach would not necessarily lead to a more fair or accurate margin because the conversion ratio based on Best Mattresses's data is *not* specific to the Mexican data.  *See* Ministerial Error Memo at 4.  Instead, using a conversion ratio based on other data could introduce distortions.  *See id.*; *see, e.g.*, *NSK Ltd. v. United States*, 510 F.3d 1375, 1382 (Fed. Cir. 2007) ("Regardless of whether a more specific reporting basis is feasible, the simple fact is that Koyo failed to demonstrate that its allocation methodology does not cause inaccuracies or distortion.").  Therefore, substantial evidence supports Commerce's decision to exclude the data altogether.

**III.    Substantial Evidence Supports Commerce's Reliance On Cambodian Trademap Export Data To Determine A Market Price Pursuant To The Transactions Disregarded Rule**

As Commerce explained in the final determination, it also disregarded the transaction values for a "significant number of minor inputs, packing materials, and fixed assets" that Best Mattresses had purchased from affiliates in a non-market economy country.  *See* IDM at 8-10; 19 U.S.C. § 1677b(f)(2)–(3); 19 C.F.R. § 351.401(b).  Commerce instead valued these inputs using Cambodian Trademap data because Commerce determined that the Cambodian Trademap data "best reflect fair market prices for the market under consideration in those instances where market prices from an unaffiliated supplier are not available."  IDM at 10.

Brooklyn Bedding makes numerous arguments contesting Commerce's determinations regarding its application of the transactions disregarded rule, *see* Brooklyn Bedding Br. at 15-32, all of which are meritless.

**A.    Substantial Evidence Supports Commerce's Decision That Cambodian Trademap Data Were The Best Available Source Of Information For Valuing The Minor Inputs Purchased From Non-Market Economy Affiliates**

Commerce applied the transactions disregarded rule to Best Mattresses's purchases of minor inputs from affiliated suppliers.  *See* IDM at 8-10.  Because the transactions disregarded rule provides that transactions between affiliated persons may be disregarded if the transfer price "does not fairly reflect the amount usually reflected in sales of merchandise under consideration *in the market under consideration*," 19 U.S.C. § 1677b(f)(2) (emphasis added), Commerce used Cambodian Trademap data to determine the market price for inputs that Best Mattresses did not also purchase from unaffiliated suppliers, and not the six-country average of GTA data Commerce used for the major input rule.  *See* IDM at 10.  Commerce resorted to the Trademap

data where Best Mattresses did not have purchases from unaffiliated parties for such inputs to use as a market price.  *Id.*

Because the transactions disregarded rule does not instruct Commerce what to do in this circumstance, Commerce had the discretion to fill the statutory void with a reasonable methodology.  If the statute does not address an issue, the Court assesses whether Commerce's interpretation is "sufficiently reasonable."  *Zenith Radio Corp. v. United States*, 437 U.S. 443, 540-51 (1978) (citation omitted); *see also Eurodif*, 555 U.S. at 316 (holding Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

Here, the use of different datasets for the major input and transactions disregarded rules is reasonable in light of the different purposes for the data.  For the major input rule, Commerce used data to determine the cost of production for inputs produced in [ ███ ], and it therefore made sense to use data for countries economically comparable to [ ███ ].  *See* IDM at 10-11. For the transactions disregarded rule, Commerce evaluated whether Best Mattresses paid below market price in its country, *i.e.*, Cambodia.  *See id.*  Accordingly, although Commerce originally used the six-country average of GTA data in the *Preliminary Determination*, Commerce reasonably revised its methodology and used Cambodian Trademap data for the *Final Determination*, recognizing that the information should "reflect" the market price in Cambodia, the country under consideration.  *Id*. at 10.  In other words, Commerce explained that "the Trademap data represent country-specific export data into a particular country (*e.g.*, Cambodia)," and it was also "a reliable source."  *Id.*; *see also* 19 U.S.C. § 1677b(f)(2); *Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316, 1343 (Ct. Int'l Trade 2018) (citing *Inland Steel Indus., Inc. v. United States*, 188 F.3d 1349, 1360–61 (Fed. Cir. 1999)) ("It is not this

court's place to substitute its judgment for that of Commerce by selecting a different method of calculation where Commerce has acted within its lawful discretion and made a reasonable decision.").  The Court should sustain this determination because it is supported by substantial evidence and in accordance with law.

     **B.**    **The Court Should Reject Brooklyn Bedding's Various Arguments Challenging Commerce's Selection Of Cambodian Trademap Data**

First, Brooklyn Bedding argues that Commerce should not have relied on the Cambodian Trademap data because they are "distortive, misrepresentative, and unreliable."  Brooklyn Bedding Br. at 16.  Specifically, Brooklyn Bedding asserts that the Trademap data are "mirror data," which are not official Cambodian import data but are reconstructed data using data on other countries' exports to Cambodia, and that GTA data from other countries showing *their* exports to Cambodia confirms the unreliability of the data.  *Id.* at 17-18.  This argument is meritless.

Although Brooklyn Beddings points to differences between the Cambodian Trademap data and its own collection of GTA data based on exports from other countries to Cambodia, it fails to identify anything specifically wrong or distortive about the Cambodian Trademap data. *See id.*  As Commerce explained in the final determination, "{t}he Trademap data for Cambodia is robust, includes prices for all the necessary affiliated inputs and, while it is aggregated differently from GTA, there is no evidence that it is faulty or inaccurate."  IDM at 10. Differences themselves are not evidence that the Trademap data are unreliable or that it does not accurately represent imports for Cambodia.  *See id.*

Notably, while Brooklyn Bedding criticizes the Cambodian Trademap data, it does not offer a better alternative.  The record does not contain Cambodian GTA data (because Cambodia does not report to GTA), and the GTA data on the record are for countries economically

comparable to [███], not Cambodia.  *See* IDM at 10-11; Cost Memo at 2.  Although

Commerce is permitted to use that information when determining the cost of production for

producers in [███], as explained above, the transactions disregarded rule specifies that the

market price should be based on the information available regarding what the price would have

been if it were for a transaction between unaffiliated parties in the market under consideration.

*See* IDM at 10 ("{Commerce} agree{s} with the respondent that the statute directs Commerce to

look to the market under consideration when testing the affiliated supplier transfer price against a

market price."); 19 U.S.C. § 1677b(f)(2).  Therefore, because Best Mattresses is located in

Cambodia and purchases from unaffiliated parties would represent market prices for Cambodia,

substantial evidence supports Commerce's decision to use Cambodian Trademap data as the

information available for market value.  *See also Yangzhou Bestpak Gifts & Crafts Co. v. United

States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013) ("Because the agency employed a methodology

similarly derived from the relevant statutory language, this court affords the appropriate

deference due to Commerce.").

 Second, Brooklyn Bedding contends that Commerce has a "consistent and predictable"

approach for the transactions disregarded rule when a market price based on purchases from

unaffiliated parties is not available, which is to base market price on the cost of production for

the affiliated suppliers.  *See* Brooklyn Bedding Br. at 20-21 (citing *Heavy Walled Rectangular

Welded Carbon Steel Pipes and Tubes from the Republic of Korea*, 86 Fed. Reg. 35,060 (Dep't

of Commerce July 1, 2021), and accompanying decision memorandum at Comment 7).  As

explained above, however, using the affiliated suppliers' cost of production is not feasible here

because they are located in [███], a non-market economy country, and Commerce therefore

found it cannot rely on their cost of production information.  *See* IDM at 9-10.  Accordingly,

Commerce's choice was between using Cambodian Trademap data to determine a Cambodian market price and using third country GTA data to determine a *Cambodian* market price.  Faced with this choice, Commerce reasonably selected the Cambodian Trademap data.  *See id.*; Cost Memo at 2; *see also Zhejiang*, 652 F.3d at 1341.

Third, Brooklyn Bedding contends that Commerce misinterpreted the term "market under consideration" in the transactions disregarded rule.  *See* Brooklyn Bedding Br. at 24-26. Brooklyn Bedding argues that because the transactions disregarded rule is about determining a respondent's purchases of inputs from an affiliate, the appropriate market under consideration is the country where the affiliated suppliers are located, *i.e.*, [ ███ ].  *Id.*  Brooklyn Bedding provides no authority to support its preferred interpretation, rather, it contends that the interpretation is supported by the context of the phrase "market under consideration."  *Id.* at 25.

However, pursuant to section 1677b(f)(2), Commerce was attempting to discern the market price that *Best Mattresses* would pay to obtain the input in Cambodia.  Therefore, Commerce reasonably interpreted "market under consideration" to mean Cambodia because a respondent in Cambodia could expect to pay the market price in Cambodia, not wherever the supplier was located.  *See* IDM at 10.  In other words, interpreting section 1677b(f)(2), Commerce determined that "the statute indicates that the item being tested should reflect a market price in the country under consideration, which is Cambodia in this case," and used Cambodian Trademap data.  *Id.*  This reasonable interpretation is entitled to deference.  *See SKF USA, Inc. v. United States*, 537 F.3d 1373, 1379 (Fed. Cir. 2008) ("[d]eference to an agency's statutory interpretation is at its peak in the case of a court's review of Commerce's interpretation of the antidumping laws"); *Thai Plastic Bags Indus. Co. v. United States*, 895 F. Supp. 2d 1337, 1344 n.4 (Ct. Int'l Trade 2013) (citing 19 U.S.C. § 1677b(f)(2), "the statute is {} *silent with*

*regard to the manner in which the resulting cost adjustment is to be applied* when constructing normal value for subject merchandise.") (emphasis added).

Fourth, Brooklyn Bedding argues that Commerce's reliance on the Trademap data is inconsistent with Commerce's practice to use only official import data, not export data, to establish surrogate values. *See* Brooklyn Bedding Br. at 26-27. Brooklyn Bedding's argument is flawed because it relies on Commerce's practice for non-market economy countries, but Commerce specifically explained that it was not "adhering to and applying a {non-market economy} factors of production methodology in this case." IDM at 10.

Moreover, the statutory text of the transactions disregarded rule permits Commerce to base the market value on "the information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated." 19 U.S.C § 1677b(f)(2). By contrast, the antidumping statute contains more specific provisions about the information Commerce is to use in non-market economy cases. Specifically, in a non-market economy proceeding, the antidumping statute states that Commerce "shall determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise," and "the valuation of the factors of production shall be based on the best information available regarding the value of such factors in a market economy country{.}" 19 U.S.C. § 1677b(c)(1). Additionally, Commerce has promulgated regulations that specifically address the valuation of factors of production for non-market economy cases. *See* 19 C.F.R. § 351.408(c), which it has not done for evaluating the information to use when applying the transactions disregarded rule. Therefore, Commerce does not have the same requirements and need not follow the same practice when selecting the "information available" pursuant to the transactions disregarded rule. Indeed, Commerce determined in the final determination that the

Cambodian Trademap data were reliable and usable to determine market prices in Cambodia. *See* IDM at 10.  Brooklyn Bedding's assertion that "superior GTA import data" were on the record is meritless because, as already explained, the GTA import data were not even from the market under consideration, *i.e.*, Cambodia.  *See* Brooklyn Bedding Br. at 27.

Finally, Brooklyn Bedding asserts that Commerce's transactions disregarded and major input rule calculations are unsupported by substantial evidence and not in accordance with law because Commerce did not exclude import data from non-market economy countries and countries with broadly available export subsidies.  *See* Brooklyn Bedding Br. at 28-29.  This argument, again, relies on the notion that Commerce conducted a surrogate value analysis, *see id.*, which it did not.  Although Commerce took guidance from its surrogate value analysis for non-market economy cases, here, Commerce expressly explained that it did not conduct its analysis pursuant to the non-market economy provisions of the statute and was not bound to follow the same procedures.  *See* IDM at 9 ("Commerce decided to not apply a{ non-market economy} factors of production methodology analysis to inputs the respondent obtained from {non-market economy}-based affiliated suppliers").

Moreover, Commerce provided a reasoned explanation for including the import data from non-market economy countries and countries with broadly available export subsidies.  As Commerce explained, "{i}n market economy cases, Commerce relies on the purchase prices paid to unaffiliated suppliers based in {non-market economy countries and countries maintaining broadly available export subsidies}.  It would be inconsistent with the law and {Commerce's} practice to exclude imports from these countries when using the GTA data as a proxy for market prices and {cost of production}."  *Id.* at 11.  Therefore, because Cambodia is a market economy country and Commerce would normally rely on purchases from non-market economy suppliers if

they were unaffiliated, Commerce reasonably determined that it would be inappropriate to

exclude the non-market economy country data as well as the data from countries with broadly

available export subsidies from the data used in determining market prices and cost of

production.  *Id.*; *see also* Cost Memo at 2.

    At bottom, "Commerce's methodology is 'presumptively correct,' and {Brooklyn

Bedding} has not shown that Commerce lacked authority" to use the Cambodian Trademap data,

which included import data from non-market economy countries and countries with broadly

available export subsidies.  *Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358, 1368

(Fed. Cir. 2014) (quoting *Fujitsu*, 88 F.3d at 1038); *see also* IDM at 10; Cost Memo at 2.

Therefore, Commerce's method of using Cambodian Trademap data to value the inputs in the

market under consideration, Cambodia, is supported by substantial evidence and otherwise in

accordance with law.

**IV.**    **Substantial Evidence Supports Commerce's Application Of The Transactions Disregarded Rule To Best Mattresses's Fixed Asset Purchases Because The Record <u>Did Not Contain Market Prices For The Fixed Assets</u>**

    Best Mattresses reported fixed asset purchases from affiliated suppliers, the depreciation

costs of which is a component of Best Mattresses's constructed value calculation.  *See* IDM at

12.  Because Best Mattresses purchased the fixed assets from affiliates in a non-market economy

country, Commerce applied the transactions disregarded rule, but Best Mattresses did not have

purchases of the specific fixed assets at issue from unaffiliated parties that would establish a

market price.  *Id.*  Therefore, because there was no record information concerning the market

prices for the fixed assets, Commerce applied the affiliate-specific transactions disregarded

adjustment determined for minor input purchases to the fixed asset purchases.  *Id.*  That is, for

each affiliated supplier, Commerce determined if there was an adjustment applied to the transfer

price of the minor input purchases from that supplier pursuant to the transactions disregarded rule (*i.e.*, how much higher the market price was than the transfer price), and Commerce applied that same percentage increase, if there was one, to the depreciation expense of the fixed assets sourced from that same affiliated supplier.  *Id*.

Best Mattresses argues that, rather than apply an adjustment based on the results for the minor inputs, Commerce should have used as information available Best Mattresses' "reported ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Best Mattresses Br. at 36.  Regarding these purchases, however, Commerce explained that Best Mattresses "did not identify any specific fixed assets that have a market price{,}" rather, "{t}he purported market prices appear to relate to the general category of 'construction materials,' not to specific assets, which makes impossible a proper comparison between similar fixed assets."  IDM at 12.

Best Mattresses contends, however, that "Commerce's practice is to use actual costs on the record as opposed to fictious, market values when possible."  Best Mattresses Br. at 37 (citing *Rebar Trade Action Coal. v. United States*, 337 F. Supp. 3d 1251, 1259-62 (Ct. Int'l Trade 2018)).  But Best Mattresses's reliance on *Rebar* is misplaced because of factual differences.  In *Rebar*, Commerce determined that certain affiliates (the non-collapsed companies) provided services at below market rates.  Commerce then revised the costs based on relying on the financial records of certain companies that were collapsed and made up the respondent group of companies, as well as the consolidated financial expense ratio of the respondent.  In remanding the determination, this Court stated that "Commerce does not explain why it relied on the cost experiences of certain collapsed fixed asset owning companies to revise the costs of the non-collapsed group."  *Rebar*, 337 F. Supp. 3d at 1260.  The Court elaborated

that "Commerce does not identify record evidence demonstrating that the cost experiences of the companies in the collapsed group that owned fixed assets were similar to those of the companies in the non-collapsed group, and finds similarity based solely on the fact that the two groups owned fixed assets." *Id.* On remand, Commerce solicited and relied on *actual* cost information for the non-collapsed companies that provided the services. *See Rebar Trade Action Coal. v. United States*, 398 F. Supp. 3d 1359, 1370-71 (Ct. Int'l Trade 2019) (*Rebar II*).

In contrast, here, Best Mattresses argues that Commerce should have used its purchases of *different* fixed assets from *different* suppliers as the market price for the fixed assets it purchased from affiliates, but it provided no evidence that the different types of fixed assets should be similarly priced. *See* Best Mattresses Br. at 35-40. Further, Best Mattresses conflates the "actual costs" at issue in *Rebar* with the ███████████████████████ that Best Mattresses argues Commerce should use here. *Id.* at 37. In the *Rebar* cases, the "actual costs" were the costs *of the affiliated providers of the service*, which Commerce used to determine the market price. *See Rebar II*, 398 F. Supp. 3d at 1370. Here, by contrast, the "actual data" are not the costs to the affiliated suppliers of the fixed assets, but rather the amounts that Best Mattresses paid for *different* fixed assets. *See* IDM at 12.

Further, Best Mattresses argues that "Commerce's expressed concern for a high degree of specificity as a reason to reject the [███████████████ is entirely disingenuous considering that Commerce opted to use raw material input prices to value fixed asset depreciation{.}" Best Mattresses Br. at 38. But the record undermines Best Mattresses's attempts to dismiss Commerce's specificity concerns.

For example, Best Mattresses states that it "provided [████████████████████ ██████████████████████████████████████████████████████████

███████████████████████████████████████ that Commerce could have used to value

affiliated transactions." *Id.* This statement might lead one to believe that Commerce could at

least match up purchases from affiliates with purchases from unaffiliated parties for the same

category of fixed asset. The opposite is true. An examination of the record reveals that for Rose

Lion only ███ ] of its [███] reported fixed asset purchases were from ████████████ and for

Best Mattresses only [███] of its [███] reported fixed asset purchases were from [████████

███ ]. *See* Cost Memo at Attachments 3B-3C (listing Best Mattresses' and Rose Lion's fixed

asset purchases). The categories for those unaffiliated purchases include ████████████

███████████████████████████████████████████

█████████████████ *See* Best Mattresses Section D Questionnaire Response at Exhibit SD1-

3 (Sept. 22, 2020) (C.R. 162); Rose Lion Section D Questionnaire Response at Exhibit SD1-3

(Sept. 22, 2020) (C.R. 202). Therefore, for all of both Best Mattresses's and Rose Lion's fixed

asset purchases, [████████████████████████████████████

████████████████████████████ *See id.* Therefore, to

compare those purchases to purchases from unaffiliated parties, Commerce would need to

compare across categories of fixed assets by, for example, comparing ████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████ Notably, direct production equipment includes fixed assets

like: [███████████████████████████████████

████████████████████████████ while most

unaffiliated fixed asset purchases were for things like: ████████████████████

████████ *See id.*

Plainly, Commerce's concerns over the specificity of such an intensive fixed asset comparison were legitimate. Commerce's approach, by contrast, matched the transfer price adjustments on minor inputs to the transfer price adjustment for the fixed assets provided by the same affiliated supplier. IDM at 12. Therefore, although Commerce's approach is also imperfect, it was a reasonable alternative because it applied an adjustment to an affiliated party's transfer price based on the minor input adjustment specific to that affiliated party. *Id.*

Best Mattresses asserts that Commerce violated the plain language of the statute because its methodology resulted in adjusting Best Mattresses's ██████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████ Best Mattresses Br. at 39. But while the original purchase price minus the depreciation (since the purchase price might represent the book value of the fixed asset) is not necessarily the *market value* of that asset, Best Mattresses acknowledges that the transactions disregarded rule applies when affiliated transactions are "below market value in the market under consideration." *Id.* at 40. Additionally, the ████████████████████████████████ ██████████████ would not necessarily represent a market price *in the market under consideration*, *i.e.*, Cambodia, unless it was purchased by a Cambodian company. *See id.*

Best Mattresses also argues that, even if substantial evidence supports Commerce's decision not to use Best Mattresses's fixed asset purchase data, Commerce's calculation was still unreasonable "because Commerce did not give interested parties the opportunity to provide market data specific to fixed asset depreciation." *Id.* Best Mattresses fails, however, to identify any statutory or regulatory requirements that Commerce violated, nor does Best Mattresses demonstrate that soliciting additional information on fixed assets would lead to a more accurate

result because Commerce's preferred source of information—purchases of the same fixed asset

from unaffiliated suppliers—was not available.  *See* IDM at 12.  Accordingly, substantial

evidence supports Commerce's reliance on the record information available.

## V.    Commerce's Selection Of The Emirates Sleep Financial Statements Is Supported By Substantial Evidence

### A.    <u>Legal Framework</u>

In assessing a respondent's dumping margin, Commerce compares "the export price or

constructed export price and normal value."  19 U.S.C. § 1677b(a).  In general, the respondent's

"normal value" is based on home market sales, third country sales or constructed value."  *Id.* §

1677b(a)(1).  In this case, normal value is constructed value because Best Mattresses had neither

home market nor third country sales.  When the preferred method of calculating a constructed

value profit and selling expenses based on the respondent's own home market and third country

sales is unavailable, the statute provides three alternative methods for Commerce to calculate

constructed value profit and selling expenses (with no particular hierarchy among the

alternatives):

> (i)      the actual amounts incurred and realized by the specific
> exporter or producer being examined in the investigation or review
> . . . for profits, in connection with the production and sale, for
> consumption in the foreign country, of merchandise that is in the
> same general category of product as the subject merchandise;
>
> (ii)     the weighted average of the actual amounts incurred and
> realized by exporters or producers that are subject to the
> investigation or review (other than the exporter or producer
> described in clause (i)) . . . for profits, in connection with the
> production and sale of a foreign like product, in the ordinary
> course of trade, for consumption in the foreign country; or
>
> (iii)    the amounts incurred and realized . . . for profits, based on
> any other reasonable method, except that the amount allowed for
> profit may not exceed the amount normally realized by the
> exporters or producers (other than the exporter or producer
> described in clause (i)) in connection with the sale, for

consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise (*i.e.*, the "profit cap").

IDM at 21; *see also* 19 U.S.C. § 1677(b)(e)(2)(B); Uruguay Round Agreements Act, Statement of Administrative Action (SAA), H.R. Doc. No. 103-316 (1994) at 840 ("at the outset, it should be emphasized, consistent with the Antidumping Duty Agreement, new section 773(e)(2)(B) does not establish a hierarchy or preference amount these alternative methods.  Further, no one approach is necessarily appropriate for use in all cases.").

Commerce could not use options (i) and (ii) because Best Mattresses does not have home market or third country sales and there are no other Cambodian mandatory respondents in the investigation.  IDM at 15.  Thus, Commerce used the only remaining option, which is any other reasonable method.  *Id*.; *see also* 19 U.S.C. § 1677(b)(e)(2)(B)(iii).

### B.     Commerce's Determination That The Emirates Sleep Financial Statements Were The Best Available Information To Calculate Profit And Selling Expenses Is Supported By Substantial Evidence

Because Best Mattresses did not have a viable home or third-country market, Commerce could not base Best Mattresses's profit and selling expenses on its home market or third-country sales when determining profit and selling expenses for constructed value.  Therefore, Commerce was faced with choosing between two available financial statements on the record, from Grand Twins International (Cambodia) Plc (GTI), a Cambodian producer of apparel and garment products, and Emirates Sleep, an Indian producer of mattresses, bases, and other sleep-related products and systems.  *See* IDM at 17.

Commerce explained the criteria it considers when choosing among available data under 19 U.S.C. § 1677b(e)(2)(B)(iii):  (1) the similarity of the potential surrogate companies' business operations and products to the respondent's business operations and products; (2) the extent to

which the financial data of the surrogate company reflects sales in the home market and does not

reflect sales to the United States; (3) the contemporaneity of the data to the period of

investigation; and (4) the extent to which the customer base of the surrogate company and the

respondent is similar.  IDM at 16 (citing *Pure Magnesium from Israel*, 66 Fed. Reg. 49,349

(Dep't of Commerce Sept. 27, 2001) (final LTFV determ.), and accompanying IDM at Comment

8; *Certain Color Television Receivers from Malaysia*, 69 Fed. Reg. 20,592 (Dep't of Commerce

Apr. 16, 2004) (final negative LTFV determ.), and accompanying IDM at Comment 26).

Commerce then evaluated the two financial statements on these criteria.  First, Commerce

found that "{b}oth GTI's and Emirates Sleep's financial statements:  1) reflect a net profit; 2) are

complete (*i.e.*, all of the financial statements are included with the auditor's report showing an

unqualified opinion and all companying footnotes were provided); and, 3) are fully translated."

*Id.* at 17.  Commerce also found that "neither financial statement reflects sales predominantly to

the United States."  *Id.*

Next, Commerce examined the business operations of the companies.  Commerce

explained its preference that the profit and selling expenses reflect:  "1) production and sales in

the foreign country; and 2) the foreign like product, *i.e.*, the merchandise under consideration."

*Id.*  Commerce found that GTI, as a Cambodian producer of apparel and garment products, is a

"producer of products that are *similar* to the inputs used to produce mattresses; however, GTI is

not a producer of mattresses."  *Id.* (emphasis added).  Regarding Emirates Sleep, Commerce

determined the company, an Indian mattress producer, produced the comparable product but was

not located in Cambodia.  *Id.*  Thus, Commerce weighed the GTI option "represent{ing} profit

information for production and sales in the preferred foreign country (Cambodia), but of

merchandise that is similar, but not comparable, to the subject merchandise{,}" against the

Emirates Sleep option "represent{ing} profit information for production and sales outside the foreign country, but of merchandise that is comparable to the subject merchandise." *Id.* Commerce concluded that, "{w}hile GTI is a Cambodian producer which would expose it to similar business conditions as those of Cambodian mattress producers, it is not a mattress producer; Emirates Sleep is a mattress producer which would expose it to similar production and industry-specific conditions as those of Cambodian mattress producers." *Id.*

Regarding contemporaneity, Commerce explained that, although the Emirates Sleep financial statement only overlaps with the first three months of the period of investigation, Commerce considered both financial statements to be contemporaneous with the period of investigation. Specifically, Commerce explained, "{b}ecause our periods of investigation and review do not normally coincide with the calendar year or other fiscal years typically adopted by companies, Commerce regularly accepts as contemporaneous a financial statement that overlaps the {period of investigation} by some amount." *Id.* at 18-19 (citing *Pure Magnesium from Israel*, 66 Fed. Reg. 49,349 (Dep't of Commerce Sept. 27, 2001) (final LTFV determ.), and accompanying IDM at Comment 8). Therefore, "Commerce does not require a financial statement's reporting period to be identical to the {period of investigation} to be considered contemporaneous." *Id.* at 19.

Ultimately, Commerce concluded that "Emirates Sleep represents a mattress producer and has business operations, products, and a customer base that are very similar to that of a Cambodian mattress producer." *Id.* at 22. Whereas GTI, "as a producer of apparel and garment products, which are not comparable merchandise, is less representative of a Cambodian mattress producer's business operations, products, and customer base." *Id.* Therefore, because Emirates Sleep was the best available information, Commerce used its financial statements to calculate the

profit and selling expense ratios to measure Best Mattresses's profit and selling expenses for its constructed value. *Id.*; *see also Catfish Farmers of Am. v. United States*, 641 F. Supp. 2d 1362, 1377 (Ct. Int'l Trade 2009) ("Where Commerce is faced with the choice of selecting from among imperfect alternatives, it has the discretion to select the best available information for a surrogate value so long as its decision is reasonable").  This decision is supported by substantial evidence and should be sustained.

### C.    The Court Should Reject Best Mattresses's Various Arguments Challenging The Emirates Sleep Financial Statements

Best Mattresses argues that the Emirates Sleep financial statements are flawed because they are not contemporaneous with the period of investigation, are incomplete, do not reflect the business operations of the respondents, and are not publicly available.  *See* Best Mattresses Br. at 42-51.  These arguments lack merit, as we explain below.

### 1.    Emirates Sleep's Financial Statements Were Sufficiently Complete And Reliable

Best Mattresses argues that Emirates Sleep's financial statements were incomplete because they were missing multiple annexures and three pages of "Note 9 are illegible even at the highest zoom level, and text on other pages are also questionable."  Best Mattresses Br. at 50-51.  Commerce addressed these arguments, explaining that it determined the financial statements were complete, reliable, and legible.  *Id.* at 20-21.

Regarding legibility, Commerce acknowledged that "three pages out of a 40-page financial statement are difficult to read," but that was "because they pertain to the details on production equipment values and depreciation over two years."  *Id.* at 20.  It was evident, Commerce explained, that "{t}hese pages were shrunk down in order to fit onto individual

pages" and "the pages in question are limited and are readable, and the totals tie to the asset balances on the balance sheets." *Id.* at 20-21.

Commerce also determined that, although the Emirates Sleep financial statements were missing certain annexures, "the Emirates Sleep financial statements are complete in that they include the full audit report, each of the financial statements, and all of the accompanying footnotes." *Id.* at 21.  For example, "{n}one of the annexures refer to information that would bring into question any of the values on the income statement which affect the profit or selling expenses.  Each of the annexure references is in a footnote that already details the affected balance sheet items." *Id*.  Commerce further explained that the "missing annexures constitute information related to sub-accounts to sub accounts, parts of line items in the Emirates Sleep financial statements, and these line items are already further explained by explanatory notes." *Id.*  Therefore, Commerce found the Emirates Sleep financial statements complete for purposes of calculating financial ratios because they "contain all of the financial statements (*i.e.*, the balance sheet, profit and loss statement, statement of cash flow, and equity), all of the Notes forming the financial statements, including sub parts to the notes, and the Independent Auditor's Report." *Id.*

Moreover, incompleteness or illegibleness alone is not sufficient to reject a financial statement.  *Ass'n of Am. Sch. Paper Suppliers, v. United States*, 791 F. Supp. 2d 1292, 1303-04 (Ct. Int'l Trade 2011).  Rather, when Commerce rejects incomplete or illegible financial statements, it "has often explicitly focused on the importance of the missing information{.}" *Id.* at 1303.  Although Best Mattresses cite *CP Kelco U.S., Inc. v. United States*, 949 F.3d 1348, 1359 (Fed. Cir. 2020), for the proposition that Commerce rejects incomplete and illegible financial statements where they were missing "vital information" to Commerce's calculations,

Best Mattresses Br. at 51, the United States Court of Appeals for the Federal Circuit *also* held

that this Court should sustain Commerce's determination when it has "sufficiently explained its

reason for choosing between two flawed financial statements." *CP Kelco*, 949 F.3d at 1359.

Indeed, in *CP Kelco*, Commerce rejected the incomplete financial statements of a

company because they were "missing complete translations for two paragraphs of the property

plant and equipment (i.e., fixed asset) footnote, a key component of a company's financial

statements." *Id.* And Commerce further explained that without a translation of the fixed asset

footnote, which "supports the use of depreciation expense, a critical component in ratio

calculations{,}" it was unable to calculate the "denominator of the selling, general and

administrative (SG&A) expense and profit ratios." *Id.* Thus, the Court sustained Commerce's

rejection of the incomplete financial statements. *See id.* at 1358-59.

Here, Commerce specifically explained why the missing annexures did *not* render

Emirates Sleep's financial statements unusable or unreliable. *See* IDM at 21. For example,

Emirates Sleep's financial statements included "the full audit report, each of the financial

statements, and all of the accompanying footnotes." *Id.* Commerce also explained how each

missing annexure had no bearing on Commerce's calculation of its financial ratios. *Id.*

Best Mattresses, however, speculates that Annexure 5 must have information about

potential countervailable subsidies, *i.e.*, government loans, and also alleges that Commerce

impermissibly speculated that Annexure 5 references balances, not countervailable government

loans. Best Mattresses Br. at 50. But Best Mattresses's belief that Annexure 5 has evidence of

"distortive" government loans is not substantiated. Rather, Commerce explained:

> Note 13 of the Emirates Sleep financial statements provides details on short-
> term loans and advances to other parties, not from other parties. These are
> assets, not liabilities. The annexure clearly refers to additional details that
> are supplementary to the significant details already shown in Note 13 on

> deposits or advances (*i.e.*, assets of Emirates Sleep) held by government authorities. Moreover, it provides no evidence for the respondent's theory that Emirates Sleep received 'massive subsidies associated with its advances to other parties.

IDM at 21.

Best Mattresses may disagree with Commerce's conclusion regarding the evidence, but that does not undermine Commerce's determination. *See Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001) ("Even if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent Commerce's determination from being supported by substantial evidence.") (citing *Fujitsu*, 88 F.3d at 1044). At bottom, plaintiffs' argument is an invitation for this Court to "reweigh this evidence, {which} this {C}ourt may not do{.}" *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1376-77 (Fed. Cir. 2015). Thus, Commerce reasonably explained why the Emirates Sleep financial statements were complete enough and reliable to be used for calculating surrogate financial ratios. *See* IDM at 30.

## 2. Emirates Sleep's Financial Statements Reflect The Business Operations Of Best Mattresses

Best Mattresses also argues that Emirates Sleep has different business operations from Best Mattresses. Best Mattresses Br. at 44-47. First, Best Mattresses argues that Emirates Sleep and Best Mattresses have businesses of a very different scale. *Id.* at 45. Commerce explained, however, that "Commerce does not typically use relative production quantities or sales as a criterion because the information to judge relative data to the overall industries is not available." IDM at 18. Moreover, Commerce explained that because GTI is not a mattress producer it would be less representative of a typical Cambodian mattress producer in terms of business operations. *Id.*

Best Mattresses further asserts that Emirates Sleep "has a totally different business model from Best Mattresses because Emirates appears to be a franchise operator and has a large sales operation."  Best Mattresses Br. at 46.  Commerce addressed this argument, explaining that this would not disqualify the financial statements from consideration.  Specifically, Commerce found that "76.71 percent of {Emirates Sleep's} activities involve the manufacturing of mattresses, while only 23.29 percent relate to marketing activities."  IDM at 18.  Commerce further explained that "the marketing, promotion, and trading activities related to mattresses and sleep systems are completely appropriate activities for a company engaged in the manufacturing and sale of mattresses."  *Id.*  Commerce also noted that "when calculating selling expenses, {it} did not include the retail, marketing, and advertising service or commission costs, but rather included only transportation expenses as a selling expense."  *Id.*  Therefore, any differences between Emirates Sleep and Best Mattresses with regard to such expenses are limited.

Thus, although plaintiffs prefer that Commerce use GTI's financial statements, substantial evidence supports Commerce's determination that Emirates Sleep's business operations are similar to that of Best Mattresses.  *See* IDM at 17-18; *see also Downhole Pipe*, 776 F.3d at 1376-77.

### 3.      Emirates Sleep's Financial Statements Were Publicly Available

Finally, Best Mattresses challenges Commerce's determination that the Emirates Sleep financial statements were publicly available despite the record not reflecting how Brooklyn Bedding procured them and that they appeared to be from a fee-based service.  *See* Best Mattresses Br. at 47-48.

As an initial matter, Commerce explained that it was "not performing a{ non-market economy} investigation in this case nor is it following a {non-market economy} methodology,

which differs significantly because of its reliance on factors of production and surrogate financial data when the economy in consideration is not market-based." IDM at 19.  Next, Commerce explained that, "to be publicly available, a financial statement need not be for a company that is publicly traded." *Id.*  Commerce further stated that "an appropriate surrogate financial statement need not be sourced directly from the public website of the company itself for it to be useable and reliable." *Id.* at 20.

Regarding whether the financial statements were procured from a fee-based service, Commerce explained that "a financial statement from a fee-based service would constitute a publicly available source." *Id.*  Therefore, whether Brooklyn Bedding procured the financial statements through a fee-based service is not relevant to whether they can be considered publicly available.  Finally, Commerce found that "Emirates Sleep is registered in India and the accompanying Board's Report describes Emirates Sleep as 'a private limited company' and the audit report states that '{w}e conducted our audit in accordance with the standards on auditing specified under {the Companies Act}.'" *Id.*  Therefore, Commerce concluded that, although Best Mattresses may have been unable to locate the Emirates Sleep financial statements itself, "there is no record evidence that the statements are not publicly available." *Id.*

Moreover, Best Mattresses misunderstands Commerce's practice regarding public availability.  Commerce will normally use financial statements that are publicly available because of the importance of ensuring that interested parties are able to comment on the reliability and relevance of the information.  *See Since Hardware (Guangzhou) Co. v. United States*, 977 F. Supp. 2d 1347, 1352 (Ct. Int'l Trade 2014) ("the primary purpose for obtaining publicly available information for financial statements 'is to ensure that all interested parties have access to such information, and are able to comment on the reliability and relevance of such

45

information in the particular case, and not as much for purposes of obtaining broader information that reflects numerous transactions as is the case for material inputs.'") (citations omitted).  But here, Best Mattresses has made no claims about its inability or difficulty in commenting on the reliability or relevance of Emirates Sleep's financial statements during the investigation.  *See* IDM at 20 ("Thus, while {Best Mattresses} was unable to locate Emirates Sleep themselves there is no record evidence that the statements are not publicly available, as indicated by the petitioners.").

In sum, both Emirates Sleep's and GTI's financial statements were imperfect—the former belonging to a non-Cambodian company and the latter to a company that does not produce mattresses but is a Cambodian company.  *See* IDM at 17.  Commerce considered these facts, however, and reasonably explained its determination that the Emirates Sleep financial statements were the best available information.  *Id.* at 17-21.  Best Mattresses's arguments seek to have this Court reweigh the evidence and reach a different conclusion, but this does not make Commerce's determination unsupported by substantial evidence.  *See Am. Silicon Techs.*, 261 F.3d at 1376.

Therefore, because Commerce reached a reasonable determination considering the record evidence, its selection of the Emirates Sleep financial statements is supported by substantial evidence.  Put simply, "Commerce sufficiently explained its reason for choosing between two flawed financial statements{.}" *CP Kelco U.S., Inc. v. United States*, 949 F.3d 1348, 1359 (Fed. Cir. 2020).

## III.     Count VI Of Plaintiffs' Second Amended Complaint Should Be Dismissed, Or, Alternatively, The Court Should Find Failure To Exhaust Administrative Remedies

Pursuant to Rule 12(b)(1) of the Rules of this Court, defendant, the United States, respectfully submits this partial motion to dismiss Count VI of the second amended complaint

because Best Mattresses lacks standing to bring the claim.  Specifically, for the reasons below,

Best Mattresses has failed to show an injury-in-fact arising from Commerce's use of the average-

to-average methodology.  Alternatively, because Best Mattresses failed to challenge the

application of the differential pricing analysis before Commerce, it has failed to exhaust its

administrative remedies.

### A.    <u>Standard Of Review</u>

The plaintiff bears the burden of proving jurisdiction.  *Juice Farms, Inc. v. United States*,

68 F.3d 1344, 1345 (Fed. Cir. 1995).  "In deciding a Rule 12(b)(1) motion to dismiss that does

not challenge the factual basis for the complainant's allegations, the court assumes 'all factual

allegations to be true and draws all reasonable inferences in plaintiff's favor.'"  *Celta Agencies,*

*Inc. v. United States*, 865 F. Supp. 2d 1348, 1352 (Ct. Int'l Trade 2012) (quoting *Henke v. United*

*States*, 60 F.3d 795, 797 (Fed. Cir. 1995)).

The jurisdiction of the Federal courts, pursuant to the Constitution, is constrained to those

cases which involve "actual cases or controversies."  *Simon v. E. Ky. Welfare Rights Org.,* 426

U.S. 26, 37 (1976); *see* U.S. Const. art. III, § 2, cl. 1.  To establish standing to bring a claim, a

plaintiff must demonstrate an "injury in fact" that is "concrete and particularized" as well as

"actual or imminent, not conjectural or hypothetical."  *Lujan v. Defenders of Wildlife*, 504 U.S.

555, 560 (1992).  The injury must be "fairly traceable to the challenged action" and it must be

"likely, as opposed to merely speculative, that the injury will be redressed by a favorable

decision."  *Id.*  Further, "{t}he Court of Appeals for the Federal Circuit and this Court have held

that a respondent attempting to contest the results of an administrative antidumping duty

proceeding in which it has prevailed in the entirety cannot demonstrate an injury in fact."  *Jubail*

*Energy Servs. Co. v. United States*, 125 F. Supp. 3d 1352, 1356 (Ct. Int'l Trade 2015).

B.    **Differential Pricing Framework**

In an antidumping proceeding, the statute directs Commerce to determine whether subject

merchandise is being, or is likely to be, sold at less than fair value in the United States by

comparing the export price (or constructed export price) and the normal value of merchandise.

19 U.S.C. § 1675(a)(2)(A).  To perform this pricing comparison, Commerce may use one of

three methodologies:

> (1) Average-to-transaction (A-T), in which Commerce compares
> the weighted average of the normal values to the export prices (or
> constructed export prices) of individual transactions.
>
> (2) Average-to-average (A-A), in which Commerce compares the
> weighted average of the normal values to the weighted average of
> the export prices (or constructed export prices).
>
> (3) Transaction-to-transaction (T-T), in which Commerce
> compares the normal value of an individual transaction to the
> export price (or constructed export price) of an individual
> transaction.

*Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1337, 1340-41 (Fed. Cir. 2017)

(citing *Union Steel v. United States*, 713 F.3d 1101, 1103 (Fed. Cir. 2013)).

In general, weighted average dumping margins are calculated using the average-to-

average method or "comparing the weighted average of the normal values to the weighted

average of the export prices (and constructed export prices) for comparable merchandise." 19

U.S.C. § 1677f-1(d)(1)(A)(i); *see also* 19 C.F.R. § 351.414(c)(1) ("the Secretary will use the

average-to-average method unless the Secretary determines another method is appropriate in a

particular case.").  Commerce "will use the transaction-to-transaction method only in unusual

situations, such as when there are very few sales of subject merchandise and the merchandise

sold in each market is identical or very similar or is custom-made."  19 C.F.R. § 351.414(c)(2).

The statute also provides that the average-to-transaction method can be used when "there is a

pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time," and Commerce explains why such differences cannot be taken into account using the average-to-average method.  19 U.S.C. § 1677f-1(d)(1)(B).

Commerce uses its differential pricing analysis to determine whether the average-to-transaction method should be used.  *See* PDM at 8.  In the first stage of the differential pricing analysis, the Cohen's *d* test is applied to determine whether the respondent's pricing behavior, as exhibited in its reported prices in the U.S. market, differed significantly between purchasers, regions, or time periods.  *Id.* at 9.  Next, the ratio test assesses the extent of the significant price differences to determine whether there exists a pattern of prices that differ significantly for all sales as measured by the Cohen's *d* test.  *Id*.

Then, in the second stage of the differential pricing analysis, Commerce examines whether using only the average-to-average method can appropriately account for such differences.  *Id.* at 9-10.  Even if some of a respondent's sales pass the Cohen's *d* test, if the ratio test shows that less than 33 percent of total sales passes the Cohen's *d* test then no pattern is found to exist, or if more than 33 percent of total sales passes the Cohen's *d* test but there is not a meaningful difference between the weighted-average dumping margin calculated using the A-to-A method and the weighted-average dumping margin calculated using an alternative comparison methodology based on the A-to-T method, then Commerce will use the average-to-average method.  *Id.*

**C.    Because There Is No "Injury-in-Fact" With The Differential Pricing
Analysis, Best Mattresses Lacks Standing To Bring This Claim**

**1.    Relevant Factual Background**

In its preliminary determination, Commerce explained that although "62.51 percent of the
value of Best Mattresses{} U.S. sales pass the Cohen's *d* test and confirms the existence of a
pattern of prices that differ significantly among purchasers, regions, or time periods,"
"Commerce determine{d} there is no meaningful difference between the weighted-average
dumping margin calculated using the average-to-average method and the weighted-average
dumping margin calculated using an alternative comparison method . . . ."  PDM at 10.
Accordingly, Commerce "appl{ied} the average-to-average method to all U.S. sales to calculate
the weighted-average dumping margin for Best Mattresses{}."  *Id.*

Commerce then established a briefing schedule to allow for comments on the preliminary
determination.  Briefing Schedule (Jan. 5, 2021) (P.R. 281).  In its case brief, Best Mattresses did
not challenge Commerce's preliminary determination regarding the differential pricing analysis.
*See generally* Best Mattresses Case Br. (P.R. 288, C.R. 271).  Commerce's determination
regarding differential pricing remained unchanged in the final determination, and Commerce
used the average-to-average method for all United States sales.  Final Analysis Memorandum at
2 (Mar. 18, 2021) (P.R. 304, C.R. 275).

On June 11, 2021, and July 9, 2021, Best Mattresses filed a summons and a complaint,
respectively, challenging Commerce's final determination.  Summons, ECF No. 1; Compl., ECF
No. 9.  On July 28, 2021, Best Mattresses amended its complaint to challenge Commerce's
determination that its United States sales exhibited a pattern of export prices (or constructed
export prices) that differed significantly among purchasers, regions, or time periods, using the
Cohen's *d* test.  First Am. Compl. ¶ 40, ECF No. 16.  A second amended complaint was later

filed on August 6, 2021, to fix a clerical error in the first amended complaint.  Second Am.

Compl. ECF No. 22.

        2.      **Best Mattresses Has Not Alleged An "Injury-In-Fact"**

Best Mattresses challenges Commerce's finding that its United States sales exhibited a

pattern of export prices (or constructed export prices) that differed significantly among

purchasers, regions, or time periods, using the Cohen's *d* test.  Second Am. Compl. ¶ 40.  Citing

*Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021), Best Mattresses argues that

"Commerce failed to explain whether Best Mattresses' sales data conformed with the underlying

assumptions necessary for the Cohen's *d* test, specifically whether the test and comparison

groups were normally distributed, equally variable, and equally numerous."  Best Mattresses Br.

at 55.  Further, Best Mattresses argues that the data "likely generate{d} false positives above the

0.8 threshold, invalidating the entire test."  *Id.*

But Count VI does not allege an "injury-in-fact" with respect to Commerce's application

of its differential pricing methodology because Commerce used the "average-to-average" method

and not an alternative comparison methodology based on the "average-to-transaction" method.

When a party has prevailed, there is no injury-in-fact and no case or controversy.  *See, e.g.*, *PAO*

*Severstal v. United States*, 219 F. Supp. 3d 1411, 1414 (Ct. Int'l Trade 2017) (holding a

prevailing party lacks standing to sue); *Zhanjiang Guolian Aquatic Prods. Co. v. United States*,

991 F. Supp. 2d 1339, 1342 (Ct. Int'l Trade 2014) (finding that a respondent receiving favorable

outcome in antidumping determination lacks standing).

As explained above, the Cohen's *d* test and Commerce's differential pricing analysis is

used to determine whether Commerce may use an alternative comparison methodology based on

the average-to-transaction method over the standard average-to-average method that Commerce

typically uses for calculating a weighted-average dumping margin.  *See* PDM at 9.  Even though

the results of the Cohen's *d* test indicated a pattern of prices that differ according to customer,

time period, or region, with 62.51 percent of the sales, by value, passing the Cohen's *d* test,

Commerce still applied its standard average-to average-method to all United States sales when

calculating the weighted-average dumping margin because it determined that this method could

account for such differences.  *See id.* at 10; Final Analysis Memo at 2.  Therefore, the results of

the Cohen's *d* test did not change Commerce's calculation of Best Mattresses' weighted-average

dumping margin.  *See id.*  Thus, there is no injury that would be redressed by a favorable

decision.  *See Lujan*, 504 U.S. at 560.

Indeed, when parties have challenged Commerce's differential pricing analysis, but

Commerce determined that the average-to-transaction method may not be used and instead used

the average-to-average method for calculating a weighted-average dumping margin, Commerce

has found these arguments to be moot.  *See e.g.*, *Welded Line Pipe From the Republic of Korea*,

86 Fed. Reg. 58,253 (Dep't of Commerce Oct. 21, 2021) (final admin. review), and

accompanying IDM at Comment 2.  Essentially, in such situations, plaintiffs seek an advisory

opinion when they have suffered no injury and when the relief requested would not redress any

injury.  *See Camreta v. Greene*, 131 S. Ct. 2020, 2038 (2011) ("judicial Power is one to render

dispositive judgments, not advisory opinions") (quotation omitted).  Put another way, Best

Mattresses's "request is, in part, prospective because it seeks 'methodological clarity' as to how

Commerce will conduct its {differential pricing} analysis in future cases," but "the {C}ourt's

post-remand review of any such clarification would amount to an impermissible advisory

opinion because the court would be opining on matters outside the scope of the instant case and

controversy."  *POSCO v. United States*, 296 F. Supp. 3d 1320, 1357 n.53 (Ct. Int'l Trade 2018).

Therefore, because Best Mattresses has suffered no injury-in-fact with respect to the application of the differential pricing analysis, the Court should dismiss Count VI of the second amended complaint.

### D.  Alternatively, Best Mattresses Failed To Exhaust Administrative Remedies

Alternatively, the Court should decline to consider Best Mattresses's differential pricing argument for failure to exhaust administrative remedies.

Congress has directed that "the Court of International Trade shall, where appropriate require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d).  This statute "indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies." *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (citing *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007)).  Also, Commerce's regulations *specifically* require a party to raise *all* arguments in a timely manner before the agency. *Corus Staal*, 502 F.3d at 1379 (citing 19 C.F.R. § 351.309(c)(2)).  "The exhaustion requirement in this context is therefore not simply a creature of court decision, as is sometimes the case, but is a requirement explicitly imposed by the agency as a prerequisite to judicial review." *Id.*  Finally, "general policies underlying the exhaustion requirement — 'protecting administrative agency authority and promoting judicial efficiency'"— would be vitiated if the Court were to consider arguments raised for the first time in judicial proceedings. *See id.* (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992)).  For these reasons, this Court should "generally take{} a 'strict view' of the requirement that parties exhaust their administrative remedies before {Commerce} in trade cases." *Id.*

Courts have recognized exceptions to exhaustion—when exhausting remedies would have been "futile," the relevant matter is a "pure question of law," an intervening court decision

would affect the agency's action, or a party had no reason to believe the agency would not follow established precedent. *Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1145–48 (Fed. Cir. 2013).

Although Best Mattresses now argues that the application of the Cohen's *d* test is unreasonable because the underlying assumptions of the Cohen's *d* test were allegedly not met, Best Mattresses Br. at 54-55, its case brief submitted to Commerce contained *no* arguments regarding differential pricing or the Cohen's *d* test. *See generally* Best Mattresses Case Br. Parties are required by regulation to include all arguments relevant to Commerce's final determination, including arguments presented before the preliminary determination. *See* 19 C.F.R. § 351.309(c)(2).

If Best Mattresses had raised its arguments about Commerce's differential pricing analysis in its case brief, then Commerce would have had the opportunity to consider and address these arguments in the final determination. "Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against *objection made at the time appropriate under its practice*." *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1383–84 (Fed. Cir. 2008) (emphasis added) (quoting *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)). However, Best Mattresses did not raise these arguments before Commerce and, thus, failed to exhaust administrative remedies.

Moreover, none of the exceptions to exhaustion apply. As evidenced by Best Mattresses's brief, its claim is not a purely legal question because it is grounded in the data and is dependent on the facts of this case. *See* Best Mattresses Br. at 52-55. Its claim also does not qualify for the futility exception because there is no indication that Commerce would not have

considered or addressed the argument.  The futility exception is also narrow and strictly viewed, and the "mere fact that an adverse decision may have been likely does not excuse a party from a statutory or regulatory requirement that it exhaust administrative remedies." *Corus Staal*, 502 F.3d at 1378-81.

Finally, the intervening judicial decision exception does not apply.  Although *Stupp*, a precedential Federal Circuit opinion on Commerce's differential pricing analysis, and specifically the Cohen's *d* test, was issued after the final determination was published, "{t}o qualify for the intervening judicial decision exception, there must have been 'judicial interpretations of existing law after decision below and pending appeal-interpretations which if applied might have materially altered the result.'" *Gerber Food (Yunnan) Co. v. United States*, 601 F. Supp. 2d 1370, 1380 (Ct. Int'l Trade 2009) (quoting *Hormel v. Helvering*, 312 U.S. 552, 558-59 (1941) (footnote omitted)).

However, the Cohen's *d* test is part of Commerce's differential pricing analysis to determine the method of price comparison used in calculating the weighted-average dumping margin, and, therefore, even if *Stupp* had been issued before the final determination, it would not have materially impacted the result of Commerce's differential pricing analysis, which was to use the average-to-average method to calculate the weighted-average dumping margin.  *See* PDM at 9-10.  As such, the intervening judicial decision exception does not apply here.  *See Gerber Food*, 601 F. Supp. 2d at 1380.  Thus, because Best Mattresses failed to exhaust its administrative remedies with respect to this claim, the Court should decline to consider this argument.

**CONCLUSION**

For these reasons, we respectfully request that the Court sustain the final determination and enter judgment in favor of the United States.  We also respectfully request that the Court dismiss Count VI of Best Mattresses's second amended complaint.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

OF COUNSEL:                                          /s/ Kara M. Westercamp
PAUL K. KEITH                                        KARA M. WESTERCAMP
Attorney                                             Trial Attorney
Office of the Chief Counsel                          U.S. Department of Justice
for Trade Enforcement and Compliance                 Civil Division
U.S. Department of Commerce                          Commercial Litigation Branch
Washington, D.C.                                     P.O. Box 480, Ben Franklin Station
                                                     Washington, D.C. 20044
                                                     Tel: 202-305-7571
                                                     Email: kara.m.westercamp@usdoj.gov

March 11, 2022                                       *Attorneys for Defendant*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the word limitation of Court of International Trade Standard Chambers Procedures § 2(B)(1) and contains approximately 16,006 words, excluding the parts of the brief exempted from the word limitation.  In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.


<u>/s/ Kara M. Westercamp</u>

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE**

|  |  |  |
|---|---|---|
| _____ | ) | |
| BEST MATTRESSES INTERNATIONAL | ) | |
| COMPANY LIMITED AND ROSE LION | ) | |
| FURNITURE INTERNATIONAL COMPANY | ) | |
| LIMITED, | ) | |
|  | ) | |
| Plaintiffs, | ) | |
|  | ) | |
| v. | ) | |
|  | ) | |
| THE UNITED STATES, | ) | Consol. Court No. 21-00281 |
|  | ) | **BUSINESS PROPRIETARY** |
| Defendant, | ) | **VERSION** |
|  | ) | |
| and | ) | |
|  | ) | |
| BROOKLYN BEDDING, LLC, CORSICANA | ) | |
| MATTRESS COMPANY, ELITE COMFORT | ) | |
| SOLUTIONS; FXI, INC., INNOCOR, INC., | ) | |
| KOLCRAFT ENTERPRISES INC., LEGGETT & | ) | |
| PLATT, INCORPORATED, THE | ) | |
| INTERNATIONAL BROTHERHOOD OF | ) | |
| TEAMSTERS, and UNITED STEEL, PAPER AND | ) | |
| FORESTRY, RUBBER, MANUFACTURING, | ) | |
| ENERGY, ALLIED INDUSTRIAL AND | ) | |
| SERVICE WORKERS INTERNATIONAL | ) | |
| UNION, AFL-CIO, | ) | |
|  | ) | |
| Defendant-Intervenors. | ) | |
| _____ | ) | |

## <u>ORDER</u>

Upon consideration of the motions for judgment upon the administrative record filed by

plaintiffs and consolidated plaintiffs, responses thereto, plaintiffs' replies, the administrative

record, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motions are DENIED;

ORDERED that Count VI of Best Mattresses's second amended complaint is dismissed;

ORDERED that the Department of Commerce's determination at issue in this action is

sustained; and

ORDERED that judgment shall enter in favor of the United States.

_____
JUDGE

Dated: _____