# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE

|  |  |
|---|---|
| BEST MATTRESSES INTERNATIONAL COMPANY LIMITED AND ROSE LION FURNITURE INTERNATIONAL COMPANY LIMITED,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br>and<br><br>BROOKLYN BEDDING, LLC ET AL.,<br><br>Defendant-Intervenors. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **Consol. Ct. No. 21-00281**<br>)    **NONCONFIDENTIAL**<br>)       **VERSION** |

### RESPONSE TO DEFENDANT-INTERVENOR'S RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Jeffrey S. Grimson
Kristin H. Mowry
Sarah M. Wyss
Wenhui (Flora) Ji
Jacob M. Reiskin
Yixin (Cleo) Li
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610 (ph)
202.595.8968 (fax)
trade@mowrygrimson.com

March 11, 2022

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................................. ii

ADMINISTRATIVE DETERMINATION UNDER REVIEW ....................................... 1

ISSUES PRESENTED ................................................................................................ 2

STATEMENT OF FACTS ........................................................................................... 2

SUMMARY OF THE ARGUMENT ........................................................................... 5

STANDARD OF REVIEW........................................................................................... 6

ARGUMENT .............................................................................................................. 8

I.   COMMERCE'S APPLICATION OF THE TRANSACTIONS DISREGARDED
     AND MAJOR INPUT RULES WAS SUPPORTED BY SUBSTANTIAL
     EVIDENCE AND OTHERWISE IN ACCORDANCE WITH LAW BECAUSE
     THE STATUTE GIVES COMMERCE DISCRETION AND CAMBODIAN
     TRADEMAP DATA WERE RELIABLE ........................................................... 8

     A.  Commerce Properly Determined That the Market Under Consideration
         Was Cambodia for Purposes of the Transactions Disregarded and Major
         Input Rules................................................................................................. 9

     B.  Commerce's Reliance on Trademap Export Data to Establish a Market
         Price Was Supported by Substantial Evidence Because These Data Best
         Reflect Cambodian Market Prices.............................................................. 15

II.  COMMERCE WAS SUPPORTED BY SUBSTANTIAL EVIDENCE IN
     DECLINING TO FOLLOW NME METHODOLOGIES ................................... 20

     A.  Commerce's Use of Export Data Was Supported by Substantial Evidence
         Because Commerce's Practice of Relying on Import Data in NME
         Investigations is Irrelevant......................................................................... 20

     B.  Commerce's Decision Not to Exclude Data From NME Countries and
         Countries That Have Widely Alleged Subsidies Was Supported by
         Substantial Evidence................................................................................... 21

III. BEST MATTRESSES ADOPTS ARGUMENTS BY THE GOVERNMENT .. 23

CONCLUSION .......................................................................................................... 23

# TABLE OF AUTHORITIES

## CASES

Altx, Inc. v. United States,
370 F.3d 1108 (Fed. Cir. 2004) ................................................................... 7

Aqua Prods., Inc. v. Matal,
872 F.3d 1290 (Fed. Cir. 2017) .............................................................. 8, 11

Ass'n of Am. Sch. Paper Suppliers v. United States,
33 CIT 1742 (2009) ................................................................................... 18

Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc,
467 U.S. 837 (1984) ...................................................................... 7, 10, 13

Comm'r v. Clark,
489 U.S. 726 (1989) .................................................................................. 14

Consolo v. Fed. Mar. Comm'n,
383 U.S. 607 (1966) .................................................................................... 7

Fujitsu Gen. Ltd. v. United States,
88 F. 3d 1034 (Fed. Cir. 1996) ................................................................... 6

Huayin Foreign Trade Corp. v. United States,
322 F.3d 1369 (Fed. Cir. 2003) .................................................................. 6

Mitsubishi Heavy Indus., Ltd. v. United States,
275 F.3d 1056 (Fed. Cir. 2001) .................................................................. 7

Nat'l Lab. Rels. Bd. v. Nevada Consol. Copper Corp.,
316 U.S. 105 (1942) ............................................................................. 7, 16

Rhone Poulenc, Inc. v. United States,
899 F.2d 1185 (Fed. Cir. 1990) ................................................................ 18

SeAH Steel Corp. v. United States,
34 CIT 605, 704 F. Supp. 2d 1353 (2010) ............................................... 12

Swiff-Train Co. v. United States,
793 F.3d 1355 (Fed. Cir. 2015) .................................................................. 7

Unicatch Indus. Co. v. United States,
__ CIT __, 539 F. Supp. 3d 1229 (2021) ............................................. 9, 13

United States v. Eurodif S.A.,
555 U.S. 305 (2009) .................................................................................... 6

United States v. Haggar Apparel Co.,
526 U.S. 380 (1999) .................................................................................... 7

## STATUTES

19 U.S.C § 1677b(f) ............................................................................. passim
19 U.S.C. § 1677b(c) .................................................................................. 20

## REGULATIONS

19 C.F.R. § 351.202(b)(6)...................................................................................................... 12

19 C.F.R. § 351.407(b) ........................................................................................................ 10

## OTHER AUTHORITIES

Certain Cold-Rolled Steel Flat Products from Brazil: Final Determination of Sales at Less Than Fair Value, 81 Fed. Reg. 44,946 (Dep't of Commerce July 29, 2016) ..................................... 8

Certain Hot-Rolled Steel Flat Products from Brazil: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part, 81 Fed. Reg. 53,424 (Dep't of Commerce Aug. 12, 2016)..................................................................... 9

Mattresses From Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam, 85 Fed. Reg. 30,984 (Int'l Trade Comm'n May 21, 2020)........................................................ 3

Mattresses From Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Antidumping Duty Orders and Amended Final Affirmative Antidumping Determination for Cambodia, 86 Fed. Reg. 26,460 (Dep't of Commerce May 14, 2021)............................................................................................................................... 2, 5

Mattresses From Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations, 85 Fed. Reg. 23,002 (Dep't of Commerce Apr. 24, 2020)...................................................................... 3

Mattresses From Cambodia: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances, 86 Fed. Reg. 15,894 (Dep't of Commerce Mar. 25, 2021) ............................................................................................... 1, 5

Mattresses From Cambodia: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures, 85 Fed. Reg. 69,594 (Dep't of Commerce Nov. 3, 2020) ................................................................................................. 3, 4

Best Mattresses International Company Limited and Rose Lion Furniture International Company Limited ("Best Mattresses"), plaintiffs in this action and defendant-intervenors in the companion case <u>Brooklyn Bedding, LLC, et al. v. United States</u>, Court No. 21-00282, hereby submit this response to the Memorandum of Points of Law and Fact in Support of Rule 56.2 Motion for Judgment on the Agency Record filed by Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO ("Petitioners") (Dec. 10, 2021), ECF No. 46 ("Pet'rs' Br.").[1]  The U.S. Department of Commerce ("Commerce") properly recognized Cambodia as a market economy country when comparing Best Mattresses' input prices to market prices in Cambodia.  Petitioners ask this Court to look past Commerce's sound discretion and well-reasoned determination and, instead, endorse non-market economy ("NME") methodologies that do not withstand scrutiny.

## ADMINISTRATIVE DETERMINATION UNDER REVIEW

Petitioners challenge certain aspects of Commerce's final affirmative antidumping duty determination on mattresses from Cambodia.  <u>See</u> <u>Mattresses From Cambodia: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances</u>, 86 Fed. Reg. 15,894 (Dep't of Commerce Mar. 25, 2021) ("<u>Final Determination</u>") (P.R. 309), and accompanying Issues and Dec. Mem. ("Final I&D Mem.") (P.R. 301), as amended by <u>Mattresses From Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Antidumping Duty Orders and Amended Final Affirmative Antidumping Determination for Cambodia</u>, 86 Fed. Reg. 26,460 (Dep't of Commerce May 14,

---

[1] All references to parties' briefs are to the nonconfidential version unless otherwise noted.

2021) ("<u>Amended Final Determination</u>") ( P.R. 325).

## ISSUES PRESENTED[2]

I. **Whether Commerce's reliance on Trademap export data to determine the market price when applying the transactions disregarded and major input rules was supported by substantial evidence and otherwise in accordance with law.**

Commerce's reliance on Cambodian Trademap export data in the Final Determination instead of Global Trade Atlas ("GTA") data to determine the market price of certain inputs in its transactions disregarded and major input rule analyses was supported by substantial evidence and otherwise in accordance with law because the Trademap data reflect Cambodia, the market under consideration, and these data are accurate and reliable.

II. **Whether Commerce's decision to decline to follow NME methodologies in calculating the market price and input COP within its transactions disregarded and major input determinations was supported by substantial evidence.**

Commerce's determination not to follow its NME methodologies by relying on export data and by including data from NME countries and countries with widely available subsidies in calculating the market price and input COP price was supported by substantial evidence and otherwise in accordance with law. Petitioners' challenges to these determinations rely on NME law and practice, which are irrelevant in the context of a market economy investigation.

## STATEMENT OF FACTS

On March 31, 2020, Petitioners filed a petition for the imposition of antidumping duties on imports of mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, Turkey and Vietnam. See <u>Mattresses From Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations,</u>

---

[2] Best Mattresses maintains its challenges to other determinations made by Commerce in applying the major input and transactions disregarded rules as presented in Best Mattresses' Memorandum of Points of Authorities in Support of Rule 56.2 Motion for Judgment Upon the Agency Record (Dec. 9, 2021), ECF No. 44 ("Best Mattresses Br.").

85 Fed. Reg. 23,002 (Dep't of Commerce Apr. 24, 2020) (P.R. 45).

This investigation is the first United States antidumping case against imports from the Kingdom of Cambodia.

On April 24, 2020, Commerce published the initiation notice of a less-than-fair value investigation on mattresses from Cambodia, covering imports from the January 1, 2019 to December 31 2019 period of investigation ("POI"). See id., at 23,003.

On May 21, 2020, the International Trade Commission (the "Commission") published notice of its affirmative preliminary injury determination. See Mattresses From Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam, 85 Fed. Reg. 30,984 (Int'l Trade Comm'n May 21, 2020).

On May 22, 2020, Commerce selected Best Mattresses International Company Limited and Rose Lion Furniture International Company Limited as mandatory respondents. See Mattresses From Cambodia: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures, 85 Fed. Reg. 69,594 (Dep't of Commerce Nov. 3, 2020) ("Prelim. Determination") (P.R. 244), and accompanying Issues and Dec. Mem. at 2 ("Prelim. Dec. Mem.") (P.R. 232).

Best Mattresses submitted timely responses to Commerce's antidumping questionnaire relating to U.S. sales, cost of production ("COP") and constructed value ("CV") as well as supplemental questionnaires. See Prelim. Dec. Mem. at 3 (P.R. 232). Best Mattresses also submitted pre-preliminary comments and argued, inter alia, that Commerce should rely on Cambodian Trademap data that it submitted when determining if its purchases if material inputs from affiliates were made at arms-length. See Letter from Best Mattresses to Commerce re: Pre-

Preliminary Determination Comments (Oct. 7, 2020) (P.R. 223) ("Pre-Prelim. Cmts."). Specifically, Best Mattresses argued that the Cambodian Trademap data "is the best 'benchmark' for cost calculation on the record because it represents the price of input in the market under consideration." Id. at 7.

On November 3, 2020, Commerce published its affirmative preliminary determination of sales at less-than-fair-value. See Prelim. Determination, 85 Fed. Reg. at 65,595 n.8 (P.R. 244); Prelim. Dec. Mem. at 5 (P.R. 232). Commerce selected various market prices against which it compared Best Mattresses' input purchases from affiliated suppliers pursuant to the transactions disregarded and major input rules codified in 19 U.S.C. § 1677b(f)(2)-(3). See Prelim. Determination, and accompanying Cost of Production and Constructed Value Calc. Adjustments at 1-2 (Public Version) ("COP Mem.") (P.R. 242).

For Best Mattresses' major inputs purchased from affiliated suppliers, Commerce selected Brazil as a surrogate country and used GTA import data into Brazil to value the COP of Best Mattresses' major inputs, instead of relying on Best Mattresses' own costs. See id. at 2. For its transactions disregarded analysis, and to value a market price for Best Mattresses' other inputs from affiliated suppliers, including fixed assets and packing materials, Commerce averaged import prices compiled by GTA for six countries (i.e., Brazil, Malaysia, Mexico, Romania, Russia and Turkey). See id. Commerce preliminarily calculated a dumping margin of 252.74 percent for Best Mattresses. See Prelim. Determination, 85 Fed. Reg. at 65,595 (P.R. 244).

Best Mattresses filed a case brief disputing Commerce's Preliminary Determination on various grounds. See Final I&D Mem. at 2 (P.R. 301). Best Mattresses challenged Commerce's CV calculation methodology and, in particular, its application of the transactions disregarded and major input rules and selection of surrogate prices to ascertain the market price and input COP of

Best Mattresses' material input purchases. See id. at Cmt. 1, pp. 5-7.

On March 25, 2021, Commerce published its affirmative final determination of sales at less-than-fair-value and calculated a dumping margin of 45.34 percent for Best Mattresses. See Final Determination, 86 Fed. Reg. at 15,895 (P.R. 309). To establish a market price necessary for its transactions disregarded analysis, Commerce determined it should rely on Cambodian Trademap data instead of a six-country composite of GTA data. See Final I&D Mem. at Cmt. 1, p. 10 (P.R. 301). To determine the COP for major inputs, Commerce determined that Cambodian Trademap data was the most accurate surrogate instead of using Brazilian GTA data. See id., Cmt. 1, pp. at 10-11. Commerce later published its amended final determination of sales at less-than-fair-value, which corrected certain clerical errors in Commerce's dumping margin calculation, assigned a dumping margin of 52.41 percent to Best Mattresses and also issued the antidumping duty order on mattresses from Cambodia. Amended Final Determination, 86 Fed. Reg. at 26,462 (P.R. 325).

## SUMMARY OF THE ARGUMENT

In this appeal, this Court is asked to review numerous aspects of Commerce's calculations and analysis under the transactions disregarded and major input rules pursuant to 19 U.S.C § 1677b(f)(2)-(3). Although Commerce made significant errors in its major input rule calculation, as presented in Best Mattresses' Rule 56.2 brief to this Court, Commerce's Final Determination was supported by substantial evidence and otherwise in accordance with law in two ways.

First, Commerce correctly used Cambodian Trademap data to determine the market value of Best Mattresses' inputs from affiliated suppliers under both the transactions disregarded and major input rules. Commerce acted in accordance with law when it interpreted the statutory and regulatory language "market under consideration" to mean Cambodia. Petitioners misinterpret the

statute in claiming that Commerce should use third country market prices where the input supplier was located outside of Cambodia. Commerce's interpretation was consistent with the plain language of the statute and was reasonable. Because the statute directs Commerce to use market values from the country under investigation, Commerce was supported by substantial evidence in selecting Cambodian Trademap data, which were accurate and reliable.

Second, Commerce's determination to rely on export data and to include data from NME countries and allegedly subsidized countries in calculating the market values and input COP under the transactions disregarded and major input rules was reasonable and supported by substantial evidence. Petitioners challenge Commerce's determination by relying exclusively on agency practice and case law from NME investigations, critically ignoring that the current case involves Cambodia, a market economy country.

Finally, Best Mattresses adopts and incorporates by reference responsive arguments made by the Defendant United States as they relate to the issues contained in this brief.

## STANDARD OF REVIEW

"{T}he Court of International Trade must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" Fujitsu Gen. Ltd. v. United States, 88 F. 3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)). "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." United States v. Eurodif S.A., 555 U.S. 305, 316 n.6 (2009). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Huayin Foreign Trade Corp. v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (citation omitted), and it requires "more than a mere scintilla," see, e.g., Swiff-Train Co. v. United States,

793 F.3d 1355, 1359 (Fed. Cir. 2015) (citation omitted). Substantial evidence is also "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent {Commerce's} finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

The agency's findings may still be supported by substantial evidence even if the possibility of drawing two inconsistent conclusions exists. See Nat'l Lab. Rels. Bd. v. Nevada Consol. Copper Corp., 316 U.S. 105, 106 (1942). The question before the Court, therefore, is not whether the Court agrees with Commerce's decision or whether the Court would have reached the same decision. Rather, a determination will be affirmed if it is "reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion." Altx, Inc. v. United States, 370 F.3d 1108, 1121 (Fed. Cir. 2004) (citation omitted). A party challenging a determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." Mitsubishi Heavy Indus., Ltd. v. United States, 275 F.3d 1056, 1060 (Fed. Cir. 2001).

In reviewing Commerce's interpretation of statutes, the Court applies the two-prong standard established in Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc, 467 U.S. 837, 842-43 (1984). First, the Court determines whether Congress' intent can be ascertained; if it can, the Court "must give effect to the unambiguously expressed intent of Congress." Id. at 843. Second, the Court determines whether the agency's interpretation of the statute is permissible. See id. at 843-44. The Court must uphold agency interpretations that are reasonable. See id. at 844. The Court follows the Chevron framework when reviewing Commerce's interpretation of its own regulations. See United States v. Haggar Apparel Co., 526 U.S. 380, 394 (1999) ("Haggar") ("{T}he Court of International Trade must, when appropriate, give regulations Chevron deference."); Aqua Prods., Inc. v. Matal, 872 F.3d 1290, 1316 (Fed. Cir. 2017) (en banc) ("We use the same interpretive rules

to construe regulations as we do statutes.").

## ARGUMENT

I. **COMMERCE'S APPLICATION OF THE TRANSACTIONS DISREGARDED AND MAJOR INPUT RULES WAS SUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE IN ACCORDANCE WITH LAW BECAUSE THE STATUTE GIVES COMMERCE DISCRETION AND CAMBODIAN TRADEMAP DATA WERE RELIABLE**

Commerce's reliance on Trademap export data to estimate the market value of certain inputs in the underlying proceeding was reasonable because the transactions disregarded and major input rules under 19 U.S.C § 1677b(f)(2)-(3) do not specify a particular methodology for determining market values and the Trademap data reflect reliable data from Cambodia, the market under consideration. In this investigation, Commerce turned to 19 U.S.C § 1677b(f)(2)-(3), the transactions disregarded rule and the major input rules, to test "whether transfer prices between {Best Mattresses and} affiliated parties occurred at prices that represent arm's length." See Final I&D Mem. at Cmt. 1, p. 10 (P.R. 301). As part of these tests, Commerce sought to compare Best Mattresses' affiliated input prices to market prices, and reasonably selected Trademap data for this purpose because "{t}he Trademap data for Cambodia is robust, includes prices for all the necessary affiliated inputs and, while it is aggregated differently from GTA, there is no evidence that it is faulty or inaccurate." Id.

As Commerce has recognized in past determinations, the agency has developed a methodology for following 19 U.S.C § 1677b(f)(2)-(3), as "the statute does not specify a particular methodology for determining market value." Certain Cold-Rolled Steel Flat Products from Brazil: Final Determination of Sales at Less Than Fair Value, 81 Fed. Reg. 44,946 (Dep't of Commerce July 29, 2016), and accompanying Issues and Dec. Mem. at Cmt. 10, p. 38. In particular, Commerce's "express preference for market value is a respondent's own purchases of the input

from unaffiliated suppliers. When no such purchases are available, the Department looks to the affiliated supplier's sales of the input to unaffiliated parties, and, lacking that, to any reasonable source for market value." Certain Hot-Rolled Steel Flat Products from Brazil: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part, 81 Fed. Reg. 53,424 (Dep't of Commerce Aug. 12, 2016) and accompanying Issues and Dec. Mem. at Cmt. 7, p. 28. As the Court explained, "{t}he statute vests Commerce with discretion to determine how best to apply the transactions disregarded rule." Unicatch Indus. Co. v. United States, __ CIT __, __, 539 F. Supp. 3d 1229, 1248 (2021) (sustaining Commerce's interpretation of the transactions disregarded statute). In Unicatch, Commerce relied "on the purchase price from individual affiliates rather than the combined weighted average to determine whether such prices are above market price" and the Court found that Commerce's decision was reasonable because there was no evidence that its "methodology represents an impermissible construction of the statutory terms." Id. Here, Commerce operated within its discretion when it relied on "any reasonable source for market value" and selected Trademap data to estimate market prices for the transactions disregarded rule and the major inputs analysis.[3] As stated below, Commerce (A) properly determined that the market under consideration was Cambodia and (B) Cambodia Trademap data best reflected Cambodian market prices.

### A. Commerce Properly Determined That the Market Under Consideration Was Cambodia for Purposes of the Transactions Disregarded and Major Input Rules

In applying the transactions disregarded and major input rules, Commerce seeks to determine the value of a transaction in "the market under consideration." See 19 U.S.C §

---

[3] Best Mattresses maintains that Commerce's calculation of the input COP within its major input rule analysis was unsupported by substantial evidence and not in accordance with law for the reasons presented in its opening brief. See Best Mattresses Br. at Sections I-II.

1677b(f)(2); 19 C.F.R. § 351.407(b). To value major inputs, Commerce chooses the higher of "(1) The price paid by the exporter or producer to the affiliated person for the major input; (2) The amount usually reflected in sales of the major input in the <u>market under consideration</u>; or (3) The cost to the affiliated person of producing the major input." 19 C.F.R. § 351.407(b) (emphasis added). Under the transaction disregard rule, Commerce determines if affiliated transactions for a particular input should be disregarded by looking at "the amount usually reflected in sales of merchandise under consideration in the <u>market under consideration</u>." 19 U.S.C. § 1677b(f)(2) (emphasis added). Although the intricacies of Commerce's calculations under these two rules differ, as no party contests, Commerce seeks to establish the market price of the input in the "market under consideration," as part of its analysis under both provisions. Petitioners argue that the "market under consideration" here is [ ▮ ] the location of some of Best Mattresses' affiliated suppliers. <u>See</u> Pet'rs' Br. at 25, ECF No. 45 (Confidential Version). For the reasons explained below, however, Petitioners' interpretation of this phrase is fundamentally flawed and Commerce's determination that the "market under consideration" is Cambodia is supported by substantial evidence and in accordance with law.

In the Final Determination, Commerce accurately stated that "the statute indicates that the item being tested should reflect a market price in the country under consideration, which is Cambodia in this case." Final I&D Mem. at Cmt. 1, p. 10 (P.R. 301). Petitioners argue that the statute is silent or ambiguous, and that Commerce's construction of the statute is impermissible. <u>See</u> Pet'rs' Br. at 24. In reviewing Commerce's interpretation of a statute, the Court should apply the two-prong <u>Chevron</u> standard. <u>See</u> <u>Chevron</u>, 467 U.S. at 842-43. First, the Court determines whether Congress' intent can be ascertained; if it can, the Court "must give effect to the unambiguously expressed intent of Congress." <u>Id.</u> at 843. Second, the Court determines whether

the agency's interpretation of the statute is permissible. See id. at 843-44. The Court must uphold agency interpretations that are reasonable. See id. at 844. The same standard applies for Commerce's interpretation of the same term – "market under consideration" – in its own regulations. See Aqua Prods., 872 F.3d at 1316 ("We use the same interpretive rules to construe regulations as we do statutes.").

The plain language of the phrase "the market under consideration" is unambiguous as shown through (1) the text of the statute and regulation and (2) the purpose of the statute and regulation. As Commerce properly recognized, "market" is equivalent to "country," and "under consideration" is equivalent to "under investigation" in the antidumping investigation at hand. See Final I&D Mem. at Cmt. 1, p. 10 (P.R. 301) (determining that "the statute indicates that the item being tested should reflect a market price in the country under consideration, which is Cambodia in this case"). Commerce's determination here that the market under consideration is Cambodia is also consistent with its use of the phrase "home market" throughout its antidumping questionnaire. For example, Commerce explains that "{t} home market refers to the market for sales of the foreign like product in the country in which the merchandise under investigation or review is produced." Letter from Commerce to Mowry & Grimson, PLLC re: Best Mattresses Initial Questionnaire at I-10 (May 8, 2020) (Public Document) (P.R. 55) ("AD Questionnaire"). There can be no question that the "home market" under this definition is Cambodia. The transactions disregarded and major input rules use almost identical language in seeking information about "sales of merchandise under consideration in the market under consideration." 19 U.S.C. § 1677b(f)(2); 19 C.F.R. § 351.407(b). Given the interchangeable use of "home market" and "market under consideration" in the statute and Commerce's own questionnaire, Commerce would act unreasonably and contrary to law if it interpreted "home market" to mean Cambodia

and "market under consideration" to mean [ ███ ] in this context.

Furthermore, the phrase is "the market under consideration" and not "a market under consideration," indicating that there can only be one single market under consideration, which is consistent with Commerce's fundamental antidumping framework for investigating a particular product from single country. Recall that this case is on mattresses from Cambodia. As Commerce made clear in issuing the first questionnaire to Best Mattresses in this proceeding – "The product under investigation is mattresses from Cambodia." AD Questionnaire at 1 (May 8, 2020). Commerce did not initiate an investigation on mattress completed in Cambodia from parts produced in China or another NME country, as that was not the scope of the petition brought by Petitioners, nor would it have been proper under Commerce's regulations, which require that a petition include "{t}he name of the country in which the subject merchandise is manufactured or produced." 19 C.F.R. § 351.202(b)(6).

The purpose of identifying a market price within the transactions disregarded and major input rules also reveals that "market under consideration" can only refer to Cambodia in this case. These rules are designed to be used "{i}n the calculation of a foreign respondent's cost of production," in order to test if a respondent's purchase price is "an arm's length or market price." SeAH Steel Corp. v. United States, 34 CIT 605, 635, 704 F. Supp. 2d 1353, 1377 (2010). The focus is unequivocally on the respondent's experience in this context, not on respondent's supplier's experience. Here, Best Mattresses, the respondent, is located in Cambodia, not [ ███ ], which makes the purpose of these rules to identify market prices for Best Mattresses' inputs in Cambodia.

Petitioners' opposite conclusion - that the "market under consideration" here is [ ███ ] – does not survive scrutiny. See Pet'rs' Br. at 24 (Confidential Version). Petitioners draw the

Court's attention to the phrase – "the element of value required to be considered," which precedes

"market under consideration" in the statute, and, according to Petitioners, provides a context

supporting their claim that "'sales of merchandise under consideration' refers to the input being

purchased, not the merchandise subject to investigation by Commerce."  See Pet'rs' Br. at 24-25

(quoting 19 U.S.C. § 1677b(f)(2)).  Again, here is the complete quote from the statute:

> A transaction directly or indirectly between affiliated persons may be disregarded
> if, in the case of any element of value required to be considered, the amount
> representing that element does not fairly reflect the amount usually reflected in
> sales of merchandise under consideration in the market under consideration.  If a
> transaction is disregarded under the preceding sentence and no other transactions
> are available for consideration, the determination of the amount shall be based on
> the information available as to what the amount would have been if the transaction
> had occurred between persons who are not affiliated.

19 U.S.C. § 1677b(f)(2) (emphasis added).  The "element of value required to be considered" is a

long way to identify the input in question and does nothing to detract from the focus on "the market

under consideration" as a single country being investigated, here Cambodia, for the reason

explained immediately above.

Even if the statute is ambiguous as to the definition of the "market under consideration,"

the Court must accord the agency discretion and uphold Commerce's interpretation if it is

reasonable.  See Chevron, 467 U.S. at 844.  Notably, the Court has found recently that "{t}he

statute vests Commerce with discretion to determine how best to apply the transactions disregarded

rule."  Unicatch, __ CIT at __, 539 F. Supp. 3d at 1248 (sustaining Commerce's interpretation of

the transactions disregarded statute).  Here, Commerce provided a clear and well-reasoned

explanation that "the market under consideration" is Cambodia because "the statute indicates that

the item being tested should reflect a market price in the country under consideration, which is

Cambodian in this case."  Final I&D Mem. at Cmt. 1, p. 10 (P.R. 301).

Petitioners offer a different interpretation, which is both illogical and deserves no deference

by this Court. Petitioners also latch onto the final sentence of the transactions disregarded rule as support for its position that [ ▮ ] is the market under consideration, which provides that "the determination of the amount shall be based on the information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated." Pet'rs' Br. at 25 (Confidential Version) (quoting 19 U.S.C. § 1677b(f)(2)). Petitioners explain that "the second sentence of the transactions disregarded rule allows Commerce to use 'information available' to determine an arm's length price and does not restrict Commerce's use of record evidence." Id. at 25 (Nonconfidential Version). This basic framing actually hurts Petitioners' position as it highlights Commerce's regulatory discretion in selecting the "information available." Here, Commerce's selection of the Cambodian Trademap data as "information available" to value the market price in the context of both the transactions disregarded and major input rules was based on its reasonable interpretation that "the market under consideration" referred to Cambodia. See Final I&D Mem. at Cmt. 1, p. 10 (P.R. 301). Petitioners' interpretation requires the Court to endorse an unprecedented exception to Commerce's market economy antidumping methodology that would required Commerce to launch an investigation of a third country where the respondent purchases inputs from affiliates in [ ▮ ] This interpretation plainly contradicts the well-established practice of construing statutes narrowly. See, e.g., Comm'r v. Clark, 489 U.S. 726, 739, (1989) (providing that "we usually read the exception narrowly in order to preserve the primary operation of the provision").

Moreover, it cannot go unnoticed that, although Petitioners embrace a statutory interpretation that makes [ ▮ ] the "market under consideration" here, Petitioners do not actually advocate for [ ▮ ] data to be used as the market values. Instead, they claim that Commerce should use data from six other countries that have no connection to Best Mattresses'

actual production of subject merchandise, as explained below. Despite advocating for Commerce to use data from Brazil, Malaysia, Mexico, Romania, Russia and Turkey, Petitioners make no argument, nor is there any, that these countries, collectively or individually, are the "market under consideration" for purposes of 19 U.S.C. § 1677b(f)(2)-(3).

In sum, Commerce's has discretion to apply 19 U.S.C. § 1677b(f)(2)-(3) within reason and within the bounds of the country under investigation. Commerce acted in accordance with law in finding that "market under consideration" means Cambodia in this case because the phrase is unambiguous. Even if there is any ambiguity, Commerce's interpretation was a reasonable exercise of agency discretion that was well supported by the plain language of the statute and regulation and the underlying purpose of the transactions disregarded and major input rules to review a respondent's COP in producing subject merchandise in the country under investigation.

**B. Commerce's Reliance on Trademap Export Data to Establish a Market Price Was Supported by Substantial Evidence Because These Data Best Reflect Cambodian Market Prices**

Commerce's decision to use Trademap export data in the Final Determination to estimate the market price within the transactions disregarded and major inputs analyses was supported by substantial evidence because these data allowed Commerce to calculate Best Mattresses' dumping margin as accurate as possible. In the Final Determination, Commerce determined that Trademap data best reflected the market prices of Best Mattresses' affiliated input purchases where market prices from unaffiliated suppliers were unavailable. See Final I&D Mem. at Cmt. 1, p. 10 (P.R. 301). Commerce had two primary choices: 1) Trademap export data for Cambodia, which reflects shipments of relevant raw materials into Cambodia or 2) GTA import data which reflects shipments of relevant raw materials into six countries that have no relation to the production of

subject merchandise aside from being economically comparable to Cambodia.[4] <u>See</u> Letter on Behalf of Rose Lion to Dep't of Commerce re: Third Supplemental Questionnaire Resp. at Ex. SD-1.4 (Sept. 22, 2020) (Public Version) (P.R. 189-208); Letter on Behalf of Best Mattresses to Dep't of Commerce re: Third Supplemental Questionnaire Resp. at Ex. SD-1.4 (Sept. 22, 2020) (Public Version) (P.R. 169-188); Letter on Behalf of Pet'rs' to Dep't of Commerce re: Mattress Pet'rs' Submission of Rebuttal Factual Info. Concerning Resp'ts' Third Supplemental Questionnaire Resp. at Attach. 4 (Oct. 20, 2020) (Public Document) (P.R. 219-220). Petitioners claim that Commerce's determination is not supported by substantial evidence because the Trademap data and the GTA export data are inconsistent. <u>See</u> Pet'rs' Br. at 15-20. To the contrary, as explained below, Commerce provided substantial evidence to refute each of Petitioners' claims.

First, Petitioners make an apples and oranges argument when they claim that Cambodian Trademap export data and Cambodian GTA export data were inconsistent and, therefore, unreliable. <u>See</u> Pet'rs' Br. at 18. As Commerce explained, the Trademap export data and the GTA export data are "aggregated differently." Final I&D Mem. at Cmt. 1, p. 10 (P.R. 301). Petitioners claim that Commerce ignored what they think is a glaring fact that the two data sets are aggregated from different sources. <u>See</u> Pet'rs' Br. at 19. Yet Petitioners ignore the reality that the two data sets are the equivalents of apples and oranges, which explains their differences. Moreover, even if Petitioners and Commerce have two different interpretations of the data, Commerce's findings may still be supported by substantial evidence even if the possibility of drawing two inconsistent conclusions exists. <u>See</u> <u>Nat'l Lab. Rels. Bd.</u>, 316 U.S. at 106. Commerce properly recognized that the two datasets are compiled differently and, thus, a direct comparison is inappropriate,

---

[4] Petitioners also added GTA export data for shipments into Cambodia to the record to demonstrate it was different from Trademap export data and to argue that the difference made the Trademap export data unreliable, which Best Mattresses disputes. <u>See</u> Pet'rs' Br. at 17-19.

finding that "{t}he GTA data represents imports into a given country, by source export country, whereas the Trademap data represent country-specific export data into a particular country (e.g., Cambodia)." Final I&D Mem. at Cmt. 1, p. 10 (P.R. 301). With different sources, it is entirely reasonable that these two data sets did not match perfectly. Further, to be supported by substantial evidence, Commerce need not select a flawless database of import transactions, but rather must select an accurate market estimate in calculating the transactions disregarded and major input rules, which is exactly what the Trademap data provided. As Commerce correctly found, the "Trademap data for Cambodia is robust, includes prices for all the necessary affiliated inputs and, while it is aggregated differently from GTA, there is no evidence that it is faulty or inaccurate." Final I&D Mem. at Cmt. 1, p. 10 (P.R. 301).

Second, Petitioners emphasize that the Trademap data were unreliable mirror data, meaning that they are composed of data extracted from other countries' exports to Cambodia because Cambodia does not report data to UN Comtrade, the primary source of Trademap data. See Pet'rs' Br. at 17. Petitioners talk around the fact that GTA export data are also "mirror" data by using Trademap's own admission that mirror data are imperfect. See id. Petitioners also claim that Commerce ignored the incongruency between the data composites and declined to pick GTA data that Petitioners claimed did not suffer Trademap's shortcomings. See id. at 19. Petitioners continue to overlook Commerce's analysis of the differences between the GTA and Trademap data. See Final I&D Mem. at Cmt. 1, p. 10 (P.R. 301) ("The GTA data represents imports into a given country, by source export country, whereas the Trademap data represent country-specific export data into a particular country (e.g., Cambodia)."). Final I&D Mem. at Cmt. 1, p. 10 (P.R. 301). Commerce explained that it understands the advantages and disadvantages of both data sets, and it concluded, contrary to its findings in the Preliminary Determination, that the Trademap data

were the most reliable.

Petitioners attempt to impose an unreasonably high bar for the Trademap data by emphasizing that it is possibly incomplete when compared to a separately-calculated source, the GTA export data. Context is important here and does not warrant the level of perfection that Petitioners claim. Commerce's purpose is to estimate a market value against which to test if Best Mattresses' input purchase prices are at arm's length. <u>See</u> Final I&D Mem. at Cmt. 1, p. 10 (P.R. 301). Commerce performs this measurement by reviewing average unit values from the Trademap data by input. Commerce doesn't need exact import volumes into Cambodia in order to obtain a reliable AUV to estimate the market price. The bottom line is that there is nothing on the record to suggest that any of the Trademap data themselves are unreliable or inaccurate, that the reporting countries did not in fact ship what they reported to Cambodia or that the shipments weren't properly classified under the relevant HTS codes. Commerce properly recognized this in finding that "Trademap data for Cambodia is robust, includes prices for all the necessary affiliated inputs and, while it is aggregated differently from GTA, there is no evidence that it is faulty or inaccurate." <u>Id.</u>

Critically, Commerce selected the Trademap data in the Final Determination because the statute requires Commerce to estimate the market value of the "market under consideration," and the Trademap data are the only data on the record for Cambodia, as fully explained in Section A above. Commerce chose the Cambodian Trademap data instead of the six-country GTA composite it used in the Preliminary Determination because Commerce determined that using "country-specific export data into a particular country (*e.g.*, Cambodia)" was essential to best reflect the market price of the country being investigated, Cambodia. <u>Id.</u> Commerce made its final determination after Best Mattresses criticized Commerce for its "fail{ure} to adequately explain

how an average of six foreign countries' GTA import data accurately reflects the production inputs' market values in Cambodia." Letter on Behalf of Best Mattresses and Rose Lion to Dep't of Commerce re: Case Br. at 25 (Jan. 19, 2021) (Public Version) ("Admin. Case Br.") (P.R. 288). Ultimately, Commerce agreed that using Cambodian Trademap data was the most accurate method for determining a market price in Cambodia, and thus, Commerce fulfilled its statutory obligation to calculate constructed values as accurately as possible. See Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990) (The "basic purpose of the statute" is to "determin{e} current margins as accurately as possible."). The Court has also expressly applied this standard in the CV context, finding that "Commerce is charged with computing a constructed value as accurately as possible." Ass'n of Am. Sch. Paper Suppliers v. United States, 33 CIT 1742, 1751 (2009).

Even if both the Trademap data and GTA data were imperfect, Commerce was tasked with constructing a margin as accurately as possible, and it provided substantial evidence when it announced that "{t}he Trademap data for Cambodia is robust, includes prices for all the necessary affiliated inputs and, while it is aggregated differently from GTA, there is no evidence that it is faulty or inaccurate." Final I&D Mem. at Cmt. 1, p. 10 (P.R. 301).

Petitioners claim that Commerce's transition from its Preliminary Determination (rejecting Trademap data) to its Final Determination (using Trademap data) was not supported by substantial evidence, see id. at 19-20, but Petitioners misrepresent Commerce's preliminary analysis. Commerce never found that the Trademap data were "unreliable," but rather Commerce indicated its Preliminary Cost Memorandum that it was unable to rely on Trademap data because "{a}fter excluding the NME countries, there is a very little import data left for calculation purposes." COP Mem. at 2 (P.R. 242). This issue was resolved, and Commerce was left with a robust Trademap dataset, when Commerce rightly concluded that "{i}n market economy cases, Commerce relies on

the purchase prices paid to unaffiliated suppliers based in these countries. It would be inconsistent with the law and {Commerce's} practice to exclude imports from these countries when using the GTA {or Trademap} data as a proxy for market prices and COP." Final I&D Mem. at Cmt. 1, p. 10 (P.R. 301). For these reasons, Commerce's conclusion that Trademap export data was the most accurate source to value the market price of Best Mattresses' inputs was supported by substantial evidence and consistent with law.

## II. COMMERCE WAS SUPPORTED BY SUBSTANTIAL EVIDENCE IN DECLINING TO FOLLOW NME METHODOLOGIES

### A. Commerce's Use of Export Data Was Supported by Substantial Evidence Because Commerce's Practice of Relying on Import Data in NME Investigations is Irrelevant

Commerce's use of Cambodian Trademap data was supported by substantial evidence despite Petitioners' claim that Commerce's longstanding practice is to rely exclusively on official import data, not export data. See Pet'rs' Br. at 26-28. Critically, Petitioners declined to mention that Commerce's practice is confined to the NME realm, which does not cover this investigation, because Cambodia is a market economy country. See id. Petitioners do not contend with Commerce's consistent statutory interpretation beginning in the Preliminary Determination that:

> Commerce decided to not apply an NME factors of production methodology analysis to inputs the respondent obtained from NME-based affiliated suppliers, because section 773(c) of the Act specifically applies to the issue of determining normal value for NME-based respondents, it does not address a method for determining COP for inputs obtained from NME based suppliers of a market economy based respondent, and for the practical reason that a complex NME analysis of the many NME-sourced affiliated inputs would not be administrable given the significant resources required and strict deadlines of an antidumping investigation.

Final I&D Mem. at Cmt. 1, p. 9 (emphasis added). Presumably, Petitioners declined to address Commerce's consistent analysis because they continue to wrongly believe that, because the relevant suppliers are located in an [ ▮▮▮▮▮▮▮▮▮▮▮ ] Commerce should rely on Section

773(c) of the Act, 19 U.S.C. § 1677b(c). Yet, section 773(c) is irrelevant, and Petitioners' decision to obscure the central detail of Commerce's historical preference for using import data in surrogate value data—that it only applies in NME investigations— is misleading. Moreover, as they do throughout their brief, Petitioners downplay that the GTA import data that they propose are for shipments into six unrelated countries. Even if Commerce did have a preference for GTA import data in the context of the transactions disregarded and major input rules, the need for data in the country under consideration is far more important, as Commerce found. Final I&D Mem. at Cmt. 1, p. 10 (P.R. 301). In sum, as Cambodia is a market economy country, Commerce was well supported in using export data to test input market prices, and the Court should reject Petitioners' argument that relied only on Commerce's NME practice.

## B. Commerce's Decision Not to Exclude Data From NME Countries and Countries That Have Widely Alleged Subsidies Was Supported by Substantial Evidence

Petitioners claim that Commerce's decision in the Final Determination to exclude data from NME countries and countries with broadly available export subsidies was not supported by substantial evidence. See Pet'rs' Br. at 29-31. While Commerce excluded data from these countries in its Preliminary Determination, Best Mattresses argued in its case brief that the requirement to exclude these data

> only applies when calculating surrogate values in an NME investigation, which is not applicable here. Commerce's implementation of surrogate country methodology lacks legal basis because this is an investigation on products from a market economy country. Commerce is inventing a new surrogate value methodology here by excluding NME data from its calculation on one hand, like in an NME investigation, but on the other hand, not giving the parties same opportunity to comment or submit other data as in an NME case.

Admin. Case Br. at 34 (Public Version) (P.R. 288). Subsequently, Commerce agreed, accurately stating in the Final Determination that "{i}n market economy cases, Commerce relies on the purchase prices paid to unaffiliated suppliers based in these countries" and, therefore, "{i}t would

be inconsistent with the law and our practice to exclude imports from these countries when using the GTA data as a proxy for market prices and COP." Final I&D Mem. at Cmt. 1, p.11 (P.R. 301).

Petitioners' argument that Commerce should have launched what would have amounted to an NME investigation was inconsistent with Commerce's authority and objectives. See id. at 10-11; see also Pet'rs' Br. at 27. Moreover, Petitioners conflate the surrogate value selection process for subject merchandise production in an NME country with the selection of input market price proxies for subject merchandise production in a market economy country. Commerce would have no statutory basis to reject the respondents' reported purchase prices of inputs from unaffiliated suppliers that were located in an NME or allegedly subsidize countries and so it has no legal basis to reject these imports in the context of a market input price. In addition, Petitioners cite an extensive quantity of authorities to show that Commerce does not prefer to rely on NME prices for price-based analysis; however, those citations are within the context of NME investigations and have no bearing here where the investigation concerns a market economy country and Commerce's duty to calculate the COP of goods in Cambodia, not in [ ████ ]. See Pet'rs' Br. at 31 (Confidential Version). In summary, Commerce's decision not to exclude NME and countries that are allegedly subsidized was supported by substantial evidence and otherwise in accordance with law.

Finally, if this Court were to agree with Petitioners that Commerce should exclude data from NME countries and countries alleged to have widespread subsidies, this Court should require Commerce to reopen the record. Finding for Petitioners on this issue would essentially require Commerce to invent a new surrogate value methodology here by excluding data from NME and subsidized countries on one hand, like in an NME investigation, but on the other hand, not giving the parties same opportunity to comment or submit other data as in an NME case. In that situation,

Commerce should not be allowed to create such a new methodology with no prior notice, no opportunity to comment and no reference to statutory authority. Best Mattresses should be entitled to provide additional comment and data.

## III. BEST MATTRESSES ADOPTS ARGUMENTS BY THE GOVERNMENT

Best Mattresses hereby concurs with and incorporates by reference the responsive arguments by the United States in its response brief insofar as they rebut claims made by Petitioners and support Commerce's related determinations.

## CONCLUSION

For these reasons, we respectfully request that this Court sustain the Final Determination and enter judgment in favor of the United States with respect to the claims brought by Petitioners as discussed herein.

Respectfully submitted,

Dated: March 11, 2022

/s/ Jeffrey S. Grimson

Jeffrey S. Grimson
Kristin H. Mowry
Sarah M. Wyss
Wenhui (Flora) Ji
Jacob M. Reiskin
Yixin (Cleo) Li

Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW, Suite 810
Washington, D.C. 20015
202-688-3610
trade@mowrygrimson.com
*Counsel to Best Mattresses International Company Limited and Rose Lion Furniture International Company Limited*

**CERTIFICATE OF COMPLIANCE**

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Jeffrey S. Grimson, hereby certify that this brief complies with the word limitations set forth in Paragraph 2(B) of the Standard Chamber Procedures. Excluding the table of contents, table of authorities, signature block and any certificates of counsel, the word count for this brief is 7,062 words. This brief thus complies with the Standard Chambers Procedures, which permits briefs of 14,000 words or fewer.

Dated: <u>March 11, 2022</u>

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW, Suite 810
Washington, D.C. 20015
202-688-3610
trade@mowrygrimson.com
*Counsel to Best Mattresses International Company Limited and Rose Lion Furniture International Company Limited*