**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| BEST MATTRESSES INTERNATIONAL COMPANY LIMITED AND ROSE LION FURNITURE INTERNTIONAL COMPANY LIMITED, <br><br>      *Plaintiffs and Consolidated Defendant-Intervenors*, <br><br>      v. <br><br> UNITED STATES, <br><br>      *Defendant*, <br><br> BROOKLYN BEDDING, LLC ET AL., <br><br>      *Defendant-Intervenors and Consolidated Plaintiffs.* | Consol. Court. No. 21-00281 |

## ORDER

Upon consideration of the Rule 56.2 Motions for Judgment upon the Agency Record filed by Plaintiffs Best Mattresses International Company Limited and Rose Lion Furniture International Company Limited, and defendant-intervenors Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO ("Mattress Petitioners"), the supporting memoranda of law, all responses thereto, and all other papers and proceedings in this action, it is hereby:

ORDERED that Plaintiffs' motion is in all respects DENIED; and it is further

ORDERED that Mattress Petitioners' Motion for Judgement Upon the Agency Record is granted, and it is further

ORDERED that the U.S. Department of Commerce's ("Commerce") final determination and resulting antidumping duty order in the antidumping duty investigation of *Mattresses from Cambodia, see Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Antidumping Duty Orders and Amended Final Affirmative Antidumping Determination for Cambodia*, 86 Fed. Reg. 26,460 (May 14, 2021), are remanded for the agency to revise its determination with respect to:

1. Commerce's selection of surrogate value data;

2. Commerce's construction and interpretation of the transactions disregarded rule; and

3. Commerce's methodology in calculating surrogate market values in its transactions disregarded analysis.

Dated: _____            _____
       New York, New York                   Gary S. Katzmann, Judge

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| BEST MATTRESSES INTERNATIONAL COMPANY LIMITED AND ROSE LION FURNITURE INTERNTIONAL COMPANY LIMITED, <br><br> *Plaintiffs and Consolidated Defendant-Intervenors*, <br><br> v. <br><br> UNITED STATES, <br><br> *Defendant*, <br><br> BROOKLYN BEDDING, LLC ET AL., <br><br> *Defendant-Intervenors and Consolidated Plaintiffs.* | Consol. Court. No. 21-00281 <br><br> **NON-CONFIDENTIAL VERSION** <br><br> Business Proprietary Information Removed from Brackets on Pages ii, 2-6, 8, 11-12, 15, 17, 20-23, 28-31, 33, and 35. |

## MATTRESS PETITIONERS' RESPONSE BRIEF IN OPPOSITION TO BEST MATTRESSES' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Yohai Baisburd
Jack A. Levy
Chase J. Dunn

CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
(202) 567-2300

*Counsel to Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO*

Date:   March 11, 2022

i

## Table of Contents

**Page**

I.  STATEMENT PURSUANT TO RULE 56.2 ................................................................. 2

    A.  Administrative Determination Under Review ................................................. 2

    B.  Issues Presented for Review ........................................................................... 3

II.  STATEMENT OF THE FACTS ........................................................................... 4

III.  SUMMARY OF THE ARGUMENT ................................................................. 11

IV.  ARGUMENT ..................................................................................................... 13

    A.  Standard of Review ....................................................................................... 13

    B.  Commerce's Interpretation and Application of the Major Input Rule Was in
        Accordance with Law and Supported by Substantial Evidence ................... 14

        1.  Commerce's Reliance on Surrogate Data to Establish Best Mattresses'
           Supplier's COP was Consistent with, and a Reasonable Interpretation
           of, the Major Input Rule ........................................................................ 16

           a)  *The Major Input Rule Unambiguously Provides Commerce with the Authority*
               *to Use Surrogate Data to Value a Major Input* ....................................... 17

           b)  *Commerce's Construction of the Major Input Rule Was Reasonable* ............ 20

        2.  Commerce Did Not Apply a NME Methodology and Provided All
           Parties an Opportunity to Submit and Comment on Surrogate Data ....... 23

        3.  Commerce Did Not Apply an NME Methodology and Therefore Did
           Not Violate the APA ............................................................................... 26

    C.  Commerce's Calculation of the Cost of Production for Certain Inputs Was
        Supported by Substantial Evidence ............................................................... 27

        1.  Commerce's Inclusion of Romanian GTA Data to Value [     ] Input
           Was Not Distortive ................................................................................. 28

        2.  Commerce Appropriately Excluded Mexican Surrogate Data Because
           Best Mattresses Failed to Provide an Accurate Conversion Ratio ........... 30

    D.  Commerce's Application of the Transactions Disregarded Rule to Adjust Best
        Mattresses' Fixed Asset Depreciation Was Supported by Substantial Evidence
        and in Accordance with Law ......................................................................... 31

    E.  Commerce's Selection of Emirates' Financial Statements to Calculate Best

Mattresses' Profit and Selling Expense Ratios was Supported by Substantial Evidence ................................................................................................ 36

    1. Emirates' Financial Statements Reflect a Producer of Mattresses with Business Operations Similar to Best Mattresses; GTI's Financial Statements Reflect Production of Non-Comparable Merchandise ......................... 36

    2. Emirates Financial Statements are Contemporaneous ............................... 39

    3. Emirates' Financial Statements are Publicly Available ........................... 40

    4. Emirates' Financial Statements Are Legible and Complete ..................... 42

    5. Conclusion ................................................................................................ 44

  F. Best Mattresses' Challenge to Commerce's Application of the Cohen's *d* Test is not Justiciable .......................................................................................... 44

V. CONCLUSION........................................................................................................ 47

# Table of Authorities

**Page(s)**

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ...........................................................................13

19 U.S.C. §1677b(a)(4) ..................................................................................... 7

19 U.S.C. § 1677b(c) ........................................................................................11

19 U.S.C. § 1677b(e) .......................................................................................36

19 U.S.C. § 1677b(e)(2)(A) .............................................................................36

19 U.S.C. § 1677b(e)(2)(B) .............................................................................36

19 U.S.C. § 1677b(e)(2)(B)(iii) .......................................................................36

19 U.S.C. § 1677b(f)(2) ............................................................................. *passim*

19 U.S.C. § 1677b(f)(3) ............................................................................. *passim*

19 U.S.C. § 1677f-1(d)(1)(A) ..........................................................................46

19 U.S.C. § 1677f-1(d)(1)(B) ..........................................................................46

28 U.S.C. § 2637(d) .........................................................................................47

**Regulations**

19 CFR § 351.407(b) .........................................................................5, 17, 19, 21

19 CFR § 351.408(c)(2) ...................................................................................24

19 CFR § 351.414(c) ........................................................................................46

**Court Decisions**

*Al Ghurair Iron & Steel LLC v. United States*, Slip Op. 2021-129 (Ct.
Int'l Trade 2021) ..............................................................................................21

*Altx, Inc. v. United States*, 370 F.3d 1108 (Fed. Cir. 2004) ...........................13

*American Spring Wire Corp. v. United States*, 569 F. Supp. 73 (Ct. Int'l
Trade 1983) ......................................................................................................45

*Apex Frozen Foods Private Ltd. v. United States*, 144 F. Supp. 3d 1308
(Ct. Int'l Trade 2016) .......................................................................................26

*Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1337 (Fed. Cir. 2017) .................................................................................................26

*Arkansas v. Oklahoma*, 503 U.S. 91 (1992) ...................................................13

*Calgon Carbon Corp. v United States*, 443 F. Supp. 1334 (Ct. Int'l Trade 2020) ...........................................................................................28

*Camara Nacional de las Industrias Azucarera y Alcoholera*, 118 F. Supp. 3d 1360 (Ct. Int'l Trade 2015) ....................................................45

*Catfish Farmers of America v. United States*, Consol. Court No. 08-00111, at 5-6 (Sept. 14, 2009) .......................................................28

*Chevron, U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ................................................................................14, 16, 17

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938) ..............................13

*Consolo v. Federal Maritime Comm'n*, 383 U.S. 607 (1966) .......................13

*Deacero S.A.P.I de C.V. v. United States*, Slip Op. 21-171 (Ct. Int'l Trade 2021) ...........................................................................................27

*Dorbest Ltd. v. United States*, 604 F.3d 1363 (Fed. Cir. 2010) ...................37

*Golden Dragon Precise Copper Tube Group, Inc. v. United States*, Slip Op. 2016-80 (Ct. Int'l Trade 2016).  ..........................................40

*GSA, S.r.l. v. United States*, 77 F. Supp. 2d 1349 (Ct. Int'l Trade 1999) ....26

*Heze Huayi Chem. Co. v. United States*, 532 F. Supp. 3d 1301 (Ct. Int'l Trade 2021) .........................................................................................22

*Honig v. Doe*, 484 U.S. 305 (1988) .............................................................45

*Husteel Co. v. United States,* 98 F. Supp. 3d 1315 (Ct. Int'l Trade 2015). ..................................15

*Itochu Bldg. Prods. v. United States*, 733 F.3d 1140 (Fed. Cir. 2013) .........47

*Jiaxing Brother Fasterner Co. v. United States*, 961 F. Supp. 2d 1323 (Ct. Int'l Trade 2015) ...........................................................................26

*Lifestyle Enter. v. United States*, 35 C.I.T. 158 (2011) ...............................37

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..................................45

*Mannesmannrohren-Werke AG & Mannesmann Pipe & Steel Corp. v. United States*, 77 F. Supp. 2d 1302 (Ct. Int'l Trade 1999) ...........................19

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984) .................................................................................................13

*Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056 (Fed. Cir. 2001) .................................................................................................13

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006) ...................................13, 14

*Perry Chemical Corp. v. United States*, 375 F. Supp. 3d 1324 (Ct. Int'l Trade 2019) ...........................................................................................45

*Rebar Trade Action Coal. v. United States*, 337 F. Supp. 1251 (Ct. Int'l Trade 2018) ...........................................................................................34

*Rebar Trade Action Coalition v. United States*, 398 F. Supp. 3d 1359 (Ct. Int'l Trade 2019) ................................................................33, 34

*Renne v. Geary*, 501 U.S. 312 (1991) .................................................................45

*Since Hardware (Guangzhou) Co., Ltd. v. United States*, 911 F. Supp. 2d 1362 (Ct. Int'l Trade 2013) ...............................................................41

*Solarworld Ams., Inc. v. United States*, 320 F. Supp. 3d 1341 (Ct. Int'l Trade 2018) ...........................................................................................28

*Tennessee Gas Pipeline Co. v. FPC*, 606 F.2d 1373 (D.C. Cir. 1979) ...............................45

*Tianjin Wanhua Co., Ltd. v. United States*, 179 F. Supp. 3d 1062 (Ct. Int'l Trade 2016) ...........................................................................................43

*Torrington Co. v. United States*, 82 F.3d 1039 (Fed. Cir. 1996) ....................14, 20, 23

*Unicatch Indus. Co. v. United States*, Slip Op. 21-117 (Ct. Int'l Trade 2021) ...........................................................................................32, 33

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009) ...........................................14

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .................................13

*Viraj Group v. United States*, 476 F.3d 1349 (Fed. Cir. 2007) ...........................18

*Xi'An Metals & Minerals Imp. & Exp. Co. v. United States*, 520 F. Supp. 3d 1314 (Ct. Int'l Trade 2021) .................................................................27

*Zenith Radio Corp. v. United States*, 437 U.S. 443 (1978) ...........................14, 23

## Administrative Determinations

*Certain Activated Carbon from the People's Republic of China: Final
Results of Antidumping Duty Administrative Review; 2016-2017*, 83 Fed.
Reg. 53,214 (Oct. 22, 2018)...................................................................................29

*Certain Cold-Rolled Steel Flat Products from Brazil: Final
Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 49,946
(July 29, 2016) .........................................................................................32, 33

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:
Final Results of Antidumping Duty Administrative Review and Final
Determination of No Shipments; 2017-2018*, 85 Fed. Reg. 23,756 (Apr.
29, 2020) ..................................................................................................40

*Mattresses from Cambodia: Final Affirmative Determination of Sales at
Less Than Fair Value and Final Negative Determination of Critical
Circumstances*, 86 Fed. Reg. 15,894 (Mar. 25, 2021) ........................................ *passim*

*Mattresses from Cambodia: Preliminary Affirmative Determination of
Sales at Less Than Fair Value, Preliminary Affirmative Determination
of Critical Circumstances, Postponement of Final Determination and
Extension of Provisional Measures*, 85 Fed. Reg. 69,594 (Nov. 3, 2020) .......................... *passim*

*Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the
Republic of Turkey, and the Socialist Republic of Vietnam: Antidumping
Duty Orders and Amended Final Affirmative Antidumping
Determination for Cambodia*, 86 Fed. Reg. 26,460 (May 14, 2021) .......................................3, 10

*Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the
Republic of Turkey, and the Socialist Republic of Vietnam: Initiation of
Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 23,002 (Apr. 24,
2020) .......................................................................................................4

*Multilayered Wood Flooring from the People's Republic of China: Final
Results of Antidumping Duty Administrative Review*, 79 Fed. Reg.
26,712 (May 9, 2014)..................................................................................29

*Persulfates from the People's Republic of China: Final Results of
Antidumping Duty Administrative Review*, 68 Fed. Reg. 6,712 (Feb. 10,
2003) .......................................................................................................41

*Welded Stainless Pressure Pipe from the Socialist Republic of Vietnam:
Final Determination of Sales at Less Than Fair Value*, 79 Fed. Reg.
31,092 (May 30, 2014)................................................................................42

*Wooden Bedroom Furniture from the People's Republic of China: Final*
*Results of Antidumping Duty Administrative Review and New Shipper*
*Reviews*, 74 Fed. Reg. 41,374 (Aug. 17, 2009) ..............................................................37

## **Other Legislative Materials**

H.R. Conf. Rep. No. 100-576 (1988) ..........................................................19, 21, 22, 25

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| BEST MATTRESSES INTERNATIONAL COMPANY LIMITED AND ROSE LION FURNITURE INTERNTIONAL COMPANY LIMITED,<br><br>*Plaintiffs and Consolidated Defendant-Intervenors,*<br><br>v.<br><br>UNITED STATES,<br><br>*Defendant,*<br><br>BROOKLYN BEDDING, LLC ET AL.,<br><br>*Defendant-Intervenors and Consolidated Plaintiffs.* | Consol. Court. No. 20-00281<br><br>**NON-CONFIDENTIAL VERSION**<br><br>Business Proprietary Information Removed from Brackets on Pages ii, 2-6, 8, 11-12, 15, 17, 20-23, 28-31, 33, and 35. |

## MATTRESS PETITIONERS' RESPONSE BRIEF IN OPPOSITION TO BEST MATTRESSES' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the US Court of International Trade, Defendant-Intervenors, and Consolidated Plaintiffs in the companion case *Brooklyn Bedding, LLC, et al. v. United States*, Court No. 21-00282, Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, (hereinafter, "Mattress Petitioners") respectfully submit this response brief in opposition to the Motion for Judgment on the Agency Record filed by Best Mattresses International Company Limited and Rose Lion Furniture International Company Limited (collectively, "Best

1

Mattresses").  *See* Memorandum of Points and Authorities in Support of Rule 56.2 Motion for

Judgment Upon the Agency Record of Plaintiffs Best Mattresses International Company

Limited and Rose Lion Furniture International Company Limited (Dec. 9, 2021) ("BM Br.").

In conducting its first antidumping duty investigation concerning imports from

Cambodia, the US Department of Commerce ("Commerce") was faced with a peculiar fact

pattern.  The respondents, Best Mattresses, began producing mattresses in Cambodia in 2019.

Although Cambodian companies, Best Mattresses had no sales of subject merchandise in

Cambodia or any third country market; Best Mattresses sold mattresses exclusively to the United

States.  Additionally, Best Mattresses claimed that all mattresses exported to the United States

were manufactured in Cambodia but admits that it relied on a significant amount of major and

minor inputs from its affiliates in [        ], a non-market economy ("NME"), to manufacture

such mattresses.  In other words, Commerce was faced with nominally market economy

respondents that were affiliated with NME suppliers that supplied an [                    ]

of the major and minor inputs used to produce subject merchandise, all of which was exported

only to the United States.  Given this unique situation, Commerce developed a methodology to

value Best Mattresses' inputs, and calculate the cost of production ("COP") and constructed

value ("CV") using information available on the record.  As discussed below, Commerce's

methodology is supported by substantial evidence and in accordance with law.

## I.  STATEMENT PURSUANT TO RULE 56.2

### A. Administrative Determination Under Review

Mattress Petitioners are domestic producers of mattresses that oppose Best Mattresses'

challenge to the final determination of Commerce's antidumping duty investigation of

Mattresses from Cambodia.  *See Mattresses from Cambodia: Final Affirmative Determination of*

*Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 86 Fed. Reg. 15,894 (Mar. 25, 2021) ("*Final Determination*") (P.R. 309) and accompanying Issues and Decision Memorandum ("IDM") (P.R. 301); *see also Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Antidumping Duty Orders and Amended Final Affirmative Antidumping Determination for Cambodia*, 86 Fed. Reg. 26,460 (May 14, 2021) (P.R. 325).[1]

### B. Issues Presented for Review

1. Whether Commerce's use of Global Trade Atlas ("GTA") data on the record to establish the COP of Best Mattresses' inputs sourced from affiliates in an NME when there was no other information on the record was supported by substantial evidence and in accordance with law.

2. Whether Commerce's inclusion of Romanian GTA data in valuing Best Mattresses' [      ] input was supported by substantial evidence when the Romanian data was not many times greater than other data on the record and was therefore not aberrational.

3. Whether Commerce's exclusion of Mexican GTA data in its calculation of Best Mattresses' [      ] input because Best Mattresses failed to provide a reliable conversion factor was supported by substantial evidence.

4. Whether Commerce's adjustment of Best Mattresses' fixed assets' depreciation expense under the transactions disregarded rule was supported by substantial evidence and in accordance with law when it used GTA data on the record for material inputs because the fixed asset data provided by Best Mattresses was for dissimilar fixed assets and no other market data was available.

5. In calculating CV profit and selling expense ratios, whether Commerce's reliance on the financial statements of Emirates Sleep Systems Private Limited ("Emirates"), which met all of Commerce's surrogate financial statement criteria, and its rejection of the financial statements of Grand Twins International ("GTI"), which does not produce mattresses, was supported by substantial evidence.

6. Whether Commerce's application of the Cohen's *d* test was supported by substantial evidence and in accordance with law and whether Best Mattresses' challenge to Commerce's Cohen's *d* analysis is justifiable given it suffered no injury in fact.

---

[1] All citations to the administrative record take the form "P.R.__" or "C.R.__".

## II.     STATEMENT OF THE FACTS

Mattress Petitioners filed a petition with Commerce on March 31, 2020, alleging that mattresses from Cambodia were being sold in the United States at less than fair value, which Commerce initiated on April 20, 2020. *See Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 23,002 (Apr. 24, 2020) (P.R. 45). Commerce selected Best Mattresses as the mandatory respondents because they accounted for the largest volume of subject exports during the period of investigation ("POI"). *See* Commerce Memorandum, "Less-Than-Fair-Value Investigation of Mattresses from Cambodia: Respondent Selection" (May 8, 2020) (P.R. 52).

On May 8, 2020, Commerce issued its standard antidumping duty questionnaire to Best Mattresses. *See Mattresses from Cambodia: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, Postponement of Final Determination and Extension of Provisional Measures*, 85 Fed. Reg. 69,594 (Nov. 3, 2020) ("*Preliminary Determination*") (P.R. 244) and accompanying Decision Memorandum ("PDM") (P.R. 236) at 2. In June and July 2020, Best Mattresses submitted responses to Commerce's antidumping duty questionnaire concerning their production activities in Cambodia, their US sales, and their cost of production. *See id.* at 3. Commerce issued several supplemental questionnaires, which Best Mattresses responded to between July and September of 2020. *See id.*

In their questionnaire responses Best Mattresses reported that [          ] of the material inputs used to produce the subject merchandise were sourced from affiliates in [       ], an NME. *See* Letter from Best Mattresses, "Sections C and D Questionnaire Response" (July 6,

2020) ("Best Mattresses C-DQR") (P.R. 107) (C.R. 47-55) at D-8 – D-9, Exhibits D-4 and D-5;

Letter from Rose Lion, "Sections C and D Questionnaire Response" (July 9, 2020) ("Rose Lion

C-DQR") (P.R. 108) (C.R. 56-67) at D-8 – D-9, Exhibits D-4 and D-5.  Specifically, Best

Mattresses reported that its "major inputs" included steel wire, foams, and quilts, which together

comprised [    ] percent of its total cost of manufacture ("TOTCOM").  The remaining material

inputs – including [                ] and other items – were similarly purchased from Best

Mattresses' [    ] affiliates and represented another [    ] percent of its TOTCOM.  Thus,

no less than [    ] percent of Best Mattresses' reported TOTCOM was based on transfer prices

from affiliated parties in [    ].  *See* Letter from Mattress Petitioners, "Mattress Petitioners'

Pre-Prelim Comments" (Oct. 2, 2020) ("Mattress Petitioner's Pre-Prelim Cmts") (P.R. 222)

(C.R. 228-229) at 5 (citing Best Mattresses C-DQR at Exhibits D-4 and D-5).  Similarly, Rose

Lion reported that its "major inputs" included steel wire, foams, and quilts, which together

comprised [    ] percent of its TOTCOM.  The remaining material inputs – including [

     ] and other items – were similarly purchased from Rose Lion's [       ] affiliates

and represented another [    ] percent of its TOTCOM.  Thus, no less than [        ] of Rose

Lion's TOTCOM was based on transfer prices from affiliated parties in [       ].  *See id.* (citing

Rose Lion C-DQR at Exhibits D-4 and D-5).

 When calculating normal value, Commerce's practice is to evaluate affiliated party

transactions to ensure they reflect arm's length prices under the "transactions disregarded" (19

U.S.C. § 1677b(f)(2)) and "major input" (19 U.S.C. § 1677b(f)(3)) rules.  Under the major input

rule, Commerce "will normally determine the value of a major input purchased from an affiliated

person based on the higher of" the transfer price between the respondents and their suppliers, a

market price, or the COP.  19 C.F.R. § 351.407(b).

To conduct its analysis, Commerce requested that Best Mattresses provide a schedule reporting all of their "POI affiliated material purchases and comparable unaffiliated purchases" and "the harmonized tariff schedule (HTS) code for the item description." *See* Letter from Commerce to Best Mattresses, "Section D Supplemental Questionnaire" (Sept. 1, 2020) (P.R. 156) (C.R. 137) at 3-4; Letter from Commerce to Rose Lion, "Section D Supplemental Questionnaire" (Sept. 1, 2020) (P.R.157) (C.R. 138) at 3-4. In addition, Commerce requested that both companies provide "the POI per-unit average import value into Cambodia for the item described" and the POI per-unit average import values for the same item using HTS values from six countries (*i.e.*, Romania, Russia, Malaysia, Turkey, Mexico and Brazil) that were economically comparable to [        ], the source of Best Mattresses' inputs. *Id.* Commerce also instructed Best Mattresses to provide a

> a separate schedule detailing the calculation of the POI per-unit average import value for Cambodia, Romania, Russia, Malaysia, Turkey, Mexico and Brazil for the item description (e.g., a schedule showing the average import values for Cambodia for the HTS which represents the item description from all countries excluding non-market economy countries and those Commerce has determined maintain broadly available export subsidies).

*Id.*

Best Mattresses submitted a response to Commerce's request. *See* Letter from Best Mattresses, "Third Supplemental Questionnaire Response" (Sept. 22, 2020) (P.R. 169-188) (C.R. 139-179) ("BM-SDQR"); Letter from Rose Lion, "Third Supplemental Questionnaire Response" (Sept. 22, 2020) (P.R. 189-208) (C.R. 180-223) ("RL-SDQR"). Mattress Petitioners also supplied official import data from GTA for the six countries requested by Commerce. *See* Letter from Mattress Petitioners, "Mattress Petitioners' Submission of Rebuttal Factual Information Concerning Respondents' Third Supplemental Questionnaire Response" (Oct. 2, 2020)

("Mattress Petitioners' RFI") (P.R. 219-220) at Attachment 5.

In the *Preliminary Determination*, Commerce recognized that Best Mattresses had "no sales in the home market of the foreign like product" and therefore had no viable home market for purposes of determining normal value.  PDM at 12.  Commerce further found Best Mattresses had insufficient sales to any third country which could serve as the basis of normal value.  *See id.*  Accordingly, Commerce used constructed value as the basis for calculating normal value, in accordance with 19 U.S.C. § 1677b(a)(4), and "calculated {constructed value} based on the sum of the costs of materials and fabrication employed in producing the subject merchandise, plus amounts for general and administrative (G&A) expenses, interest, profit, selling expenses and U.S. packing costs."  *Id.* at 13.

Commerce "relied on the COP and {constructed value} data submitted by Best Mattresses and Rose Lion except" that it adjusted reported transfer prices for major and minor inputs purchased from affiliated parties pursuant to the "transactions disregarded" and "major input rules."  *Id.*  Specifically, Commerce found that "Best Mattress and Rose Lion purchased steel wire, quilt and various kinds of foams from various non-market economy ("NME") affiliated parties that were major inputs into the production of the merchandise under consideration."  Commerce Memorandum, "Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination" (Oct. 27, 2020) ("Preliminary COP Memo") (P.R. 242) (C.R. 241) at 1-2.  During "the POI, Best Mattresses and Rose Lion {also} purchased various minor inputs from NME affiliated parties."  *Id.* at 2.

With respect to the "transactions disregarded" analysis, Commerce "compared the price paid to the affiliate (*i.e.*, the transfer price) to a market price."  Preliminary COP Memo at 2.  To determine a "market price" as a benchmark:

> For affiliated inputs where respondent did not purchase the same input from an unaffiliated party, we determined a market price using the average of the GTA data for the six countries Brazil, Malaysia, Mexico, Romania, Russia, and Turkey. We calculated the percentage difference between the transfer price and market price and adjusted for the difference. As a result, for the minor inputs, we increased the combined Best Mattresses' and Rose Lion's reported TOTCOM by [          ] percent. In addition, we increased the PACKU field in the sales database by [          ] percent. *Id.*

Similarly, with respect to the "major input" analysis, Commerce noted that Best Mattresses' affiliates' COP was not on the record and, therefore, Commerce "derived COP amounts by the Harmonized Tariff Schedule ("HTS") number of the specific inputs, using the Brazil Global Trade Atlas ("GTA") data" on the record. Preliminary COP Memo at 2. Commerce further explained that:

> We used Brazil as the surrogate country because Brazil provides coverage for all of the relevant HTS classifications, Brazil is the fourth largest mattress market in the world, and the Brazilian market is supplied almost entirely by domestic raw materials producers. For affiliated inputs where respondent did not purchase the same input from an unaffiliated party, we determined a market price using the average of the Global Trade Atlas ("GTA") data for the six countries Brazil, Malaysia, Mexico, Romania, Russia and Turkey. We did not use Cambodia data because Cambodia is not a reporting country in GTA…As a result, for the major inputs we increased the combined Best Mattresses' and Rose Lion's reported cost of manufacture (TOTCOM) by [          ] percent.

*Id.* (emphasis supplied). In addition, Commerce relied on the financial statements of Emirates to calculate Best Mattresses' profit and selling expenses ratios because it was the best information available and met all of Commerce's criteria for surrogate financial statements. *See* PDM at 14. Based on these adjustments to constructed value, *inter alia*, Commerce calculated a preliminary estimated weighted-average dumping margin of 252.74 percent for both Best Mattresses and Rose Lion. *See Preliminary Determination*.

On January 19, 2021, Best Mattresses filed a case brief disputing, *inter alia*, Commerce's CV calculation methodology and its application of the transactions disregarded and major input rules and the use of surrogate values to value Best Mattresses' inputs sourced from affiliated

suppliers in an NME.  *See* Letter from Best Mattresses, "Case Brief" (Jan. 19, 2021)

("Respondents' Case Br.") (P.R. 288) (C.R. 271).  Best Mattresses also argued that Commerce's

reliance on Emirates' financial statements to calculate CV profit was unsupported by substantial

evidence and that Commerce should revise its calculation of Best Mattresses' fixed asset

depreciation.  *See id.* at 5-7, 13-14.

On February 1, 2021, Mattress Petitioners filed a rebuttal brief.  *See* Letter from Mattress

Petitioners, "Mattress Petitioners' Rebuttal Brief" (Feb. 1, 2021) ("Mattress Petitioners' Rebuttal

Br.") (P.R. 292) (C.R. 272).  Mattress Petitioners argued Commerce's CV calculation

methodology was reasonable given Best Mattresses' affiliation with suppliers in NME countries.

*See id.* at 2-13.  Mattress Petitioners also explained Commerce's reliance on Emirates' financial

statements to calculate CV profit was supported by substantial evidence and the best information

available, especially considering Best Mattresses only alternative was to use financial statements

of a garment, not a mattress, manufacturer.  *See id.* at 13-29.

On March 25, 2021, Commerce published it *Final Determination*, in which it made

substantial changes to its transactions disregarded and major input rule analyses.  *First*, in

determining a market price to apply in its transactions disregarded and major input analyses

Commerce did not rely on the GTA six-country average data but found "that the Cambodian

Trademap data best reflect fair market prices for the market under consideration in those

instances where market prices from an unaffiliated supplier are not available."  IDM at Comment

1; *see also* Commerce Memorandum, "Cost of Production and Constructed Value Calculation

Adjustments for the Final Determination" (Mar. 18, 2021) ("Final COP Memo") (P.R. 307)

(C.R. 276) at 2.  *Second*, in determining the COP of the inputs Commerce did not rely

exclusively on Brazilian GTA data but relied on the GTA six-country average because this

"average represents a broader set of data for use as the information available."  IDM at Comment 1.  Specifically, "in the absence of the affiliates' COP, we derived the surrogate COP amounts by using HTS number specific inputs from the average of the GTA data for the six countries Brazil, Malaysia, Mexico, Romania, Russia and Turkey (including all NME countries and countries with export subsidies)."  *Id.*  In its calculation, Commerce excluded Mexican data because Best Mattresses failed to provide a conversion ratio in the form and manner requested by Commerce. Additionally, Commerce explained that it was not "adhering to and applying an NME factors of production methodology in this case" but was "simply using readily available surrogate information to fill the gaps where market prices and COP information are not available in order to implement the statutory rules for testing whether transfer prices between affiliated parties occurred at prices that represent arm's length."  *Id.*  Commerce further emphasized that all parties "were afforded an opportunity to comment on the {surrogate} data provided by other parties and the comments made by other parties."  *Id.*  In addition, Commerce continued to rely upon the financial statements of Emirates.  *See* IDM at Comment 2.

Based on its changes in the *Final Determination*, Commerce revised Best Mattresses' dumping margin from 252.74 percent calculated in the *Preliminary Determination* to 45.34 percent.  *See Final Determination*.

Following allegations of ministerial errors by Mattress Petitioners, Best Mattresses, and Rose Lion, Commerce published its final ministerial error memorandum on April 19, 2021, which resulted in revisions to the final dumping margin.  *See* Commerce Memorandum, "Allegations of Ministerial Errors in Final Determination" (Apr. 19, 2021) ("ME Memo") (P.R. 315) (C.R. 285).  On May 14, 2021, Commerce published an amended *Final Determination* and calculated an estimated weighted-average dumping margin of 52.41 percent for both Best

Mattresses and Rose Lion.  *See Amended Final Determination*.

## III.    SUMMARY OF THE ARGUMENT

In Section IV.B, Mattress Petitioners demonstrate that Commerce's application of the major input rule pursuant to 19 U.S.C. § 1677b(f)(3) was in accordance with law.  Under the major input rule, Commerce tests whether a respondent's purchases of inputs from affiliated parties that are used in the production of subject merchandise were made at arm's length by comparing the transfer price to a market price or COP.  Best Mattresses sourced substantial inputs from its affiliated suppliers in [          ], a NME, but did not purchase the same inputs from non-affiliated suppliers, and thus there was no viable market price benchmark for comparison.  Moreover, Best Mattresses' affiliated suppliers were located in an NME and, therefore, Commerce could not rely upon the affiliated suppliers' reported COP.  Accordingly, Commerce reasonably relied upon the statutory grant of discretion to use "information available" on the record, in the form of GTA surrogate data, to establish the COP of the inputs in order to carry out its major input analysis.

Mattress Petitioners also rebut Best Mattresses' contention that Commerce relied upon an NME methodology under 19 U.S.C. § 1677b(c) when it used surrogate data on the record—it did not.  Rather, Commerce relied upon the discretion set forth in the major input rule to use information available on the record to establish the COP.  Accordingly, Best Mattresses' contention that Commerce violated its surrogate value procedures under 19 U.S.C. § 1677b(c)(1) and acted contrary to its obligations under the Administrative Procedure Act ("APA") by engaging in rulemaking without notice and comment is without merit.

In Section IV.C, Mattress Petitioners demonstrate that Commerce's calculation of the major input COP was supported by substantial evidence.  *First*, Commerce reasonably did not

exclude Romanian data from its COP calculation because the data were not aberrational. *Second*, Commerce reasonably excluded Mexico data when calculating the COP for [      ] because Best Mattresses failed to provide an adequate conversion factor.

In Section IV.D, Mattress Petitioners demonstrate that Commerce's adjustment of Best Mattresses' fixed asset depreciation expenses under the transactions disregarded rule, 19 U.S.C. § 1677b(f)(2), was supported by substantial evidence and in accordance with law because Best Mattresses had no other purchases of similar fixed assets to use as a benchmark and therefore Commerce reasonably used an adjustment ratio calculated for input purchases from the same supplier.

In Section IV.E, Mattress Petitioners demonstrate that Commerce correctly relied upon the financial statements of Emirates to calculate CV profit and selling expenses because Emirates is a mattress producer with operations similar to those of Best Mattresses, Emirates' financial statements were publicly available and contemporaneous with the POI, and Emirates' financial statements were legible and contained all relevant information.  Commerce reasonably rejected the financial statements of GTI because it is a manufacturer of non-comparable merchandise (*i.e.*, garment products, not mattresses).

Finally, in Section IV.F Mattress Petitioners demonstrate that Best Mattresses' challenge to Commerce's application of the Cohen's *d* test is not justiciable because it suffered no injury in fact from Commerce's application of the average-to-average method to calculate Best Mattresses' dumping margin.  Moreover, Best Mattresses did not raise this issue before Commerce and therefore failed to exhaust its administrative remedies.

## IV.    ARGUMENT

### A.  Standard of Review

This Court must sustain Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

A "party challenging {Commerce's} determination under the substantial evidence standard 'has chosen a course with a higher barrier to reversal.'"  *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (quoting *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001)).  The substantial evidence standard is a deferential standard which tests whether a determination is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).  The Court must affirm Commerce's determination "if it is reasonable and supported by the record as a whole, even if some evidence detracts from the {agency's} conclusion."  *Nippon Steel Corp. v. United States*, 458 F.3d at 1352 (Fed. Cir. 2006) (quoting *Altx, Inc. v. United States*, 370 F.3d 1108, 1121 (Fed. Cir. 2004)).  Therefore, "even if it is possible to draw two inconsistent conclusions from evidence in the record," this does not mean that Commerce's findings are unsupported by substantial evidence within the meaning of the statute.  *Nippon Steel*, 458 F.3d. at 1352; *see also Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620 (1966).  Succinctly stated by the Supreme Court: a reviewing court "should not supplant the agency's findings merely by identifying alternative findings that could be supported by substantial evidence."  *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992).  Likewise, it is reversible error for the Court to

"assess{} credibility and reweigh{} the evidence," as "it is the role of the expert factfinder...to decide which side's evidence to believe." *Nippon Steel*, 458 F.3d at 1359.

With respect to questions of law, this Court is guided by the framework provided in *Chevron, U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ("*Chevron*"). Under *Chevron*, an agency's "interpretation {of a statute} governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009). As the Supreme Court has explained, "'{t}he whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency.'" *Id*. Importantly, an "agency's construction need not be the only—or even the most reasonable—interpretation of the statute. *See Zenith Radio Corp. v. United States*, 437 U.S. 443, 450 (1978). Rather, "any reasonable construction of the statute is a permissible construction." *Torrington Co. v. United States*, 82 F.3d 1039, 1044 (Fed. Cir. 1996).

### B. Commerce's Interpretation and Application of the Major Input Rule Was in Accordance with Law and Supported by Substantial Evidence

Congress provided two mechanisms through which Commerce can evaluate transactions between affiliated parties to ensure they reflect market prices and do not mask dumping. *See generally* 19 U.S.C. §§ 1677b(f)(2), (3) (outlining the "transactions disregarded" and "major input" rules). Pursuant to the major input rule:

> If, in the case of a transaction between affiliated persons involving the production by one of such persons of a major input to the merchandise, the administering authority has reasonable grounds to believe or suspect that an amount represented as the value of such input is less than the cost of production of such input, then the administering authority *may determine the value of the major input on the basis of the information available regarding such cost of production*, if such cost is greater than the amount that would be determined for such input under paragraph (2). (emphasis supplied).

Thus, the "major input rule is applied when there is a transaction between affiliated parties

involving one party's production of a major input needed for the production of the subject merchandise, as such a situation presents reasonable grounds for Commerce to suspect that 'an amount represented as the value of such input is less than the cost of production of such input.'" *Husteel Co. v. United States*, 98 F. Supp. 3d 1315, 1357 (Ct. Int'l Trade 2015).

Best Mattresses challenges Commerce's interpretation and application of the major input rule in this case.  Specifically, Best Mattresses asserts that: (1) Commerce's reliance on surrogate data to establish the COP of major inputs Best Mattresses obtained from affiliated suppliers in [        ] was both inconsistent with, and an unreasonable interpretation of, the statutory language in 19 U.S.C. § 1677b(f)(3); (2) Commerce's use of surrogate data to establish Best Mattresses' affiliated supplier's COP was an unlawful application of Commerce's NME methodology in a market economy case; (3) Commerce "failed to follow the proper surrogate value selection procedures;" and (4) Commerce acted unlawfully by using an NME surrogate value methodology in its major input rule application without following the proper procedures set forth in the APA.  *See* BM Br. at 11-28.  Best Mattresses' arguments are without merit.

*First*, Commerce's reliance on surrogate data on the record to calculate Best Mattresses' supplier's COP was consistent with, and a reasonable interpretation of, the major input rule. *Second*, Commerce did not apply an NME factors of production methodology in this case. Rather, because Best Mattresses' affiliated suppliers were based in an NME Commerce could not rely on the supplier's reported COP.  Given no other record information concerning the COP of these inputs, Commerce requested the parties provide surrogate data to value the major inputs in question so that it could carry out a major input analysis pursuant to 19 U.S.C. § 1677b(f)(3). This was not an NME factors of production analysis; rather, it was a reasonable attempt to use "information available" to value the major inputs in question.  *Third*, and relatedly, Commerce

adopted indicators of reliability from its surrogate value practice and provided all parties an

opportunity to provide surrogate data, to comment on the surrogate data placed on the record,

and to comment on Commerce's preliminary use of the surrogate data.  *Fourth*, Commerce did

not apply an NME methodology and, therefore, did not violate the APA.  Accordingly, this Court

should find that Commerce's interpretation and application of the major input rule was

reasonable and in accordance with law.

>    1.  *Commerce's Reliance on Surrogate Data to Establish Best Mattresses'*
>        *Supplier's COP was Consistent with, and a Reasonable Interpretation of, the*
>        *Major Input Rule*

Best Mattresses contends that Commerce's interpretation of the major input rule, 19

U.S.C. § 1677b(f)(3), as permitting the agency to use surrogate data on the record to value a

major input sourced from affiliated parties was not in accordance with law.  *See* BM Br. at 13-

20.  Best Mattresses acknowledges that a determination of the lawfulness of an agency's

construction of a statute is analyzed under the two-step test outlined in *Chevron*.  Best Mattresses

argues that Commerce's interpretation was unlawful under *Chevron* step one because the statute

unambiguously relates only to a respondent's input value and "gives Commerce no authority to

construct respondent's supplier's COP using outside surrogate data."  BM Br. at 16.  Best

Mattresses further argues that even if the Court finds 19 U.S.C. § 1677b(f)(3) ambiguous,

Commerce's construction of the statute was not reasonable under *Chevron* step two because

"Commerce chose information with no relation to Best Mattresses' suppliers' production or

actual mattress input production anywhere in the world."  *Id.* at 17.

Best Mattresses is wrong.  As discussed below, 19 U.S.C. § 1677b(f)(3) unambiguously

provides Commerce with discretion to use "information available" on the record to value the

major input in question, including using surrogate data on the record to value the COP of the

input in question.  Even assuming, *arguendo*, that 19 U.S.C. § 1677b(f)(3) is ambiguous,

Commerce's interpretation of "information available" as permitting the agency to rely on

surrogate data on the record is a reasonable interpretation of the major input rule, consistent with

Commerce's regulations implementing the major input rule, and consistent with Commerce's

longstanding major input practice.  Moreover, Commerce's selection of surrogate data from

countries economically comparable to [          ] (*i.e.*, comparable to the actual source of Best

Mattresses' inputs) was reasonable and provided an accurate estimate of the value of the inputs

in question.  Accordingly, the Court should affirm Commerce's interpretation of the major input

rule under *Chevron* step one or, alternatively, *Chevron* step two.

### a) *The Major Input Rule Unambiguously Provides Commerce with the Authority to Use Surrogate Data to Value a Major Input*

In the underlying investigation, Commerce applied the major input rule because Best

Mattresses "obtained three major inputs from its NME-based affiliated suppliers.  These major

inputs represent a significant portion of {Best Mattresses'} cost of manufacture (COM)."  IDM

at Comment 1.  Under its major input analysis, Commerce normally will determine the value of

the major input in question using the higher of (1) the transfer price the respondent paid the

affiliate for the input, (2) a market price for the input, or (3) the cost to the affiliated person of

producing the major input.  *See* 19 U.S.C. § 1677b(f)(3); 19 C.F.R. § 351.407(b).  However,

> Best Mattresses/Rose Lion reported that it did not purchase many of these items
> from unaffiliated suppliers and that their unaffiliated suppliers did not sell the same
> items to unaffiliated customers. Thus, for many items, Commerce was without a
> market price against which to test the affiliated party purchases. Furthermore,
> because these transactions were between Best Mattresses/Rose Lion and NME-
> based affiliated suppliers, Commerce was unable to rely on the affiliated suppliers'
> cost of production for use in applying the major input rule or as a substitute for a
> market price…

IDM at Comment 1.  Accordingly, Commerce explained that 19 U.S.C. § 1677b(f)(3)

"{r}ecogniz{es} that the affiliated suppliers' actual COP may not be available" and thus the "statute states that 'the administering authority may determine the value of the major input on the basis of the information available regarding such cost of production.'" *Id.*  Therefore, "Commerce sought to obtain surrogate information that would allow it to fulfill the requirements of {19 U.S.C. § 1677b(f)(3)}." *Id.*

Commerce's interpretation of the major input rule is in accordance with law under *Chevron* step one because the statute unambiguously provides Commerce wide discretion to use "information available" on the record to value a respondent's major input sourced from affiliated parties.  The major input rule states:

> If, in the case of a transaction between affiliated persons involving the production by one of such persons of a major input to the merchandise, the administering authority has reasonable grounds to believe or suspect that an amount represented as the value of such input is less than the cost of production of such input, then the administering authority ***may determine the value of the major input on the basis of the information available regarding such cost of production***, if such cost is greater than the amount that would be determined for such input under paragraph (2).

19 U.S.C. § 1677b(f)(3) (emphasis supplied).  Congress did not limit the range of information Commerce may use to value a major input; instead, it granted Commerce broad authority to choose "information available."  As the Federal Circuit explains, the "major input rule…provides Commerce discretion in valuing one company's production input, when the company receives that input from an affiliated company." *Viraj Group v. United States*, 476 F.3d 1349, 1356 (Fed. Cir. 2007).

Given Congress' grant of broad discretion to Commerce, Best Mattresses' assertion that "the specific authority {granted under the major input rule} relates only to <u>respondent's</u> input value and gives Commerce no authority to construct respondents' suppliers' COP using outside surrogate data" is unavailing.  BM Br. at 16.  In fact, Congress anticipated that a respondent or

its supplier may not provide market values and the COP of a major input.  In such a situation,

Congress explained:

> The conferees expect that, if petitioner makes a bona fide allegation that the transfer price for the major input or the arms-length price is less than the related party's cost of production, then Commerce will investigate such claims and may request cost-of-production information from the related party seller of the input. *If the related party seller does not provide reliable data on its costs of production*, and Commerce has reasonable grounds to believe or suspect that the transfer price and also the arms-length price would be less than the cost of production, *then Commerce should use best information to establish a reasonable estimate of the related party's costs of production for such input*.

H.R. Conf. Rep. No. 100-576 at 595 (1988) (emphasis supplied).  Congress further explained

that in "relying on best evidence available," Commerce "may use information developed during

the course of a previous antidumping investigation of the particular material or component,"

demonstrating Congress' understanding that Commerce may need to rely on data not provided

by respondents to establish a market price and COP in carrying out a major input analysis.  *Id.*

In addition, Commerce's interpretation of 19 U.S.C. § 1677b(f)(3) is consistent with its

regulations.  Specifically, 19 C.F.R. § 351.407(b) provides that in a major input rule analysis

Commerce "normally will determine the value of a major input purchased from an affiliated

person based on the higher of" (1) the transfer price, (2) a market price for input, or (3) "the cost

to the affiliated person of producing the major input."  Best Mattresses asserts that "the cost to

the affiliated person" means "actual cost to the supplier" and "does not mean estimated cost

based on outside surrogate data."  BM Br. at 17.  But as noted, *supra*, Congress explicitly

anticipated that actual COP data may not be on the record and granted Commerce discretion to

estimate the COP as part of its major input analysis.  *Cf. Mannesmannrohren-Werke AG &*

*Mannesmann Pipe & Steel Corp. v. United States*, 77 F. Supp. 2d 1302 (Ct. Int'l Trade 1999)

(noting that Congress provided Commerce discretion to "estimate{} a related party's cost-of-

production for purposes of § 1677b(f)(3)").

In sum, Congress provided Commerce with broad discretion (*i.e.*, use of "information available") to estimate the value of a major input or its COP in conducting a major input analysis. The legislative history of the major input rule confirms that Congress' broad grant of authority included estimating the value and COP of the major input using surrogate data (*i.e.*, data from sources other than the respondent or its supplier). Because the "intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Torrington Co. v. United States*, 82 F.3d at 1044.

### b)   *Commerce's Construction of the Major Input Rule Was Reasonable*

Assuming, *arguendo*, the Court finds 19 U.S.C. § 1677b(f)(3) is ambiguous, it should nevertheless find Commerce's interpretation was reasonable under *Chevron* step two. Best Mattresses asserts that "Commerce's interpretation was unreasonable under *Chevron* step two because Commerce chose information with no relation to Best Mattresses' suppliers' production or actual mattress input production anywhere in the world." BM Br. at 17. Best Mattresses is wrong. In a major input analysis, Congress granted Commerce the authority to use reasonable estimates of the COP when actual COP is not on the record. Using its authority, Commerce selected surrogate COP data from countries economically comparable to [          ], the location of Best Mattresses' affiliated suppliers. Commerce's surrogate methodology is a reasonable estimate of Best Mattresses' input suppliers' COP.

As noted above, Best Mattresses "obtained three major inputs from its NME-based affiliated suppliers." IDM at Comment 1. Because "these transactions were between {Best Mattresses} and NME-based affiliated suppliers, {Commerce} was unable to rely on the affiliated suppliers' cost of production for use in applying the major input rule or as a substitute

for a market price as Commerce often does when market prices of minor inputs are not available." *Id.*; *see also Al Ghurair Iron & Steel LLC v. United States*, Slip Op. 2021-129 at *43 (Ct. Int'l Trade 2021) (noting the antidumping statute "presumes that NME costs and prices are inherently unreliable").  Accordingly, "Commerce sought to obtain surrogate information that would allow it to" conduct its major input analysis.  Specifically, Commerce

> determined that the most reasonably available information to the parties for this purpose is the Global Trade Atlas (GTA) data, as these data are readily available and reasonably specific to the voluminous number of affiliated NME inputs. Further, to narrow the request and given that the affiliated suppliers are from an NME country, Commerce determined that it was appropriate to solicit GTA data from countries economically similar to the affiliated suppliers' country.  Thus, Commerce requested and obtained from the parties GTA data for the countries that are currently used by Commerce as potential surrogate sources for the particular NME country (*i.e.*, Brazil, Malaysia, Mexico, Romania, Russia, and Turkey).

*Id.*  Commerce's methodology was consistent with Congress' understanding that, when COP of the input is not on the record, "Commerce should use {the} best information to establish a reasonable estimate of the related party's costs of production for such input."  H.R. Conf. Rep. No. 100-576 at 595 (1988).

Best Mattresses asserts Commerce's methodology was unreasonable because "Commerce overlooked the most import factor here: this is not an investigation on [          ] imports" and therefore "Commerce distorted Best Mattress' dumping margin by calculating Best Mattresses' COP, in part, as if it were located in [          ]."  BM Br. at 18.  But Best Mattresses fails to recognize the purpose of the major input rule: to compare the transfer price paid to either a market price or the COP.  Commerce's regulations clarify that Commerce "normally will determine the value of a major input purchased from an affiliated person based on the higher of" the transfer price, market price, or "cost to the affiliated person of producing the major input." 19 C.F.R. § 351.407(b).  Accordingly, if a respondent's supplier is not located in the country

subject to investigation (as is the case here) Commerce will necessarily be required to rely on costs or market price data from sources outside the country subject to investigation.

Similarly, Best Mattresses' assertion that "Commerce made no finding that imports into Romania, Russia, Malaysia, Turkey, Mexico and Brazil under the same HTS codes…had any reasonable connection to the inputs actually used by Best Mattresses in its production of mattresses in Cambodia" is without merit.  BM Br. at 18.  Best Mattresses did not source its major inputs from Cambodia but from affiliated suppliers in [        ].  As such, Commerce narrowed its surrogate data to only those countries economically comparable to [        ], the location of Best Mattresses' affiliated suppliers.  Commerce's methodology was reasonable and ensured the surrogate value data was sufficiently specific to Best Mattresses' affiliated suppliers' production experience.

Additionally, Best Mattresses erroneously asserts that the surrogate data Commerce relied upon was unreasonable because "GTA data reflect import prices, which are higher than COP because they necessarily include profit to the seller."  BM Br. at 18-19.  But again, Congress did not require that Commerce *establish* the COP; rather, because Best Mattresses' supplier's COP was unavailable Commerce sought to "establish a *reasonable estimate* of the related party's costs of production for such input" given the information on the record.  H.R. Conf. Rep. No. 100-576 at 595 (1988) (emphasis supplied).  Here, the only information on the record was GTA data.  Commerce has repeatedly "explained its preference for the GTA database as a source of reliable data."  *Heze Huayi Chem. Co. v. United States*, 532 F. Supp. 3d 1301, 1327 (Ct. Int'l Trade 2021).  Accordingly, given the dearth of information on the record, Commerce's reliance on GTA data to estimate Best Mattresses' supplier's COP was reasonable.

Finally, Best Mattresses argues that the introduction of new legislation concerning inputs

sourced from NME suppliers "clearly shows that the current law governing this investigation does not authorize Commerce to treat NME-sourced inputs differently" than ME-sourced inputs. BM Br. at 19-20.  This argument is without merit.  Senate Bill S.1187 modifies the transactions disregarded rule under 19 U.S.C. § 1677b(f)(2) but does not modify the major input rule under 19 U.S.C. § 1677b(f)(3), and is therefore not relevant to Commerce's analysis here.  Moreover, Commerce did not treat Best Mattresses' NME-sourced inputs differently than ME-sourced inputs.  Rather, Commerce (1) could not rely on Best Mattresses' supplier's COP, (2) could not rely on [          ] import prices given it is a NME, and therefore (3) reasonably estimated the COP using surrogate data for countries economically comparable to [          ], consistent with Congress' intent in establishing the major input rule.

In sum, the Supreme Court has explained that an "agency's construction {of a statute} need not be the only—or even the most reasonable—interpretation of the statute." *See Zenith Radio Corp. v. United States*, 437 U.S. at 450.  Rather, "any reasonable construction of the statute is a permissible construction." *Torrington Co. v. United States*, 82 F.3d at 1044.  As discussed above, Commerce reasonably interpreted the major input rule's grant of authority to use the "information available" to establish COP as permitting the agency to rely on surrogate data on the record when no other information was available.  Commerce's construction of the statute is consistent with the plain language of the statute, supported by the legislative history of the major input rule, Commerce's regulations, and past practice.  Accordingly, the Court should affirm Commerce's major input analysis as supported by substantial evidence and in accordance with law.

### 2. *Commerce Did Not Apply a NME Methodology and Provided All Parties an Opportunity to Submit and Comment on Surrogate Data*

Best Mattresses contends that Commerce's major input analysis is unlawful because 19

U.S.C. § 1677b(f)(3) does not authorize "Commerce to use surrogate values within the major input rule analysis…Commerce may only use surrogate values in an NME proceeding."  BM Br. at 20.  In short, Best Mattresses asserts Commerce unlawfully applied its NME methodology in this case and failed to follow its NME surrogate value selection procedure.  *See* BM. Br. at 20-26.  Best Mattresses is again wrong.  The major input rule authorizes Commerce to rely upon "information available" to establish the COP of a major input when usable actual cost information is not on the record (as is the case here), including surrogate data on the record.  Accordingly, Commerce did not apply its NME methodology in this case and did not violate its NME surrogate value selection procedures.

In the *Final Determination*, Commerce explained that it was not "adhering to and applying an NME factors of production methodology" but rather was "simply using readily available surrogate information to fill the gaps where market prices and COP information are not available in order to implement the statutory rules for testing whether transfer prices between affiliated parties occurred at prices that represent arm's length."  IDM at Comment 1; *see also id*. (explaining that Commerce "consider{ed} it reasonable…to rely on the imports into countries that are economically comparable to the country of the affiliated NME suppliers as the COP for those suppliers, as information available").  Indeed, Commerce's methodology in this case differs significantly from its NME practice.  For example, Commerce did not select a single surrogate country to use as a source for surrogate values, as is its preference in the NME context.  *See* 19 C.F.R. § 351.408(c)(2).  Instead, Commerce "use{d} the import data for all of the six economically comparable countries as a surrogate COP" in order to "fill the gaps in applying the major input rule."  IDM at Comment 1.  This is consistent with Congress' explanation that in the major input context Commerce can "establish a reasonable estimate of the related party's costs of

production for such input" when actual cost data is unusable or not on the record.  H.R. Conf.

Rep. No. 100-576 at 595 (1988).

In addition, Best Mattresses faults Commerce for using surrogate selection criteria

typically employed in its NME practice (*i.e.*, economic comparability and a broad dataset).  *See*

BM Br. at 22.  But this does not show Commerce applied an NME methodology.  Rather,

Commerce simply adopted certain indicators of reliability of surrogate data from its NME

practice to ensure the surrogate data it relied upon in the major input context was accurate.  In

other words, the surrogate selection criteria, far from rendering Commerce's major input

methodology unlawful or unreliable, was appropriate to ensure the accuracy of the surrogate data

on the record.

As demonstrated above, Best Mattresses mistakenly equates the use of surrogate data

with Commerce's NME practice.  Accordingly, its argument that Commerce's use of surrogate

data "render{ed} its decision arbitrary because it treated a similar situation differently without

adequate explanation and factual support on the record," BM Br. at 23, is without merit.  Best

Mattresses is also wrong that Commerce "fail{ed} to provide parties with a full opportunity to

submit factual information related to input COP."  *Id.* at 26.  As Commerce explained:

> we disagree that parties were not given an opportunity to comment on the process
> or the decisions made at the preliminary or final determinations. In accordance with
> Commerce's regulations concerning the submission of factual information, parties
> were afforded an opportunity to comment on the data provided by other parties and
> the comments made by other parties. Further, the parties were able to provide pre-
> preliminary comments on how the collected data might be used and through the
> briefing process for the final determination were afforded the opportunity to
> comment on Commerce's *Preliminary Determination*. In addition, at the request of
> the parties, Commerce held a public hearing.

IDM at Comment 1.  In short, Best Mattresses had ample opportunity to submit surrogate data,

comment on Commerce's use of that data before and after the *Preliminary Determination*, and to

argue its case in a public hearing.

In sum, Best Mattresses' fatal flaw is its assertion that Commerce's use of surrogate value data is synonymous with Commerce's application of its NME methodology—it is not. Commerce did not apply its NME methodology but relied on the discretion granted by Congress to estimate the COP of Best Mattresses' supplier's COP using "information available" (here, surrogate value data placed on the record by both parties).  Consequently, Best Mattresses' argument that Commerce relied upon its NME methodology is wrong and this Court should affirm Commerce's major input analysis as in accordance with law.

### 3. *Commerce Did Not Apply an NME Methodology and Therefore Did Not Violate the APA*

Best Mattresses contends that Commerce "violated the APA because it has effectuated a new rule without providing any public notice or giving the public the opportunity to comment" when it used surrogate value data to determine Best Mattresses' supplier's COP.  BM Br. at 26-28.  Best Mattresses' argument betrays a fundamental misunderstanding of the APA and the antidumping statute.

Best Mattresses fails to recognize that the notice and comment procedures set forth in the APA "do not apply to antidumping administrative procedures, which mostly involved fact-based, investigative activities."  *Jiaxing Brother Fastener Co. v. United States*, 961 F. Supp. 2d 1323, 1331 (Ct. Int'l Trade 2015) (quoting *GSA, S.r.l. v. United States*, 77 F. Supp. 2d 1349, 1359 (Ct. Int'l Trade 1999)).  The "APA's notice and comment requirement applies to legislative rules and does not apply to 'interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice."  *Apex Frozen Foods Private Ltd. v. United States*, 144 F. Supp. 3d 1308, 1320 (Ct. Int'l Trade 2016), *aff'd* 862 F.3d 1337 (Fed. Cir. 2017).  This Court previously affirmed, for example, that "Commerce's shift from the *Nails* test to the differential

pricing analysis is not subject to notice and comment requirements" of the APA.  *See id.*; *see also Xi'An Metals & Minerals Imp. & Exp. Co. v. United States*, 520 F. Supp. 3d 1314, 1323 (Ct. Int'l Trade 2021) ("Commerce's adoption of a CONNUM-specific reporting requirement does not amount to the implementation of a legislative rule that would require notice-and-comment rulemaking."); *Deacero S.A.P.I de C.V. v. United States*, Slip Op. 21-171 at 12 (Ct. Int'l Trade 2021) (explaining Commerce "was not required to engage in notice-and-comment rulemaking to deduct Section 232 duties" because the decision "is not a new policy" and because "Commerce was only complying with its statutory duty….").

In sum, Commerce's use of surrogate value data was part of its statutory interpretation of the major input rule and was not a new policy.  *See* IDM at Comment 1 ("Therefore, Commerce sought to obtain surrogate information that would allow it to fulfill the requirements of sections 773(f)(2) and (3) of the Act.").  Commerce was decidedly not engaged in rulemaking.  As demonstrated above, Commerce's interpretation of 19 U.S.C. § 1677b(f)(3) was reasonable and in accordance with law.  Accordingly, this Court should reject Best Mattresses' erroneous APA argument as inconsistent with judicial precedent.

### C. Commerce's Calculation of the Cost of Production for Certain Inputs Was Supported by Substantial Evidence

Best Mattresses asserts that the "Commerce's input COP calculation was unsupported by substantial evidence" because "Commerce unreasonably included aberrational and distortive data from Romania in its input COP calculation" and "Commerce unreasonably excluded Mexico data from the input COP calculation on the basis of differential measurement units even though there was a conversion factor on the record."  BM Br. at 28-35.  Best Mattresses' arguments are based on its incorrect assumption that "Commerce used an NME surrogate value methodology in this case."  *Id.* at 28.  As demonstrated above, Commerce did not use an NME surrogate value

methodology in this case and, therefore, Best Mattresses' arguments are without merit because Commerce's NME surrogate value practice is not applicable in the major input context.  *See* Section IV.B.  Moreover, Commerce's inclusion of Romanian data was not distortive and Commerce appropriately excluded Mexico data from the input COP calculation because Best Mattresses failed to provide a conversion ratio.

1. *Commerce's Inclusion of Romanian GTA Data to Value [        ] Input Was Not Distortive*

Contrary to Best Mattresses' contention, *see* BM Br. at 29-32, Commerce's inclusion of Romanian GTA data when valuing the COP of Best Mattresses' [        ] input was supported by substantial evidence because the Romanian GTA data are not aberrational and do not undermine Commerce's overall major input analysis.

Commerce considers import data to be aberrationally high if the data is "many times higher than the import values from other countries." *Solarworld Ams., Inc. v. United States*, 320 F. Supp. 3d 1341, 1351 (Ct. Int'l Trade 2018).  The Merriam-Webster dictionary defines "many" as "being one of a ***large*** but indefinite number."  *See* Merriam-Webster, *Definition of "Many*,*"* https://www.merriam-webster.com/dictionary/many (emphasis supplied).  In interpreting Commerce's practice, this Court has previously found an AUV aberrational (*i.e.*, "many times higher") when it was "almost 30 times higher than" other AUVs for the same input from other surrogate countries.  *Calgon Carbon Corp. v United States*, 443 F. Supp. 1334, 1350 (Ct. Int'l Trade 2020); *see also Catfish Farmers of America v. United States*, Consol. Court No. 08-00111, at 5-6 (Sept. 14, 2009), ECF No. 100-1 (excluding unit values from Japan and the Netherlands from the import value used as surrogate value for respondent's labels because the unit value from the Netherlands and Japan were more than 79 and 30 times greater respectively, than the overall average import values).

The Romanian AUV for Best Mattresses' [          ] input is not "many times higher" than the other AUVs on the record.  For example, the Romanian data are [

          ] times higher than the next highest AUV (*i.e.*, compared to [          ]).  *See* Final COP Memo at Attachment 1E.  This is not a "large" number and, thus, is not "many times higher" than other AUVs on the record.  Commerce has explained that a surrogate value "appearing on the low or high end of a range of values is not enough to find such data aberrational."  *Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 83 Fed. Reg. 53,214 (Oct. 22, 2018), IDM at Comment 3; *see also Multilayered Wood Flooring from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 79 Fed. Reg. 26,712 (May 9, 2014), IDM at Comment 6 ("Merely being at the low end, or the high end of a range, for that matter, does not render a data point as an outlier.").  That is precisely the case here.

In contrast, Commerce excluded Malaysian data in calculating the COP of [          ] because the Malaysian data were [     ] times higher than the lowest AUV on the record for the same input (*i.e.*, compared to [                ]).  *See* Preliminary COP Memo at Attachment 2C.  For this reason, Best Mattresses' assertion that "Commerce's decision not to exclude the aberrational Romanian data was unsupported by substantial evidence and arbitrary" is unavailing.  BM Br. at 30.  The Malaysian data for [          ] was "many times higher" than other AUVs for that input and Commerce appropriately excluded it; the Romanian data for [          ] was not "many times higher" than other AUVs for that input and, accordingly, Commerce reasonably did not exclude such data in calculating the COP.  Consequently, Commerce's inclusion of Romanian GTA data in its COP calculation was supported by substantial evidence.

2.  *Commerce Appropriately Excluded Mexican Surrogate Data Because Best Mattresses Failed to Provide an Accurate Conversion Ratio*

In the *Final Determination*, Commerce excluded Mexican GTA data in valuing Best Mattresses' [        ] input because Best Mattresses reported its [        ] purchases on a square meters basis (m2), Mexican GTA data is reported in kilograms (kg), and Best Mattresses failed to provide a reliable conversion ratio.  *See* ME Memo at 4.  Commerce's decision to exclude Mexican GTA data is supported by substantial evidence and Best Mattresses' arguments to the contrary are unavailing.  *See* BM Br. at 32-35.

As explained previously, Commerce relied upon the average of GTA data for six countries (Brazil, Malaysia, Mexico, Romania, Russia, and Turkey) to establish surrogate COP for Best Mattresses' inputs.  *See* Final COP Memo at 2.  In valuing Best Mattresses' [        ] input, Commerce "intentionally did not include the per unit import costs of the Mexican GTA data for [        ] in the calculation" because Best Mattresses reported its [        ] purchases on a m2 basis and the Mexican GTA data reported AUVs on a kg basis.  *See* ME Memo at 4. Contrary to Best Mattresses assertion that "Commerce ignored record evidence that would allow the agency to easily calculate the value in kilograms," BM Br. at 32, Commerce explained that:

> We disagree with {Best Mattresses} that we can convert the Mexican [        ] data from m2 to kg using the conversion ratio in the {Best Mattresses'} supplemental section D questionnaire submission…{because} there is no universal conversion factor to convert m2 to kg.  The conversion factor used by {Best Mattresses}, which is based on their own records, cannot be applied to all other countries' GTA data. The density relied on by {Best Mattresses} is different from that inherent in the data of other countries.

ME Memo at 4.

Best Mattresses contention that Commerce erred because it "has frequently converted different units of measurement" is misplaced because the conversion factor for this input requires knowledge of the density of the material, which varies across countries.  BM Br. at 33.  For

example, Best Mattresses admits that the "conversion factor" it provided for Best Mattresses and

Rose Lion is different as between the two companies, *see* BM Br. at 33, which alone confirms

Commerce's analysis that there is "no universal conversion factor to convert M2 to kg."  ME

Memo at 4.  Moreover, Mattress Petitioners provided an analysis in rebuttal ministerial error

comments demonstrating that [                               ] data, which report units of

measure of both [     ] and kilograms, result in widely different [          ] conversion factors.

*See* Letter from Mattress Petitioners, "Mattress Petitioners' Rebuttal to Respondents' Ministerial

Error Allegation" (Apr. 5, 2021) (P.R. 314) (C.R. 284) at Attachment 1 (showing a [        ]

"conversion factor" of [

                          ]).  Put simply, if Commerce were to arbitrarily assume that the [      ]

conversion factor for [        ] imported into Mexico is the same as for the [        ] that Best

Mattresses purchased, it would be introducing gross distortion into its calculations.  Accordingly,

Commerce's decision to exclude Mexican GTA data was supported by substantial evidence.

### D.  Commerce's Application of the Transactions Disregarded Rule to Adjust Best Mattresses' Fixed Asset Depreciation Was Supported by Substantial Evidence and in Accordance with Law

Best Mattresses asserts that Commerce's application of the transactions disregarded rule

to its fixed asset depreciation expense was unlawful because "Commerce ignored Best

Mattresses' [                ] market-rate Cambodian purchases and, instead, used Cambodian

Trademap data to determine the market price."  BM Br. at 35-40.  Specifically, Best Mattresses

asserts Commerce should have used its [

       ] to establish a market price to compare against the transfer price for fixed assets rather

than applying the percentage difference between transfer price and market value calculated for

its purchases of other inputs.  *Id.*  Best Mattresses' arguments are without merit.

Pursuant to the transactions disregarded rule, Commerce may disregard transactions between persons found to be affiliated for purposes of calculating COP "if, in the case of any element of value required to be considered, the amount represent that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration." 19 U.S.C. § 1677b(f)(2).  Thus, "the statute directs the Department to test the arm's length nature of affiliated transactions to determine whether they reflect a market value." *Certain Cold-Rolled Steel Flat Products from Brazil: Final Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 49,946 (July 29, 2016) ("*CRS from Brazil*"), IDM at Comment 10.  Because the statute does not specify a particular methodology for determining market value, this Court has recognized that the "statute vests Commerce with discretion to determine how best to apply the transactions disregarded rule." *Unicatch Indus. Co. v. United States*, Slip Op. 21-117 (Ct. Int'l Trade 2021).  To this end, Commerce has developed a methodology whereby its "express preference for market value is a respondent's own purchases of the input from unaffiliated suppliers.  When no such purchases are available, the Department looks to the affiliated supplier's sales of the input to unaffiliated parties, and, lacking that, ***to any reasonable source for market value***." *CRS from Brazil*, IDM at Comment 10 (emphasis supplied).

Best Mattresses reported purchases of fixed assets from affiliated parties.  *See* IDM at Comment 1.  In applying the transactions disregarded rule, Commerce observed that Best Mattresses "did not identify any specific fixed assets that have a market price," rendering "impossible a proper comparison between similar fixed assets." *Id.*  Accordingly, Commerce resorted to "any reasonable source for market value" and "appl{ied} the results of those affiliated input purchases we could test, to the fixed asset purchases…That is, Commerce compared the

overall difference between the transfer price and market price, for each affiliated supplier, on

minor input transactions, and applied, if applicable, the resulting adjustment percentage to the

depreciation expense of the fixed assets supplied by that same affiliated supplier." *Id.*

Commerce "applied the adjustment only to the current year's depreciation expense, not to the

entire fixed assets," because "the purchase of fixed assets and raw material inputs are different in

that one relates to the current year while the other benefits multiple years." *Id.*

 Best Mattresses' contention that "Commerce decision to decline to use [

       ] in its transactions disregarded analysis violated the plain

language of the statute" is wrong.  BM Br. at 36.  In establishing the market price, Commerce's

"preference 'is to use the price paid by the respondent itself in transactions with unaffiliated

suppliers' ***involving identical products*** when such information is available."  *Unicatch Indus.*

*Co. v. United States*, at *38 (citation omitted) (emphasis supplied).  When the respondent does

not have purchases of the identical product, the statute gives Commerce discretion to use

"information available" on the record to establish a market price.  *See id.* at *37.  Accordingly,

Best Mattresses contention that "Commerce has no statutory or regulatory requirement to only

use respondent data that narrowly cover the affiliated input in question," BM Br. at 37, is directly

contradicted by the statutory language and Commerce's longstanding practice.  Here, Commerce

explained that the "fixed assets" Best Mattresses claimed could be used to establish a market

price "relate to the general category of 'construction materials,' not to specific assets, which

makes impossible a proper comparison between similar fixed assets."  IDM at Comment 1.

 Moreover, Best Mattresses' reliance on *Rebar Trade Action Coalition v. United States*,

398 F. Supp. 3d 1359 (Ct. Int'l Trade 2019) ("*Rebar*") is unavailing.  *See* BM Br. at 36-37.  In

that case, Commerce determined that non-collapsed fixed-asset holding companies provided

services to the respondent at below market rates and revised the costs using the financial expense ratios from collapsed fixed-asset holding companies. *See Rebar* at 1370-71. The Court rejected Commerce's transactions disregarded analysis because "the record reveals that the costs incurred by the non-collapsed asset owners are distinct in important ways from those of the collapsed-fixed asset owners" and Commerce had not sufficiently analyzed those differences. *Rebar Trade Action Coal. v. United States*, 337 F. Supp. 1251, 1260 (Ct. Int'l Trade 2018). The Court did not hold that Commerce could not resort to information available on the record when actual costs were unavailable; in fact, the Court recognized that Commerce may resort to "a reasonable source for market value available on the record," *Rebar* at 1372, when the respondent does not have purchases of the identical input from unaffiliated suppliers—which is the case here.

Furthermore, Best Mattresses' argument that Commerce "did not give interested parties the opportunity to provide market data specific to fixed asset depreciation" is without merit. BM Br. at 39. As an initial matter, in the Section D questionnaire Commerce requested that Best Mattresses "provide a worksheet that identifies those inputs and other items (*e.g.*, fixed assets, services, etc.) that your company receives from affiliated parties" and to include "the POI total quantity and transfer price of the transaction" and the "percentage the item represents of the total MUC's COM." Best Mattresses C-DQR at D-9. In the supplemental Section D questionnaire, Commerce explicitly requested that Best Mattresses provide "depreciation expense for the POI" for its fixed asset purchases." BM-SDQR at SD-4. In addition, Commerce provided all parties the opportunity to submit surrogate information to be used in the transactions disregarded and major input rule analyses, which includes market values for depreciation of fixed assets. *See* IDM at Comment 1. In "accordance with Commerce's regulations concerning the submission of factual information, parties were afforded an opportunity to comment on the data provided by

other parties and the comments made by other parties.  Further, the parties were able to provide

pre-preliminary comments on how the collected data might be used and through the briefing

process for the final determination were afforded the opportunity to comment on Commerce's

*Preliminary Determination*." *Id.*  In short, Best Mattresses had ample opportunity to provide

information related to its fixed assets and depreciation expenses but neglected to do so.

Finally, Best Mattresses erroneously asserts that "Commerce further violated the plain

language of the statute by adjusting Best Mattresses' [


]."  BM Br. at 39-40.  But as Commerce explained, "the original purchase price or

the book value of the affiliated supplier are {not} relevant, because it is the market value on the

date of sale for the asset that is relevant for testing the arm's length nature of the transaction."

IDM at Comment 1.  In other words, under the transactions disregarded rule Commerce must

compare the transfer price of the purchased equipment to a market value during the same time

period, not by comparison to the suppliers' [                                     ].

In sum, Commerce reasonably used its discretion under the transactions disregarded rule

to evaluate the arm's length nature of Best Mattresses' fixed asset purchases.  Because Best

Mattresses could not report purchases of identical assets [                              ], Commerce

followed its longstanding practice and used a reasonable source for market value (*i.e.*, the

percentage difference between transfer prices and market values for other minor inputs from the

same suppliers) as a proxy.  As discussed above, Commerce's selection of information available

on the record was reasonable and supported by substantial evidence.

### E. Commerce's Selection of Emirates' Financial Statements to Calculate Best Mattresses' Profit and Selling Expense Ratios was Supported by Substantial Evidence

Commerce based its normal value calculation on CV pursuant to 19 U.S.C. § 1677b(e) because Best Mattresses did not have a viable home or third-country market. *See* IDM at Comment 2. Lacking a viable home or third-country market, Commerce was unable to calculate CV profit and selling expenses using the preferred method under 19 U.S.C. § 1677b(e)(2)(A) and, therefore, turned to the alternatives set forth in 19 U.S.C. § 1677b(e)(2)(B). *Id.* In the *Final Determination*, Commerce appropriately relied upon the financial statements of Emirates to calculate CV profit and selling expenses in accordance with 19 U.S.C. § 1677b(e)(2)(B)(iii) (*i.e.*, under the "any other reasonable method" alternative) because Emirates is a producer of identical merchandise, its business operations and customer base are similar to those of Best Mattresses, its financial statements are audited, complete, and contemporaneous with the POI. *Id.*

Best Mattresses argues Commerce's reliance on Emirates' financial statements was unlawful because: (1) Emirates' financial statements are not perfectly contemporaneous with the POI, (2) Emirates "has different business operations from Best Mattresses," (3) Emirates' financial statements are not publicly available, (4) Emirates' financial statements are "not entirely legible or complete," and (5) GTI, a producer of apparel and garments, was "the only reasonable source for determining the CV profit and selling expense ratios." BM Br. at 40-52. As discussed below, Best Mattresses' arguments are without record support and rest upon fundamental misunderstandings of Commerce's CV practice.

> 1. *Emirates' Financial Statements Reflect a Producer of Mattresses with Business Operations Similar to Best Mattresses; GTI's Financial Statements Reflect Production of Non-Comparable Merchandise*

Best Mattresses argues that Emirates' financial statements demonstrate its business

operations are dissimilar to those of Best Mattresses and, therefore, Commerce should have relied upon the financial statements of GTI (a producer of apparel and garments, not mattresses). *See* BM Br. 40-52.  Specifically, Best Mattresses argues that (1) Emirates and Best Mattresses have "business of very different scale," (2) Emirates "appears to be a franchise operator and has a large sales operation" suggesting it is not a manufacturer, and (3) Emirates had a small amount of marketing and advertising whereas Best Mattresses had no marketing or advertising expenses. *Id.*  Best Mattresses' arguments miss the mark.

*First*, the mere fact that Emirates is a smaller company than Best Mattresses or GTI is immaterial.  Commerce explained in the *Final Determination* that it "does not typically use relative production quantities or sales as a criterion" when selecting surrogate financial statements.  IDM at Comment 2; *see also Wooden Bedroom Furniture from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and New Shipper Reviews*, 74 Fed. Reg. 41,374 (Aug. 17, 2009), IDM at Comment 14 ("the Department's practice is to disregard company size as a basis upon which to determine the representative nature of a company's financial statements….").  Commerce's practice of disregarding the comparative size of companies when analyzing financial statements has been affirmed by the Federal Circuit.  *See Lifestyle Enter. v. United States*, 35 C.I.T. 158, 176 (2011) (noting the Federal Circuit in *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1374 (Fed. Cir. 2010) held "Commerce can rely on certain financial surrogate companies' financial statements even where distortions based on economies of scale exist…").

*Second*, Best Mattresses' claim that Emirates "appears to be a franchise operator and has a large sales operation" is inconsistent with record evidence.  As an initial matter, Best Mattresses' claim that Emirates is a "franchise operator" and not a manufacturer is based on a

news article from 2014, five years before the POI; the news article has no bearing on the operations of Emirates in 2019.  *See* Letter from Best Mattresses, "Rebuttal Comments on Petitioners' Constructed Value Information" (Aug. 24, 2020) (P.R. 152) at Ex. CVR-1.  Further, Commerce recognized Emirates' 2019 financial statements "show that 76.71 percent of its activities involve the manufacturing of mattresses…."  IDM at Comment 2.  Similarly, Note 1 of Emirates' financial statements explains that the "Company is a manufacturing company basically into the manufacturing of all types and kinds of mattresses, bases and other sleep related products and systems."  Letter from Mattress Petitioners, "Submission Concerning CV Profit and Selling Expense" (Aug. 17, 2020) (P.R. 142) at Attachment 2 (PDF 44).

Moreover, the mere fact that Emirates earned some revenue from marketing and advertising does not render its business operations dissimilar to those of Best Mattresses.  As Commerce explained,

> The Emirates Sleep financial statements show that 76.71 percent of its activities involve the manufacturing of mattresses, while only 23.29 percent relate to marketing activities. Further, in addition to explaining that the "company basically {is} into the manufacturing of all types and kinds of mattresses and other sleep related products and systems," Note 1 of the Emirates Sleep's financial statements states "{t}he company is also into trading both wholesale and retail of such manufactured products" and "{t}he company provides advertising, marketing, and promotion services to its holding company," Dubai Furniture Manufacturing LLC. We believe that the marketing, promotion, and trading activities related to mattresses and sleep systems are completely appropriate activities for a company engaged in the manufacturing and sale of mattresses. Additionally, there is no record evidence, nor has the respondent shown, that the expenses related to these revenues are missing from the calculation of profit on the Emirates Sleep financial statements.

IDM at Comment 2.  Thus, Emirates' marketing and advertising activities does not demonstrate that its operations are dissimilar to those of Best Mattresses.  Moreover, Commerce explained that Best Mattresses' preference, "GTI, *is not a mattress producer* and would by this criterion be less representative of a typical Cambodian mattress producer."  IDM at Comment 2 (emphasis

supplied).

Given the factual record, Commerce concluded that "{w}hile GTI is a Cambodian producer which would expose it to similar business conditions as those of Cambodian mattress producers, it is not a mattress producer; Emirates Sleep is a mattress producer which would expose it to similar production and industry- specific conditions as those of Cambodian mattress producers." IDM at Comment 2. Best Mattresses has failed to undermine Commerce's well-reasoned conclusion and, accordingly, Commerce's determination that Emirates' business operations are similar to those of Best Mattresses is supported by substantial evidence.

### 2. *Emirates Financial Statements are Contemporaneous*

Best Mattresses argues that Commerce's selection of Emirates' financial statements was unsupported by substantial evidence because "GTI's 2019 financial statements are contemporaneous with the entire POI, while Emirates' financial statements only overlap by three months." BM Br. at 42. Best Mattresses' argument is without merit.

*First,* Commerce's longstanding practice is to treat financial statements that overlap with any portion of the POI as contemporaneous. As Commerce explained in the *Final Determination*:

> Because our periods of investigation and review do not normally coincide with the calendar year or other fiscal years typically adopted by companies, ***Commerce regularly accepts as contemporaneous a statement that overlaps the POI by some amount***…Therefore, while Commerce prefers to use contemporaneous financial statements for CV profit, Commerce does not require a financial statement's reporting period to be identical to the POI to be considered contemporaneous…***as long as the financial statement period overlaps the POI, we consider it contemporaneous….***

IDM at Comment 2 (emphasis supplied). Best Mattresses ignores that it "is 'well-established' that Commerce considers data that overlap any portion of the {POI} to be contemporaneous."

*Golden Dragon Precise Copper Tube Group, Inc. v. United States*, Slip Op. 2016-80 at *13 (Ct. Int'l Trade 2016).

*Second*, Best Mattresses' attempt to support its contemporaneity argument rests on a mischaracterization of Commerce's determination in *Certain Frozen Fish Fillets*. *See* BM Br. at 43. In that case, Commerce explained that it was "no longer consider{ing} MMC's non-contemporaneous 2016-2017 financial statements or {partly contemporaneous but} incomplete 2017-2018 financial statements" because "other contemporaneous Indian financial statements are on the record." *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 Fed. Reg. 23,756 (Apr. 29, 2020), IDM at Comment 2. In other words, Commerce rejected one financial statement because it was not contemporaneous with any part of the POR and rejected a partly contemporaneous financial statement because it was incomplete; Commerce did not "explicitly reject{} alternative financial statements on the record because completely contemporaneous surrogate financial statements were available." BM Br. at 43.

In sum, Commerce's practice is to accept financial statements as contemporaneous if they overlap with any portion of the POI. Emirates' financial statements overlap with three months of the POI, rendering them contemporaneous. Although GTI's financial statements overlap with the entire POI, GTI is not a mattress producer, as explained above. Accordingly, Commerce's determination that Emirates' financial statements were contemporaneous is supported by substantial evidence.

### 3.  *Emirates' Financial Statements are Publicly Available*

Best Mattress erroneously asserts that Emirates' financial statements are not publicly available, arguing that Commerce failed to recognize that Emirates "is not publicly traded" and

"disregarded that Emirates is registered at a private company in India as opposed to GTI which is public in Cambodia."  BM Br. at 47-49.  Best Mattresses also alleges that no record evidence supports Commerce's conclusion that Emirates' financial statements are available through a fee-based subscription service.  *Id.* at 49.  Best Mattresses' arguments are without merit.

*First*, Commerce's longstanding practice is that "to be publicly available, a financial statement need not be for a company that is publicly traded."  IDM at Comment 2; *see also Persulfates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 68 Fed. Reg. 6,712 (Feb. 10, 2003), IDM at Comment 8 (rejecting the argument that "Gujurat's financial statements are not publicly available because Gujuarat is not a public corporation" and disagreeing "that financial statements of public corporations are inherently more reliable than those of private companies, especially in cases where the financial statements are audited by public accounting firms.").

*Second*, record evidence establishes that Emirates financial statements are publicly available.  Best Mattresses aver, citing *Since Hardware*, that financial statements are publicly available only where the party provides a "step-by-step explanation by the submitter of how the financial statements were obtained."  BM Br. at 48.  But Best Mattresses reliance on *Since Hardware* is misplaced.  There, petitioners were able to get financial statements directly from the company by requesting them, but the respondents were unsuccessful with similar requests.  *See Since Hardware (Guangzhou) Co., Ltd. v. United States*, 911 F. Supp. 2d 1362, 1369 (Ct. Int'l Trade 2013).   Here, Commerce issued a memorandum seeking CV and profit and selling expense comments and information, as follows:

> Commerce is providing all interested parties the opportunity to comment and submit new factual information on CV profit and selling expenses for the above-referenced investigation. Each of the surrogate financial statements you

> submit must be complete (*i.e.*, including the auditor's report and all footnotes). Ensure that every page of the financial statements you submit includes a full English translation.

IDM at Comment 2. As Commerce recognized, it "did not expressly require the parties to explain how they obtained the information." *Id.* Commerce was satisfied that the statements were public based on Mattress Petitioners explanation that the statements were "obtained…from a public fee-based subscription service." *Id.*

### 4. Emirates' Financial Statements Are Legible and Complete

Best Mattresses also argues that Emirates' financial statements are illegible and incomplete, rendering them unusable. *See* BM Br. at 49-51. Specifically, Best Mattresses contends that Emirates' financial statements are incomplete because "they are missing five 'annexures,'" that are referenced in the financial statement notes and Commerce's practice is to discard incomplete financial statements. *Id.* at 50. Best Mattresses' arguments are not supported by record evidence and rely on a misunderstanding of Commerce practice.

*First*, Emirates' financial statements are legible and all relevant information is readable. Commerce's practice is to reject financial statements that are illegible only where it "prevent{s} a full and accurate analysis of the statements and prevent their use in calculating financial ratios." *Welded Stainless Pressure Pipe from the Socialist Republic of Vietnam: Final Determination of Sales at Less Than Fair Value*, 79 Fed. Reg. 31,092 (May 30, 2014), IDM at Comment 1 (finding "many numbers and line-item descriptions within the company's balance sheet and associated schedules cannot be determined with certainty; thus, the resulting financial ratios cannot be calculated with accuracy."). That is not the case here. As Commerce explained:

> While three pages out of a 40-page financial statement are difficult to read, it is because they pertain to the details on production equipment values and depreciation over two years. These pages were shrunk down in order to fit onto individual pages. While Commerce regularly rejects surrogate financial statements where they are

> illegible, especially where an alternative quality source is available, *here the pages in question are limited and are readable, and the totals tie to the asset balances on the balance sheets*.

IDM at Comment 2 (emphasis supplied).  Thus, even if "difficult to read," Emirates' financial statements are legible, readable, and, most importantly, the information relevant for calculating surrogate financial ratios are consistent and accurate.

    *Second*, Emirates' financial statements are complete and include all information necessary to calculate surrogate financial ratios.  Contrary to Best Mattresses' assertion, Commerce's practice is not to reject all financial statements that are missing some information.  Rather, as this Court has explained: "To clarify Commerce's actual practice, Commerce has rejected incomplete financial statements of potential surrogate companies because those statements did not include *data necessary for calculating financial ratios*."  *Tianjin Wanhua Co., Ltd. v. United States*, 179 F. Supp. 3d 1062, 1068 (Ct. Int'l Trade 2016) (emphasis supplied) (affirming Commerce's use of financial statements that included an incomplete annual report).  Although Best Mattresses claims Emirates' financial statements are incomplete because they are missing five "annexures," it failed to make any argument that the annexures were necessary for calculating surrogate financial ratios.  As Commerce explained, "{n}one of the annexures refer to information that would bring into question any of the values on the income statement which affect the profit or selling expenses.  Each of the annexure references is in a footnote that already details the affected balance sheet items."  IDM at Comment 2.  Moreover:

> The missing annexures constitute information related to sub-accounts to sub accounts, parts of line items in the Emirates Sleep financial statements, and these line items are already further explained by explanatory notes. The Emirates Sleep financial statements contain all of the financial statements (*i.e.*, the balance sheet, profit and loss statement, statement of cash flow, and equity), all of the Notes forming the financial statements, including sub parts to the notes, and the Independent Auditor's Report. Accordingly, we determine the Emirates Sleep

financial statements to be complete for purposes of calculating surrogate financial ratios.

IDM at Comment 2.

Finally, Best Mattresses' claim that Emirates' financial statements are incomplete because Note 13 details allegedly "massive loan balances with government authorities" and that such balances could be "significantly distortive" is incorrect.  BM Br. at 50-51.  Balances and loans with governments are not inherently distortive; rather, such loans are only distortive if they are below market rates.  Best Mattresses does not cite to any record evidence showing distortion.

### 5. Conclusion

In summary, Emirates is a mattress manufacturer and its business operations are similar to those of Best Mattresses.  *See* IDM at Comment 2.  In contrast, "GTI is a Cambodian producer of apparel and garment products…GTI is not a producer of mattresses."  *Id.*  Emirates' financial statements overlap with the POI and are therefore contemporaneous.  *Id.*  Mattress Petitioners provided sufficient information regarding how Emirates' financial statements can be obtained from public sources and, therefore, Emirates' financial statements are publicly available.  *Id.*  Finally, Emirates' financial statements are legible, provide all relevant information for calculating surrogate financial ratios and are therefore sufficiently complete under Commerce's longstanding practice.  *Id.*  Accordingly, Commerce's selection of Emirates' financial statements was supported by substantial evidence.

### F.  Best Mattresses' Challenge to Commerce's Application of the Cohen's *d* Test is not Justiciable

Best Mattresses asserts that the "results of Commerce's Cohen's *d* test are unreasonable as applied to Best Mattresses' sales data" because Commerce's analysis allegedly "includes data which violates the assumptions present in the Cohen's *d* test, generates incorrect or misleading

results, and is thus inappropriate for application to Best Mattresses' sales." BM Br. at 52-56.

The Court should reject Best Mattresses' argument as not ripe for consideration.

Pursuant to Article III of the Constitution, the Court "may adjudicate only actual, ongoing controversies." *Honig v. Doe*, 484 U.S. 305, 317 (1988). To satisfy the "case or controversy" requirement of Article III, "there must exist 'a present, live controversy . . . to avoid advisory opinions on abstract propositions of law.'" *American Spring Wire Corp. v. United States*, 569 F. Supp. 73, 74-75 (Ct. Int'l Trade 1983) (quoting *Tennessee Gas Pipeline Co. v. FPC*, 606 F.2d 1373, 1379 (D.C. Cir. 1979)). At its "irreducible constitutional minimum," the constitutional doctrine of standing requires satisfaction of three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent; (2) a causal connection between the injury and defendant's challenged conduct; and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see also Perry Chemical Corp. v. United States*, 375 F. Supp. 3d 1324, 1332 (Ct. Int'l Trade 2019) (recognizing the constitutional requirement of suffering an "injury in fact" applies in a 1581(i) case); *Camara Nacional de las Industrias Azucarera y Alcoholera*, 118 F. Supp. 3d 1360, 1364-65 (Ct. Int'l Trade 2015) (citing the *Lujan* requirements).

"Justiciability concerns not only the standing of litigants to assert particular claims, but also the appropriate timing of judicial intervention." *Renne v. Geary*, 501 U.S. 312, 320 (1991) (holding that the issue was not ripe for consideration because the respondents failed to demonstrate a live dispute involving the actual or threatened application of § 6(b) of the California Constitution to bar particular free speech). A ripe controversy could not be found where "no adverse consequences" exist. *Id.*

Best Mattresses does not possess constitutional standing to challenge Commerce's use of

45

the Cohen's *d* test in the underlying investigation because it cannot demonstrate that it was injured by any of those actions. More importantly, the Court cannot redress any purported injury because there was no injury. There is no live case or controversy in Best Mattresses' argument regarding the Cohen's *d* test because, regardless of the results of the Cohen's *d* test, Commerce in fact used the average-to-average method to calculate Best Mattresses' dumping margin. *See* Memorandum from Commerce, "Final Determination Analysis Memorandum for Best Mattresses International Company Limited and Rose Lion Furniture International Company Limited" (Mar. 18, 2021) ("Final Analysis Memo") (P.R. 304) (C.R. 275) at 3.

Pursuant to Section 777A(d)(1)(A) of the Act and 19 C.F.R. § 351.414(c), Commerce calculates weighted-average dumping margins by comparing weighted-average NVs to weighted-average EPs or CEPs, *i.e.*, the average-to-average method, or transaction-specific NVs to transaction specific EPs or CEPs, *i.e.*, the transaction-to-transaction method, unless the Department determines that another method is appropriate in a particular situation. *See* PDM at 8-10.

Commerce applies a "differential pricing" analysis for determining whether application of an alternative comparison method is appropriate in a particular situation pursuant to 19 C.F.R. § 351.414(c) and consistent with Section 777A(d)(1)(B) of the Act. *See id.* In the first stage of the differential pricing analysis, the Cohen's *d* test is applied. *See id.* at 9. The Cohen's *d* coefficient is a generally recognized statistical measure of the extent of the difference between the mean, *i.e.*, weighted-average price, of a test group and the mean, *i.e.*, weighted-average price, of a comparison group. *See id.* In the *Preliminary Determination* and unchanged in the *Final Determination*, Commerce determined that the average-to-average method appropriately accounted for such differences because there was not a meaningful difference in the weighted-

average dumping margins when calculated using the average-to-average method and an

alternative method based on the average-to-transaction method applied to the US sales which

pass the Cohen's *d* test.  *See id*. at 8-10; Final Analysis Memo at 3.  Accordingly, Commerce

used the average-to-average method for all US sales to calculate the weighted average dumping

margin for Ashley.  *See id*.  Because Commerce relied on the average-to-average method in both

the *Preliminary* and *Final Determinations*, Best Mattresses never suffered any injury because the

Cohen's *d* test did not result in use of an alternative comparison methodology.  Put simply, there

is nothing for the Court to redress.

Moreover, Mattress Petitioners note that Best Mattresses failed to raise this issue in its

case brief before Commerce and, therefore, has failed to exhaust its administrative remedies as

required by 28 U.S.C. § 2637(d).  *See* Respondents' Case Br.  Section 2637(d) "indicates a

congressional intent that, absent a strong contrary reason, the {trade} court should insist that

parties exhaust their remedies before the pertinent administrative agency."  *Itochu Bldg. Prods.

v. United States*, 733 F.3d 1140, 1145 (Fed. Cir. 2013) (citations omitted).  Similarly,

Commerce's regulations require that a "case brief must present all arguments that continue in the

submitter's view to be relevant to" Commerce's final determination.  19 C.F.R. § 351.309(c)(2).

Best Mattresses has not claimed any exception to the exhaustion doctrine applies in this case.

*See* BM Br. at 52-56.  Accordingly, Best Mattresses' failure to raise this issue before Commerce

was a failure to exhaust its administrative remedies and the Court should therefore not consider

this argument.

## V.    CONCLUSION

For the foregoing reasons, the Court should reject Best Mattresses' challenges to

Commerce's *Final Determination*.

NON-CONFIDENTIAL VERSION

Respectfully submitted,

/s/ Yohai Baisburd

Yohai Baisburd
Jack A. Levy
Chase J. Dunn

CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
(202) 567-2300

*Counsel to Brooklyn Bedding, LLC,
Corsicana Mattress Company, Elite
Comfort Solutions, FXI, Inc., Innocor, Inc.,
Kolcraft Enterprises Inc., Leggett & Platt,
Incorporated, International Brotherhood
of Teamsters, United Steel Paper and
Forestry, Rubber, Manufacturing, Energy,
Allied Industrial and Service Workers
International Union, AFL-CIO*

Date:   March 11, 2022

Court. No. 21-00281

### Certificate of Compliance

The undersigned hereby certifies that the forgoing submission of "Mattress Petitioners'
Response Brief In Opposition to Best Mattresses' Rule 56.2 Motion for Judgment on the Agency
Record," filed by Defendant-Intervenors, Mattress Petitioners, on March 11, 2022, contains
14,472 words, including footnotes, and excluding the table of contents, table of authorities, and
signature block, and therefore, complies with the word limitations set forth in Paragraph 2(B) of
the Standard Chamber Procedures, as modified by the order granting Defendant-Intervenor's
Consent Motion for Enlargement of the Word Count Limit.  *See* ECF 50.


BY: /s/  Yohai Baisburd