**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| BEST MATTRESSES INTERNATIONAL COMPANY LIMITED AND ROSE LION FURNITURE INTERNTIONAL COMPANY LIMITED,<br><br>   *Plaintiffs and Consolidated Defendant-Intervenors*,<br><br>  v.<br><br>UNITED STATES,<br><br>   *Defendant*,<br><br>BROOKLYN BEDDING, LLC ET AL.,<br><br>   *Defendant-Intervenors and Consolidated Plaintiffs.* | Consol. Court. No. 21-00281<br><br>**NON-CONFIDENTIAL VERSION**<br><br>Business Proprietary Information Removed from Brackets on Pages ii, 2, 7, 10-14. |

<u>**MATTRESS PETITIONERS' REPLY BRIEF**</u>

Yohai Baisburd
Jack A. Levy
Chase J. Dunn

CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
(202) 567-2300

*Counsel to Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO*

Date:   April 22, 2022

**Table of Contents**

                                                                                                                    **Page**

I.   ARGUMENT ................................................................................................................. 2

     A.   Commerce's Construction of the Transactions Disregarded Rule is Unsupported
          by Substantial Evidence and is Not in Accordance with Law ........................................ 2

          1.   The Purpose and Language of the Transactions Disregarded Rule (19
               U.S.C. § 1677b(f)(2)) Confirm That The "Market Under
               Consideration" Refers to the Market of the Affiliated Supplier ................................ 3

          2.   Defendant's and Best Mattresses' Other Arguments Are Similarly
               Without Merit ............................................................................................................... 8

     B.   Commerce's Use of Cambodian Trademap Data Is Not Supported By
          Substantial Evidence Because Cambodia is Not the "Market Under
          Consideration" and Because the Trademap Data Are Unreliable ................................. 11

          1.   Commerce's Reliance on Trademap Export Data to Determine a
               Market Price Was Not Supported by Substantial Evidence Because
               Such Data Do Not Reflect Market Prices in [          ] ................................ 11

          2.   Neither Defendant Nor Best Mattresses Rebut Mattress Petitioners'
               Argument that Cambodian Trademap Data Are Distorted and
               Unreliable ................................................................................................................... 12

     C.   Commerce's Longstanding Surrogate Value Practice of Relying Exclusively on
          Import Data Rather Than Export Data Is Not Confined to Its NME Practice ............... 14

     D.   Commerce's Refusal to Exclude Data from NMEs and Countries with Broadly
          Available Export Subsidies Is Not In Accordance With Law ........................................ 17

II.  CONCLUSION ............................................................................................................. 20

**Table of Authorities**

**Page(s)**

**Statutes**

19 U.S.C. § 1677b................................................................................................3, 4, 8, 9

19 U.S.C. § 1677b(a)(1)(A)......................................................................................4

19 U.S.C. § 1677b(a)(1)(B)(i)..................................................................................4

19 U.S.C. § 1677b(c)(1)............................................................................................15

19 U.S.C. § 1677b(f)(1)(A).......................................................................................19

19 U.S.C. § 1677b(f)(2) ..................................................................................... *passim*

**Court Decisions**

*Am. Tubular Prods., LLC v. United States*, 847 F.3d 1354 (Fed. Cir. 2017)........................................................................................................................11

*GPX Int'l Tire Corp. v. United States*, 37 C.I.T. 1544 (2013)...................................13

*Mid Continent Nail Corp. v. United States*, 38 C.I.T. 958 (2014)................................15

*Rhodia, Inc. v. United States*, 185 F. Supp. 2d 1343 (Ct. Int'l Trade 2001)........................................................................................................................16

*Russello v. United States*, 464 U.S. 16 (1983) ...........................................................5

*Sao Ta Foods Joint Stock Co. v. United States*, 425 F. Supp. 3d 1314 (Ct. Int'l Trade 2020)..............................................................................................16

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001)...............................17

*SKF USA Inc. v. United States*, 630 F.3d 1365 (Fed. Cir. 2011)...............................8

*SolarWorld Ams., Inc. v. United States*, 532 F. Supp. 3d 1266 (Ct. Int'l Trade 2021).......................................................................................................13

*Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358 (Fed. Cir. 2014)........................................................................................................................19

*Tianjin Mach. Import & Export Corp. v. United States*, 16 C.I.T. 931 (1992)......................................................................................................................16, 18

*Unicatch Indus. Co. v. United States*, 539 F. Supp. 3d 1229 (Ct. Int'l Trade 2021).......................................................................................................10

*Writing Instrument Mfrs. Ass'n, Pencil Section v. United States*, 984 F.
Supp. 629 (Ct. Int'l Trade 1997)............................................................14, 15

**<u>Administrative Determinations</u>**

*Bottom Mount Refrigerator-Freezers from the Republic of Korea:*
*Preliminary Negative Countervailing Duty Determination and*
*Alignment of Final Determination with Final Antidumping*
*Determination*, 76 Fed. Reg. 55,044 (Sept. 6, 2011) ......................................6

*Certain Cut-to-Length Carbon Steel Plate from Romania: Notice of*
*Final Results and Final Partial Rescission of Antidumping Duty*
*Administrative Review*, 70 Fed. Reg. 12,651 (Mar. 15, 2005)......................19

*Certain Hot-Rolled Steel Flat Products from the Republic of Korea:*
*Final Results of Antidumping Duty Administrative Review; 2019-2020*,
87 Fed. Reg. 12,660 (Mar. 7, 2022).................................................................3

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from*
*the Republic of Korea: Final Results of Antidumping Duty*
*Administrative Review; 2018-2019*, 86 Fed. Reg. 35,060 (July 1, 2021).......6, 8, 10, 11

*Mattresses from Cambodia: Final Affirmative Determination of Sales at*
*Less Than Fair Value and Final Negative Determination of Critical*
*Circumstances*, 86 Fed. Reg. 15,894 (Mar. 25, 2021) .......................... *passim*

*Mattresses from Cambodia: Preliminary Affirmative Determination of*
*Sales at Less Than Fair Value, Preliminary Affirmative Determination*
*of Critical Circumstances, Postponement of Final Determination and*
*Extension of Provisional Measures*, 85 Fed. Reg. 69,594 (Nov. 3, 2020) ...........2, 8, 20

*Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the*
*Republic of Turkey, and the Socialist Republic of Vietnam: Antidumping*
*Duty Orders and Amended Final Affirmative Antidumping*
*Determination for Cambodia*, 86 Fed. Reg. 26,460 (May 14, 2021) .................. *passim*

*Notice of Final Determination of Sales at Less Than Fair Value and*
*Affirmative Critical Circumstances Determination: Bottom Mount*
*Combination Refrigerator-Freezers From Mexico*, 77 Fed. Reg. 17,422
(Mar. 26, 2012) .....................................................................................6, 8, 10

*Notice of Final Determination of Sales at Less Than Fair Value and*
*Final Determination of Critical Circumstances: Diamond Sawblades*
*and Parts Thereof from the Republic of Korea*, 71 Fed. Reg. 29,310
(May 22, 2006).................................................................................................19

*Notice of Final Results of Antidumping Duty Administrative Review:*
*Certain Softwood Lumber Products from Canada*, 70 Fed. Reg. 73,437
(Dec. 12, 2005) ................................................................................................................... *passim*

*Polyethylene Terephthalate Film, Sheet, and Strip from the People's*
*Republic of China Final Results of Antidumping Duty Administrative*
*Review; 2010-2011*, 78 Fed. Reg. 35,245 (June 12, 2013) ..........................................................17

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished,*
*From the People's Republic of China: Final Results of the 2007-2008*
*Administrative Review of the Antidumping Duty Order*, 75 Fed. Reg. 844
(Jan. 6, 2010).............................................................................................................................16, 17

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| BEST MATTRESSES INTERNATIONAL COMPANY LIMITED AND ROSE LION FURNITURE INTERNTIONAL COMPANY LIMITED, <br><br> *Plaintiffs and Consolidated Defendant-Intervenors*, <br><br> v. <br><br> UNITED STATES, <br><br> *Defendant*, <br><br> BROOKLYN BEDDING, LLC ET AL., <br><br> *Defendant-Intervenors and Consolidated Plaintiffs.* | Consol. Court. No. 20-00281 <br><br> **NON-CONFIDENTIAL VERSION** <br><br> Business Proprietary Information Removed from Brackets on Pages ii, 2, 7, 10-14. |

<u>**MATTRESS PETITIONERS' REPLY BRIEF**</u>

Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, (hereinafter, "Mattress Petitioners") herein reply to the response briefs filed on March 11, 2022, by Defendant, the United States ("Defendant's Br.") and Plaintiffs, Best Mattresses International Company Limited and Rose Lion Furniture International Company Limited ("Best Mattresses' Br.") responding to Mattress Petitioners' opening brief in this action ("Mattress Petitioners' Br.").  As discussed below, neither Defendant nor Best Mattresses overcome the challenges to the Department of

1

Commerce's ("Commerce") *Final Determination* raised by Mattress Petitioners. Accordingly, this Court should find Commerce's *Final Determination* unsupported by substantial evidence and not in accordance with law, consistent with Mattress Petitioners' Rule 56.2 brief and the arguments contained herein.

## I.   ARGUMENT

### A.  Commerce's Construction of the Transactions Disregarded Rule is Unsupported by Substantial Evidence and is Not in Accordance with Law

Mattress Petitioners' argument is straightforward: pursuant to the transactions disregarded rule (19 U.S.C. § 1677b(f)(2)) Commerce compares a respondent's purchase price of an input from its affiliate (*i.e.*, the transfer price) to a comparable market price for the same input to determine if the transfer price reflects a market value. If the record lacks a usable market price benchmark, Commerce has developed a consistent and predictable practice of relying on the supplier's total cost of production ("COP") as a surrogate for a market price. In this case, there were no usable market prices on the record. Moreover, because Best Mattresses' affiliated supplier was based in a non-market economy ("NME") (*i.e.*, [          ]) Commerce could not rely on the supplier's reported COP. Therefore, consistent with statutory discretion to use "information available" on the record and Commerce's past practice, in the *Preliminary Determination* Commerce reasonably constructed the COP using surrogate values from countries economically comparable to [          ], the location of the affiliated supplier. In the *Final Determination*, however, Commerce unlawfully departed from its past practice and relied on Cambodian market values to establish a COP benchmark for an input produced in [          ] based on an unreasonable construction and interpretation of "the market under consideration" in 19 U.S.C. § 1677b(f)(2).

1.  *The Purpose and Language of the Transactions Disregarded Rule (19 U.S.C. § 1677b(f)(2)) Confirm That The "Market Under Consideration" Refers to the Market of the Affiliated Supplier*

Defendant and Best Mattresses argue that the purpose of the transactions disregarded rule confirms Commerce's conclusory statement, for which it provided no analysis or citation to past agency practice, that "the statute indicates that the item being tested {under the transactions disregarded rule} should reflect a market price in the country under consideration, which is Cambodia in this case." IDM at 10; *see* Defendant's Br. at 28 ("pursuant to section 1677b(f)(2), Commerce was attempting to discern the market price that Best Mattresses would pay to obtain the input in Cambodia" and therefore "reasonably interpreted 'market under consideration' to mean Cambodia"); Best Mattresses' Br. at 12 ("the purpose of identifying a market price within the transactions disregarded rule…reveals that 'market under consideration' can only refer to Cambodia in this case"). This argument is without merit and is inconsistent with the plain language of the transactions disregarded rule, the structure of 19 U.S.C. § 1677b, and Commerce's past practice.

The purpose of the transactions disregarded rule "is to ensure that the affiliated purchases of inputs are made at arm's length (*i.e.*, market prices) to prevent cost shifting between affiliated parties." *Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2019-2020*, 87 Fed. Reg. 12,660 (Mar. 7, 2022), IDM at Comment 4.  The "arm's-length test is qualitative in nature, not quantitative, in that it seeks to find the market value that ***best represents the company's own experience*** in the ***specific markets*** in which it operates." *Notice of Final Results of Antidumping Duty Administrative Review: Certain Softwood Lumber Products from Canada*, 70 Fed. Reg. 73,437 (Dec. 12, 2005) ("*Softwood Lumber from Canada*"), IDM at Comment 12 (emphasis supplied). Accordingly,

3

pursuant to 19 U.S.C. § 1677b(f)(2):

> <u>A transaction directly or indirectly between affiliated persons</u> may be disregarded if, <u>in the case of any element of value required to be considered</u>, the <u>amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration</u>. If a transaction is disregarded under the preceding sentence and no other transactions are available for consideration, the determination of the amount shall be based on the information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated.

The transactions disregarded rule concerns "a transaction…between affiliated persons," meaning a respondent's purchase of an input used to produce subject merchandise from its affiliated supplier. The rule is designed to address "any element of value required to be considered" as part of that transaction, meaning the value of the purchased input. As such, "the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration" means the value of the input in question does not reflect a market price usually reflected in purchases of that same input. Consequently, "in the market under consideration" means in the market where the ***input*** was produced and sold.

The language and structure of 19 U.S.C. § 1677b confirm that "market under consideration" refers to the location of the affiliated supplier, not the country subject to investigation. Notably, 19 U.S.C. § 1677b(f)(2) does not use the term "subject merchandise" or "exporting country," the terms used elsewhere in 19 U.S.C. § 1677b when discussing the country and merchandise subject to investigation. For example, the statute explains that the "normal value of the ***subject merchandise***" is "the price at which the foreign like product is first sold…for consumption in the ***exporting country***." 19 U.S.C. §§ 1677b(a)(1)(A), (B)(i) (emphasis supplied). The terms "merchandise under consideration" and "market under consideration" appear only in the context of discussing the transactions disregarded rule. Consequently, the structure of 19 U.S.C. § 1677b confirms that the language of 19 U.S.C. § 1677b(f)(2) (*i.e.*, "sales

4

of merchandise under consideration in the market under consideration") unambiguously refer to sales and purchases of inputs in the market where the affiliated supplier is located. *Cf. Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion.").

Moreover, Defendant is wrong that Mattress Petitioners "provide{} no authority to support its preferred interpretation" that the "market under consideration" refers to the market where the affiliated input supplier is located. Defendant's Br. at 28. Mattress Petitioners' interpretation of the transactions disregarded rule is in accordance with Commerce's "general practice" under the transactions disregarded rule of "defin{ing} the market under consideration as the entire home market *or third country*." *Softwood Lumber from Canada*, IDM at Comment 32 (emphasis supplied). In *Softwood Lumber from Canada*, Commerce "defined 'the market under consideration' for wood chips as the province in which the sales occurred," confirming that the location of the affiliated input supplier is the proper "market under consideration" under the transactions disregarded rule. *Id.* Thus, under Commerce's "general practice" when a respondent and its affiliated supplier are both located in the same country (*i.e.*, "home market") Commerce must establish a market price or the COP of the input in that market; if, however, a respondent and its affiliated supplier are not located in the same country (*i.e.*, the supplier resides in a "third country") Commerce must establish a market price or COP of the input in the third country (*i.e.*, where "the sales occurred").

For example, *Bottom Mount Refrigerators from Mexico* involved a Korean conglomerate with affiliates located across the globe. The Mexican respondent, Samsung Electronics Mexico ("SAM") purchased compressors (a minor input) from its Korean affiliate, Samsung Gwangju

Electronics CO., Ltd. ("SGEC"). *See Notice of Final Determination of Sales at Less Than Fair Value and Affirmative Critical Circumstances Determination: Bottom Mount Combination Refrigerator-Freezers From Mexico*, 77 Fed. Reg. 17,422 (Mar. 26, 2012) ("*BMRF from Mexico*"), IDM at Comment 29; *see also Bottom Mount Refrigerator-Freezers from the Republic of Korea: Preliminary Negative Countervailing Duty Determination and Alignment of Final Determination with Final Antidumping Determination*, 76 Fed. Reg. 55,044 (Sept. 6, 2011) (noting that SGEC is a Korean producer of bottom mount refrigerators and subject to the CVD investigation). Because SGEC, which was located in Korea, was SAM's only source of the minor inputs, Commerce "analyze{d} Samsung's purchases of compressors by comparing the transfer price to its affiliate's COP." *BMRF From Mexico*, IDM at Comment 29. In other words, Commerce used the ***Korean affiliates' COP*** as a surrogate market price when analyzing the ***Mexican respondent's*** purchase of the minor input. Commerce recently reiterated its practice that "where a market price is not available, Commerce has developed a consistent and predictable approach whereby it may use an affiliate's total cost of providing the {good or} service as information available for a market price." *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2018-2019*, 86 Fed. Reg. 35,060 (July 1, 2021) ("*Steel Pipes and Tubes from Korea*"), IDM at Comment 7.

Best Mattresses attempts to rebut this analysis by claiming that the transactions disregarded rule "is unequivocally focused on the respondent's experience…, not on respondent's supplier's experience" and therefore the "'market under consideration' can only refer to Cambodia in this case." Best Mattresses' Br. at 12. But this is misleading. It is accurate to say that the purpose of the "arm's length test" is to "find the market value that best represents

the company's own experience," but that experience is tied to "the ***specific markets in which it***

***operates***." *Softwood Lumber from Canada*, IDM at Comment 12 (emphasis supplied). Thus, if a

respondent's experience is purchasing inputs from affiliated suppliers outside of the exporting

country then Commerce must establish a market price benchmark from that "specific market{}

in which {the respondent is} operat{ing}." *Id.* If Commerce relies on market values or a

surrogate COP for an input produced in a market other than the market where the supplier is

located (as is the case here) it would not be using a market price benchmark that "best represents

the company's own experience." *Id.*

     Similarly, Defendant erroneously argues that Commerce's reliance on Cambodian

Trademap data in its transactions disregarded analysis, as opposed to the GTA six-country

average used in the major input rule context, was "reasonable in light of the different purposes

for the data." Defendant's Br. at 25. Specifically, Defendant argues that in the major input

context Commerce "used data to determine the cost of production for inputs produced in

[     ], and it therefore made sense to use data for countries economically comparable to

[     ]." *Id.* But as noted above, that is the same purpose of Commerce's transactions

disregarded analysis. Because Best Mattresses did not source the inputs from any other affiliated

or unaffiliated supplier, and thus no market values were on the record, Commerce's practice is to

establish the COP for inputs produced in [    ] by Best Mattresses' affiliated suppliers.

Commerce's use of different surrogate data for the same purpose is unreasonable because it is

based on an erroneous statutory construction of the transactions disregarded rule, discussed

*supra*, and based on an unacknowledged departure from past practice.

     In sum, if Best Mattresses' affiliated input suppliers were located in a market economy

outside of Cambodia, Commerce would have used the affiliates' COP in that country as a

surrogate market price consistent with the text of 19 U.S.C. § 1677b(f)(2) and Commerce's

practice outlined in *Softwood Lumber from Canada*, *BMFR from Mexico*, and *Steel Pipes and*

*Tubes from Korea*. The only wrinkle in this case is that Best Mattresses' affiliated supplier is

located in an NME, and so Commerce cannot rely on the reported COP. Consistent with the

discretion to use "information available" under 19 U.S.C. § 1677b(f)(2), Commerce reasonably

addressed this issue in the *Preliminary Determination* by relying on surrogate values to establish

a comparable COP to that reported by Best Mattresses' affiliated supplier. As discussed above,

Commerce's departure from this methodology in the *Final Determination* was based on its

unreasonable construction of "market under consideration" in 19 U.S.C. § 1677b(f)(2) and an

unlawful departure from Commerce's past practice. *Cf. SKF USA Inc. v. United States*, 630 F.3d

1365, 1373 (Fed. Cir. 2011) ("When an agency changes its practice, it is obligated to provide an

adequate explanation for the change.").

> 2. *Defendant's and Best Mattresses' Other Arguments Are Similarly Without*
> *Merit*

Defendant and Best Mattresses make several other overlapping arguments in support of

Commerce's erroneous statutory construction and unlawful departure from past practice. As

discussed below, none of Defendant's nor Best Mattresses' arguments withstand scrutiny.

*First*, Best Mattresses wrongly asserts that Commerce's interpretation of "market under

consideration" as equivalent to "country under investigation" is supported by Commerce's use of

"home market" in the antidumping questionnaire. Best Mattresses' Br. at 11-12. The normal

value statute does not use the phrase "home market." *See* 19 U.S.C. § 1677b. Moreover,

Commerce has expressly stated that its "general practice is to define the market under

consideration as the entire ***home market or third country***," demonstrating that the term "market

under consideration" is not synonymous with "home market" or "exporting country," the phrase

used in 19 U.S.C. § 1677b to identify the country subject to investigation. *Softwood Lumber Products from Canada*, IDM at Comment 32 (emphasis supplied). Thus, Best Mattresses is simply wrong that there is an "interchangeable use of 'home market' and 'market under consideration' in the statute and Commerce's own questionnaire." Best Mattresses' Br. at 11.

*Second,* Best Mattresses' argument that "there can only be one single market under consideration" because the statutory language is "'the market under consideration' and not 'a market under consideration'" is without merit. Best Mattresses' Br. at 12. Mattress Petitioners agree that there can only be "one single market under consideration" insofar as an affiliated supplier cannot produce any particular input in two countries at the same time. This does not mean, however, that the "market under consideration" is synonymous with "exporting country" or "country subject to investigation." In addition, Mattress Petitioners do not dispute that "{t}he product under investigation is mattresses from Cambodia." Best Mattresses' Br. at 12. In evaluating affiliated party transactions under the transactions disregarded rule, however, a respondent's affiliated supplier may exist outside the "exporting country" or "country subject to investigation" (as is the case here) and therefore Commerce must establish a market value or the COP of the input in the market where it was produced.

*Third,* Defendant and Best Mattresses are wrong that the transactions disregarded rule provides Commerce with discretion to use the Cambodian Trademap data. *See* Defendant's Br. at 25 ("the transactions disregarded rule does not instruct Commerce what to do" when there is no viable market price on the record and therefore "Commerce had the discretion to fill the statutory void with a reasonably methodology"); Best Mattresses' Br. at 8 (asserting that Commerce's reliance on Trademap data "was reasonable because the transactions disregarded {rule}…do{es} not specify a particular methodology for determining market value").  Mattress Petitioners do not

dispute that the "statute vests Commerce with discretion to determine how best to apply the transactions disregarded rule." *Unicatch Indus. Co. v. United States*, 539 F. Supp. 3d 1229, 1248 (Ct. Int'l Trade 2021). Defendant and Best Mattresses fail to recognize, however, that "where a market price is not available, Commerce has developed a "consistent and predictable approach whereby it may use an affiliate's total cost of providing the {good or} service as information available for a market price." *Steel Pipes and Tubes from Korea*, IDM at Comment 7. Moreover, Commerce has explained its "general practice" under the transactions disregarded rule of "defin{ing} the market under consideration as the entire home market or third country." *Softwood Lumber from Canada*, IDM at Comment 32; *see also BMRF from Mexico*, IDM at Comment 29. It is Commerce's departure from this past practice, by relying on the Cambodian Trademap data rather than the six-country average GTA data to establish Best Mattresses' affiliated supplier's COP, that renders Commerce's transactions disregarded analysis in the *Final Determination* unsupported by substantial evidence and otherwise not in accordance with law. Neither Defendant nor Best Mattresses has defended, nor pointed to any record evidence justifying, Commerce failure to follow its longstanding transactions disregarded methodology.

*Finally*, Best Mattresses argues that "{d}espite advocating for Commerce to use data from Brazil, Malaysia, Mexico, Romania, Russia, and Turkey, Petitioners make no argument, nor is there any, that these countries, collectively or individually, are the 'market under consideration.'" Best Mattresses Br. at 15. This argument is unavailing. As discussed above, the "market under consideration" in this case is [      ] because that is where Best Mattresses' affiliated suppliers are located. If [      ] were a market economy, Commerce would have used Best Mattresses' affiliated suppliers' reported COP, consistent with *BMRF from Mexico*. However, [      ] is an NME and the "statute presumes that government action distorts the

prices that NME exporters pay for their inputs." *Am. Tubular Prods., LLC v. United States*, 847

F.3d 1354, 1362 (Fed. Cir. 2017). As a result, Commerce was forced to rely on "information

available" on the record in the form of surrogate values to approximate Best Mattresses'

affiliated suppliers' COP. This is consistent with the purpose of the "arm's length test," which is

to "find the market value that best represents the company's own experience." *Softwood Lumber

from Canada*, IDM at Comment 12 (emphasis supplied). The Cambodian Trademap data do not

provide a reasonable estimate of market values or COP that best represent Best Mattresses' own

experience because Best Mattresses did not purchase these inputs from suppliers in Cambodia.

### B. Commerce's Use of Cambodian Trademap Data Is Not Supported By Substantial Evidence Because Cambodia is Not the "Market Under Consideration" and Because the Trademap Data Are Unreliable

> *1. Commerce's Reliance on Trademap Export Data to Determine a Market Price Was Not Supported by Substantial Evidence Because Such Data Do Not Reflect Market Prices in [        ]*

As noted above, Commerce has developed a consistent and predictable approach whereby

it may use an affiliate's total cost of providing the {good or} service as information available for

a market price." *Steel Pipes and Tubes from Korea*, IDM at Comment 7. In this case, Best

Mattresses' affiliated suppliers are located in [       ] and, therefore, Commerce was required to

establish a market price or COP benchmark for the input produced and sold in [       ]. In the

*Final Determination*, however, Commerce relied on Cambodian Trademap data to establish the

COP of Best Mattresses' affiliated supplier's COP. The Cambodian Trademap data do not

provide accurate surrogate values to establish the COP in [       ] because such data include

only export values into Cambodia. Accordingly, Commerce's use of Cambodian Trademap data

to establish an estimate of Best Mattresses' [              ] COP renders its transactions

disregarded analysis unsupported by substantial evidence. Neither Best Mattresses nor Defendant

have rebutted that, should the Court agree with Mattress Petitioners that [      ] is the

appropriate "market under consideration," Commerce's *Final Determination* is unsupported by

substantial evidence. *See generally* Defendant's Br. at 24-31; Best Mattresses' Br. at 8-20.

        2.   *Neither Defendant Nor Best Mattresses Rebut Mattress Petitioners' Argument that Cambodian Trademap Data Are Distorted and Unreliable*

Defendant contends that although there are radical differences as between Cambodian

Trademap export data and GTA export data on the record, "{d}ifferences themselves are not

evidence that the Trademap data are unreliable." Defendant Br. at 26. Similarly, Best Mattresses

argues that the "two datasets are compiled differently and, thus, a direct comparison is

inappropriate." Best Mattresses' Br. at 16. Neither argument undermines Mattress Petitioners'

demonstration that the Trademap export data are distorted, misrepresentative, and incorrect or

that GTA ***import*** data are the best surrogate dataset for use in Commerce's transactions

disregarded analysis. *See* Mattress Petitioners' Br. at 15-20.

   Defendant and Best Mattresses fail to recognize that Commerce had three different

surrogate value datasets on the record to use in estimating market value and/or the COP under

the transactions disregarded and major input rules: (1) Trademap "mirror" data consisting of

reporting countries exports to Cambodia, (2) GTA "mirror" data consisting of reporting countries

exports to Cambodia, and (3) GTA data consisting of official import statistics from countries

economically comparable to [      ]. *See* IDM at Comment 1; Mattress Petitioners' Br. at 17.

Contrary to Best Mattresses' assertion, the Trademap mirror data and GTA mirror data are not

"the equivalents of apples and oranges, which explains their differences." Best Mattresses' Br. at

16. Rather, both datasets are "mirror data" and use reporting countries exports to Cambodia for

the same HTS codes; the data are, or should be, a basis for an apples-to-apples comparison. *See*

Mattress Petitioners' Br. at 17.

However, a comparison of the Trademap and GTA export data, which ostensibly are reporting the same thing, demonstrates that [

]. *See id.* at 17-18. Neither Defendant nor Best Mattresses dispute this. These [                                    ] do not reflect minor differences that may arise from aggregating the same data differently; it demonstrates that the Trademap and GTA "mirror data" cannot be reconciled and are therefore unreliable. *See SolarWorld Ams., Inc. v. United States*, 532 F. Supp. 3d 1266, 1270 (Ct. Int'l Trade 2021) ("Commerce's practice is to avoid using aberrational values as surrogate values.").

Moreover, the crucial point here is that Commerce never addressed the evidence of distortion identified by Mattress Petitioners. Rather, Commerce simply concluded, without any evidence or discussion of the distortions highlighted by Mattress Petitioners, that the "Trademap data for Cambodia is robust, includes prices for all the necessary affiliated inputs and, while it is aggregated differently from GTA, there is no evidence that it is faulty or inaccurate."  IDM at Comment 1. Again, the fact that Trademap and GTA are ostensibly providing the same "mirror data" and yet reported [                                                ] is evidence that the data are not "robust" and are "faulty or inaccurate." Commerce's failure to address record evidence undermining its conclusion warrants remand. *See GPX Int'l Tire Corp. v. United States*, 37 C.I.T. 1544, 1553 (2013) (explaining that Commerce "cannot ignore relevant evidence by adopting a methodology that refuses to consider it…Commerce must consider all probative evidence, whether it finds it independently dispositive or not").

In contrast, GTA ***import*** data do not suffer from the shortcomings of the "mirror data." *See* Mattress Petitioners' Br. at 18-19. The import data are based on official import statistics and

NON-CONFIDENTIAL VERSION

there is no record evidence suggesting that the [                                    ] are

distortive or unreliable. Moreover, as discussed below, the import data are consistent with

Commerce's express preference to rely on import data, rather than export data, when utilizing

surrogate values. Accordingly, Commerce's reliance on the Cambodian Trademap data in the

*Final Determination* is not supported by substantial evidence.

### C. Commerce's Longstanding Surrogate Value Practice of Relying Exclusively on Import Data Rather Than Export Data Is Not Confined to Its NME Practice

Mattress Petitioners argued that Commerce's reliance on Trademap export data was not

in accordance with law because Commerce's longstanding practice is to rely exclusively on

official import data when using surrogate values and Commerce provided no explanation for its

departure from that practice. *See* Mattress Petitioners' Br. at 26-28. Neither Defendant nor Best

Mattresses dispute that Commerce has such a practice; rather, they assert that Commerce's

practice of exclusively relying on official import data, rather than export data, when using

surrogate values is limited to Commerce's NME methodology. Because Commerce did not apply

an NME methodology in this case, Defendant and Best Mattresses contend, Commerce's reliance

on Trademap export data was in accordance with law. *See* Defendant's Br. at 29-30; Best

Mattresses' Br. at 20-21. Defendant and Best Mattresses are wrong.

*First*, Commerce recognized in the *Final Determination* that use of surrogate values is

not restricted to NME cases:

> we disagree with the respondent that Commerce is adhering to and applying an
> NME factors of production methodology in this case. We are simply using readily
> available surrogate information to fill the gaps where market prices and COP
> information are not available in order to implement the statutory rules for testing
> whether transfer prices between affiliated parties occurred at prices that represent
> arm's length.

IDM at Comment 1; *see also Writing Instrument Mfrs. Ass'n, Pencil Section v. United States,*

984 F. Supp. 629, 641 (Ct. Int'l Trade 1997) (recognizing Commerce may rely on "surrogate values obtained of inputs when calculating constructed value."). Before this Court, Defendant recognized that "the fact that the antidumping statute and Commerce's regulations provide a surrogate value methodology for non-market economy countries does *not* mean that Commerce is prohibited from using similar considerations when selecting information reasonably available under the major input rule." Defendant's Br. at 20. The same is true under the transactions disregarded rule, which provides Commerce with discretion to use "information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated." 19 U.S.C. § 1677b(f)(2). In other words, the "statute instructs Commerce to replace the disregarded data by using…surrogate data based on whatever information was in the record." *Mid Continent Nail Corp. v. United States*, 38 C.I.T. 958, 982 (2014). Accordingly, Commerce's use of surrogate values and its reliance on certain surrogate value selection criteria to ensure such data are accurate and reliable is not synonymous with applying an NME methodology, as Best Mattresses insists. *See* Best Mattresses' Br. at 20-21.

*Second*, Defendant argues that "the antidumping statute contains more specific provisions about the information Commerce is to use in non-market economy cases" and therefore "Commerce does not have the same requirements and need not follow the same practice when selecting the 'information available' pursuant to the transactions disregarded rule." Defendant's Br. at 29. Defendant is wrong that the NME provision of the statute contains more specific criteria for valuing inputs than exist under the transactions disregarded rule. In an NME proceeding, Commerce values the factors of production "based on the best information available," 19 U.S.C. § 1677b(c)(1), while under the transactions disregarded rule Commerce may value an input using "information available" on the record, 19 U.S.C. § 1677b(f)(2). Both

statutory provisions rely on "information available," giving Commerce some discretion in selecting surrogate values.

However, although Commerce has discretion to rely on surrogate values under the transactions disregarded or major input rules its selection of surrogate values must reflect "the overall purpose of the antidumping statute, {which is} calculating accurate dumping margins." *Sao Ta Foods Joint Stock Co. v. United States*, 425 F. Supp. 3d 1314, 1321 (Ct. Int'l Trade 2020). This Court has held that "the goals of accuracy, fairness, and predictability should apply whether a country's economy is market or nonmarket oriented." *Tianjin Mach. Import & Export Corp. v. United States*, 16 C.I.T. 931, 942 (1992). Accordingly, surrogate value selection criteria that are appropriate in the NME context to ensure "accuracy, fairness, and predictability" are equally appropriate when Commerce uses surrogate values outside the NME context, as in the major input and transactions disregarded rules. This is especially true here insofar as Commerce uses surrogate values as part of its transactions disregarded analysis for the same purpose surrogate values are used in an NME proceeding: to value inputs of production. In the NME context, Commerce relies on surrogate values "to construct the product's normal value as it would have been if the NME country were a market economy country." *Rhodia, Inc. v. United States*, 185 F. Supp. 2d 1343, 1351 (Ct. Int'l Trade 2001). Here, Commerce relied on surrogate values to determine the value of inputs purchased from affiliated parties "had {the transaction} occurred between persons who are not affiliated." 19 U.S.C. § 1677b(f)(2).

In the NME context, Commerce has explained that "Department precedent holds that the country-specific export data….are not suitable comparative price benchmarks to test the validity of selected" surrogate values. *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China: Final Results of the 2007-2008 Administrative*

*Review of the Antidumping Duty Order*, 75 Fed. Reg. 844 (Jan. 6, 2010), IDM at Comment 2; *see also Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 Fed. Reg. 35,245 (June 12, 2013), IDM at Comment 2.A ("the Department finds country-specific export data are not suitable benchmarks to test the validity of selected SV data"). Put simply, if Commerce believes relying on country-specific export data is not appropriate in selecting surrogate values in the NME context then Commerce must explain why using country-specific export data is appropriate in the market economy context when applying the transactions disregarded and/or major input rules. Commerce's failure to apply similar criteria in selecting surrogate values here when the statute uses nearly identical language as between the NME provisions and the transactions disregarded rule, and the surrogate values are used for an identical purpose (*i.e.*, valuing inputs using surrogate data), renders its *Final Determination* unsupported by substantial evidence and not in accordance with law. *Cf. SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (noting that it "is well-established that 'an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently").

### D. Commerce's Refusal to Exclude Data from NMEs and Countries with Broadly Available Export Subsidies Is Not In Accordance With Law

Defendant and Best Mattresses contend that Commerce was not required to follow its longstanding surrogate value practice of excluding import data from NMEs and countries with broadly available export subsidies because that practice is restricted to its NME methodology. *See* Defendant's Br. at 30 ("Commerce expressly explained that it did not conduct its analysis pursuant to the non-market economy provisions of the statute and was not bound to follow the same procedures"); Best Mattresses' Br. at 22 (asserting Mattress Petitioners' advocated "that Commerce should have launched what would have amounted to an NME investigation" and

17

dismissing Mattress Petitioners' cited authority because "those citations are within the context of NME investigations and have no bearing here"). As discussed below, Defendant and Best Mattresses have sidestepped Mattress Petitioners' arguments. Consequently, their rebuttal arguments do nothing more than tear down the strawman they erect.

*First*, neither Defendant nor Best Mattresses dispute that Commerce has a longstanding practice of excluding data from NMEs and countries with broadly available export subsidies when using surrogate values. *See* Defendant's Br. at 30-31; Best Mattresses' Br. at 21-22. As noted above, to the extent Commerce is relying on "information available" and using surrogate values to value an input of production, it is obligated to follow its longstanding surrogate value practice, whether applied in an NME or market economy context. *See Tianjin Mach. Import & Export Corp. v. United States*, 16 C.I.T. at 942 ("the goals of accuracy, fairness, and predictability should apply whether a country's economy is market or nonmarket oriented").

*Second*, Defendant and Best Mattresses defend Commerce's inclusion of these distorted surrogate data because "in market economy cases, Commerce relies on the purchase prices paid to unaffiliated suppliers based in {non-market economy countries and countries maintaining broadly available export subsidies}." Defendant's Br. at 30 (citing IDM at Comment 1); Best Mattresses' Br. at 21-22. But Commerce did not rely on Best Mattresses records in its transactions disregarded and major input analyses, and so this analogy is inapt. *See* Mattress Petitioners Br. at 29-30. The question before the Court is how Commerce is to treat potentially distortive surrogate values, and whether its surrogate value practice in the NME context is relevant to its use of surrogate values in the context of applying the transactions disregarded and major input rules.

*Third*, Best Mattresses is simply wrong that "Commerce would have no statutory basis to

reject the respondent's reported purchase prices of inputs from unaffiliated suppliers that were located in an NME or allegedly subsidize countries and so it has no legal basis to reject these imports in the context of a market input price." Best Mattresses' Br. at 22. When calculating constructed value, Commerce calculates costs based on the records of the exporter or producer only if they "reasonably reflect costs associated with production." 19 U.S.C. § 1677b(f)(1)(A). As the Court of Appeals explains, 19 U.S.C. § 1677b(f)(1)(A) "does not require Commerce to accept {a respondent's} records." *Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358, 1365 (Fed. Cir. 2014). Accordingly, in the market economy context Commerce can disregard a respondent's purchases of inputs (*i.e.*, costs) that do not reasonably reflect costs associated with production.

Commerce has long recognized that "the Act generally assumes that prices for goods produced in NMEs cannot be relied upon for purposes of a price-based analysis." *Notice of Final Determination of Sales at Less Than Fair Value and Final Determination of Critical Circumstances: Diamond Sawblades and Parts Thereof from the Republic of Korea*, 71 Fed. Reg. 29,310 (May 22, 2006), IDM at Comment 12. Commerce also has a practice of not us{ing} export prices from a market economy for the valuation of surrogate values when we have a reasonable basis to believe or suspect that the product benefits from broadly available export subsidies." *Certain Cut-to-Length Carbon Steel Plate from Romania: Notice of Final Results and Final Partial Rescission of Antidumping Duty Administrative Review*, 70 Fed. Reg. 12,651 (Mar. 15, 2005), IDM at Comment 3. Consequently, surrogate values from NMEs and countries with broadly available export subsidies do not "reasonably reflect costs associated with production." *See* Mattress Petitioners' Br. at 28-32.

Finally, this Court should reject Best Mattresses request to "require Commerce to reopen

the record." Best Mattresses' Br. at 22-23. Commerce did not "invent a new surrogate value methodology" in this case and did not prevent Best Mattresses from commenting fully on Commerce's transactions disregarded and major input rule analysis. *Id.* at 22. As explained above, Commerce did not invent a new surrogate value methodology but, in fact, departed from its longstanding surrogate value practice. Moreover, Commerce explained that Best Mattresses had ample opportunity to comment on Commerce's methodology:

> Further, we disagree that parties were not given an opportunity to comment on the process or the decisions made at the preliminary or final determinations. In accordance with Commerce's regulations concerning the submission of factual information, parties were afforded an opportunity to comment on the data provided by other parties and the comments made by other parties. Further, the parties were able to provide pre-preliminary comments on how the collected data might be used and through the briefing process for the final determination were afforded the opportunity to comment on Commerce's *Preliminary Determination*. In addition, at the request of the parties, Commerce held a public hearing.

IDM at Comment 1. Accordingly, Best Mattresses arguments are without merit.

## II.   CONCLUSION

For the foregoing reasons, the Court should find Commerce's *Final Determination* unsupported by substantial evidence and otherwise not in accordance with law, consistent with Mattress Petitioners' Rule 56.2 brief and the arguments contained herein.

NON-CONFIDENTIAL VERSION

Respectfully submitted,

/s/ Yohai Baisburd

Yohai Baisburd
Jack A. Levy
Chase J. Dunn

CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
(202) 567-2300

*Counsel to Brooklyn Bedding, LLC,
Corsicana Mattress Company, Elite
Comfort Solutions, FXI, Inc., Innocor, Inc.,
Kolcraft Enterprises Inc., Leggett & Platt,
Incorporated, International Brotherhood
of Teamsters, United Steel Paper and
Forestry, Rubber, Manufacturing, Energy,
Allied Industrial and Service Workers
International Union, AFL-CIO*

Date:   April 22, 2022

21

Court. No. 21-00281

## <u>Certificate of Compliance</u>

The undersigned hereby certifies that the forgoing submission of "Mattress Petitioners'
Reply Brief," filed by Defendant-Intervenors, Mattress Petitioners, on April 22, 2022, contains
5,944 words, including footnotes, and excluding the table of contents, table of authorities, and
signature block, and therefore, complies with the word limitations set forth in Paragraph 2(B) of
the Standard Chamber Procedures.

BY: /s/  Yohai Baisburd