# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| BEST MATTRESSES INTERNATIONAL COMPANY LIMITED AND ROSE LION FURNITURE INTERNATIONAL COMPANY LIMITED, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br> and <br><br> BROOKLYN BEDDING, LLC ET AL., <br><br> Defendant-Intervenors. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Consol. Ct. No. 21-00281 <br> **Non-confidential Version** |

**REPLY BRIEF IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD OF PLAINTIFFS BEST MATTRESSES INTERNATIONAL COMPANY LIMITED AND ROSE LION FURNITURE INTERNATIONAL COMPANY LIMITED**

Jeffrey S. Grimson
Kristin H. Mowry
Sarah M. Wyss
Wenhui (Flora) Ji
Jacob M. Reiskin
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610 (ph)
202.595.8968 (fax)
trade@mowrygrimson.com

April 22, 2022

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

ARGUMENT ................................................................................................................... 1

**I.    COMMERCE'S VALUATION OF BEST MATTRESSES' MAJOR INPUT COST OF PRODUCTION WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW** ........................................................................................... 1

    **A.    The Statute Unambiguously Prohibits Commerce from Using Surrogate Data to Value the Input COP** .................................................................................................. 2

    **B.    Commerce's Use of GTA Import Data to Value the Input COP Was An Unreasonable Construction of The Statute** ....................................................................................... 7

    **C.    Commerce's Procedural Deficiencies Rendered its Input COP Valuation Unsupported by Substantial Evidence and Not in Accordance With Law** ................................. 9

**II.   COMMERCE'S CALCULATION OF THE INPUT COP WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE** ....................................................................................... 13

    **A.    Commerce's Inclusion of Aberrational Romania Data Seriously Distorted Commerce's Normal Value Calculation** ..................................................................................... 13

    **B.    Commerce's Exclusion of Mexican Data Was Unsupported by Substantial Evidence** .. 14

**III.  COMMERCE'S APPLICATION OF THE TRANSACTIONS DISREGARDED RULE WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE NOT IN ACCORDANCE WITH LAW** ....................................................................................... 15

    **A.    Commerce Unreasonably Rejected Best Mattresses' Purchases to Establish the Market Value of Fixed Asset Depreciation** ........................................................................ 15

    **B.    Commerce Unreasonably Rejected Best Mattresses' Proposed Market Values for [ ███ ██████ ]** ................................................................................................................ 17

**IV.   COMMERCE'S RELIANCE ON EMIRATES' FINANCIAL STATEMENTS WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE** ...................................................... 18

    **A.    Emirates' Financial Statements Are Not Contemporaneous** ........................................... 18

    **B.    Emirates' Financial Statements Are Incomplete** ............................................................. 20

    **C.    Emirates' Financial Statements Do Not Reflect the Business Operations of Best Mattresses** ....................................................................................................................... 22

    **D.    Emirates' Financial Statements Were Not Publicly Available** ....................................... 23

    **E.    GTI's Financial Statements Were the Only Reasonable Financial Statements on the Record for Commerce to Calculate the CV Financial Ratios** ......................................... 25

**V.    JUDICIAL ECONOMY SUPPORTS THE REMAND OF COMMERCE'S APPLICATION OF THE COHEN'S D TEST** ................................................................ 25

**CONCLUSION** ................................................................................................................ 27

## TABLE OF AUTHORITIES

**Cases**

Ad Hoc Shrimp Trade Action Comm. v. United States,
__CIT__, 219 F. Supp. 3d 1286 (2017) ................................................................. 14

Allied Pac. Food (Dalian) Co. v. United States,
32 CIT 1328, 587 F. Supp. 2d 1330 (2008) .......................................................... 12

Apex Frozen Foods Private Ltd. v. United States,
_CIT_, 144 F. Supp. 3d 1308 (2016) ............................................................. 10, 11

Chevron U.S.A., Inc. v. NRDC,
467 U.S. 837 (1984) ............................................................................................. 3, 7

Corus Staal BV v. United States,
502 F.3d 1370 (Fed. Cir. 2007)........................................................................ 26, 27

CP Kelco U.S., Inc. v. United States,
949 F.3d 1348 (Fed. Cir. 2020) ............................................................................. 21

Diamond Sawblades Mfrs. Coal. v. United States,
704 F. App'x 924 (Fed. Cir. 2017) ........................................................................ 17

Dongguan Sunrise Furniture Co., Ltd. v. United States,
36 CIT 860, 865 F. Supp. 2d 1216 (2012) ............................................................ 21

Dongguan Sunrise Furniture Co., Ltd. v. United States,
37 CIT 489, 904 F. Supp. 2d 1359 (2013) ............................................................ 21

Golden Dragon Precise Copper Tube Group, Inc. v. United States,
No. 14-00116, 2016 Ct. Intl. Trade LEXIS 81 (Aug. 23, 2016) ............................ 19

Home Meridian Int'l, Inc. v. United States,
36 CIT 1279, 865 F. Supp. 2d 1311 (2012) .......................................................... 20

Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States,
__ CIT __, 429 F. Supp. 3d 1353 (2020) ................................................................ 4

In re Rowe,
750 F.3d 392 (Fed. Cir. 2014)................................................................................. 7

Ins v. Chadha,
462 U.S. 919 (1983) ................................................................................................ 4

INS v. Elias-Zacarias,
502 U.S. 478 (1992). ............................................................................................... 9

Mannesmannrohren-Werke AG & Mannesmann Pipe & Steel Corp. v. United States,
23 CIT 826, 77 F. Supp. 2d 1302 (1999) ................................................................ 3

Mid Continent Steel & Wire, Inc. v. United States,
__ CIT __, 273 F. Supp. 3d 1348 (2017) .............................................................. 23

Mid Continent Steel & Wire, Inc. v. United States,
2022 U.S. App. LEXIS 10767 (Fed. Cir. Apr. 21, 2022) ...................................... 26

Mittal Steel Galati S.A. v. United States,
31 C.I.T. 1121, 502 F. Supp. 2d 1295 (2007) ...................................................... 15

Nation Ford Chem. Co. v. United States,

166 F.3d 1373 (Fed. Cir. 1999) ................................................................................. 23

NLRB v. Wyman-Gordon Co.,
394 U.S. 759 (1969) ................................................................................................ 11

NSK Ltd. v. United States,
481 F.3d 1355 (Fed. Cir. 2007) ................................................................................. 7

Rebar Trade Action Coal. v. United States,
_ CIT __, 337 F. Supp. 3d 1251 (2018) .................................................................. 16

RZBC Grp. Shareholding Co. v. United States,
No. 15-00022, 2016 Ct. Intl. Trade LEXIS 68 (June 30, 2016) ............................... 5

Since Hardware (Guangzhou) Co., Ltd. v. United States,
37 CIT 803, 911 F. Supp. 2d 1362 (2013) ............................................................. 24

SKF USA Inc. v. United States,
263 F.3d 1369 (Fed. Cir. 2001) ............................................................................... 10

Solarworld Ams., Inc. v. United States,
__ CIT __, 320 F. Supp. 3d 1341 (2018) ............................................................... 13

Thai Pineapple Canning Indus. Corp. v. United States,
273 F.3d 1077 (Fed. Cir. 2001) ................................................................................. 8

Tri Union Frozen Prods. v. United States,
__ CIT__, 227 F. Supp. 3d 1387 (2017) ................................................................. 13

U.S. Steel Corp. v. United States,
36 C.I.T. 613, 844 F. Supp. 2d 1334 (2012) ............................................................ 8

Vinh Hoan Corp. v. United States,
No. 13 - 00156, 2015 CIT LEXIS 156 (Aug. 3, 2015) ........................................... 20

Xi'An Metals & Minerals Imp. & Exp. Co. v. United States,
_CIT_, 520 F. Supp. 3d 1314 (2021) ..................................................................... 11

## Statutes

19 U.S.C § 1677b(f)(2) ...................................................................................... 15, 17

19 U.S.C § 1677b(f)(3) .................................................................................. 1, 2, 4, 7

19 U.S.C. § 1677b(b) ............................................................................................... 9

19 U.S.C. § 1677e(a) ................................................................................................ 7

## Other Authorities

Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of
Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-
2018, 85 Fed. Reg. 23,756 (Apr. 29, 2020) ...................................................... 19, 20

Citric Acid and Certain Citrate Salts From Canada: Final Results of Antidumping Duty
Administrative Review, 76 Fed. Reg. 34,048 and accompanying Issues and Dec. Mem. at 10
(Dep't of Commerce June 10, 2011) ...................................................................... 16

Final Results of Redetermination Pursuant to Remand at 7, U.S. Steel Corp. v. United States,
No.09-00156 (Ct. Int'l Trade Feb. 15, 2011), ECF 105 ............................................ 8

H.R. REP. NO. 100-576, at 595 (1988) ....................................................................... 6

Harmonized Tariff Schedule, Subheading 392113, USITC (2022 Revision 4),
    https://hts.usitc.gov/?query=392113 ("Tariff Schedule"). ........................................... 5

Mattresses From Cambodia: Final Affirmative Determination of Sales at Less Than Fair Value
    and Final Negative Determination of Critical Circumstances, 86 Fed. Reg. 15,894 (Dep't of
    Commerce Mar. 25, 2021) ....................................................................................................... 2

Notice of Final Determination of Sales at Less Than Fair Value: Certain Polyester Staple Fiber
    From the Republic of Korea, 65 Fed. Reg. 16,880 (Dep't of Commerce Mar. 30, 2000).......... 8

Utility Scale Wind Towers From the Socialist Republic of Vietnam, 80 Fed. Reg. 55,333 (Dep't
    of Commerce Sept. 15, 2015)................................................................................................... 19

**Regulations**

19 C.F.R. § 351.301(a)................................................................................................................ 17

Plaintiffs Best Mattresses International Company Limited and Rose Lion Furniture International Company Limited (collectively "Best Mattresses"), reply to the response briefs of Defendant United States and Defendant-Intervenors Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises, Inc., Leggett & Platt, Incorporated, the International Brotherhood of Teamsters, and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO (collectively, "Petitioners"). See Def's Mot. To Partially Dismiss and Resp. to Pls' Mots. For J. On The Agency R., ECF No. 56 (Mar. 11, 2022) ("Def. Br."); Mattresses Pet'rs' Resp. Br. In Opp'n to Best Mattresses' Rule 56.2 Mot. For J. On The Agency R., ECF No. 58 (Mar. 11, 2022) ("Pet'rs' Br.").[1]

## ARGUMENT

## I. COMMERCE'S VALUATION OF BEST MATTRESSES' MAJOR INPUT COST OF PRODUCTION WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW

Contrary to the United States' and Petitioners' arguments, Commerce's application of the major input rule under 19 U.S.C § 1677b(f)(3) was unsupported by substantial evidence and not in accordance with law because Commerce had no legal authority to use surrogate data from six unrelated countries to estimate the cost of production ("COP") of Best Mattresses' suppliers. Both the United States and Petitioners ask the Court to give Commerce tremendous deference, but they fail to recognize that Commerce's discretion has limits. Although Commerce may assess the value of a respondent's major input purchases from affiliates by comparing three values (transfer price, market price and input COP), Commerce may not construct the input COP using surrogate data as

---

[1] All references to parties' briefs are to the nonconfidential version unless otherwise noted.

it did in the Final Determination.    See Mattresses From Cambodia: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances, 86 Fed. Reg. 15,894 (Dep't of Commerce Mar. 25, 2021) ("Final Determination") (P.R. 309), and accompanying Cost Mem. at 2 (Public Version) ("Final Cost Mem.") (P.R. 307) (determining input COP by averaging Global Trade Atlas ("GTA") data for six countries: Brazil, Malaysia, Mexico, Romania, Russia and Turkey).  Further, even if the statute is ambiguous, both the United States and Petitioners fail to defend Commerce's determination as a reasonable interpretation of the statute.

### A.  The Statute Unambiguously Prohibits Commerce from Using Surrogate Data to Value the Input COP

Both the United States and Petitioners claim that Commerce's determination to use surrogate input COP data was lawful because Commerce "may determine the value of the major input on the basis of the information available regarding such cost of production" under 19 U.S.C § 1677b (f)(3), but this is a misinterpretation of the statute.  See Def. Br. at 15; Pet'rs' Br. at 18. This statutory language must be read in its full context, which reads:

> If, in the case of a transaction between affiliated persons involving the production by one of such persons of a major input to the merchandise, the administering authority has reasonable grounds to believe or suspect that an amount represented as the value of such input is less than the cost of production of such input, then the administering authority may determine the value of the major input on the basis of the information available regarding such cost of production, if such cost is greater than the amount that would be determined for such input under paragraph (2).[2]

19 U.S.C § 1677b(f)(3) (emphasis added).  Critically, there is a mandatory prerequisite that must be met before Commerce may value the major input based on the information available; Commerce

---

[2] Paragraph (2) states the rule for disregarding a transaction if "the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration," or, in short, the arm's length market price.  19 U.S.C § 1677b(f)(2).

first must have "reasonable grounds to believe or suspect that an amount represented as the value of such input is less than the cost of production of such input." Id.; see also Mannesmannrohren-Werke AG & Mannesmann Pipe & Steel Corp. v. United States, 23 CIT 826, 836, 77 F. Supp. 2d 1302, 1311 (1999) ("Commerce should use best information to estimate a related party's cost of production only when it has 'reasonable grounds to believe or suspect that the transfer price and also the arms length price would be less than the cost of production.'"). The Court must give full effect to this unambiguous statutory prerequisite. See Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 843 (1984). Here, Commerce had no such reasonable grounds, nor could it, because it had no information on the record establishing the COP of the major inputs. The facts are quite simple: Commerce determined not to request COP input data from Best Mattresses, and as a result, Commerce was left without COP input data. See Final Determination, and accompanying Issues and Dec. Mem. at 9 (P.R. 301) ("Final I&D Mem."). There is no information from which Commerce can reasonably assess if the value of the input is less than the input COP despite the United States' and Petitioners' claims that GTA import data serves this purpose. See id.; Def. Br. at 15; Pet'rs' Br. at 16-17. The GTA data plainly are not COP information by any stretch of the imagination, as explained below.

The United States and Petitioners argue unpersuasively that the legislative history supports their reading of the statute because Congress indicated that Commerce may "base the value of such input on the best evidence available as to its costs of production when such costs are greater than the price that would be used as a result of the application of paragraph (2)('arms-length price')." Def. Br. at 16; see also Pet'rs' Br. at 18-19. This is inapplicable here because there is no information available information as to COP. Even the United States and Petitioners acknowledge that the "GTA import data are not direct cost of production data." Def. Br. at 17; see also Pet'rs'

3

Br. at 22.  Rather, the GTA data are import prices into six irrelevant countries.  The best evidence available standard does not give Commerce power to substitute a respondent's own costs with sales prices of completely irrelevant products from completely irrelevant countries.  Simply put, the GTA data are so flawed and detached from Best Mattresses' actual production of subject merchandise that they are not even in the realm of evidence available as to input COP.

The United States also incorrectly claims that the statute is silent, claiming "that there is nothing in the major input rule prohibiting Commerce from relying on import data as the information available."  See Def. Br. at 19.  The United States goes beyond established doctrines of statutory interpretation with this claim.  See Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States, __ CIT __, __, 429 F. Supp. 3d 1353, 1363 (2020) (explaining that the absence of a denominator in the plain language of the statute does not mean the statute is silent).  Similarly, here, the lack of an express prohibition against or mention of "import data" does not convey authority on Commerce to use GTA however it chooses.  To the contrary, Commerce's authority stems from its enabling statute.  Because the statute only allows Commerce to use "information available regarding such cost of production," 19 U.S.C § 1677b(f)(3), Commerce "reach{es} beyond the limits of the statute" by using information here that Commerce itself admits has no relation to the input COP.  Ins v. Chadha, 462 U.S. 919, 979 n.16 (1983) ("{T}he Executive's . . . administrative activity cannot reach beyond the limits of the statute.").

In addition, the Court must employ a close textual reading of the next clause of the statute, which states that Commerce "may determine the value of the major input on the basis of the information available regarding such cost of production."  19 U.S.C § 1677b(f)(3).  The direct object of the verb "determine" is "the value of the major input," and not the "cost of production." Id.  In its attempt to defend Commerce, the United States removes the object of the verb as written

("the value of the major input") when it stated that Commerce "determine{d} the costs of production for the affiliated major input producers" on the basis of "import data on the record." See Def. Br. at 14 (citing Final I&D Mem. at 10 (P.R. 301); Final Cost Mem. at 1-2 (P.R. 307)). The statute does not allow Commerce to determine the COP based on information available, it allows Commerce to determine the major input value based on information available. This distinction has meaning. By limiting Commerce's use of "information available" to the input value, Congress drew a line in the sand as to how many layers of construction Commerce may use in determining normal value. In other words, Commerce may construct the value of the major input by referencing the supplier's COP, but Commerce may not construct the supplier's COP.

In all the esoteric discussion of statutory interpretation, the Court cannot lose sight of the real commercial data that the United States and Petitioners claim reflect Best Mattresses' suppliers' COP. Take one major input for example, foam. Best Mattresses purchased foam that was produced in [ ▮ ]. See Final Cost Mem. at 2 (Business Proprietary Document) (C.R.276). To value the COP of that [ ▮ ] foam in, Commerce used the selling price of "Other plates, sheets, film, foil and strip, of plastics; Of polyurethanes" to importer purchasers in Turkey, Malaysia, Brazil, Mexico, Romania and Russia. See Final Cost Mem. at Attach. 1F5 and 1F6 (Public Version) (GTA data for Harmonized Tariff Schedule ("HTS") subheading 392113); Harmonized Tariff Schedule, Subheading 392113, USITC (2022 Revision 4), https://hts.usitc.gov/?query=392113 ("Tariff Schedule").

Two key facts establish that the GTA data is definitively not COP data. First, the GTA data reflect the price of finished goods traded at market prices. See RZBC Grp. Shareholding Co. v. United States, No. 15-00022, 2016 Ct. Intl. Trade LEXIS 68, at *31 (June 30, 2016) (explaining that GTA data represent "world market price{s}" that are "collected from customs agencies around

the world, and hence, represent industrial and commercial shipments of goods"). The prices reflected in GTA data necessarily include profit and shipping, which are not part of the COP. See H.R. REP. NO. 100-576, at 595 (1988) (Conf. Rep.) ("The term 'costs of production' means all fully allocated costs, including overhead but not including profit."). The GTA values are, therefore, distinctly higher than the input COP that Commerce intended to estimate. Second, the GTA data are overly broad, as they reflect a whole category of finished goods that fall within six-digit HTS categories. See Final Cost Mem. at Attach. 1F1 – 1F6 (Public Version) (P.R. 307); Tariff Schedule, Subheadings 392113, 721710 and 581100.

Petitioners fail to address the shortcomings of the GTA data but claim that "Commerce sought to 'establish a reasonable estimate of the related party's costs of production for such input' given the information on the record." Pet'rs' Br. at 22 (citing H.R. REP. NO. 100-576, at 595). Petitioners ignore the full context of the legislative history that they cite. In particular, Commerce's authority to use "best information to establish a reasonable estimate of the related party's costs of production for such input" only arises when 1) "petitioner makes a bona fide allegation that the transfer price for the major input or the arms-length price is less than the related party's costs of production," 2) Commerce "investigate{s} such claims and may request cost-of-production information from the related party seller of the input," 3) "the related party seller does not provide reliable data on its costs of production" and 4) "Commerce has reasonable grounds to believe or suspect that the transfer price and also the arms-length price would be less than the cost of production." H.R. REP. NO. 100-576, at 595. None of those events transpired in this case— Petitioners did not make an allegation, Commerce did not investigate based on such an allegation, the related party did not fail to provide data because Commerce didn't request it and Commerce had no reasonable grounds to believe or suspect that the transfer price was less than COP.

Commerce, therefore, lacked statutory authority to construct the suppliers' COP based on information available, as confirmed by legislative history.

### B. Commerce's Use of GTA Import Data to Value the Input COP Was An Unreasonable Construction of The Statute

Even assuming *arguendo* that the statutory language is silent or ambiguous as to if and how Commerce may construct input COP values within the major input rule, 19 U.S.C § 1677b (f)(3), this Court must still find Commerce's determination contrary to law because its interpretation of the statute is unreasonable. See Chevron, 467 U.S. at 842-43. The United States and Petitioners argue that the Court should find that "any reasonable construction of the statute is a permissible construction." See Def. Br. at 11; Pet'rs' Br. at 23. We agree with that premise; however, Commerce's construction of the statute is far from reasonable in this case.

The United States and Petitioners attempt to frame Commerce's use of GTA data as a reasonable gap-filling measure. See Def. Br. at 13; Pet'rs' Br. at 22-23. What both defendants fail to recognize, however, is that Commerce's statutory "gap-filling" authority arises under a separate subsection of the statute and is limited to instances where "necessary information is not available on the record." 19 U.S.C. § 1677e(a) (emphasis added); see also NSK Ltd. v. United States, 481 F.3d 1355, 1360 (Fed. Cir. 2007) (upholding Commerce's gap-filling decision because "necessary information is not available on the record") (citing 19 U.S.C. § 1677e(a)). Here, there is no gap on the record because an input COP is not necessary. See Mem. of P. & A. In Supp. Of Rule 56.2 Mot. For J. On The Agency R. Of Pls. Best Mattresses at 15-17, ECF No. 44 (Dec. 9, 2021) ("BM Br."). Congress used discretionary language in providing that Commerce "may determine the value of the major input on the basis of the information available regarding such cost of production." 19 U.S.C § 1677b(f)(3) (emphasis added); In re Rowe, 750 F.3d 392, 397 (Fed. Cir. 2014) ("{T}he term 'may' typically indicates authorization without obligation.").

7

Commerce has properly eliminated the unnecessary input COP benchmark from its major input analysis in a past similar case and proceeded to test the transaction by comparing the transfer price and the market price.  See Final Results of Redetermination Pursuant to Remand at 7, U.S. Steel Corp. v. United States, No.09-00156 (Ct. Int'l Trade Feb. 15, 2011), ECF 105, sustained by U.S. Steel Corp. v. United States, 36 C.I.T. 613, 844 F. Supp. 2d 1334 (2012)); Notice of Final Determination of Sales at Less Than Fair Value: Certain Polyester Staple Fiber From the Republic of Korea, 65 Fed. Reg. 16,880 (Dep't of Commerce Mar. 30, 2000), accompanying Issues and Dec. Mem. at Cmt. 6 (explaining that where input COP data is absent from the record, and the respondent has cooperated to the best of its ability, "we will choose between the higher of the market or transfer price").  Similarly, here, without input COP information, the only reasonable determination was for Commerce to compare the market and transfer price in its major input rule analysis and Commerce's unreasonable determination otherwise is not entitled to deference by this Court.  See Thai Pineapple Canning Indus. Corp. v. United States, 273 F.3d 1077, 1083 (Fed. Cir. 2001) ("{I}f the Government's position is unreasonable, deference does the agency no good.").

As explained in depth above, the GTA data reflect: 1) a range of products that are not purchased by Best Mattresses, 2) six countries from which Best Mattresses does not source inputs and 3) import sales prices that include profit and shipping and are, by definition, inflated over a seller's COP.  See infra Section A; see also BM Br. at 17-19.   Both the United States and Petitioners try to support Commerce's use of the GTA data by arguing that the data are from countries that are economically comparable to [ ██ ], where Best Mattresses' suppliers are located.  See Def. Br. at 19-20; Pet'rs' Br. at 20.  Economic comparability on a country level, however, is a mere attenuated speck of evidence connecting the GTA data to Best Mattresses' suppliers when the overwhelming majority of record evidence is "so compelling" as to the flaws

of the GTA data "that no reasonable factfinder" could reach the same determination as Commerce to use the GTA data to value Best Mattresses' suppliers' COP. <u>INS v. Elias-Zacarias</u>, 502 U.S. 478, 483-84 (1992).

Similarly, the United States claims that Commerce improved its methodology from its Preliminary Determination by including all six countries instead of just using Brazil such that the GTA data now represents a "broader set of data," Def. Br. at 14, but the move from a single surrogate country with no relation to Best Mattresses' production process to six irrelevant surrogate countries compounded the error and cured nothing, leaving Commerce's determination unsupported by substantial evidence and unreasonable.

### C. Commerce's Procedural Deficiencies Rendered its Input COP Valuation Unsupported by Substantial Evidence and Not in Accordance With Law

The United States and Petitioners erroneously claim that Commerce was not required to afford parties a meaningful opportunity to participate in the input COP surrogate value ("SV") selection process because Commerce did not strictly use an SV methodology. <u>See</u> Def. Br. at 20; Pet'rs' Br. at 24. Both parties focus on technicalities but overlook the crux of Best Mattresses' procedural complaint: Commerce failed to provide notice of and an opportunity to comment on Commerce's input COP methodology and data choice. <u>See</u> BM Br. at 22-27.

Even if the Court determines that Commerce did not act outside of 19 U.S.C. § 1677b(b) by employing an SV methodology in a ME case, as the United States claims, <u>see</u> Def. Br. at 19, no reasonable mind can deny the similarities between the surrogate input COP data used in this case and the SV data typically used by Commerce in an Non-market Economy ("NME") case. Despite the similarities in the type and use of data, Commerce failed to give parties the opportunity to participate and supplement the record, rendering its determination unsupported by substantial evidence and not in accordance with law.

Both the United States and Petitioners attempt to distinguish the current case from NME proceedings because Commerce selected six surrogate countries to value the input COP here whereas in NME proceedings, Commerce selects a single surrogate country.  See Def. Br. at 19-20; Pet'rs' Br. at 24.  This is a distinction without a difference.  Commerce used the six countries here, collectively, as economically comparable substitute for [ █ ] just as it does in an typical NME case and yet Commerce arbitrarily failed to provide Best Mattresses with an opportunity to comment on surrogate country choice or provide affirmative and rebuttal SV data.  See BM Br. at 23; See SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("{A}n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.").  Neither the United States nor Petitioners persuasively defend Commerce's arbitrary and lesser treatment of Best Mattresses, a cooperative Market Economy ("ME") producer, as compared to similarly situated respondents in an NME case.  In essence, despite the fact that it produced mattresses in an ME, because it sourced inputs from [ █ ] Best Mattresses was treated worse than a [ █ ] in an NME case.

Moreover, if Commerce was not bound by its SV procedures, as the United States and Petitioners claim, then Commerce must be creating a new rule subject to the Administrative Procedures Act ("APA").  Commerce's determination here was not merely "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice" to which the APA's notice and comment requirement does not apply.  Pet'rs' Br. at 26 (citing Apex Frozen Foods Private Ltd. v. United States, _CIT_, _, 144 F. Supp. 3d 1308, 1320 (2016), aff'd 862 F.3d 1337 (Fed. Cir. 2017); see also Def. Br. at 20-21.  Instead, Commerce's actions here amounted to rulemaking because "in the absence of the rule there would not be an adequate legislative basis" for Commerce's use of import data to construct an input COP, as explained above in Section A.

See <u>Apex</u>,  CIT  ,  , 144 F. Supp. 3d at 1320.

The United States and Petitioners completely overlook considerations of fairness that underpin the APA's notice and comment procedures.  See <u>NLRB v. Wyman-Gordon Co.</u>, 394 U.S. 759, 764 (1969) (providing that "{n}otice requirements {are to} assure fairness and mature consideration of rules of general application").  The United States, instead, tries to characterize Commerce's actions here as a mere shift in reporting obligations akin to instances where Commerce was not bound by the APA.  See Pet'rs' Br. at 26-27 (citing, for example, <u>Xi'An Metals & Minerals Imp. & Exp. Co. v. United States</u>, _CIT_, _, 520 F. Supp. 3d 1314, 1323 (2021)).  In <u>Xi'An Metals</u>, the Court found that Commerce's requirement that the respondent report CONNUM-specific data is not a legislative rule, in part, because Commerce announced its intention to impose this requirement in a previous administrative review.  See <u>Xi'An Metals</u>, __ CIT at __, 520 F. Supp. 3d at 1326.  To the contrary, here, Commerce never informed the parties of its intention to implement a new major input rule framework or even explained why it requested the GTA data from Best Mattresses.  See <u>e.g.</u>, Letter from Dep't of Commerce to Best Mattresses re: Supplemental Section D Questionnaire at 4 (Sept. 1, 2020) (Public Version) ("BM Suppl. Section D Questionnaire") (P.R. 156) (Commerce merely instructed Best Mattresses to provide GTA data for a proscribed list of countries.).  And, since this was the very first antidumping case against Cambodia, there was no prior proceeding to attribute proper notice to Best Mattresses of Commerce's intentions.

Despite the complete lack of transparency and notice, the United States and Petitioners suggest that Commerce nonetheless provided Best Mattresses opportunities to comment in pre-preliminary determination comments and its case brief.  See Def. Br. at 20; Pet'rs' Br. at 25-26.  Both parties conveniently left out an important fact that Best Mattresses never had the opportunity

to submit new factual information.  Prior to the Preliminary Determination, Commerce never informed the parties how it would calculate input COP or why it requested the GTA data from Best Mattresses.  See BM Suppl. Section D Questionnaire at 4 (Public Version) (P.R. 156); Letter from Dep't of Commerce to Rose Lion Furniture International Company Limited re: Section D Supplemental Questionnaire at 4 (Sept. 1, 2020) (Public Version) (P.R. 157).  Without knowing how Commerce intended to use these data, Best Mattresses could not adequately comment on them or submit alternative factual information that would serve Commerce's intended purpose.  The first and only opportunity that Best Mattresses could raise the issue was in the administrative case brief.  At that point, Best Mattresses challenged Commerce's methodology and asked Commerce to reopen the record in the case brief, but Commerce refused.  See Letter on Behalf of Best Mattresses to Dep't of Commerce re: Case Brief at 21-25 (Jan. 21, 2021) (Public Version) (P.R. 288).  For these reasons, and to the United States' and Petitioners' claims, Commerce deprived Best Mattresses of an adequate opportunity to build the record.  See Allied Pac. Food (Dalian) Co. v. United States, 32 CIT 1328, 1364-65, 587 F. Supp. 2d 1330, 1361 (2008) (Commerce was required to reopen the record where the investigation was conducted under an unlawful regulation.).

In sum, for the reasons explained herein in Section I, Commerce's valuation of the input COP within its major input rule calculation was unsupported by substantial evidence and not in accordance with law.  Despite the attempted defenses set forth by the United States and Petitioners, the record here firmly establishes that Commerce acted without express statutory authority when it used multi-country GTA data to value the input COP, and even if the statute is silent or ambiguous, Commerce's determination to use GTA data and its process for collecting such data was unreasonable and arbitrary.

## II.     COMMERCE'S CALCULATION OF THE INPUT COP WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE

### A. Commerce's Inclusion of Aberrational Romania Data Seriously Distorted Commerce's Normal Value Calculation

Both the United States and Petitioners fail to redeem Commerce's unsupported inclusion of aberrational data from Romania in its input COP calculation.  See Def. Br. at 22; Pet'rs' Br. at 28-29.  Despite the United States' characterization of the data as merely being on the high end, the record clearly shows that Romania data for [ ▆ ] are "many times higher" than the rest, which is the definition of aberrational.  See BM Br. at 29-30 (Confidential Version), ECF 43; Solarworld Ams., Inc. v. United States, __ CIT __, __, 320 F. Supp. 3d 1341, 1351 (2018).

Petitioners attempt to persuade the Court that the data must fall within a certain range—30 times or 76 times higher—in order to qualify as aberrational, see Pet'rs' Br. at 28-29, however Petitioners fail to support this numerical bright line.  Instead, Commerce's practice, as affirmed by the Court, is to treat data as aberrational if they are "many times higher" and are extreme outliers, distorted or misrepresentative, or somehow incorrect.  SolarWorld __CIT at __, 320 F. Supp. 3d at 1351; see Tri Union Frozen Prods. v. United States, __ CIT__, __, 227 F. Supp. 3d 1387, 1394-95 (2017).  As Best Mattresses illustrated in its opening brief with a comparison table, the Romania [ ▆ ] data meet the aberrational threshold.  See BM Br. at 30 (Confidential Version).  Moreover, Petitioners suggest a threshold for aberrational data that directly contradicts Commerce's separate determinations in this case and Petitioners' own admissions.  See BM Br. at 30-31 (explaining that Commerce excluded Malaysia data for [ ▆▆▆▆▆▆▆▆▆ ] when the average unit value ("AUV") for Malaysia is [ ▆ ] times higher than the lowest AUV); See Pet'rs' Br. at 29 (Confidential Version) (acknowledging that [ ▆ ] times higher is enough to be aberrational).

Further, the United States wrongly claims that "{u}sing the average of the six countries' GTA data helps to smooth out any unusually high or low values that may exist."  See Def. Br. at 22. The United States provides no legal support for this notion and its arguments contradict common sense because, although a higher volume of data may lessen the impact of an aberrational value on the final average, it does not cure the individual aberrance.  The bad apple still spoils the bunch.  Instead, Commerce's decision to include aberrational data introduced distortion and contradicted the agency's obligation to calculate an accurate margin and rendered the agency's determination unsupported by substantial evidence.  See Ad Hoc Shrimp Trade Action Comm. v. United States, __CIT__, __, 219 F. Supp. 3d 1286, 1291, 1299 (2017) ("Commerce has acknowledged that aberrational values should not be used" in order to carry out its statutory directive to determine dumping margins as accurately as possible.).

## B. Commerce's Exclusion of Mexican Data Was Unsupported by Substantial Evidence

The United States and Petitioners again lose sight of Commerce's underlying obligation to calculate Best Mattresses' margin as accurately as possible when they attempt to defend Commerce's unreasonable refusal to use reliable record information to convert the Mexican GTA data from square meters to kilograms.  The United States argues that Commerce correctly rejected the conversion data because they were not Mexico-specific and Petitioners claim that Commerce cannot use the convertor without knowing the density of the Mexican data.  See Def. Br. at 23; see also Pet'rs' Br. at 30-31.  Both of these arguments wrongly and narrowly focus on finding a Mexico-specific conversion factor but ignore Commerce's overall use of the GTA data—to measure the COP of [ ▮ ] as part of Best Mattresses' overall COP of the subject merchandise.  See Final I&D Mem. at 9 (P.R. 301).  The only reasonable determination, therefore, is for Commerce to tailor its calculation to Best Mattresses' experience as much as possible by using the

conversion ratio for the type of [ ▉ ] that Best Mattresses used in its production of subject merchandise.  See e.g., Mittal Steel Galati S.A. v. United States, 31 C.I.T. 1121, 1137, 502 F. Supp. 2d 1295, 1309 (2007) (In selecting surrogate values, "Commerce's task is to duplicate, to the best of its ability, the prices a company would pay for its inputs.").  In sum, Commerce's determination remained unsupported by substantial evidence despite the arguments presented by the United States and Petitioners.

## III.   COMMERCE'S APPLICATION OF THE TRANSACTIONS DISREGARDED RULE WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE NOT IN ACCORDANCE WITH LAW

### A. Commerce Unreasonably Rejected Best Mattresses' Purchases to Establish the Market Value of Fixed Asset Depreciation

The United States and Petitioners make several unavailing claims to defend Commerce's application of the transactions disregarded rule under 19 U.S.C § 1677b(f)(2).  Neither party, however, justifies the fundamental error in Commerce's determination—Commerce's failure to use Best Mattresses' [ ▉ ] market-rate Cambodian purchases as the market value under 19 U.S.C § 1677b(f)(2) against which to measure Best Mattresses' fixed asset depreciation expenses instead of Cambodian Trademap data for raw material inputs.  See Final I&D Mem. at 10 (P.R. 301).

All parties agree that, under 19 U.S.C. § 1677b(f)(2), Commerce was obligated to determine the market value of an affiliated input purchase "based on the information available." Both the United States and Petitioners, however, ignore the statute's command. The statute's silence as to the definition of "information available" does not mean that the statute is ambiguous.  Instead, the statute provides Commerce with instruction to use "information available" to determine what the transaction would have been had it occurred at arms-length.

15

All parties ask this Court to consider <u>Rebar Trade Action Coal. v. United States</u>, __ CIT __, __, 337 F. Supp. 3d 1251 (2018), in which this Court explained what best constitutes "information available." Using <u>Rebar</u> as support, the United States and Petitioners essentially make an administrability argument by claiming that Commerce may turn to a reasonable source for a market value when a respondent does not have purchases of an <u>identical</u> input from unaffiliated suppliers. <u>See</u> Def. Br. at 33-35; Pet'rs' Br. at 34.  The United States and Petitioners are wrong because Commerce was able to readily use the Cambodian market dataset by pairing each of Best Mattresses fixed asset prices with a range of categories of market data.  <u>See id</u>.  Instead, Commerce invented an arbitrary and capricious specificity test that is not found in statute and not consistent with its past practice to use "information available."  <u>See</u> <u>Citric Acid and Certain Citrate Salts From Canada: Final Results of Antidumping Duty Administrative Review</u>, 76 Fed. Reg. 34,048 and accompanying Issues and Dec. Mem. at 10 (Dep't of Commerce June 10, 2011) (explaining that Commerce "considers transactions between persons who are not affiliated to occur at market value and uses such market values as a benchmark for the transactions disregarded rule").  In particular, Commerce claimed that "purported market prices appear to relate to the general category of 'construction materials,' not to specific assets, which makes impossible a proper comparison between similar fixed assets." Final I&D Mem. at 12 (P.R. 301).  Commerce's invention of this specificity requirement ignores the clear language of the statute to use "information available."

The United States and Petitioners incorrectly state that, although Commerce did not ask for depreciation-specific data, Best Mattresses could have provided it.  <u>See</u> Def. Br. at 35; Pet'rs' Br. at 34.  This argument runs contrary to Commerce's regulations, which expressly prohibited Best Mattresses from freely submitting factual information related to depreciation.  <u>See</u> 19 C.F.R. §

351.301(a) (providing that all factual information must fall within proscribed categories or else be requested by Commerce). Commerce requested data from Best Mattresses related to raw material inputs, which is very different from fix asset depreciation. Commerce, therefore had an obligation to provide Best Mattresses with an opportunity to comment on <u>depreciation</u> data; its failure to do so and related determination to use incompatible raw material input data was arbitrary and capricious and not supported by substantial evidence. See <u>Diamond Sawblades Mfrs. Coal. v. United States</u>, 704 F. App'x 924, 928 (Fed. Cir. 2017) (recognizing the relevance of Commerce's practice of providing interested parties opportunity to comment).

**B. Commerce Unreasonably Rejected Best Mattresses' Proposed Market Values for [▮▮▮▮▮▮▮▮▮]**

The United States wrongly claims that Commerce had no obligation to use higher than market purchases [▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮] because they do not represent "a market under consideration," i.e., Cambodia. See Def. Br. at 35 (Confidential Version). Similarly, Petitioners claim that using the actual price of [▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮] is irrelevant because there was not arms-length transaction data on the date of sale, as required by the statute. See Pet'rs' Br. at 35 (Confidential Version). Both of these assessments are wrong because Best Mattresses' [ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ ]. See BM Br. at 39-40 (Confidential Version). Additionally, Commerce's decision that the original purchase price is irrelevant to determining whether a transaction was of market value is arbitrary and inconsistent with plain language of the statute that the transactions are only disregarded when affiliated transactions are below market value in the market under consideration. See 19 U.S.C. § 1677b(f)(2).

17

In summary, Commerce's application of the transactions disregarded rule was unsupported by substantial evidence and not in accordance with law because Commerce wrongly rejected data on [ ███████ ] transactions that best valued Best Mattress' fixed asset depreciation and improperly valued certain [ ████████████ ].

## IV.   COMMERCE'S RELIANCE ON EMIRATES' FINANCIAL STATEMENTS WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE

Contrary to the United States' and Petitioners' arguments, Commerce's selection of the financial statements of Emirates Sleep Systems Private Limited ("Emirates"), which were seriously flawed and incomplete, over those of Grand Twins International (Cambodia) Plc's ("GTI"), which were without disqualifying flaws, was unsupported by substantial evidence because no reasonable mind could find that Emirates was the superior choice upon analysis of Commerce's four-factor criteria under 19 U.S.C. § 1677b(e)(2)(B)(iii).

### A.   Emirates' Financial Statements Are Not Contemporaneous

Petitioners' claim that Commerce has an established practice of treating slightly overlapping financial statements as contemporaneous is both an incorrect summary of Commerce's practice and is inconsistent with law.  See Pet'rs' Br. at 39.  Critically, Emirates' financial statements are not just slightly inconsistent.  The period of investigation ("POI") here is January 1, 2019 through December 31, 2019, while Emirates' financial statements cover the financial year ending March 31, 2019. See Letter on Behalf of the Pet'rs re: Mattress Pet'rs' Submission Concerning CV Profit and Selling Expenses at Attach. 2 (Aug.17, 2020) (Aug. 17, 2020) (Public Document) ("Pet'rs' CV Information") (P.R 142).  By Contrast, GTI's financial statements covered 2019, ending December 31, 2019, an exact fit.  See Letter on Behalf of Rose Lion and Best Mattresses re: CV Profit and Selling Expense Cmts. and Info. at Ex. CV-1 (Public Document) (Aug. 17, 2020) ("Resp'ts' CV Info") (P.R. 143-144).  To get past this problem,

18

Petitioners rely on only two cases in their attempt to discredit Best Mattresses' argument, both of which are distinguishable.  See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018, 85 Fed. Reg. 23,756 (Apr. 29, 2020), and accompanying Issues and Dec. Mem. at Cmt. 2 ("Certain Frozen Fish"); see also Golden Dragon Precise Copper Tube Group, Inc. v. United States, No. 14-00116, 2016 Ct. Intl. Trade LEXIS 81, at *13 (Aug. 23, 2016) ("Golden Dragon").  In Golden Dragon, an unreported case, the Court explained that "Commerce considers data that overlap any portion of the POR to be contemporaneous," however, the Court emphasized that contemporaneity is one of several factors that Commerce balances simultaneously.  Id.  The facts in Golden Dragon are also dissimilar because the more contemporaneous financial statement overlapped by ten months instead of two months—a still imperfect fit—and the selected financial statement had fewer issues and some supporting factors not present in Emirates' financial statements.  See id. at *4-5, 13-14.  For support, the Court also cited to Utility Scale Wind Towers From the Socialist Republic of Vietnam, 80 Fed. Reg. 55,333 (Dep't of Commerce Sept. 15, 2015), and accompanying Dec. Mem. at Cmt. 4.B., in which Commerce selects financial statements that have minimal drawbacks—the level on contemporaneity and the public availability.  See id.  In the case at bar, the Emirates' financial statements are considerably less reliable and accurate than the statements used in the Golden Dragon and Wind Towers cases, as the Emirates' statements were deficient under each of the four factors that Commerce analyzes. GTI's financial statements were one hundred percent contemporaneous with the period of investigation.

Petitioners also claim that Best Mattresses "mischateriz{e}" Commerce's determination in Certain Frozen Fish because Petitioners portray Best Mattresses' argument to mean that the lack

of contemporaneity *alone* was enough to reject the financial statements.  Pet'rs' Br. at 40.

Petitioners' assertion misses the forest for the trees because Commerce determined that it has a

"practice to use financial statements for a fiscal year which overlaps during the greatest number of

months," and in considering contemporaneity, <u>along with other weaknesses</u>, the financial

statements in question were not adequate surrogates.  <u>See</u> Certain Frozen Fish at p. 21.  When a

financial statement is not completely contemporaneous, Commerce may still opt to use it, however,

it only does so <u>after balancing all of the evidence on the record</u> related to the four relevant factors.

<u>See</u> <u>Home Meridian Int'l, Inc. v. United States</u>, 36 CIT 1279, 1287, 865 F. Supp. 2d 1311, 1319

(2012) ("Where two data sets are equally accurate, Commerce may prefer the contemporaneous

data set over the non-contemporaneous data set."); <u>see also</u> <u>Vinh Hoan Corp. v. United States</u>, No.

13 - 00156, 2015 CIT LEXIS 156, at *28-29 (Aug. 3, 2015) ("In some cases we have found that

data which partially covers the period, and include months outside of the POR, are not as fully

contemporaneous as data which covers the entire period.").  Evaluating contemporaneity and

looking to all the factors, Commerce's decision to pick Emirates' <u>non</u>-contemporaneous financial

statements over GTI's fully contemporaneous financial statements in light of Emirates' numerous

deficiencies is not supported by substantial evidence.

### B.  Emirates' Financial Statements Are Incomplete

The United States and Petitioners both incorrectly claim that Emirates' financial statements

were complete.  <u>See</u> Def. Br. at 40-43; Pet'rs' Br. at 42-44.  As Best Mattresses described in its

opening brief, the financial statements Commerce selected were partially illegible, missing

annexures, difficult to read, and potentially excluded evidence confirming receipt of government

subsidies.  <u>See</u> BM Br. at 49-51.  Yet, the United States and Petitioners argue that Commerce's

decision was supported by substantial evidence because for the purposes of calculating financial

ratios, no information was missing, and Commerce specifically addressed why a missing annexure was not essential.  <u>See</u> Def. Br. at 41-42; Pet'rs' Br. at 42-44.  These assessments miss the mark because neither responds to Best Mattresses' argument that there is insufficient record evidence to understand the impact of the missing information.  <u>See</u> BM Br. at 51.  Even if the missing information is not necessary, which Best Mattresses strongly disagree, such information is still missing and proves that the financial statement incomplete.  Commerce was impermissibly circular in claiming that the missing information was irrelevant since its relevance could only be assessed if the information were not missing.   Moreover, the information has great potential relevance if it confirms that Emirates received countervailable subsidies, yet another reason to disqualify Emirates.

Neither the United States nor Petitioners adequately address commanding precedent either. In <u>CP Kelco U.S., Inc. v. United States</u>, 949 F.3d 1348, 1359 (Fed. Cir. 2020), the Court of Appeals for the Federal Circuit ("CAFC") upheld Commerce's determination rejecting incomplete financial statements because the missing information was of "critical importance" and could provide vital information that could significantly impact the surrogate financial ratios.  In a string of cases, this Court and the CAFC also found that when another reliable financial statement is available on the record, Commerce's decision to rely on a financial statement with missing information is not supported by substantial evidence.  <u>See</u> <u>Dongguan Sunrise Furniture Co., Ltd. v. United States</u>, 37 CIT 489, 497-98, 904 F. Supp. 2d 1359, 1367 (2013).  Commerce cannot merely assert that missing information is irrelevant because "{w}ithout further information, the court cannot determine whether Commerce has decided unreasonably to use a dubious financial statement."  <u>Dongguan Sunrise Furniture Co., Ltd. v. United States</u>, 36 CIT 860, 886-87, 865 F. Supp. 2d 1216, 1243 (2012), <u>aff'd</u> 669 F. App'x 571 (Fed. Cir. 2016).  Here, Commerce has not

provided this Court sufficient evidence to even assess whether Commerce's decision to overlook the defects of illegibility and evidence of government subsidies was reasonable, especially when GTI's complete and legible financial statements were on the record.  See BM Br. at 49-52.  Missing information is of critical importance to Commerce's duty to calculate the normal value accurately, and the problems with Emirates' financial statements make Commerce's decision to summarily reject GTI's financial statements unreasonable.

Petitioners and the United States merely repeat Commerce's shallow assertion that the missing information was not necessary but neither party provides any new legal or factual analysis that redeems Commerce's determination or explains how it was supported by substantial evidence. See Def. Br. at 41-42; Pet'rs' Br. at 42-44.

### C. Emirates' Financial Statements Do Not Reflect the Business Operations of Best Mattresses

Like the other factors, the United States and Petitioners claim, but do not demonstrate, that Commerce provided an adequate factual basis to prove that Emirates had similar operations to Best Mattresses and complied with the statute's command to use "any other reasonable method" when picking surrogate values.  The United States claims that Commerce addressed differences between Best Mattresses and Emirates, see Def. Br. at 44, however, it fails to substantiate its assertions.  Petitioners make several claims: that the fact Emirates is a smaller company is irrelevant, that there is insufficient evidence to demonstrate that Emirates is primarily a franchise operation, that Emirates incomparably huge marketing budget is irrelevant, and that above all, Emirates is a mattress producer. See Pet'rs' Br. at 37-39. Those claims are wrong because the record shows that these business operations differences, combined with problems under the other three factors, leaves Commerce's determination unsupported by substantial evidence.

As Best Mattresses explained in its opening brief, Emirates and Best Mattresses are nothing alike.  See BM Br. at 44-47.  The lack of similarity is legally problematic because under Commerce's four-factor test, it considers a respondent's production experience in selecting surrogate financial statements and "prioritize{s} the data on the record that best reflected the respondent's production experience."  Mid Continent Steel & Wire, Inc. v. United States, __ CIT __, __, 273 F. Supp. 3d 1348, 1352 (2017); see also Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999) ("The 'best available information' concerning the valuation of a particular factor of production may constitute information from the surrogate country that is directly analogous to the production experience of the NME producer"). [3]

Commerce ignored two striking differences between the companies when it compared the business operations of Best Mattresses and Emirates. (1) Emirates and Best Mattresses have business of very different scale as measured by revenue and (2) Emirates was established as a franchise operation and had 23% of its revenues from marketing services whereas GTI and Best Mattresses produced [ ■ ] their revenue from [ ████████ ].  See BM Br. at 44-47 (Confidential Version).  Emirates was a significantly different business from Best Mattresses and Commerce did not rely on the best available information when it chose against using GTI's financial statements. And, while one negative factor may not change the overall balance alone, analysis of all four factors does not support Commerce's decision to select Emirates over GTI.

### D.  Emirates' Financial Statements Were Not Publicly Available

Finally, the United States and Petitioners wrongly claim that Emirates' financial statements were publicly available despite a deficit of evidence on the record substantiating that claim.  The United States and Petitioners claim that although Best Mattresses was unable to obtain the financial

---

[3] Cambodia is a ME country, but NME investigations are analogous here because Commerce uses similar selection criteria in NME and Constructed Value ("CV") calculations.

statements themselves, that does not mean the statements are not publicly available.  See Def. Br. at 46; Pet'rs' Br. at 41.  Petitioners also claim that Commerce was satisfied with how the statements were obtained.  See id.  Both parties are oblivious to the circularity of their arguments regarding public availability.  The United States attempts to prove a positive with a negative, i.e., it argues that because there was no evidence that statements were not publicly available—and despite Best Mattresses' statement that it could not find them—the lack of evidence means that they were publicly available.

This Court has explained that a party's mere assertion of public availability does not render this information publicly available; rather, Commerce's practice is to require a detailed step-by-step explanation by the submitter of how the financial statements were obtained so "any party would be able to replicate these steps" in acquiring the financial statements.  Since Hardware (Guangzhou) Co., Ltd. v. United States, 37 CIT 803, 809, 911 F. Supp. 2d 1362, 1369 (2013). Petitioners continue to insist that Commerce was satisfied that Emirates' financial statements were obtained from a fee-based service, however, Commerce's determination was vague and unsupported by substantial evidence; it accepted the statements only because "{w}e agree that a financial statement from a fee-based service would constitute a publicly available source."  Final I&D Mem. at 20 (P.R. 301) (emphasis added); see Pet'rs' Br. at 41-42.  Critically, Petitioners cannot point the Court to one shred of record evidence establishing that they purchased the Emirates' financial statements through a fee-based service or that they received the statements directly from the company, and yet they endorse both theoretical positions in their response brief. The Court must disregard this line of defense without record support.

Petitioners also argue that Emirates need not be publicly traded for Commerce to use its financial statements.  See Pet'rs' Br. at 41.  Emirates misunderstands Best Mattresses' point. The

fact that Emirates was not publicly traded is not by itself dispositive, rather, it is one additional factor showing that the company's financial statements are not publicly available.   The bottom line is that all of the facts demonstrating that Emirates' financial statements were not publicly available stand in stark contrast to the publicly availability of GTI's financial statements.

### E.  GTI's Financial Statements Were the Only Reasonable Financial Statements on the Record for Commerce to Calculate the CV Financial Ratios

In summary, the United States and Petitioners cherry pick instances in Commerce's past practice where the agency has accepted flawed financial statements, yet neither adequately respond to Best Mattresses' complaint that Commerce has no past practice of accepting financial statements that fail each and every one of the factors in the balancing test, as it did here.   Balancing Commerce's four factors as applied on the record evidence leads to only one reasonable conclusion: GTI's financial statements perform drastically better.   As explained fully in Best Mattresses' opening brief, the GTI financial statements are contemporaneous, complete, publicly available and GTI and Best Mattresses have similar business operations.   See BM Br. at 40-52. Commerce's decision to use Emirates' financial statements was unsupported by substantial evidence because Commerce did not properly apply the four factors to establish "other reasonable method."   This Court should remand Commerce's determination so that the agency can recalculate Best Mattresses' CV profit and selling expense ratios using GTI's financial statements.

## V.   JUDICIAL ECONOMY SUPPORTS THE REMAND OF COMMERCE'S APPLICATION OF THE COHEN'S D TEST

Contrary to the United States' and Petitioners' arguments that "plaintiffs seek an advisory opinion when they have suffered no injury," Def. Br. at 52, see also Pet'rs' Br. at 46, the faulty assumptions upon which Commerce's differential pricing analysis rested represent key barriers to any potential relief granted to Best Mattresses.   Neither the United States nor Petitioners deny that

Commerce applied the same Cohen's *d* test to Best Mattresses that was overruled in <u>Stupp Corp.</u> <u>v. United States</u>, 5 F.4th 1341 (Fed. Cir. 2021).  Continued application of the Cohen's *d* test upon remand could require additional rounds of briefing regarding an inflated antidumping duty and would waste the resources of the Court and all parties to this proceeding.  <u>See</u> BM Br. at 52-56. In the interests of judicial economy, accuracy and to avoid unnecessary repetition and duplicative efforts, the Court should not delay in remanding this issue to Commerce.  <u>See</u> <u>Stratoflex, Inc. v.</u> <u>Aeroquip Corp.</u>, 713 F.2d 1530, 1539 (Fed. Cir. 1983) ("The result being unchanged, a remand for reconsideration of the evidence would in this case constitute a waste of resources for the courts and the parties.").

Additionally, the United States and Petitioners argue that Best Mattresses failed to exhaust administrative remedies regarding this issue.  <u>See</u> Def. Br. at 53-54; Pet'rs' Br. at 47.  Respondents may be excused from this exhaustion requirement if "an important court decision was issued after the party's case brief would have been filed." <u>Corus Staal BV v. United States</u>, 502 F.3d 1370, 1381 (Fed. Cir. 2007).  The CAFC issued its opinion in <u>Stupp</u> after the Final Determination, rendering impossible any discussion of this decision during administrative briefing.

For this same reason, the fact that the CAFC has now overturned the application of the Cohen's *d* test for yet another reason warrants remand for Commerce to conform to those court decisions arising after the administrative proceeding.  <u>See</u> <u>Mid Continent Steel & Wire, Inc. v.</u> <u>United States</u>, 2022 U.S. App. LEXIS 10767, *1 (Fed. Cir. Apr. 21, 2022).  The CAFC in <u>Mid</u> <u>Continent</u> found that Commerce's use of simple-average standard deviation, rather than weighted-average or population standard deviation, in the Cohen's *d* calculation lacked sufficient explanation in its departure from practices elaborated in the relevant supporting literature.  <u>See</u> <u>id.</u> No. 21-1747, 2022 U.S. App. LEXIS 10767, at *21.  The simple-average standard deviation

26

methodology employed by Commerce in <u>Mid Continent</u> was also utilized by Commerce in the underlying investigation.  <u>See</u> BM Br. at 53.  The Court should exercise its discretion to consider the issue raised by <u>Mid Continent</u> and render a consistent decision herein.  <u>See</u> <u>Corus Staal</u>, 502 F.3d at 1381 ("{A}pplying exhaustion principles in trade cases is subject to the discretion of the judge of the Court of International Trade.").

**CONCLUSION**

For the foregoing reasons, Best Mattresses request that the Court grant its Motion for Judgment Upon the Agency Record and remand the Final Determination consistent with the points of law and record evidence discussed in Best Mattresses' opening brief and this reply brief.

Respectfully submitted,

<u>Dated</u>: April 22, 2022

/s/ Jeffrey S. Grimson

Jeffrey S. Grimson
Kristin H. Mowry
Sarah M. Wyss
Wenhui (Flora) Ji
Jacob M. Reiskin

Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW, Suite 810
Washington, D.C. 20015
202-688-3610
trade@mowrygrimson.com
*Counsel to Best Mattresses International*
*Company Limited and Rose Lion Furniture*
*International Company Limited*

**CERTIFICATE OF COMPLIANCE**

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Jeffrey S. Grimson, hereby certify that this brief complies with the word limitations set forth in Paragraph 2(B) of the Standard Chamber Procedures and as modified by the order granting Plaintiffs' Consent Motion For Enlargement of Word Count Limit in the Court's September 23, 2021 Scheduling Order, ECF No. 61.  Excluding the table of contents, table of authorities, signature block and any certificates of counsel, the word count for this brief is 8,475 words.

Dated: <u>April 22, 2022</u>

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW, Suite 810
Washington, D.C. 20015
202-688-3610
trade@mowrygrimson.com
*Counsel to Best Mattresses International*
*Company Limited and Rose Lion Furniture*
*International Company Limited*