Slip Op. 23-19

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| BEST MATTRESSES INTERNATIONAL COMPANY LIMITED AND ROSE LION FURNITURE INTERNATIONAL COMPANY LIMITED, | |
| Plaintiffs and Consolidated Defendant-Intervenors, | |
| v. | Before: Gary S. Katzmann, Judge |
| UNITED STATES, | Consol. Court No. 21-00281 |
| Defendant, | *PUBLIC VERSION* |
| and | |
| BROOKLYN BEDDING, LLC; CORSICANA MATTRESS COMPANY; ELITE COMFORT SOLUTIONS; FXI, INC.; INNOCOR, INC.; KOLCRAFT ENTERPRISES INC.; LEGGETT & PLATT, INCORPORATED; THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS; AND UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, | |
| Defendant-Intervenors and Consolidated Plaintiffs. | |

## OPINION AND ORDER

[ Plaintiffs' Motion for Judgment on the Agency Record is granted in part and denied in part. Defendant-Intervenors' Motion for Judgment on the Agency Record is granted. The U.S. Department of Commerce's Partial Motion to Dismiss is granted. Commerce's Final Determination is remanded for reconsideration or further explanation. ]

Dated: February 17, 2023

Jeffrey S. Grimson, Jacob Reiskin, Kristin H. Mowry, Sarah M. Wyss, and Wenhui (Flora) Ji, Mowry & Grimson, PLLC, of Washington, D.C., for Plaintiffs and Consolidated Defendant-Intervenors Best Mattresses International Company Limited and Rose Lion Furniture International Company Limited.

Kara M. Westercamp, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States. With her on the brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and L. Misha Preheim, Assistant Director. Of counsel on the brief was Paul K. Keith, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Yohai Baisburd, Jack A. Levy, and Chase J. Dunn, Cassidy Levy Kent (USA) LLP, of Washington, D.C., for Defendant Intervenors and Consolidated Plaintiffs Brooklyn Bedding, LLC; Corsicana Mattress Company; Elite Comfort Solutions; FXI, Inc.; Innocor, Inc.; Kolcraft Enterprises Inc.; Leggett &Platt, Incorporated; the International Brotherhood of Teamsters; and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO.

Katzmann, Judge:  Important issues relating to agency discretion, surrogate value methodology, and the treatment of NME-based affiliated suppliers in market economy proceedings spring forth from the facts of this case. Plaintiffs Best Mattresses International Company Limited ("Best Mattresses") and Rose Lion Furniture International Company Limited ("Rose Lion") challenge certain aspects of the final affirmative antidumping duty determination regarding mattresses from Cambodia by Defendant U.S. Department of Commerce ("Commerce" or "the Government"). See Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Antidumping Duty Orders and Amended Final Affirmative Antidumping Determination for Cambodia, 86 Fed. Reg. 26,460 (Dep't Com. May 14, 2021) ("Final Determination"), P.R. 325.[1] Defendant-Intervenors Brooklyn

---

[1] Commerce had initially noticed its final antidumping duty determination on March 25, 2021. See Mattresses from Cambodia: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances, 86 Fed. Reg. 15,894 (Dep't Com. Mar.

Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc.,

Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, the International Brotherhood of

Teamsters, and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial

and Service Workers International Union, AFL-CIO challenge additional aspects of Commerce's

Final Determination.[2]  Plaintiffs and Defendant-Intervenors each move for judgment on the agency

record pursuant to USCIT Rule 56.2 and argue that parts of the Final Determination were

"unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19

U.S.C. § 1516a(b)(1)(B)(i).

The Final Determination is the result of Commerce's first antidumping duty investigation

involving mattresses from Cambodia.  See Mem. from J. Maeder to C. Marsh, re: Issues and

Decisions Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value

Investigation of Mattresses from Cambodia at 3 (Dep't Com. Mar. 18, 2021), P.R. 301 ("IDM").

In this market economy investigation, Commerce confronted an issue of first impression:  how to

calculate constructed value for respondents who, while formally based in market economies,

sourced a substantial percentage of their minor and major inputs from affiliated suppliers located

in a non-market economy ("NME").  Plaintiffs assert five challenges to the Final Determination:

(1) Commerce's use of surrogate country data to value input cost of production ("COP") under the

Major Input Rule, 19 U.S.C. § 1677b(f)(3), in a market economy proceeding was unauthorized

___

25, 2021), P.R. 309 ("Unamended Final Determination").   Commerce later amended that determination to correct two ministerial errors.  See Final Determination, 86 Fed. Reg. at 26,461. The court will refer to the amended final determination, see id., as the Final Determination.

[2] Defendant-Intervenors' challenge, see Compl., Brooklyn Bedding, LLC v. United States, No. 21-cv-00282 (CIT July 12, 2021), ECF No. 13, was consolidated with Plaintiffs' case under case number 21-cv-00281 on September 21, 2021, see Order, Sept. 21, 2021, ECF No. 30.

and unreasonable; (2) Commerce's inclusion and exclusion of certain country data were unreasonable; (3) Commerce's use of the Transactions Disregarded Rule, 19 U.S.C. § 1677b(f)(2), to adjust Plaintiffs' fixed asset depreciation expenses was unauthorized and unreasonable; (4) Commerce's selection of the financial statement for calculating Plaintiffs' profit and selling expense ratios was unreasonable; and (5) Commerce's application of the Cohen's *d* test in calculating weighted average dumping margins was unauthorized. Defendant-Intervenors submit three more: (1) Commerce's construction of the Transactions Disregarded Rule, which interpreted "market under consideration" to mean the country under investigation, was not in accordance with law and unreasonable; (2) Commerce's use of distortive and unreliable Trademap surrogate data to value market price under the Transactions Disregarded Rule was unreasonable; and (3) Commerce's inclusion of NME and export-subsidizing countries in the surrogate data was unauthorized and unreasonable. Additionally, the Government moves to dismiss Count VI of Plaintiffs' Complaint for lack of standing to challenge Commerce's application of the Cohen's *d* test. <u>See</u> USCIT R. 12(b)(2). As with Commerce's investigation, many of these arguments are matters of first impression before the Court of International Trade.

First, the court grants the Government's motion to dismiss Count VI of Plaintiffs' Complaint. Plaintiffs fail to establish standing to challenge Commerce's application of the Cohen's *d* test because any difference in Commerce's methodology would not have materially impacted the result of the dumping margin. Second, the court grants in part and denies in part Plaintiffs' Motion for Judgment on the Agency Record. Almost all of Plaintiffs' challenges yield to the broad legal and factfinding discretion enjoyed by Commerce, which is master of the antidumping statutes. Notably, the court holds that Commerce's interpretation of the Major Inputs

Rule, 19 U.S.C. § 1677b(f)(3); see infra pp. 7–8, to allow use of third-country surrogate data as "information available" for determining the COP of a major input purchased from an affiliated NME-based supplier is reasonable and warrants deference.  But Plaintiffs prevail on two claims; Commerce's determinations that the financial statement it had selected was publicly available and sufficiently complete were unreasonable.  Third, the court grants the Defendant-Intervenors' Motion for Judgment on the Agency Record.  The court concludes that Commerce's interpretation of "market under consideration" in the Transactions Disregarded Rule, 19 U.S.C. § 1677b(f)(2); see infra pp. 6–7, to strictly mean the country under investigation is unreasonably inflexible and inconsistent with prior practice.  Because Commerce's selection of Trademap data is premised on that interpretation, the court does not reach the other issues concerning the Trademap data's reliability.  Moreover, Commerce's continued inclusion of NME and export-subsidizing countries in the surrogate data was inconsistent with other reasoning in its Final Determination.  The court, therefore, remands to Commerce for reconsideration or further explanation consistent with this opinion.

## BACKGROUND

### I.    *Legal Framework for Antidumping Duty Determinations*

"Dumping occurs when a foreign company sells a product in the United States at a lower price than what it sells that same product for in its home market."  Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d 1041, 1046 (Fed. Cir. 2012).  This practice constitutes unfair competition because it permits foreign producers to undercut domestic companies by selling products below reasonable fair market value.  Id.  To address the harmful impact of such unfair competition, Congress enacted the Tariff Act of 1930, which empowers Commerce to investigate potential

Consol. Court No. 21-00281                                                      Page 6
*PUBLIC VERSION*

dumping and, if necessary, to issue orders instituting duties on subject merchandise.  Id. at 1047.

When Commerce concludes that duties are appropriate, the agency is required to determine

"margins as accurately as possible."  Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191

(Fed. Cir. 1990).

　　　　Commerce imposes antidumping ("AD") duties on foreign goods if it determines that the

goods are being, or are likely to be, sold at less than fair value, and the International Trade

Commission ("ITC") concludes that the sale of the merchandise below fair value materially

injures, threatens, or impedes the establishment of an industry in the United States.  See 19 U.S.C.

§ 1673; Diamond Sawblades Mfrs. Coal. v. United States, 866 F.3d 1304, 1306 (Fed. Cir. 2017).

Merchandise is sold at less than fair value when the normal value ("NV") is greater than the price

charged for the product in the United States.  See 19 U.S.C. § 1673.  Commerce traditionally

determines NV by reference to market prices in the exporting country, id. § 1677b(a)(1)(B)(i), or

a third country, id. § 1677b(a)(1)(B)(ii).  If there does not exist a viable home market or third

country market to serve as the basis for NV, Commerce uses constructed value ("CV") as the basis

for NV.  See id. § 1677b(a)(4).  CV is calculated by adding the exporter's COP, selling expenses

and profits, and costs of containers and other shipping expenses.  See id. § 1677b(e); HiSteel Co.,

Ltd v. United States, 45 CIT __, __, 547 F. Supp. 3d 1233, 1238 (2021).

### A.    *Special Rules for Calculating of COP and CV*

　　　　19 U.S.C. § 1677b(f) codifies special rules for the calculation of COP and CV.  When

Commerce considers price data reflecting transactions between an exporter and its affiliated

supplier, the agency must apply the Transactions Disregarded Rule, id. § 1677b(f)(2), and Major

Input Rule, id. § 1677b(f)(3), in order to ensure that the price used in the CV calculation most

accurately reflects the value of the input.  The underlying concern is that simply relying on the

transaction purchase price for an input from an affiliated supplier ("transfer price"), without testing

it against external measures of value, could be reflective of exporters' cost-sharing arrangements

with affiliates or like distortions.

> The Transactions Disregarded Rule states:
>
> A transaction directly or indirectly between affiliated persons may be disregarded
> if, in the case of any element of value required to be considered, the amount
> representing that element does not fairly reflect the amount usually reflected in
> sales of merchandise under consideration in the market under consideration.  If a
> transaction is disregarded under the preceding sentence and no other transactions
> are available for consideration, the determination of the amount shall be based on
> the information available as to what the amount would have been if the transaction
> had occurred between persons who are not affiliated.

19 U.S.C. § 1677b(f)(2).  In other words, Commerce determines the market price of the input to

test whether the transfer price "does not fairly reflect the amount usually reflected in sales of

merchandise under consideration in the market under consideration." Id.  Commerce's calculation

of the market price "shall be based on the information available as to what the amount would have

been if the transaction had occurred between persons who are not affiliated." Id.  If testing the

market price against the transfer price reveals that the former is the more reliable indicator,

Commerce uses it in determining constructed value. Id.

> The Major Input Rule, operating somewhat similarly, is codified in the next subsection:
>
> If, in the case of a transaction between affiliated persons involving the production
> by one of such persons of a major input to the merchandise, the administering
> authority has reasonable grounds to believe or suspect that an amount represented
> as the value of such input is less than the cost of production of such input, then the
> administering authority may determine the value of the major input on the basis of
> the information available regarding such cost of production, if such cost is greater
> than the amount that would be determined for such input under paragraph (2).

Consol. Court No. 21-00281                                                      Page 8
***PUBLIC VERSION***

19 U.S.C. § 1677b(f)(3).  Commerce has codified its formal interpretation of the Major Input Rule.

See 19 C.F.R. § 351.407(b) (2022); see also NTN Bearing Corp. of Am. v. United States, 368 F.3d

1369, 1375 (Fed. Cir. 2004) (affirming the validity of 19 C.F.R. § 351.407(b) under Chevron).  Per

that rule, Commerce "normally" will determine the value of a major input purchased from an

affiliated entity by selecting the higher of:

> (1) The price paid by the exporter or producer to the affiliated person for the major
> input [("transfer price")];
>
> (2) The amount usually reflected in sales of the major input in the market under
> consideration [("market price")]; or
>
> (3) The cost to the affiliated person of producing the major input [("input COP")].

19 C.F.R. § 351.407(b) (2022).

### B.    Calculation of Profit and Selling Expense Ratios

As part of its constructed value calculation, Commerce must also determine the value of a

respondent's profit and selling expenses.  See 19 U.S.C. § 1677b(e)(2).  Commerce's preferred

methods of calculating profit and selling expenses is to rely on the respondent's own home market

or third-country sales.  See id. § 1677b(e)(2)(A).  But if neither is available, then Commerce may

choose one of three alternative methods:

> (i) the actual amounts incurred and realized by the specific exporter or producer
> being examined in the investigation or review for selling, general, and
> administrative expenses, and for profits, in connection with the production and sale,
> for consumption in the foreign country, of merchandise that is in the same general
> category of products as the subject merchandise,
>
> (ii) the weighted average of the actual amounts incurred and realized by exporters
> or producers that are subject to the investigation or review (other than the exporter
> or producer described in clause (i)) for selling, general, and administrative
> expenses, and for profits, in connection with the production and sale of a foreign
> like product, in the ordinary course of trade, for consumption in the foreign country,
> or

(iii) the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise . . . .

IDM at 15–16 (quoting 19 U.S.C. § 1677b(e)(2)(B)). There is no preference among the three methods, so long as Commerce's choice is reasonable. See also Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, at 840 (1994) ("At the outset, it should be emphasized that, consistent with the Antidumping Agreement, new section 773(e)(2)(B) does not establish a hierarchy or preference among these alternative methods. Further, no one approach is necessarily appropriate for use in all cases."). In NME investigations, "Commerce values certain factors of production, such as selling, general, and administrative expenses . . . and profit, by using financial ratios derived from financial statements of producers of comparable merchandise in the surrogate country." Ad Hoc Shrimp Trade Action Comm. v. United States, 618 F.3d 1316, 1319 (Fed. Cir. 2010).

### C.    *Calculation of Dumping Margin*

After calculating CV as the basis for NV, Commerce will then determine the weighted average dumping margin. In general, the agency "compar[es] . . . the weighted average of the normal values with the weighted average of the exported prices (and constructed export prices) for comparable merchandise," termed the average-to-average ("A-to-A") method, "unless the Secretary determines another method is appropriate in a particular case." 19 C.F.R. § 351.414(b)(1), (c)(1); see also 19 U.S.C. § 1677f–1(d)(1)(A)(i).

"The average-to-average method, however, sometimes fails to detect 'targeted' or 'masked' dumping, because a respondent's sales of low-priced 'dumped' merchandise would be

averaged with (and offset by) sales of higher-priced 'masking' merchandise, giving the impression that no dumping was taking place." <u>Stupp Corp. v. United States</u>, 5 F.4th 1341, 1345 (Fed. Cir. 2021) (internal quotation marks and citation omitted); <u>see also</u> <u>Differential Pricing Analysis;</u> <u>Request for Comments</u>, 79 Fed. Reg. 26,720, 26,721 (Dep't Com. May 9, 2014).   Congress therefore authorized Commerce to use two alternative methods to address the kind of targeted dumping that the A-to-A method sometimes fails to detect.   <u>Stupp</u>, 5 F.4th at 1345.   First, Commerce may compare the NVs of individual transactions to the export prices of individual transactions, a method known as the transaction-to-transaction ("T-to-T") method.  <u>Id.</u> § 1677f–1(d)(1)(A)(ii).  Commerce employs the T-to-T method only in "unusual" situations, such as "when there are very few sales of subject merchandise and the merchandise sold in each market is identical or very similar or is custom-made."  19 C.F.R. § 351.414(c)(2).  Second, Commerce may use the average-to-transaction ("A-to-T") method, which "involves a comparison of the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise."  <u>Id.</u> § 351.414(b)(3).  Commerce is authorized to use the A-to-T method only if "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time," and if Commerce "explains why such differences cannot be taken into account" using alternative methods.  19 U.S.C. § 1677f-1(d)(1)(B).

        To determine whether to apply the A-to-T or T-to-T methods instead of the A-to-A method, Commerce conducts a differential pricing analysis.  <u>Apex Frozen Foods Priv. Ltd. v. United States,</u> 862 F.3d 1337, 1342 & n.2 (Fed. Cir. 2017); <u>see also</u> <u>Stupp</u>, 5 F.4th at 1346–47.  In the first step of the differential pricing analysis, Commerce segments export sales into subsets based on region,

purchasers, and time periods.   See Differential Pricing Analysis, 79 Fed. Reg. at 26,722.

Commerce then applies the Cohen's $d$ test, a statistical test determining effect size, to each subset

to evaluate the extent to which prices differ significantly among purchasers, regions, or time

periods.  See id.  If the Cohen's $d$ coefficient is 0.8 or greater, the sales in the group "pass" the

Cohen's $d$ test.  See id.  Commerce next applies the "ratio test" on the aggregated results of the

Cohen's $d$ test on each subset to assess the extent of the significant price differences for all sales.

See id.  If less than 33 percent of the value of total sales passes the Cohen's $d$ test, Commerce will

use the A-to-A method to calculate the weighted-average dumping margin.  See id. at 26,723.  If

more than 33 percent but less than 66 percent of the value of total sales pass the Cohen's $d$ test,

Commerce has the discretion to apply a hybrid method, wherein it applies the A-to-A method to

sales which do not pass the Cohen's $d$ test, and the A-to-T method to sales which pass the Cohen's

$d$ test.  See id.  And if more than 66 percent of the value of total sales pass the Cohen's $d$ test,

Commerce tentatively applies the A-to-T method to all sales.  See id. at 26,722–23.

Finally, Commerce applies the "meaningful difference" test, which compares the AD

margins resulting from different methodologies, to examine whether using only the A-to-A method

can appropriately account for price differences.  See 19 U.S.C. § 1677f–1(d)(1)(B)(ii); Stupp, 5

F.4th at 1347; Differential Pricing Analysis, 79 Fed. Reg. at 26,723.  Under this test, Commerce

compares the dumping margin that results from applying only the A-to-A method with the

dumping margin that results from applying the alternative method that is tentatively selected based

on the Cohen's $d$ and ratio tests.  See Differential Pricing Analysis, 79 Fed. Reg. at 26,723.  A

difference in the weighted average dumping margins is considered meaningful if (1) there is a 25

percent relative change and both rates are above the de minimis threshold of two percent, or (2)

Consol. Court No. 21-00281                                                     Page 12
*PUBLIC VERSION*

the A-to-A weighted average dumping margin is below the de minimis threshold and the alternative margin is above.  See id.  Commerce uses the alternative approach to calculate AD margin if it concludes there is a meaningful difference; absent a meaningful difference, Commerce will apply the A-to-A method.  See id.

## II.     *Factual Background*

On March 31, 2020, Defendant-Intervenors filed antidumping petitions with Commerce alleging the importation of mattresses from Cambodia, among other countries, at less than fair value.  See Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations, 85 Fed. Reg. 23,002, 23,003 (Dep't Com. Apr. 24, 2020), P.R. 45.  Commerce published an initiation notice on April 24, 2020, for the less-than-fair value investigation of mattresses from Cambodia with a period of investigation ("POI") from January 1, 2019, to December 31, 2019. See id.  On May 8, 2020, Commerce selected Best Mattresses and Rose Lion as mandatory respondents.  See Mem. from J. McGowan to J. Maeder, re: Respondent Selection at 1 (Dep't Com. May 8, 2020), P.R. 52.  On May 21, 2020, the ITC preliminarily determined that there is a reasonable indication that an industry in the United States is materially injured by reason of imports of mattresses from Cambodia.  See Mem. from J. Maeder to J.I. Kessler, re: Decision Memorandum for the Preliminary Affirmative Determination in the Less-Than-Fair-Value Investigation of Mattresses from Cambodia at 2 (Dep't Com. Oct. 27, 2020), P.R. 232 ("PDM").

In June and July 2020, Plaintiffs submitted responses to Section A of Commerce's antidumping questionnaire relating to general information, and to Sections C and D relating to U.S. sales, COP, and CV.  See Letter from Best Mattresses to W. Ross, Sec'y of Com., re: Sections

**PUBLIC VERSION**

C and D Questionnaire Response at D-8 to -9 & Exs. D-4 to -5 (July 6, 2020), P.R. 107, C.R. 47–

55 ("Best Mattresses C-DQR"); Letter from Rose Lion to W. Ross, Sec'y of Com., re: Sections C

and D Questionnaire Response at D-8 to -9 & Exs. D-4 to -5 (July 9, 2020), P.R. 108, C.R. 56–67

("Rose Lion C-DQR").  In the questionnaire response, Best Mattresses reported that no less than

[[    ]] percent of its total cost of manufacture ("TOTCOM") was based on transfer prices from

affiliated parties in [[        ]], Best Mattresses C-DQR at Exs. D-4 to -5, and Rose Lion reported

that no less than [[    ]] percent of its TOTCOM was based on transfer prices from affiliated parties

in [[        ]], Rose Lion C-DQR at Exs. D-4 and D-5.

     From June 2020 to August 2020, Defendant-Intervenors submitted comments on Plaintiffs'

questionnaire responses related to the determination of CV profit and selling expenses.  PDM at

3.  From July 2020 to September 2020, Plaintiffs submitted responses to Commerce's

supplemental questionnaires.  Id. at 3.  For the calculation of the profit and selling expense ratio,

Plaintiffs submitted the financial statements of Grand Twins International (Cambodia) Plc

("GTI").  See Letter from Rose Lion & Best Mattresses to W. Ross, Sec'y of Com., re: CV Profit

and Selling Expenses Comments and Information at Ex. CV-1 (Aug 17, 2020), P.R. 143–144.

Defendant-Intervenors submitted the financial statements of Emirates Sleep Systems Private

Limited ("Emirates").  See Letter from Mattress Pet'rs to W. Ross, Sec'y of Com., re: Mattress

Petitioners' Submission Concerning CV Profit and Selling Expenses at attach. 2 (Aug. 17, 2020),

P.R. 142 ("Emirates Fin. Stmts.").

     In September 2020, Commerce issued a supplemental questionnaire requesting a schedule

reporting all of Best Mattresses' POI affiliated material purchases and comparable unaffiliated

purchases, including (1) data on affiliated suppliers' sales of the same input to unaffiliated

customers and (2) the "POI per-unit average input value" of each input into Cambodia, as well as

for Romania, Russia, Malaysia, Turkey, Mexico, and Brazil.  Letter from M. Martin to Best

Mattresses Int'l Co., re: Antidumping Duty Investigation of Mattresses from Cambodia at 4 (Dep't

Com. Sept. 1, 2020), P.R. 156, C.R. 137; Letter from M. Martin to Rose Lion Furniture Int'l Co.,

re: Antidumping Duty Investigation of Mattresses from Cambodia at 4 (Dep't Com. Sept. 1, 2020),

P.R. 157, C.R. 138 (together, "Sec. D Supp. Qs.").  Notably, Commerce did not ask Plaintiffs to

submit the affiliated suppliers' actual COP data.

Plaintiffs responded that Commerce's first request was inapplicable because Plaintiffs'

"affiliated suppliers . . . did not have sales of the same input to unaffiliated customers in the market

under consideration during the POI."  Letter from Best Mattresses to W. Ross, Sec'y of Com., re:

Third Supplemental Questionnaire Response at SD-3 (Sept. 22, 2020), P.R. 169–188, C.R. 139–

179; Letter from Rose Lion to W. Ross, Sec'y of Com., re: Third Supplemental Questionnaire

Response at SD-3 (Sept. 22, 2020), P.R. 189–208, C.R. 180–223 (together, "Third Supp. Q.

Resps.").  To satisfy the second request, Plaintiffs submitted data, published by Global Trade Atlas

("GTA"),[3] of all POI per-unit average import values for Romania, Russia, Malaysia, Turkey,

Mexico, and Brazil; but because Cambodia does not report data to the GTA, Plaintiffs provided

"mirror data" sourced from Trademap, another trade database.[4]  <u>See</u> Third Supp. Q. Resps. at SD-

---

[3] Global Trade Atlas "is an online trade data system" that advertises that it "allows users to view
world trade flows for products of interest using the latest import/export data from the official
sources of more than 70 Countries." <u>Global Trade Atlas</u>, Glob. Trade Info. Servs.,
www.gtis.com/English/GTIS_GTA.html (last visited Feb. 17, 2023).

[4] Trademap data, maintained by the International Trade Centre of the World Trade Organization
and United Nations Conference on Trade and Development, is "mainly based" on trade data
reported to UN Comtrade; the trade data of "countries that do not report their national trade
statistics to UN Comtrade" is "reconstructed on the basis of data reported by partner countries."

3 to -4.  In response, Defendant-Intervenors submitted mirror data from GTA, not Trademap, to show that the two datasets, both of which ostensibly constructed the same value of imports into Cambodia, were different and therefore unreliable.  See Third Supp. Q. Rebuttal at attach. 4.

In November 2020, Commerce published its affirmative preliminary determination.  <u>See</u> <u>Mattresses from Cambodia: Preliminary Affirmative Determination of Sales at Less Than Fair</u> <u>Value, Preliminary Affirmative Determination of Critical Circumstances, Postponement of Final</u> <u>Determination, and Extension of Provisional Measures</u>, 85 Fed. Reg. 69,694 (Dep't Com. Nov. 3, 2020), P.R. 244 ("<u>Preliminary Determination</u>").  Commerce calculated a preliminary dumping margin of 252.74 percent for Best Mattresses.  <u>See</u> PDM at 6.  Because Best Mattresses presented no viable home market or third-country market, Commerce used constructed value as the basis for calculating normal value.  <u>Id.</u> at 13.

In the PDM, Commerce "relied on the COP and CV data submitted" by Plaintiffs in the questionnaires but adjusted the data pursuant to the Transactions Disregarded and Major Input Rule.  PDM at 13.  As Plaintiffs purchased certain major inputs from affiliated parties located in an NME country, Commerce determined the COP for the affiliates pursuant to the Major Input Rule in 19 U.S.C. § 1677b(f)(3).  <u>See</u> Mem. from S. Medillo to N. Halper, re: Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination at 2 (Dep't Com. Oct. 27, 2020), P.R. 242 ("Prelim. Cost Mem.").  Specifically, in the absence of affiliates'

---

Letter from Mattress Pet'rs to W. Ross, Sec'y of Com., re: Mattress Petitioners' Submission of Rebuttal Factual Information Concerning Respondents' Third Supplemental Questionnaire Responses at attach. 1 (Oct. 2, 2020), P.R. 219–220 ("Third Supp. Q. Rebuttal").  The resulting data is called "mirror data," which "is better than no data at all but . . . has a number of shortcomings."  <u>Id.</u> at attach. 2.

COP, Commerce derived surrogate COP amounts by the Harmonized Tariff Schedule ("HTS")

number of specific inputs using GTA import data into Brazil, excluding imports from NMEs and

subsidized countries.  Prelim. Cost Mem. at 2.  Commerce explained that it chose Brazil as the

surrogate country "because Brazil provides coverage for all of the relevant HTS classifications,

Brazil is the fourth largest mattress market in the world, and the Brazilian market is supplied almost

entirely by domestic raw materials producers."  Id.[5]

Commerce also compared affiliated party purchase prices for minor inputs to a market

price pursuant to the Transactions Disregarded Rule, 19 U.S.C. § 1677b(f)(2).  See Prelim. Cost

Mem. at 2.  Where a market price based on unaffiliated party purchases was unavailable,

Commerce determined a market price using the average of GTA data for six countries (i.e., Brazil,

Malaysia, Mexico, Romania, Russia, and Turkey), excluding imports from NMEs and subsidized

countries.  Id.  Commerce explained that it used the GTA average instead of the Trademap data

submitted by Plaintiffs because there was little import data left for calculation purposes after

excluding NME countries in the Trademap data.  Id.

For depreciation costs associated with the purchase of various fixed assets from NME

affiliated parties for which a market price was unavailable, Commerce adjusted the costs based on

the adjustment it determined for the minor input purchases from the same affiliate.  See id.  To

construct Plaintiffs' profit and selling expense ratios, Commerce used financial statements from

---

[5] While it is not at issue in the current proceeding, Commerce also determined that there was
insufficient evidence to warrant investigation for a "particular market situation."  See PDM at 16;
see also 19 U.S.C. § 1677(15)(C) (allowing Commerce to consider sales and transactions to be
"outside the ordinary course of trade" when a "particular market situation prevents a proper
comparison with the export price or constructed export price").

Consol. Court No. 21-00281                                                                Page 17
*PUBLIC VERSION*

Emirates, the Indian mattress company whose statements were submitted by Defendant-Intervenors.  See PDM at 14; Prelim. Cost Mem. at 3.

In its Preliminary Determination, Commerce conducted a differential pricing analysis and found that 62.51 percent of the value of Plaintiffs' sales passed the Cohen's *d* test.  PDM at 10; see also Mem. from P.N. Cox, re: Amended Final Determination Analysis Memorandum at 3 (Dep't Com. Apr. 19, 2021), P.R. 316 ("Am. Final Determination Mem.").  In applying the "ratio test," Commerce found that the value of sales to purchasers, regions, and time periods that passed the Cohen's *d* test accounted for more than 33 percent and less than 66 percent of the value of total sales, which supported its application of the hybrid A-to-A and A-to-T approach to calculate the dumping margin.  PDM at 10.  But Commerce determined that there was no meaningful difference between using the A-to-A method and a hybrid method, see supra pp. 11–12, and therefore used the default A-to-A method to calculate the dumping margin.  PDM at 10.

On January 19, 2021, Plaintiffs filed a case brief challenging Commerce's Preliminary Determination on various grounds, and on February 1, 2021, Defendant-Intervenors filed a rebuttal brief.  See Case Brief (Jan. 19, 2021), P.R. 288, C.R. 271 ("Pls.' Case Br."); Rebuttal Brief (Feb. 1, 2021), P.R. 292, C.R. 272.  Plaintiffs challenged Commerce's application of the Transactions Disregarded and Major Input Rules, calculation of fixed asset depreciation, and use of Emirates' financial statements instead of the GTI statements submitted by Plaintiffs.  See generally Pls.' Case Br.

On March 25, 2021, Commerce issued its affirmative final decision with a final estimated dumping margin of 45.34 percent.  See Unamended Final Determination, 86 Fed. Reg. at 15,895–96.  Commerce continued to use the financial statements of Emirates to determine constructed

value profit, citing its prior determination in <u>Notice of Final Determination of Sales at Less Than</u>

<u>Fair Value: Pure Magnesium from Israel</u>, 66 Fed. Reg. 49,349 (Dep't Com. Sept. 27, 2001), for

the relevant criteria informing its choice of surrogate data.  <u>See</u> IDM at 15–22.  But Commerce

revised other decisions from the Preliminary Determination.  <u>See</u> <u>id.</u> at 8–13.  These revisions

included adjustments to the application of the Major Input and Transaction Disregarded Rules for

transactions with affiliated suppliers located in NME countries.  In the Final Determination, to

determine the COP when applying the Major Input Rule, Commerce relied on the six-country GTA

data average rather than the Brazilian GTA data alone as it did in the Preliminary Determination.

<u>See</u> <u>id.</u> at 10–11.  In addition, unlike the Preliminary Determination, Commerce did not exclude

imports from NMEs or subsidized countries.  <u>Id.</u>  at 11.  Commerce also explained that it was

unable to rely on affiliated suppliers' reported COP because the suppliers were based in NMEs,

and thus "sought to obtain surrogate information."  <u>Id.</u> at 9.  Commerce further considered it

reasonable to rely on imports into countries that are economically comparable to the country of

the affiliated NME suppliers but caveated that it was not employing an NME factors of production

methodology.[6] <u>Id.</u> at 10–11.  Commerce also decided to include Romanian GTA data, determining

that it was not aberrational, and exclude Mexican GTA data, determining that no universal

conversion factor existed to convert the data from kilograms to the required unit of measurement.

<u>See</u> <u>id.</u> at 11; Mem. from S. Medillo to N. Halper, re: Cost of Production and Constructed Value

---

[6] 19 U.S.C. § 1677b(c) provides the methodology for investigations on subject merchandise exported from NME countries and requires Commerce to "determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise."

Consol. Court No. 21-00281                                                    Page 19
PUBLIC VERSION

Calculation Adjustments for the Final Determination at attachs. 1E, 1F4 (Dep't Com. Mar. 18, 2021), P.R. 307, C.R. 276 ("Final Cost Mem.").

Commerce also noted that to determine a market price for purchases of minor inputs from affiliated suppliers pursuant to the Transactions Disregarded Rule, it relied on Cambodian Trademap data rather than the six-country average of GTA data as it did in its Preliminary Determination. See id. at 10. Commerce explained that "the statute indicates that the item being tested should reflect a market price in the country under consideration, which is Cambodia in this case. Accordingly, we have reevaluated our preliminary determination . . . and now find that the Cambodian Trademap data best reflect fair market prices for the market under consideration." IDM at 10. It further observed that "the Trademap data for Cambodia is robust, includes prices for all the necessary affiliated inputs and, while it is aggregated differently from GTA, there is no evidence that it is faulty or inaccurate." Id. Commerce also applied a transactions disregarded adjustment to account for expenses associated with the depreciation of fixed assets purchased from affiliated suppliers but modified the adjustment in the Final Determination. See id. at 12. Specifically, Commerce calculated the percentage difference between the transfer price and constructed market price for minor inputs from affiliated suppliers, then applied the percentage difference to depreciation costs of fixed assets purchased from that same affiliate supplier. See id.

Plaintiffs did not challenge the differential pricing analysis findings in its case brief after the PDM, and Commerce continued to use the A-to-A method in its Final Determination and Amended Final Determination. See Pls.' Case Br.; Mem. from P. Cox & J. McGowan, re: Final Determination Analysis Memorandum at 2 (Dep't Com. Mar. 18, 2021), P.R. 304; Am. Final Determination Mem. at 2. In the Amended Final Determination Memorandum, Commerce found

Consol. Court No. 21-00281                                                          Page 20
**PUBLIC VERSION**

that, as reported in the Preliminary Determination, 62.51 percent of the value of U.S. sales pass

the Cohen's *d* test, "confirm[ing] the existence of a pattern of prices that differ significantly among

purchases, regions, or time periods."  Am. Final Determination Mem. at 3.  It then found that the

weighted-average dumping margin produced by the three methodologies were 52.41 percent using

the A-to-A method, 52.42 percent using the hybrid method that incorporates both the A-to-A and

A-to-T methods, and 52.50 percent using the A-to-T method.  See id. at 2.  Commerce concluded

there was no meaningful difference between the weighted average dumping margins calculated

using the A-to-A method and alternative methods and applied the A-to-A method for all of

Plaintiffs' U.S. sales, see supra pp. 11–12, resulting in a final amended dumping margin of 52.41

percent, see Am. Final Determination Mem. at 3.

Following the correction of certain ministerial errors, see Am. Final Determination Mem.

at 2, Commerce published the antidumping duty order and the final amended estimated dumping

margin of 52.41 percent.  See Final Determination, 86 Fed. Reg. at 26,460.

### III.    *Procedural History*

Plaintiffs and Defendant-Intervenors timely filed complaints challenging Commerce's

Final Determination on July 9, 2021, and July 12, 2021, respectively.  See Compl., July 9, 2021,

ECF No. 9; Compl., Brooklyn Bedding, LLC v. United States, No. 21-cv-00282 (CIT July 12,

2021), ECF No. 13.  The cases were consolidated under case number 21-cv-00281 on September

21, 2021.  See Order, Sept. 21, 2021, ECF No. 30.  On December 9, 2021, Plaintiffs filed the

instant Motion for Judgment on the Agency Record pursuant to USCIT Rule 56.2.  See Pls.' Mem.

in Supp. of Mot. for J. upon Agency R., Dec. 9, 2021, ECF No. 43 ("Pls.' Br.").  Defendant-

Intervenors filed their Motion for Judgment on the Agency Record pursuant to USCIT Rule 56.2

Consol. Court No. 21-00281                                                    Page 21
**PUBLIC VERSION**

on the same day.   See Def.-Inters.' Mem. in Supp. of Mot. for J. on Agency R., Dec. 9, 2021, ECF

No. 45 ("Def.-Inters.' Br.").   On March 11, 2022, Defendant filed its response to Plaintiffs' and

Defendant-Intervenors' motions and moved to dismiss part of Plaintiffs' Complaint for lack of

standing.   See Def.'s Mot. to Partially Dismiss and Resp. to Pls.' Mot. for J. on Agency R., Mar.

11, 2022, ECF No. 54 ("Def.'s Br.").   Plaintiffs and Defendant-Intervenors filed response briefs

to one another's Rule 56.2 motions, see Pls.' Resp. to Def.-Inters.' Rule 56.2 Mot. for J. on Agency

R., Mar. 11, 2022, ECF No. 57 ("Pls.' Resp. Br."); Def.-Inters.' Resp. Br. in Opp. to Pls.' Rule

56.2 Mot. for J. on Agency R., Mar 14, 2022, ECF No. 59, and replies in support of their motions

for judgment on the agency record, see Pls.' Reply, Apr. 22, 2022, ECF No. 65; Def.-Inters.' Reply,

Apr. 22, 2022, ECF No. 63.

      The court scheduled oral argument for July 19, 2022, see Order, May 13, 2022, ECF No.

68.   The court issued questions in advance of argument, see Ct.'s Qs. for Oral Arg., July 5, 2022,

ECF No. 72, to which the parties filed responses, see Pls.' Resp. to Ct.'s Oral Arg. Qs. ("Pls.'

OAQ Resp."), July 15, 2022, ECF No. 75; Def.'s Resp. to Ct.'s Oral Arg. Qs., July 15, 2022, ECF

No. 73 ("Def.'s OAQ Resp."); Def.-Inters.' Resp. to Ct.'s Oral Arg. Qs., July 15, 2022, ECF No.

77.   The court invited parties to file submissions after oral argument on July 19, 2022, see Oral

Arg., July 19, 2022, ECF No. 80, and on July 26, 2022, all parties made such submissions, see

Pls.' Post-Arg. Subm., July 26, 2022, ECF No. 84; Def.'s Post-Arg. Subm., July 26, 2022, ECF

No. 85; Def.-Inters.' Post-Arg. Subm., July 26, 2022, ECF No. 82.   The court issued additional

questions for the parties, see Ct.'s Supp. Qs., Oct. 14, 2022, ECF No. 89, to which all parties filed

responses, see Pls.' Resp. to Ct.'s Supp. Qs., Oct. 28, 2022, ECF No. 93; Def.'s Resp. to Ct.'s

Consol. Court No. 21-00281                                                              Page 22
**PUBLIC VERSION**

Supp. Qs., Oct. 28, 2022, ECF No. 90; Def.-Inters.' Resp. to Ct.'s Supp. Qs., Oct. 28, 2022, ECF

No. 92.

**JURISDICTION**

Plaintiffs bear the burden of establishing jurisdiction.  See FW/PBS, Inc. v. City of Dallas,

493 U.S. 215, 231 (1990).  The complaint alleges subject matter jurisdiction under 28 U.S.C. §

1581(c), which grants to the Court of International Trade "exclusive jurisdiction of any civil action

commenced under section 516A or 517 of the Tariff Act of 1930."  28 U.S.C. § 1581(c); see also

19 U.S.C. § 1516a(a)(2).  But the outer bounds of federal jurisdiction are defined in Article III of

the U.S. Constitution, which limits the judicial power to "actual cases or controversies" and

similarly must be satisfied by the party invoking the court's authority.  Spokeo, Inc. v. Robins, 578

U.S. 330, 337 (2016) (internal quotation marks omitted) (quoting Raines v. Byrd, 521 U.S. 811,

818 (1997)).

The Government challenges Plaintiffs' standing to bring Count VI of the Complaint, which

alleges that "Commerce's finding that Plaintiffs' U.S. sales exhibited an existence of a pattern of

prices that differed significantly among purchasers, regions, or time periods, using the Cohen's *d*

test, was unreasonable, not supported by substantial evidence, and otherwise not in accordance

with law."  Compl. ¶ 40.  A plaintiff seeking to establish standing must meet three elements: (1)

an "injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3)

that is likely to be redressed by a favorable judicial decision."  Spokeo, 578 U.S. at 338 (citing

Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992); Friends of the Earth, Inc. v. Laidlaw

Env't Servs. (TOC), Inc., 528 U.S. 167, 180–81 (2000)).  Furthermore, it is a founding principle

Consol. Court No. 21-00281                                                        Page 23
**PUBLIC VERSION**

that federal courts issue dispositive, not advisory, opinions.  See Camreta v. Greene, 563 U.S. 692,

717 (2011).

Plaintiffs have failed to establish injury-in-fact.  The Government argues that Plaintiffs

lack standing because any difference in Commerce's methodology would not have materially

impacted the result of the dumping margin.  Def.'s Br. at 46–47.  Indeed, Commerce explained

that although "62.51 percent of the value of Best Mattresses[] U.S. sales pass the Cohen's *d* test

and confirms the existence of a pattern of prices that differ significantly among purchasers, regions,

or time periods," "there is no meaningful difference between the weighted-average dumping

margin calculated using the average-to-average method and the weighted-average dumping margin

calculated using an alternative comparison method . . . ."  PDM at 10 (emphasis added).  Plaintiffs

also concede that "the application of the Cohen's *d* test did not result in a change in Best

Mattresses' margin," Pls.' OAQ Resp. at 23, and they do not request a method different from the

average-to-average calculation method that Commerce ultimately applied, id. at 24.  "[A]n injury

in fact must be both concrete and particularized," and importantly for this case, "[a] 'concrete'

injury must be 'de facto'; that is, it must actually exist."  Spokeo, 578 U.S. at 341 (emphasis in

original).  Because Commerce ultimately applied the method of calculation that Plaintiffs

requested, and Commerce's use of the Cohen's *d* test is not dispositive to the final dumping margin,

the alleged harm of a potentially misapplied Cohen's *d* test amounts to a "bare procedural

violation" and does not "entail a degree of risk sufficient to meet the concreteness requirement."

Id. at 341, 343; see also, e.g., Royal Thai Gov't v. United States, 38 CIT __, __, 978 F. Supp. 2d

1330, 1333 (2014) (reasoning that typically, "when a respondent challenges an administrative

proceeding in which it has prevailed there is no case or controversy, and thus no jurisdiction lies.").

Put simply, Plaintiffs' injury is too "divorced from any concrete harm" to establish Article III

standing.  Spokeo, 578 U.S. at 341.

Plaintiffs nonetheless urge the court to find error in Commerce's application of the Cohen's

*d* test in "the interests of judicial economy . . . to avoid unnecessary repetition and duplicative

efforts" when this court reviews Commerce's redetermination after remand.  Pls.' Reply at 26.

Relying on Stupp Corp. v. United States, where the Federal Circuit remanded Commerce's

application of the Cohen's *d* test "to explain whether the limits on the use of the Cohen's *d* test . . .

were satisfied in this case," 5 F.4th at 1360, Plaintiffs allege that "Commerce failed to explain

whether the sales data conformed with the underlying assumptions necessary for the Cohen's *d*

test," including in particular, "whether the test and comparison groups were normally distributed,

equally variable, and equally numerous."  Pls.' Br. at 55.  Plaintiffs also suggest that Commerce

did not sufficiently explain its usage of a simple-average standard deviation, rather than weighted-

average or population standard deviation, in the Cohen's *d* calculation.  See Mid Continent Steel

& Wire, Inc. v. United States, 31 F.4th 1367, 1381 (Fed. Cir. 2022) (concluding that Commerce

failed to sufficiently justify its use of a simple-average standard deviation).

But Plaintiffs' prudential concerns about repetitive briefing at a later stage cannot justify

an extension of judicial power beyond Article III's mandatory limits.  "[A] federal court does not

have the 'power to render an advisory opinion on a question simply because [it] may have to face

the same question in the future.'"  Verson v. United States, 22 CIT 151, 153–54, 5 F. Supp. 2d

963, 966 (1998) (quoting NLRB v. Globe Sec. Servs., Inc., 548 F.2d 1115, 1118 (3rd Cir. 1977)).

If the court were to rule for Plaintiffs now, and if the Cohen's *d* test is once again immaterial to

the final dumping margin on remand, then the court will have opined on a hypothetical legal matter

outside the live controversy of this case.  And while it may be that "there are possible remand recalculations in which Commerce would otherwise use the average-to-transaction methodology overturned in <u>Stupp</u>, resulting in an unlawful dumping margin calculation," Pls.' OAQ Resp. at 23, Plaintiffs "will still have a right to challenge that redetermination . . . during the course of any remand" if Commerce does not apply the A-to-A method to calculate dumping margins in its redetermination.  <u>Royal Thai</u>, 38 CIT at __, 978 F. Supp. 2d at 1334.  Ultimately, the relief that Plaintiffs seek exceeds what the Constitution permits.  This court dismisses Count VI of the Complaint as nonjusticiable.

## DISCUSSION

The court turns now to Plaintiffs' and Defendant-Intervenors' surviving claims.  The Court of International Trade sustains Commerce's antidumping determinations, findings, and conclusions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Nippon Steel Corp. v. United States</u>, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (internal quotation marks omitted) (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).  Support from substantial evidence is satisfied by "less than the weight of evidence but more than a mere scintilla of evidence." <u>Elbit Sys. of Am., LLC v. Thales Visionix, Inc.</u>, 881 F.3d 1354, 1355 (Fed. Cir. 2018) (internal quotation marks omitted) (quoting <u>In re Nuvasive, Inc.</u>, 842 F.3d 1376, 1379 (Fed. Cir. 2016)).  Substantial evidence must account for "contradictory evidence or evidence from which conflicting inferences could be drawn." <u>Suramerica de Aleaciones Laminadas, C.A. v. United States</u>, 44 F.3d 978, 985 (Fed. Cir. 1994)

(internal quotation marks omitted) (quoting <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 487

(1951)).  Commerce "must examine the relevant data and articulate a satisfactory explanation for

its action including a 'rational connection between the facts found and the choice made.'"  <u>Motor</u>

<u>Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983) (quoting

<u>Burlington Truck Lines v. United States</u>, 371 U.S. 156, 168 (1962)).  The agency is not required

to address every piece of evidence submitted by the parties, and Commerce is presumed to have

considered all the evidence in the record absent a showing to the contrary.  <u>See</u> <u>Nucor Corp. v.</u>

<u>United States</u>, 28 CIT 188, 233, 318 F. Supp. 3d 1207, 1247 (2004), <u>aff'd</u>, 414 F.3d 1331 (Fed.

Cir. 2005).  But Commerce must respond to arguments made by interested parties that bear on

issues material to its determinations.  <u>See</u> <u>Itochu Bldg. Prods., Co. v. United States</u>, 40 CIT __, __,

163 F. Supp 3d 1330, 1337 (2016).

       To determine whether Commerce's interpretation of a statute "is in accordance with the

law," 19 U.S.C. § 1516a(b)(1)(B)(i), the court applies the two-step framework set forth in <u>Chevron</u>

<u>U.S.A., Inc. v. Natural Resources Defense Council</u>, 467 U.S. 837 (1984).  The court first inquires

"whether Congress has directly spoken to the precise question at issue.  [I]f the intent of Congress

is clear, the court, as well as the agency, must give effect to the unambiguously expressed intent

of Congress."  <u>Id.</u> at 842–43 (footnote omitted).  The court uses "traditional tools of statutory

construction," beginning with the plain meaning of the text, to determine the intent of Congress

with respect to a particular statutory provision.  <u>Timex V.I., Inc. v. United States</u>, 157 F.3d 879,

882 (Fed. Cir. 1998) (internal quotation marks omitted) (quoting <u>Chevron</u>, 467 U.S. at 843 n.9).

The court may also consider "the statute's structure, canons of statutory construction, and

legislative history" if the text itself does not clearly indicate Congress's aim.  <u>Id.</u>  But if

Consol. Court No. 21-00281                                                          Page 27
**PUBLIC VERSION**

Congressional intent is ultimately unclear, the second question for the court is "whether the agency's answer is based on a permissible construction of the statute." Chevron, 467 U.S. at 843. "Commerce is the 'master of antidumping law' and has technical expertise in the 'complex economic and accounting decisions' required in administering the statutory scheme." Shanxi Hairui Trade Co. v. United States, 39 F.4th 1357, 1361 (Fed. Cir. 2022) (quoting PSC VSMPO-Avisma Corp. v. United States, 688 F.3d 751, 764 (Fed. Cir. 2012)). The court "therefore defers to its interpretation of the statute when implementing its antidumping duty methodology unless it is 'arbitrary, capricious, or manifestly contrary to statute,'" id. (quoting PSC VSMPO-Avisma Corp., 688 F.3d at 764).

I.  ***Commerce's Determination of the Cost of Production in its Application of the Major Input Rule Is Supported by Substantial Evidence and in Accordance with Law***

Plaintiffs first allege that "use of surrogate country data from six countries to value the COP of Plaintiffs' major inputs in this market economy investigation rather than Plaintiffs' own reported prices or, alternatively, market price data from Cambodia is unsupported by substantial evidence and otherwise not in accordance with law." Compl. ¶ 30. As has been noted, the Major Input Rule, codified in the U.S. Code, provides:

> If, in the case of a transaction between affiliated persons involving the production by one of such persons of a major input to the merchandise, the administering authority has reasonable grounds to believe or suspect that an amount represented as the value of such input is less than the cost of production of such input, then the administering authority may determine the value of the major input on the basis of the information available regarding such cost of production, if such cost is greater than the amount that would be determined for such input under paragraph (2).

19 U.S.C. § 1677b(f)(3). Under the Major Input Rule, Commerce "normally" will determine the value of a major input purchased from an affiliated person based on the higher of:

Consol. Court No. 21-00281                                                                 Page 28
*PUBLIC VERSION*

(1) The price paid by the exporter or producer to the affiliated person for the major input;

(2) The amount usually reflected in sales of the major input in the market under consideration; or

(3) The cost to the affiliated person of producing the major input.

19 C.F.R. § 351.407(b); see also NTN Bearing Corp., 368 F.3d at 1375 (affirming Commerce's authority to administer this statutory scheme pursuant to 19 U.S.C. § 1677(1)).

Plaintiffs challenge two aspects of Commerce's administration of the Major Input Rule, both of which include subordinate arguments questioning the authority and reasonableness of agency action. Plaintiffs first argue that Commerce's use of surrogate data of third-party countries to calculate input COP was an unauthorized and unreasonable exercise of its authority under the Major Input Rule. See Pls.' Br. at 13–28. In the alternative, Plaintiffs argue that Commerce's decisions to include and exclude subsets of data from the input COP calculations were unreasonable. See Pls.' Br. at 28–35. The court, addressing each objection in turn, sustains Commerce's use and calculation of surrogate data pursuant to the Major Input Rule.

> ### A.     *Commerce's Use of Surrogate Data Is in Accordance with Law and Supported by Substantial Evidence*

Specifically, Plaintiffs argue that Commerce exceeded its statutory authority conferred by 19 U.S.C. § 1677b(f)(3). Per Plaintiffs, the statute only "allows Commerce to determine the major input value based on information available" and "does not allow Commerce to determine the COP based on information available." Pls.' Reply at 5. Nothing in the Tariff Act or Commerce's implementing regulation, they maintain, gives Commerce the authority to use third-country surrogate value data to construct the input COP as it did in the Final Determination. Pls.' Br. at 14. Plaintiffs further argue that neither 19 U.S.C. § 1677b(f)(3) nor 19 C.F.R. § 351.407(b)

expressly require Commerce to use COP in determining the value of a major input, and that its

gap-filling authority is limited to where necessary information is not available on the record.  Pls.'

Br. at 15; Pls.' Reply at 7.  They moreover allege that Commerce failed to meet the statutory

requirement that it have "reasonable grounds to believe or suspect that an amount represented as

the value of such input is less than the cost of product of such input."  19 U.S.C. § 1677b(f)(3);

Pls.' Reply at 3.  To be clear, Plaintiffs do not contest Commerce's decision not to request actual

COP data from its suppliers.  See supra pp. 13–14.  They instead challenge the agency's use of

third-country surrogate data to estimate the suppliers' COP in light of the fact that there was no

actual COP data on the record.  Pls.' Br. at 17.

Plaintiffs also argue that even if the statute is ambiguous with respect to Commerce's

authority to use surrogate values, Commerce acted unreasonably by choosing data that do not

accurately reflect of inputs' fair values.  Pls.' Br. at 17–18 (citing Chevron, 467 U.S. 837).

Plaintiffs specifically contend that the data chosen does not have a reasonable connection to the

inputs used by Plaintiffs and are distortive due to their inclusion of sellers' profits.  Id.  (citing

SolarWorld Ams., Inc. v. United States, 962 F.3d 1351, 1359 (Fed. Cir. 2020); NTN Bearing Corp.

v. United States, 14 CIT 623, 642, 747 F. Supp 726, 743 (1990)).  Plaintiffs argue further that

Commerce's use of GTA import data constituted unauthorized reliance on 19 U.S.C. § 1677b(c),

which only applies to NME proceedings and is thus inapplicable to Cambodia as a market

economy.  Pls.' Br. at 20.  Finally, Plaintiffs assert that Commerce violated the Administrative

Procedure Act by engaging in rulemaking with respect to the use of the NME surrogate value

methodology within the Major Input Rule without proper notice and comment procedures.  Id. at

26.

The first issue before the court is whether Commerce was permitted by statute and supported by substantial evidence in using the GTA average data to determine the value of the major inputs by constructing the COP as provided in 19 U.S.C. § 1677b(f)(3) and 19 C.F.R. § 351.407(b)(3). This issue has three component questions, which the following subsections address in turn: (1) whether Commerce met the condition precedent to apply the Major Input Rule; (2) whether Commerce's usage of GTA average data to construct COP is in accordance with law and supported by substantial evidence; and (3) whether Commerce used and was statutorily bound by the NME methodology in 19 U.S.C. § 1677b(c).

### 1. Commerce's Use of GTA Information to Establish the Condition Precedent Is in Accordance with Law and Supported by Substantial Evidence

As a threshold matter, the court must determine whether Commerce complied with the condition precedent in 19 U.S.C. § 1677b(f)(3). Commerce may rely on constructed COP to value major inputs only if it has "reasonable grounds to believe or suspect that an amount represented as the value of [an] input is less than the cost of production of such input." 19 U.S.C. § 1677b(f)(3); see also, e.g., Mannesmannrohren-Werke AG v. United States, 23 CIT 826, 835–36, 77 F. Supp. 2d 1302, 1310–11 (1999) ("By its plain language, the requirement that Commerce have 'reasonable grounds to believe or suspect' a below-cost sale serves as a condition precedent to Commerce's use of an affiliated party's cost-of-production."). Commerce argues that it had reasonable grounds because the "the Global Trade Atlas (GTA) information on the record that Commerce used to determine the cost of production showed that the value of the affiliate-supplied input was below the cost of production." Def.'s OAQ Resp. at 4. Plaintiffs insist that "[t]here is no information from which Commerce can reasonably assess if the value of the input is less than

the input COP," Pls.' Reply at 3,[7] and challenge Commerce's reliance on the GTA information,

which was "third-party data" that Commerce requested instead of requesting COP input data from

Best Mattresses and "was completely unrelated to 'information available regarding such cost of

production.'" Pls.' Resp. to Ct.'s Supp. Qs. at 3 (quoting 19 U.S.C. § 1677b(f)(3)).

Commerce's approach is in accordance with law. The condition precedent is precedent

only to Commerce's determination of the major input's value, not to Commerce's ability to solicit

or consider information regarding COP. See 19 U.S.C. § 1677b(f)(3) ("If . . . [Commerce] has

reasonable grounds . . . , then the administering authority may determine the value of the major

input . . . ." (emphasis added)); see also 19 C.F.R. § 351.301(a) ("[Commerce] may request any

person to submit factual information at any time during a proceeding . . . ."); id. § 351.301(c)(4)

("[C]ommerce may place factual information on the record of the proceeding at any time.").

Insofar as Plaintiffs suggest that Commerce may not use third-party information to establish

reasonable grounds, see Pls.' Resp. to Ct.'s Supp. Qs. at 3, the statute contains no such restriction.

See also infra pp. 33–34. There is similarly no restriction against Commerce's use of the GTA

information on the record both to satisfy the condition precedent and to constitute the "information

available regarding such cost of production" under 19 U.S.C. § 1677b(f)(3). In fact, the statute

requires Commerce to "request information necessary to calculate the constructed value and cost

---

[7] Plaintiffs' challenge to Commerce's satisfaction of the condition precedent appears to be first squarely raised in their Reply. See Pls.' Reply at 2–3. While the court is not obligated to consider arguments not raised in Plaintiffs' opening brief, Novosteel SA v. United States, 284 F.3d 1261, 1273–74 (Fed. Cir. 2002), the Government did not argue that the argument was waived and addressed it in subsequent briefing. Def.'s OAQ Resp. at 3–4. The court "exercise[s] [its] discretion to nonetheless consider the issue." Veterans4You LLC v. United States, 985 F.3d 850, 857–58 (Fed. Cir. 2021).

of production under subsections (e) and (f)," 19 U.S.C. § 1677b(b)(2)(A)(ii), which is a

requirement to test affiliated transactions, "both minor and major, . . . to insure they were at arm'[s-

]length prices, which for major inputs requires they are above the cost of the affiliated supplier."

IDM at 12.  Of course, Commerce's use of the GTA data must still be reasonable under the

substantial evidence standard.  See 19 U.S.C. § 1516a(b)(1)(B)(i).  But to hold for Plaintiffs as a

matter of law would constitute judicial line-drawing among the information available on

Commerce's record that is unmoored in either the statutory language or agency interpretation.

Substantial evidence also supported Commerce's use of GTA data to establish "reasonable

grounds" under 19 U.S.C. § 1677b(f)(3).  Plaintiffs allege that Commerce's finding of "reasonable

grounds" was unreasonable because the GTA data "was completely unrelated to 'information

available regarding such cost of production,'" Pls.' Resp. to Ct.'s Supp. Qs. at 3 (quoting 19 U.S.C.

§ 1677b(f)(3)), which is Plaintiffs' same argument to challenge Commerce's use of the GTA data

to calculate the input COP.  For the same reasons below that justified Commerce's use of GTA

data, see infra pp. 37–40, and because Commerce's use of GTA data is in accordance with law,

the court affirms Commerce's finding of "reasonable grounds."

      **2.**      **Commerce's Construction of the Input COP Using Third-Country Surrogate Data Is in Accordance with Law and Supported by Substantial Evidence**

The court must next determine whether Commerce's interpretation of 19 U.S.C.

§ 1677b(f)(3) to permit construction of Best Mattresses' suppliers' COP using third-country data

is in accordance with law and supported by substantial evidence.  Plaintiffs first argue that

"Congress acted outside of the bounds of the Act . . . . Congress conferred authority on Commerce

to calculate normal value under 19 U.S.C. § 1677b in a very specific manner, including detailed

provisions for how Commerce may use CV for market economy determinations under 19 U.S.C.

§ 1677b(e) and how Commerce may determine normal value in NME determinations under 19

U.S.C. § 1677b(c) by using surrogate value data." Pls.' Br. at 12 (emphasis in original). This

statutory scheme, Plaintiffs maintain, does not allow Commerce to "alter its normal value

calculation methodology in a market economy case when the mandatory respondent purchases

inputs from affiliates located in NME countries." Id.

Under Chevron step one, the Major Input Rule leaves open the question of whether

Commerce may determine the COP using third-party data despite the lack of actual COP data from

an NME-affiliated supplier. Plaintiffs argue that because the plain text "allows Commerce to

determine the major input value based on information available," Congress "drew a line in the

sand as to how many layers of construction Commerce may use in determining normal value," and

the statute "does not allow Commerce to determine the COP based on information available." Pls.'

Reply at 5; see also 19 U.S.C. § 1677b(f)(3) ("[Commerce] may determine the value of the major

input on the basis of the information available regarding such cost of production . . . ."). Put

differently, Plaintiffs stress that the object of "determine" is "the value of the major input," not

"cost of production." But such a restrictive read of the Major Input Rule is in tension with the

statute's reference to "the information available," which leaves the reasonable selection of relevant

information to Commerce's discretion. Moreover, the force of negative inferences by reading one

statutory provision to the exclusion of another is "especially feeble . . . in the administrative

setting, where Congress is presumed to have left to reasonable agency discretion questions that it

has not directly resolved." Waterkeeper All. v. Env't Prot. Agency, 853 F.3d 527, 534 (D.C. Cir.

2017) (internal quotation marks omitted) (quoting Cheney R. Co. v. I.C.C., 902 F.2d 66, 69 (D.C.

Cir. 1990)); <u>see also</u> <u>Hyundai Steel Co. v. United States</u>, 19 F.4th 1346, 1353 n.9 (Fed. Cir. 2021)

(noting the appellant's argument that "courts have been hesitant to rely on that canon in the

administrative law context" and citing <u>Cheney Railroad Co.</u>, but not applying the rule because the

negative implication was based on the fact that Congress had amended one provision and not

another). Nothing in the plain text prevents Commerce from constructing the COP from third-

party data, so long as its use of the third-party data is reasonable.

Legislative history reveals Congressional intent to leave COP calculations to Commerce's

broad discretion. In the absence of text that "directly resolve[s]" the question, the court looks to

the legislative history of the Major Input Rule. The conference report for the Major Input Rule

states:

> Commerce may base the value of [an] input on the <u>best evidence available as to its</u>
> <u>costs of production</u> when such costs are greater than the [market price]. . . . If the
> related party seller does not provide reliable data on its costs of production, and
> Commerce has reasonable grounds to believe or suspect that the transfer price and
> also the arms-length price would be less than the costs of production, then
> Commerce should use <u>best information</u> to establish a <u>reasonable estimate of the</u>
> <u>related party's costs of production</u> for such input.

H.R. Rep. No. 100-576, at 595 (1988), <u>as reprinted in</u> 1988 U.S.C.C.A.N. 1547, 1628 (emphasis

added). Congress's statement that Commerce may use "best information" to determine a

"<u>reasonable estimate</u>" not only grants the agency wide discretion in determining the "best evidence

available as to . . . costs of production," but also suggests -- in its use of the word "estimate" -- that

Commerce may look beyond the affiliated supplier's COP as reported by the respondent, but only

if reasonable to do so. See also <u>Viraj Grp. v. United States</u>, 476 F.3d 1349, 1356 (Fed. Cir. 2007)

("[The] Major Input Rule . . . provides Commerce discretion in valuing one company's production

input, when the company receives that input from an affiliated company."). From this field of

*PUBLIC VERSION*

discretion, however, Plaintiffs attempt to carve out an exception; they argue that recently introduced Senate Bill S. 1187, which will "amend[] the law to specify that Commerce is authorized to disregard costs for inputs obtained from non-market economics," Eliminating Global Market Distortions to Protect Americans Jobs Act 2, https://www.brown.senate.gov/imo/media/doc/eliminating_global_market_distortions_to_protect _americans_jobs_act_section-by-section.pdf (last visited Feb. 17, 2023) ("S. 1187 Summary"), suggests that "the current law governing this investigation does not authorize Commerce to treat NME-sourced inputs differently."  Pls.' Br. at 20 (citing Eliminating Global Market Distortions to Protect American Jobs Act of 2021, S. 1187, 117th Cong. § 205(a)(2) (1st Sess. 2021)).  S. 1187 is not instructive here.  As an initial matter, "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one," Andrus v. Shell Oil Co., 446 U.S. 657, 666 n.8 (internal quotation marks omitted) (quoting United States v. Price, 361 U.S. 304, 313 (1960)), and "arguments predicated upon subsequent Congressional actions must be weighed with extreme care," id., particularly when the post-enactment evidence is not a subsequent law but a subsequent legislative report that has not benefitted from the full legislative process.  See South Carolina v. Regan, 465 U.S. 367, 380 n.17 (1984).  Yet even with the Senate Bill's diminished persuasive force, it is still consistent with the Government and Defendant-Intervenors' position: it signals a Congressional intent to "disregard[] inputs produced by or acquired from non-market economies as being outside the ordinary course of trade" where the law currently commits that matter entirely to Commerce's discretion.  S. 1187 § 205(a)(2); see also S. 1187 Summary at 3 ("[T]he [current] statute gives little guidance as to what types of costs should be considered not reasonably reflective of market costs of production.").  Congress has not clearly spoken on the issue of whether

Commerce may determine the COP using third-party data instead of actual data from the NME-based affiliated suppliers, leaving the question to Commerce's reasonable discretion.

Under Chevron step two, Commerce's construction of the Major Input Rule to allow the determination of input COP using surrogate data despite the lack of actual data from an NME-affiliated supplier was reasonable.  "Deference to an agency's statutory interpretation is at its peak in the case of a court's review of Commerce's interpretation of the antidumping laws."  Koyo Seiko Co. v. United States, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (citing Daewoo Elecs. Co. v. United States, 6 F.3d 1511, 1516 (Fed. Cir. 1993)).  Plaintiffs argue that Commerce, lacking input COP information, could have alternatively compared only two of the three benchmark prices under 19 C.F.R. § 351.407(b): transfer price and market price.  See Pls.' Br. at 17; see also U.S. Steel Corp. v. United States, 36 CIT 613, 616, 844 F. Supp. 2d 1334, 1337 (2012) (affirming an uncontested remand redetermination that acknowledged Commerce's practice of not requiring COP data for an input when the respondent is unable to compel an affiliate and when no other information is available).  But Plaintiffs' alternative begs the very question.  It presumes that there was no information available regarding COP for Commerce to use, whereas Commerce's interpretation is that the GTA data did constitute information available.  The agency's formal interpretation of the Major Input Rule, 19 C.F.R. § 351.407(b), is to compare all three values of transfer price, market price, and input COP on the basis of the information available.  See NTN Bearing Corp., 368 F.3d at 1376 (affirming Commerce's interpretation in 19 C.F.R. § 351.407(b)); Huvis Corp. v. U.S., 32 CIT 845, 849 (2008), 2008 WL 2977890, aff'd, 570 F.3d 1347 (Fed. Cir. 2009) ("Commerce will compare all three values . . . .").  Commerce, therefore, "sought to obtain surrogate information that would allow it to fulfill the requirements of sections 773(f)(2) and (3)

of the Act" and selected the GTA data as the "most readily available information to the parties for

this purpose."  IDM at 9.  Commerce's interpretation is reasonable because it was consistent with,

and acted in furtherance of, its obligations under 19 U.S.C. § 1677b(f)(3) and 19 C.F.R. §

351.407(b).  See Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1378

(Fed. Cir. 2013) ("Because the agency employed a methodology similarly derived from the

relevant statutory language, this court affords the appropriate deference due to Commerce.").  And

because Commerce's "interpretation governs in the absence of unambiguous statutory language to

the contrary or unreasonable resolution of language that is ambiguous," United States v. Eurodif

S.A., 555 U.S. 305, 316 (2009), its determination of the COP using third-party data warrants

Chevron deference.  Put simply, Commerce's decision to use surrogate data was reasonably

sourced in its authority to determine the "information available regarding such cost of production."

19 U.S.C. § 1677b(f)(3).

      Having established that Commerce's process is in accordance with law, the court now

evaluates whether substantial evidence supported Commerce's decision to select six countries'

GTA import data.  Plaintiffs argue that Commerce's selected GTA import data from Brazil,

Malaysia, Mexico, Romania, Russia, and Turkey bears "no relation to Best Mattresses's suppliers'

production or actual mattress input production anywhere in the world," and that Commerce failed

to explain how the selected data was adequate to estimate the COP of major inputs in the

production of mattresses in Cambodia.  Pls.' Br. at 17–18.  Commerce explained:

> We determined that the most reasonably available information to the parties . . . is
> the Global Trade Atlas (GTA) data, as these data are readily available and
> reasonably specific to the voluminous number of affiliated NME inputs.  Further,
> to narrow the request and given that the affiliated suppliers are from an NME
> country, Commerce determined that it was appropriate to solicit GTA data from

***PUBLIC VERSION***

> countries economically similar to the affiliated suppliers' country. Thus, Commerce requested and obtained from the parties GTA data for the countries that are currently used by Commerce as potential surrogate sources for the particular NME country . . . .

> [Commerce] considers it reasonable in this case to rely on the imports into countries that are economically comparable to the country of the affiliated NME suppliers as the COP for those suppliers, as information reasonably available.

IDM at 9, 11. Plaintiffs nonetheless maintain that because the surrogate values for the COP of two major inputs -- [[                    ]] -- were higher than the transfer price and market value, those surrogate values were plugged into the margin calculation and resulted in "calculating Best Mattresses' COP, in part, as if it were located in [[          ]]." Pls.' Br. at 18. They also contend that Commerce failed to find that the imports into the six selected countries under the same "broad HTS codes" as [[                    ]] "had any reasonable connection to the inputs actually used by Best Mattresses in its production of mattresses in Cambodia" or to "mattress input production anywhere in the world." Id. at 16, 18. Plaintiffs further object to the use of GTA import data, arguing that import price data is higher than COP because it necessarily includes the profit to the seller. See Pls.' Br. at 18–19.

Substantial evidence supports Commerce's decision to use the GTA data from six countries to estimate affiliated suppliers' COP. First, because nearly [[     ]] percent of Best Mattresses's affiliated suppliers are based in [[         ]], Commerce reasonably decided to assign a surrogate value instead of relying on nonexistent COP data from an NME. See IDM at 9. The court is not aware of a case or administrative decision where Commerce has relied on NME-based affiliated suppliers' actual COP in applying the Major Input Rule, nor do Plaintiffs contest Commerce's decision not to request actual COP data from its suppliers. See Pls.' Br. at 17. Commerce has also noted that it "would generally not rely on cost of production information for a non-market economy

producer, even if unaffiliated," because NMEs do "'not operate on market principles of cost or

pricing structures, so that sales of merchandise in such country do not reflect the fair value of the

merchandise.'"  Def.'s OAQ Resp. at 3 (quoting 19 U.S.C. § 1677(18)(A)).  And as established

above, nothing in the Major Input Rule obligates Commerce to proceed with an empty input COP

value -- considering the high percentage of affiliated suppliers based in an NME country,

Commerce decision to calculate an estimate based on surrogate values was justified.  Second,

Plaintiffs' contention that using the surrogate values leads to an unsatisfactory result, as if Best

Mattresses's was located in [[          ]], is little more than an observation about the statutory

scheme -- not a defect, but by design.  As Commerce made clear, the six countries selected are the

countries "currently used by Commerce as potential surrogate sources for" [[          ]].  IDM at 9.

Had nearly [[     ]] percent of Best Mattresses's affiliated suppliers of its major inputs not been

based in [[          ]], then use of the GTA data substantiating the input COP may not have been

appropriate.  Third, Best Mattresses's objections about "broad HTS codes" are similarly without

merit, considering that Best Mattresses itself provided the HTS codes corresponding to its inputs.

See Best Mattresses Supplemental Section D Response at Exhibit SD1-1.1 (Sept. 22, 2020), C.R.

141; Rose Lion Supplemental Section D Response at Exhibit SD1-1.1 (Sept. 22, 2020), C.R. 181;

see also QVD Food Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011) ("QVD is in an

awkward position to argue that Commerce abused its discretion by not relying on evidence that

QVD itself failed to introduce into the record.").  And finally, while Plaintiffs are correct that

import price data would necessarily include profit, this court's inquiry is not whether Commerce

correctly estimated the input COP, but whether Commerce's use of the "information available"

was a reasonable estimate of input COP.  See H.R. Conf. Rep. No. 100-576, at 595.  Given the

lack of other suitable information on the record, and considering the agency's "preference for the

GTA database as a source of reliable data," Heze Huayi Chemical Co. v. United States, 45 CIT

__, __, 532 F. Supp. 3d 1301, 1326 (2021), Commerce's use of import pricing to estimate input

COP was reasonable.  Commerce's construction of the input COP using the GTA trade data was,

therefore, in accordance with law and supported by substantial evidence.

> **3.    Commerce's Decision Not to Follow the Procedures for
> Employing an NME Surrogate Value Methodology Is in
> Accordance with Law**

While the Tariff Act makes clear that the calculation of normal value pursuant to 19 U.S.C.

§ 1677b(c) applies only if "the subject merchandise is exported from a nonmarket economy

country," 19 U.S.C. § 1677b(c)(1)(A), Best Mattresses reads that provision to mean that the Act

"only allows [Commerce] to apply surrogate value methodology in an NME proceeding."  Pls.'

Br. at 20.  Commerce, Plaintiffs argue, acted outside its authority in applying a surrogate value

methodology to a market economy proceeding.

Commerce acted within its authority granted by the Major Input Rule, 19 U.S.C. §

1677b(f)(3).  The agency neither formally invoked, nor functionally replicated, its NME surrogate

value methodology in this case.  Commerce was clear that it "decided not to apply an NME factors

of production methodology analysis to inputs the respondent obtained from NME-based affiliated

suppliers, because section 773(c) of the Act specifically applies to the issue of determining normal

value for NME-based respondents," which Plaintiffs are not.  IDM at 9.  And in using an average

of GTA data from six countries, Commerce significantly diverged from its codified preference to

rely on only one surrogate country to value all inputs in NME proceedings.  See 19 C.F.R. §

351.408(c)(2).  Moreover, to the extent Plaintiffs argue that 19 U.S.C. § 1677b(c) impliedly limits

the use of surrogate data to NME proceedings simply because those provisions reference surrogate

data, that reading is overbroad.  The better read of the statute is that the lack of indication in the

plain text commits the matter to Commerce's discretion.  See Waterkeeper All., 853 F.3d at 534

(negative inferences derived from a statutory provision are "especially feeble . . . in the

administrative setting, where Congress is presumed to have left to reasonable agency discretion

questions that it has not directly resolved" (internal quotation marks omitted) (quoting Cheney R.

Co., 902 F.2d at 69)).   The source of that discretion, as discussed above, is Commerce's

authorization to administer the Major Input Rule and to "value the major input on the basis of the

information available regarding such cost of production," which may include reasonably selected

surrogate data.  19 U.S.C. § 1677b(f)(3).

Because Commerce's use of surrogate data was an authorized and reasonable exercise of

its authority pursuant to the Major Input Rule, Plaintiffs' alternative arguments -- that Commerce

failed to follow the proper surrogate value selection procedure under 19 C.F.R. § 351.408, and that

Commerce violated the Administrative Procedure Act by engaging in improper rulemaking -- are

dismissed.  See also Apex Frozen Foods Priv. Ltd. v. United States, 40 CIT __, __, 144 F. Supp.

3d 1308, 1320 (2016), aff'd, 862 F.3d 1337 (Fed. Cir. 2017) ("[T]he APA's notice and comment

requirement applies to legislative rules and does not apply to 'interpretive rules, general statements

of policy, or rules of agency organization, procedure, or practice.'" (quoting 5 U.S.C. § 553(b)(A)).

Plaintiffs more broadly object that Commerce's "failure to provide parties with a full opportunity

to submit factual information related to input COP was unsupported by substantial evidence

because it restricted parties' opportunity to be heard and lead to an inaccurate dumping margin"

and "it never once explained its surrogate selection framework nor requested information to build

the record that would allow the agency to calculate a margin as accurately as possible." Pls.' Br.

at 25–26. But all parties were afforded the opportunity to respond to data provided by, and

comments made by, other parties; all parties were also "able to provide pre-preliminary comments"

on the use of collected data and to comment on the Preliminary Determination throughout the

briefing for the Final Determination. IDM at 10. These procedural guarantees satisfy Commerce's

obligation to calculate input COP under the Major Input Rule "on a fair and equitable basis," Koyo

Seiko Co., 36 F.3d at 1573, and Plaintiffs do not identify any statute, rule, or case that would

obligate Commerce to solicit even more information to properly administer the Major Input Rule.

Because Commerce is not subject to the requirements for employing a surrogate value

methodology in NME proceedings, and because Commerce's construction of the input COP is

consistent with the Major Input Rule and justified on the record, Commerce's use of surrogate data

is in accordance with law and supported by substantial evidence.

### B.   *Commerce's Calculation of COP Is Supported by Substantial Evidence*

The second issue before the court relating to Commerce's determination of input COP is

whether Commerce's decisions to include or exclude GTA data in its calculations were supported

by substantial evidence. Plaintiffs challenge two aspects of Commerce's final analysis. First,

Plaintiffs argue that Commerce unreasonably included aberrational and distortive GTA data from

Romania. See Pls.' Br. at 29–32. Second, Plaintiffs contend that Commerce's decision to exclude

GTA data from Mexico due to different measurement units was unreasonable because the agency

did not use the conversion factor on the record that Plaintiffs had themselves supplied. See Pls.'

Br. at 32–35. Each calculation decision is reviewed for substantial evidence, including whether

Commerce has adequately considered information from Plaintiffs that "fairly detracts from [the]

weight" of the agency's decision.  See Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351

(Fed. Cir. 2006).  The court sustains Commerce's calculation method.

### 1.   Commerce's Inclusion of Romanian Data Is Supported by Substantial Evidence

"Commerce has acknowledged that aberrational values should not be used."  Ad Hoc

Shrimp Trade Action Comm. v. United States, 41 CIT __, __, 219 F. Supp. 3d 1286, 1291 (2017).

Data is aberrantly high when it is "many times higher than the import values from other countries."

SolarWorld Ams., Inc. v. United States, 42 CIT __, __, 320 F. Supp. 3d 1341, 1351 (2018) (internal

quotation marks and citation omitted).  While there is no bright-line rule for what multiple of other

price values would qualify as "aberrational," the court has previously affirmed the exclusion of

"aberrational values" that were nearly 30 times higher than other values, Calgon Carbon Corp. v.

United States, 44 CIT __, __, 443 F. Supp. 3d 1334, 1350 (2020), and 30 and 79 times higher than

the average unit value, Catfish Farmers of Am. v. United States, 33 CIT 1258, 1260, 641 F. Supp.

2d 1362, 1367 (2009); see also Final Results of Redetermination at 5–6, Catfish Farmers of Am.,

No. 08-00111 (CIT Dec. 10, 2009), ECF No. 100-1.  Plaintiffs argue that Commerce's inclusion

of Romanian GTA data when valuing the COP of [[          ]] was unsupported by substantial

evidence because the Romanian GTA data was aberrational and "many times higher" than the rest

of the data.  Pls.' Br. at 29.

The record supports Commerce's determination that Romanian GTA data is not

sufficiently aberrant to be excluded.  The Romanian [[          ]] value is [[          ]] USD/kg, which

is [[                    ]] higher than the next highest value and [[                    ]] higher than the

lowest value.  See Final Cost Mem. at attach. 1E.  These multiples are a far cry from the values

that courts have affirmed to be "aberrationally high."  See, e.g., SolarWorld Ams., Inc. v. United

States, 962 F.3d 1351, 1361 (Fed. Cir. 2020) (inclusion of multiple of 191 times was remanded for

reconsideration); Jacobi Carbons AB v. United States, 619 F. App'x 992, 1000 (Fed. Cir. 2015)

(suggesting that multiples of 30 and 15 times are aberrational); Calgon Carbon Corp., 443 F. Supp.

3d at 1350 (multiple of 30 times was aberrational); Catfish Farmers of Am., 33 CIT at 1260, 641

F. Supp. 2d at 1367 (multiples of 30 and 79 were aberrational).  Commerce explained that the fact

that "some [price values] are higher than the average and some are lower" on the spectrum of price

values "is no reason, in and of itself, to exclude any of the data" as aberrational.  IDM at 11.  The

court agrees and affirms Commerce's reliance on the Romanian GTA data.[8]

## 2. Commerce's Exclusion of Mexican Data Is Supported by Substantial Evidence

Plaintiffs also argue that Commerce's decision to exclude Mexican GTA data in valuing

Best Mattresses's [[        ]] input COP was unreasonable.  Commerce stated that "[n]o data was

submitted by both the Respondents and the Petitioners for Mexico that were expressed in

kilograms.  Therefore, we did not include its per unit cost in the average calculation."  Final Cost

Mem. at attach. 1E, n.1, C.R. 276.  Plaintiffs contend that because they reported their own [[

]] purchases quantities in both [[                                                    ]] in their supplemental section D

---

[8] Commerce's exclusion of Malaysian price data in calculating the [[          ]] COP is consistent
with the court's holding.  The Malaysian data was [[                    ]] higher than the next highest
value and [[                    ]] higher than the lowest value, see Preliminary Cost Memorandum
at Attachment 2C, C.R. 241, but both multiples appear sufficiently higher from the exclusion of
the Romanian data so as not to be arbitrary.  Although Commerce did not explain its conclusion
that the Malaysian data was aberrational, "[a]n explicit explanation is not necessary . . . where the
agency's decisional path is reasonably discernible," as it is here.  Wheatland Tube Co. v. United
States, 161 F.3d 1365, 1369–70 (Fed. Cir. 1998).

Consol. Court No. 21-00281                                                    Page 45
*PUBLIC VERSION*

questionnaire response submission, Commerce could have constructed a [[

           ]] ratio to convert the Mexican data into kilograms.  Id. at 33.

        The record justifies Commerce's exclusion of the Mexican GTA data.  Data on the record

supports the calculation of at least five different [[        ]] densities, which vary greatly.  First, the

densities of the [[        ]] purchased by Best Mattresses and Rose Lion are different between the

two companies.  Id.; see also Pls.' Br. at 33 (representing the two densities to be [[

           ]]).  Furthermore, Defendant-Intervenors demonstrated that the [[

           ]] data, all three of which report units of measure of both [[                ]] and

kilograms, result in varying densities.  See Letter from Mattress Pet'rs to G. Raimondo, Sec'y of

Com., re: Mattress Petitioners' Rebuttal to Respondents' Ministerial Error Allegation at 3 (Apr. 5,

2021), C.R. 284 (determining the range of densities to be [[

                                                        ]]).   Commerce,

reviewing the record, explained that because "[t]he density relied on by Best Mattresses/Rose Lion

is different from that inherent in the data of other countries" and "there is no universal conversion

factor to covert [[     ]] to kg," "[t]he conversion factor used by Best Mattresses/Rose Lion, which

is based on their own records, cannot be applied to all other countries' GTA data."  Mem. from J.

McGowan to J. Maeder, re: Allegations of Ministerial Errors in Final Determination at 4 (Dep't

Com. Apr. 19, 2021), P.R. 315, C.R. 285.  Commerce's finding of no universal conversion value

was not a result of "ignor[ing] convertor information on the record," Pls.' Br. at 35, but of evidence

that demonstrated varying density values.

        Commerce also sufficiently explained its deviation from prior investigations where it has

relied on respondent-reported data to construct conversion facts.  Plaintiffs insist that the "only

Consol. Court No. 21-00281                                                                              Page 46
**PUBLIC VERSION**

reasonable method" is for Commerce to have used Best Mattresses's own conversion rate, as it did

in Ceramic Tile from the People's Republic of China: Preliminary Affirmative Determination of

Sales at Less Than Fair Value, Preliminary Negative Critical Circumstances Determination, and

Postponement of Final Determination, 84 Fed. Reg. 61,877 (Dep't Com. Nov. 14, 2019), and

accompanying Prelim. Results Analysis Mem. at 9 ("Ceramic Tile Mem."). In that investigation,

Commerce converted a dataset from a USD/m$^2$ basis to a USD/kg basis by calculating a conversion

rate of m$^2$/kg from the respondent's reported data. See id. Here, Commerce sufficiently explained

why the situations are distinguishable. See Nippon Steel Corp. v. U.S. Int'l Trade Comm'n, 494

F.3d 1371, 1377 n.5 (Fed. Cir. 2007) ("When an agency decides to change course . . . , it must

adequately explain the reason for a reversal of policy."). Commerce calculated a sufficiently

accurate conversion factor in Ceramic Tile because the investigation involved an NME respondent

and only one country's import statistics were used. See Ceramic Tile Mem. at 9. Not so here.

Commerce had on the record not one, but six, country datasets, three of which -- as Commerce

explains and this court affirms -- support a competing finding that there is no universal density for

[[          ]]. See also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into

Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative

Review and Final Determination of No Shipments; 2019-2020, 87 Fed. Reg. 38,379 (Dep't Com.

June 28, 2022), and accompanying IDM at 18–19 (declining to use the respondent's reported

conversion factor, "even if the respondents' conversion factors accurately reflect the weight of

their solar glass per square meter," because "[t]here is no evidence that the thickness of the glass

imported into Malaysia is the same as that of the respondents' glass"). And the court's inquiry is

not whether the agency's approach was the best calculation method, but whether a reasonable mind

could conclude that the agency's approach was the best calculation method.  Substantial evidence

supported Commerce's exclusion of Mexican GTA data and, more broadly, its calculation of input

COP from the GTA data.

## II.   *Commerce's Application of the Transactions Disregarded Rule Is in Not Accordance with Law and Not Supported by Substantial Evidence*

Before proceeding to Plaintiffs' other challenges to the Final Determination, the court

considers Defendant-Intervenors' challenges to Commerce's application of the Transactions

Disregarded Rule, 19 U.S.C. § 1677b(f)(2).  Among other arguments, Defendant-Intervenors

contend that Commerce's "unreasonable construction and interpretation of the transactions

disregarded rule" and "its refusal to follow its longstanding practice of excluding from surrogate

value data those data that are from NMEs or from countries with broadly available export

subsidies" both render Commerce's Final Determination not in accordance with law and

unsupported by substantial evidence.  Def.-Inters.' Br. at 2.  The court agrees.  Commerce's

interpretation of the Transactions Disregarded Rule is not in accordance with law, and the record

did not justify why Commerce included imports from NMEs or countries with broadly available

export subsidies in its surrogate value calculations.  The court remands to Commerce for

reconsideration or further explanation consistent with this opinion.

## A.   *Commerce's Determination of the Market Price Pursuant to the Transactions Disregarded Rule Is Not in Accordance with Law*

At the heart of Defendant-Intervenors' challenge to Commerce's calculation of market

price, and Commerce's and Plaintiffs' related defense, is whether Commerce's interpretation of

"market under consideration" merits deference.  Under the Transactions Disregarded Rule,

Commerce may disregard the transfer price of an input between the respondent and an affiliated

supplier and instead use the input's market price in its normal value calculation.  As has been

noted, the codified rule states:

> A transaction directly or indirectly between affiliated persons may be disregarded
> if, in the case of any element of value required to be considered, the amount
> representing that element does not fairly reflect the amount usually reflected in
> sales of merchandise under consideration in the market under consideration.  If a
> transaction is disregarded under the preceding sentence and no other transactions
> are available for consideration, the determination of the amount shall be based on
> the information available as to what the amount would have been if the transaction
> had occurred between persons who are not affiliated.

19 U.S.C. § 1677b(f)(2).

Commerce's shift from the six-country GTA average in the Preliminary Determination to

the Cambodian Trademap data, see supra note 4, in the Final Determination was due, according to

Commerce, to its interpretation of "market under consideration" under the Transaction

Disregarded Rule.  Commerce stated that "the statute indicates that the item being tested should

reflect a market price in the country under consideration, which is Cambodia in this case.

Accordingly, we have reevaluated our preliminary determination . . . and now find that the

Cambodian Trademap data best reflect fair market prices for the market under consideration."

IDM at 10.  Put simply, Commerce reasoned: Because "market under consideration" means

Cambodia, Cambodian Trademap data is the best choice.  Whereas Commerce and Plaintiffs argue

that "market under consideration" is best read to refer to the country subject to the antidumping

investigation, Def.'s Br. at 28–29; Pls.' Resp. Br. at 9–15, Defendant-Intervenors contend that the

phrase unambiguously refers to the market of the affiliated supplier, Def.-Inters.' Br. at 24–26.

The issue is whether Commerce's interpretation of the Transactions Disregarded Rule "is in

accordance with the law," 19 U.S.C. § 1516a(b)(1)(B)(i), thereby warranting deference under

Chevron's two-step framework.  The court determines that it does not and remands for reconsideration or further explanation.

Under Chevron step one, the meaning of "market under consideration" is ambiguous.  The text of the Transactions Disregarded Rule is silent on whether to look to the market of the affiliated supplier or the respondent.  Looking instead to context, Defendant-Intervenors stress that because the Transactions Disregarded Rule focuses on inputs into the merchandise subject to investigation by Commerce, see 19 U.S.C. § 1677b(f)(2) (limiting the rule to "the case of any element of value required to be considered"), the subsequent phrasing -- "the amount usually reflected in sales of merchandise under consideration" -- refers to the input being purchased, not the merchandise subject to investigation by Commerce.  See Def.-Inters.' Br. at 24–25 (quoting 19 U.S.C. § 1677b(f)(2)).  They argue that the next phrase, "market under consideration," must also refer to the market where the supplier of that input is located.  See id.  But that leap from "merchandise under consideration" to "market under consideration" leaves the court right back where it started, because it is still consistent with the provision's broader context that Commerce must consider the input prices within the respondent's home market.  Furthermore, the broad phrasing in the statute's second sentence, which authorizes Commerce to determine the amount "based on the information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated," is once again a grant of reasonable discretion to the agency in determining the source information for market price.[9]  19 U.S.C. § 1677b(f)(2); see also Unicatch Indus. Co.

---

[9] Nor is the legislative history helpful in illuminating Congressional intent.  Commerce may ignore sales made outside the ordinary course of trade, when "such sales or transactions have characteristics that are not ordinary as compared to sales or transactions generally made in the same market."  H.R. Rep. No. 103-826, at 76 (1994), as reprinted in 1994 U.S.C.C.A.N. 3773,

v. United States, 45 CIT __, __, 539 F. Supp. 3d 1229, 1248 (2021) ("The statute vests Commerce

with discretion to determine how best to apply the transactions disregarded rule . . . .").

But under Chevron step two, Commerce's interpretation of "market under consideration"

to mean the country subject to investigation as opposed to the country of the affiliated supplier

was unreasonable.  Commerce's prior decisions do not reveal a unified interpretation of "market

under consideration" to mean either the country of the affiliated supplier or the country subject to

investigation -- in fact, choosing one or the other forces a false dichotomy.  This court has

explained Commerce's practice in applying the Transactions Disregarded Rule as follows:

> Commerce has expressed a preference for how to establish market value. . . . First,
> it looks at whether respondent purchased the input from an unaffiliated supplier; if
> unavailable, it looks to sales of the input between an affiliate supplier and an
> unaffiliated party, and as a final resort, to a reasonable source for market value
> available on the record.

Rebar Trade Action Coal. v. United States, 43 CIT __, __, 398 F. Supp. 3d 1359, 1372 (2019); see

also Diamond Sawblades Mfrs. Coal. v. United States, 38 CIT __, __, 2014 WL 5463307, at *2

n.2 (2014), aff'd sub nom. Diamond Sawblades Mfrs. Coal. v. Hyosung D & P Co., 809 F.3d 626

---

3848.  Congressional reports do not conclusively clarify whether "market under consideration"
unambiguously refers to the country under investigation or the country of the affiliate supplier.  In
H. R. Rep. 103-826, Congress did explain -- in the context of subsection 773(b)(1) of the Tariff
Act -- that "[o]nly if there are no above-cost sales in the ordinary course of trade in the foreign
market under consideration will Commerce resort to constructed value." Id. at 90 (emphasis
added).  The only use of the phrase "market under consideration" in section 773 of the Tariff Act
is in the Transactions Disregarded Rule.

Importing Congress's use of the word "foreign" into the Transactions Disregarded Rule would
possibly suggest that "market under consideration" cannot refer to the country of the affiliate
supplier because a "market" would not be "foreign" if the affiliate supplier were located in the
United States.  But Congress did not include the word "foreign" in the statute, nor did it explain
the concept further in the Committee report.  The evidence from legislative history is ultimately
too tenuous to support a finding of unambiguous intent.

**PUBLIC VERSION**

(Fed. Cir. 2015) (Commerce may, as last resort, "rely on . . . 'any reasonable method' to confirm

that the affiliated prices reflect arm's length transactions").[10]  And when resorting to a "reasonable

source for market value," if "a market price is not available, Commerce has developed a consistent

and predictable approach whereby it may use an affiliate's total cost of providing the [good or

service] as information available for a market price."  Heavy Walled Rectangular Welded Carbon

Steel Pipes and Tubes from the Republic of Korea: Final Results of Antidumping Duty

Administrative Review; 2018–2019, 86 Fed. Reg. 35,060 (Dep't Com. July 1, 2021), and

accompanying IDM cmt. 24 ("Carbon Steel Pipes IDM").  And any reasonable interpretation of

"market under consideration" must "derive[] from [this] relevant statutory language."  Yangzhou,

716 F.3d at 1378.  The phrase "market under consideration," therefore, is purposefully broad to

ensure that, whatever the choice, Commerce may select a market that allows for a "reasonable

source for market value," Rebar, 398 F. Supp. 3d at 1372, to "confirm that the affiliated prices

reflect arm's length transactions," Diamond Sawblades, 2014 WL 5463307, at *2 n.2.  Commerce

itself has affirmed that it has the flexibility to choose the appropriate market.  Notice of Final

Results of Antidumping Duty Administrative Review: Certain Softwood Lumber Products from

Canada, 70 Fed. Reg. 73,437 (Dep't Com. Dec. 12, 2005), and accompanying IDM cmt. 32 ("The

Department's general practice is to define the market under consideration as the entire home

market or third country." (emphasis added)).  Commerce's decision to interpret "market under

---

[10] Other Court of International Trade decisions are persuasive but not binding.  See Algoma Steel
Corp. v. United States, 865 F.2d 240, 243 (Fed. Cir. 1989).  The court exercises its discretion to
consider and address such cases, particularly where the litigants cite them as evidence of
Commerce's established practices and preferences, which facilitates the analysis of the case now
before the court.

Consol. Court No. 21-00281                                                                    Page 52
**PUBLIC VERSION**

consideration" to mean only the "country under consideration," IDM at 10, is therefore not only

be an arbitrary and unexplained departure from prior practice, but also an unreasonably restrictive

reading of the provision.

To be clear, today's holding does not prevent Commerce from selecting Cambodia as the

"market under consideration" for purposes of the Transactions Disregarded Rule on remand.

Where Commerce erred is that it hinged its reasoning on a faulty reading of the statute that

presumed that "market under consideration" referred to the country subject to investigation, see

IDM at 10 ("[T]he statute indicates that the item being tested should reflect a market price in the

country under consideration, which is Cambodia in this case."), when it should have explained

why the selection of Cambodia constituted a "'reasonable method' to confirm that the affiliated

prices reflect arm's length transactions" between respondent and [[          ]] suppliers.  Diamond

Sawblades, 2014 WL 5463307, at *2 n.2; see also Carbon Steel Pipes IDM at cmt. 24 (noting that

usual practice is to rely on the affiliated supplier's COP, which necessarily involves prices from

the affiliated supplier's country).  Whether Commerce selects Cambodia or [[      ]] on remand,

"Commerce's final determination cannot be sustained" when "the court cannot discern

Commerce's analytical pathway," and it must adequately justify its choice.[11]  Garg Tube Exp. LLP

---

[11] Because Commerce's interpretation of "market under transaction" is not in accordance with law, Commerce's decision to use Cambodian Trademap data is unjustified.  For that reason, the court does not reach Defendant-Intervenor's other challenges to Commerce's use of Cambodian Trademap data, including whether the Trademap export data is "distorted, misrepresentative, and incorrect," see Def.-Inters.' Br. at 17, and whether Commerce departed from a longstanding practice of relying exclusively on official import data, not export data, to establish surrogate values, id. at 26–27.

v. United States, 45 CIT __, __, 527 F. Supp. 3d 1362, 1372 (2021) (citing SEC v. Chenery Corp.

332 U.S. 194, 196–97 (1947)).

> **B.      Commerce's Inclusion of Imports from NME Countries and Countries
> with Broadly Available Export Subsidies in the GTA and Trademap
> Data Is Not Supported by Substantial Evidence**

When calculating constructed value, Commerce must normally calculate "costs . . . based

on the records of the exporter or producer of the merchandise, if such records . . . reasonably reflect

the costs associated with the production and sale of the merchandise."  19 U.S.C. § 1677b(f)(1)(A).

If substantial evidence supports the agency's finding that the records are not reasonably reflective

of production and sale, then § 1677b(f)(1)(A) "does not require Commerce to accept [a

respondent's] records."  Thai Plastic Bags Indus. Co. v. United States, 746 F.3d 1358, 1365 (Fed.

Cir. 2014).  Defendant-Intervenors argue that Commerce erred because it had already determined

that it would not rely on Plaintiffs' records in the Transactions Disregarded Rule and Major Input

Rule contexts, see Def.-Inters.' Br. 29–30, and that Commerce's longstanding practice in NME

investigations to exclude data from NMEs and countries with broadly available export subsidies

should apply here, see Def.-Inters.' Br. at 31–32.

Commerce has taken the position that, in the context of affiliated suppliers, it "cannot rely

on the affiliated suppliers' actual cost of production because the affiliates are based in an NME

country."   IDM at 10; see also id. at 9 ("[B]ecause these transactions were between Best

Mattresses/Rose Lion and NME-based affiliated suppliers, Commerce was unable to rely on the

affiliated suppliers' cost of production . . . .").  The NME distinction was dispositive because

Commerce usually relies on the reported input COP values if the affiliated supplier is from a

market economy.  And as discussed, supra pp. 36–37, Commerce's decision to not consider the

respondent data and to use surrogate data was sourced in its authority to determine the "information

available regarding such cost of production." 19 U.S.C. § 1677b(f)(3). But now, Commerce states:

> In market economy cases, Commerce is required under section 773(f)(1)(A) of the
> Act to calculate costs based on the records of the exporter or producer of the
> merchandise which are kept in accordance with generally accepted accounting
> principles and reasonably reflect costs associated with production. In market
> economy cases, Commerce relies on the purchase prices paid to unaffiliated
> suppliers based in these countries. It would be inconsistent with the law and our
> practice to exclude imports from these countries when using GTA data as a proxy
> for market prices and COP.

IDM at 11.

Commerce fails to justify why its presumption of NME unreliability applies in the affiliated

supplier context, but not in the unaffiliated supplier context. Put simply, when Commerce must

determine whether surrogate data that includes NME and countries with broadly available export

subsidies may "reasonably reflect the costs associated with the production and sale of the

merchandise," 19 U.S.C. § 1677b(f)(1)(A), Commerce does not apply the same presumption of

NME data unreliability and instead argues that it must rely on purchase prices paid to unaffiliated

NME-based suppliers. See IDM at 11. And while it is true that Commerce was not subject to the

methodological obligations of 19 U.S.C. § 1677b(c) because Plaintiffs are not NME-based

respondents, see IDM at 9, the lack of § 1677b(c)'s formal application does not exempt

Commerce's obligation to address the unreliability of NME data, which is derived from the Tariff

Act as a whole and affirmed by Commerce's prior practice. See 19 U.S.C. § 1677(18)(A); Notice

of Final Determination of Sales at Less Than Fair Value and Final Determination of Critical

Circumstances: Diamond Sawblades and Parts Thereof from the Republic of Korea, 71 Fed. Reg.

29,310 (Dep't Com. May 22, 2006), and accompanying IDM cmt. 12 ("[T]he Act generally

assumes that prices for goods produced in NMEs cannot be relied upon for purposes of a price-

based analysis." (emphasis added)); see also Certain Cut-to-Length Carbon Steel Plate from Romania: Notice of Final Results and Final Partial Rescission of Antidumping Duty Administrative Review, 70 Fed. Reg. 12,651 (Dep't Com. Mar. 15, 2005), and accompanying IDM cmt. 3 ("Consistent with our practice, we do not use export prices from a market economy for the valuation of surrogate values when we have a reasonable basis to believe or suspect that the product benefits from broadly available export subsidies."). If the presumption does not apply with equal force in the unaffiliated supplier versus affiliated supplier contexts, then the agency must provide affirmative reasons to explain why that is so. The court remands to Commerce for reconsideration or further explanation.

### III.    Commerce's Application of the Transactions Disregarded Rule to Best Mattresses's Fixed Asset Depreciation Is Supported by Substantial Evidence and in Accordance with Law

Having reviewed Defendant-Intervenors' challenge to Commerce's application of the Transactions Disregarded Rule, 19 U.S.C. § 1677b(f)(2), the court now considers Plaintiffs' challenge to Commerce's application of the same rule to the depreciation expenses of fixed assets purchased from Best Mattresses' affiliated suppliers. As part of its calculation of Best Mattresses's constructed value, Commerce must include depreciation expenses of fixed asset purchases in its calculation of respondents' cost of manufacturing and general and administrative expenses. See Prelim. Cost Mem. at 2; Final Cost Mem. at 3. Because Best Mattresses had purchased fixed assets from affiliated suppliers, Commerce was required to test those purchases against market price pursuant to the Transactions Disregarded Rule. See 19 U.S.C. § 1677b(f)(2); IDM at 12. Best Mattresses submitted market price data on [[

]].  See Pls.' Br. at 36.  Commerce declined to use [[

]] and explained:

> The respondent did not identify any specific fixed assets that have a market price. The purported market prices appear to relate to the general category of "construction materials," not to specific assets, which makes impossible a proper comparison between similar fixed assets.  Because we are not able to directly test the affiliated asset purchases because no reasonable market price information is available, . . . .  Commerce compared the overall difference between the transfer price and market price, for each affiliated supplier, on minor input transactions, and applied, if applicable, the resulting adjustment percentage to the depreciation expense of the fixed assets supplied by that same affiliated supplier.

IDM at 12.  Commerce's method ultimately relied on the same Cambodian Trademap data, which provided the market prices for raw material inputs, to determine the adjustment percentage for fixed asset depreciation expenses provided by affiliated supplier.

Commerce's application of the Transactions Disregarded Rule to fixed asset depreciation from affiliated suppliers is in accordance with law and supported by substantial evidence. Plaintiffs submit three challenges to Commerce's methodology.  First, Plaintiffs argue that by rejecting Plaintiffs' reported data on [[                                                                    ]] in calculating the fixed asset depreciation cost related to assets from affiliated suppliers, Commerce invented a specificity requirement not grounded in law and failed to use "the information available" as required by the plain text of 19 U.S.C. § 1677b(f)(2).  See Pls.' Br. at 36–39.  Second, Plaintiffs contend that Commerce did not give interested parties the opportunity to provide market data specific to fixed asset depreciation, rendering Commerce's decision unsupported by substantial evidence.  Pls.' Br. at 39.  Third, Plaintiffs claim that Commerce erred in applying the Transactions Disregarded Rule because it adjusted the [[

]].  See Pls.' Br. at 39–40.  The court addresses each in turn.

First, Commerce exercised reasonable discretion when it chose not to use Plaintiffs'

reported data on [[                                                              ]] in calculating the fixed asset

depreciation cost.  When applying the Transactions Disregarded Rule, Commerce prefers a

respondent's reported data on its own purchases from unaffiliated suppliers; if unavailable, then it

considers the affiliated supplier's sales to unaffiliated purchasers.  Certain Cold-Rolled Steel Flat

Products from Brazil: Final Determination of Sales at Less Than Fair Value, 81 Fed. Reg. 49,946

(Dep't Com. July 29, 2016), and accompanying IDM cmt. 10; see also Rebar, 398 F. Supp. 3d at

1372 (finding that Commerce "first looks at whether respondent purchased the input from an

unaffiliated supplier; if unavailable, it looks to sales of the input between an affiliate supplier and

an unaffiliated party" (emphasis added)).  "[A]s a final resort," Commerce looks "to a reasonable

source for market value available on the record."  Rebar, 398 F. Supp. 3d at 1372.  Here, Plaintiffs

reported  [[

                                                  ]].  See Pls.' Br. at 35, 38.  Plaintiffs

then paired each fixed asset price with a range of categories of market data, such as [[

                                  ]].  Id. at 38.  But only [[      ]] of Rose Lion's [[     ]] reported fixed

asset purchases, and only [[        ]] of Best Mattresses' [[        ]], were from [[

]].  Def.'s Br. at 34.  And the purchases from [[                                  ]] were limited to [[

                                ]].  In requiring specificity, see IDM at 12, Commerce reasonably decided

Consol. Court No. 21-00281                                                                Page 58
**_PUBLIC VERSION_**

that Plaintiffs' price data would distort specific input depreciation costs by using poorly

representative categories of fixed asset depreciation costs.  For example, to compare [[

]], Commerce must have either [[

]].  Neither method would properly compare like inputs; both would

distort depreciation cost.

Commerce's decision to use percentage adjustments based on minor input price differences

was otherwise a reasonable alternative and consistent with 19 U.S.C. § 1677b(f)(2).  "If a

transaction is disregarded . . . , the determination of the amount shall be based on the <u>information

available</u> as to what the amount would have been." 19 U.S.C. § 1677b(f)(2).  Because Plaintiffs

did not report market prices for the specific inputs at issue, Commerce instead calculated the

percentage difference between the transfer price and constructed market price for minor inputs

from affiliated suppliers, which was the "information available" under the Transactions

Disregarded Rule.  <u>See</u> IDM at 12.  Commerce then applied the percentage difference, derived

from the minor input difference of an affiliated supplier, to depreciation costs of fixed assets

purchased from that same affiliate supplier.  <u>Id.</u>  "The statute vests Commerce with discretion to

determine how best to apply the transactions disregarded rule," <u>Unicatch</u>, 539 F. Supp. 3d at 1248,

and nothing in the text of "information available" forbids Commerce from applying the affiliate-

specific adjustment for minor input purchases to the fixed asset purchases.  Plaintiffs' argument

that Commerce could have paired fixed asset prices "with a range of categories of market data,"

Pls.' Reply at 16, only further underscores that the range does not reflect identical inputs.

Commerce also "applied the adjustment only to the current year's depreciation expense, not to the

entire fixed assets" because, unlike minor inputs, fixed assets are purchased for use in more than

one year.  See IDM at 12.  Commerce, therefore, articulated a rational connection between the

facts and application of the percentage difference to fixed asset depreciation expenses.  State Farm,

463 U.S. 29, 43.

      Today's holding is also consistent with Rebar and Commerce's expressed preferences for

calculating market value.  In Rebar, Commerce solicited and relied on actual costs of inputs from

affiliated providers of services in order to determine the market price for those same inputs

pursuant to the Transactions Disregarded Rule.  Rebar, 398 F. Supp. 3d at 1359.  The Rebar court

reasoned that "Commerce has expressed a preference for how to establish market value," where it

first "looks at whether respondent purchased the input from an affiliated supplier."  Id.  From this

language, Plaintiffs propose a rule that Commerce must use data reported by the respondent "as

opposed to fictious, market values when possible."  Pls.' Br. at 37.  But in Rebar, Commerce relied

on the actual costs to the affiliated providers for the same inputs; here, Commerce chose not to

rely on actual costs to the respondent for different inputs.  Commerce's decision is consistent with

its preference "to use the price paid by the respondent itself in transactions with unaffiliated

suppliers involving identical products when such information is available because this price best

represents the respondent's own experience in the market under consideration."  Unicatch, 539 F.

Supp. 3d at 1249 (emphasis added) (citation and internal quotation marks omitted).  After finding

the conditions for use of Plaintiffs' reported data to be deficient, Commerce turned "to a reasonable source for market value available on the record." Rebar, 398 F. Supp. 3d at 1372. To hold otherwise would compel Commerce to draw inferences or use methodologies in Plaintiffs' favor, particularly from generalized market price data when data on specific input prices was unavailable. See Rebar, 398 F. Supp. 3d at 1372 ("whether respondent purchased the input" (emphasis added)); see also Shanxi Hairui Trade Co., 39 F.4th at 1361 (deferring "to [Commerce's] interpretation of the statute when implementing its antidumping duty methodology unless it is 'arbitrary, capricious, or manifestly contrary to statute'" (quoting PSC VSMPO-Avisma Corp., 688 F.3d at 764)). Commerce's explanation was, therefore, in accordance with law and justified by substantial evidence.

Plaintiffs' alternative argument that Commerce should have solicited market data specific to fixed asset depreciation, instead of resorting to percentage adjustments based on minor input data, also fails. As an initial matter, Commerce requested sufficient information to substantiate its determinations. The Section D questionnaire requested that Best Mattresses "provide a worksheet that identifies those inputs and other items (e.g., fixed assets, services, etc.) that your company receives from affiliated parties" and to include "the POI total quantity and transfer price of the transactions" and the "percentage the item represents of the total [merchandise under consideration's cost of manufacture]." Best Mattresses C-DQR at D-9; Rose Lion C-DQR at D-9. And in the supplemental Section D questionnaires, Commerce expressly requested "for each [affiliated] supplier," "a schedule of the individual fixed assets . . . purchased with . . . [d]epreciation expense for the POI." See Sec. D Supp. Qs. at 4–5. That Commerce did not request additional market data specific to fixed asset depreciation is consistent with its practice;

Consol. Court No. 21-00281                                                          Page 61
**PUBLIC VERSION**

Commerce's preferred method is "to use the price paid by the respondent itself in transactions with

unaffiliated suppliers involving identical products when such information is available," Unicatch,

539 F. Supp. 3d at 1249, and because that information was unavailable, Commerce reasonably

turned to other "information available" on the record.  19 U.S.C. § 1677b(f)(2).  Plaintiffs could

have attempted to introduce market data under 19 C.F.R. § 351.301(a) and (c)(5), which enumerate

categories of information for submitting factual information and include a catch-all provision

subject to Commerce's approval (and subsequent judicial review).  But because Plaintiffs did not

do so, nor have Plaintiffs alleged how the analysis would have been more accurate had Commerce

requested such information, Plaintiffs' argument -- which borders on the hypothetical -- does not

hold water.

       Finally, Commerce acted in accordance with law in invoking the Transactions Disregarded

Rule where transfer prices to Best Mattresses were higher than the original purchase price to

affiliated suppliers.  Plaintiffs argue that Commerce violated the plain text of 19 U.S.C. §

1677b(f)(2) because Best Mattresses's [[


                                    ]], and therefore the transfer prices "fairly reflect[ed]" the

market price.  Pls.' Br. at 39–40.  But as Commerce explained, "the original purchase price or the

book value of the affiliated supplier are [not] relevant, because it is the market value on the date

of sale for the asset that is relevant for testing the arm's length nature of the transaction."  IDM at

12 (emphasis added).  Book value and market value are distinct.  Compare Book Value, Black's

Law Dictionary (11th ed. 2019) ("The value at which an asset is carried on a balance sheet."), with

19 C.F.R. § 351.407(b)(2) (referring to market value as "the amount usually reflected in sales of

the major input in the market under consideration").  The original purchase price may represent

book value for fixed assets whose market value was higher at the time; and even so, it is reasonable

for Commerce to test transfer prices against contemporaneous, as opposed to dated, market prices.

Because "no reasonable market price information was available," IDM at 12, Commerce acted in

accordance with law.[12]

IV.     *Commerce's Reliance on Emirates's Financial Statements to Calculate Profit
        Ratios Is Only Partly Supported by Substantial Evidence*

Plaintiffs' final challenge contests Commerce's use of the Emirates financial statements.

This issue is, at its heart, a question of standard of review.  Without a viable home or third-country

market during the POI for Best Mattresses and Rose Lion, Commerce had to calculate CV profit

using "any other reasonable method."  19 U.S.C. § 1677b(e)(2)(B)(iii).  Commerce solicited

comments from the parties regarding the calculation of CV profit, and the parties submitted two

separate financial statements as potential surrogates.  See Prelim. Cost Mem. at 3; cf. Ad Hoc

Shrimp, 618 F.3d at 1319 ("Commerce values certain factors of production, such as selling,

general, and administrative expenses . . . and profit, by using financial ratios derived from financial

statements of producers of comparable merchandise in the surrogate country.").  The parties agree

that  Commerce  weighs  four  criteria  for  choosing  among  surrogate  data  under  §

1677b(e)(2)(B)(iii):

> (1) the similarity of the potential surrogate companies' business operations and
> products to the respondent's business operations and products; (2) the extent to
> which the financial data of the surrogate company reflects sales in the home market
> and does not reflect sales to the United States; . . . (3) the contemporaneity of the
> data to the POI. . . . [and (4)] the extent to which the customer base of the surrogate

---

[12] The court expresses no view on the Government's alternative argument that Commerce had no
obligation to use original acquired price data because they do not represent a "market under
consideration" under 19 U.S.C. § 1677b(f)(2).  See Def.'s Br. at 35.

Consol. Court No. 21-00281                                                                    Page 63
**PUBLIC VERSION**

company and the respondent is similar (<u>e.g.</u>, original equipment manufacturers versus retailers).

IDM at 16 (citing <u>Notice of Final Determination of Sales at Less Than Fair Value: Pure Magnesium from Israel</u>, 66 Fed. Reg. 49,349 (Dep't Com. Sept. 27, 2001), and accompanying IDM cmt. 8; <u>Notice of Final Determination of Sales at Not Less Than Fair Value: Certain Color Television Receivers from Malaysia</u>, 69 Fed. Reg. 20,592 (Dep't Com. Apr. 16, 2004), and accompanying IDM cmt. 26); <u>see also</u> <u>Mid Continent Steel & Wire, Inc. v. United States</u>, 45 CIT __, __, 551 F. Supp. 3d 1360, 1364 n.6 (2021).   Moreover, Commerce prefers financial statements that are publicly available and complete.   <u>See, e.g.</u>, <u>CP Kelco U.S., Inc. v. United States</u>, 949 F.3d 1348, 1359 (Fed. Cir. 2020); <u>Since Hardware (Guangzhou) Co. v. United States</u>, 37 CIT 803, 805, 911 F. Supp. 2d 1362, 1366 (2013).   "Accordingly, 'when presented with multiple imperfect potential' financial statements, Commerce is required to 'faithfully compare the strengths and weaknesses of each before deciding which to use.'"   <u>Ashley Furniture Indus., LLC v. United States</u>, 46 CIT __, __, __ F. Supp. 3d __, __, 2022 WL 17489243, at *5 (Nov. 28, 2022) (quoting <u>CP Kelco US, Inc. v. United States</u>, 39 CIT __, __, 2015 WL 1544714, at *7 (Mar. 31, 2015)).

Plaintiffs argue that Commerce's decision to use the Emirates statements over those of GTI was unsupported by substantial evidence for four reasons: (1) Emirates's financial statements were not entirely contemporaneous with the POI, <u>see</u> Pls.' Br. at 42–43; (2) Emirates's business model is different from that of Best Mattresses, <u>see</u> <u>id.</u> at 44–47; (3) Emirates's financial statements are not publicly available, <u>see</u> <u>id.</u> at 47–49; and (4) Emirates's financial statements are incomplete and not entirely legible, <u>see</u> <u>id.</u> at 49–51.   The GTI data, Plaintiffs conclude, was the only reasonable option of the two.   <u>See</u> <u>id.</u> at 51–52.   But all parties also acknowledge that Commerce was limited to choosing between two surrogates that had obvious deviations from the respondent companies.

Consol. Court No. 21-00281                                                                    Page 64
*PUBLIC VERSION*

And "[w]here Commerce is faced with the choice of selecting from among imperfect alternatives, it has the discretion to select the best available information for a surrogate value so long as its decision is reasonable." Catfish Farmers of Am. v. United States, 33 CIT 1258, 1273, 641 F. Supp. 2d 1362, 1377 (2009). "The Court's role . . . is not to evaluate whether the information Commerce used was the best available" or to reweigh the evidence, "but rather whether a reasonable mind could conclude that Commerce chose the best available information." Goldlink Indus. Co. v. United States, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006).

Despite Commerce's substantial discretion to choose between two imperfect financial statements, the court concludes that its choice of Emirates was only partly supported by substantial evidence. The record supported Commerce's conclusions that the Emirates statements were representative of Best Mattresses's business operations, sufficiently contemporaneous with the POI, and sufficiently legible. But Commerce did not adequately explain its finding that the Emirates statements were publicly available, and the record did not support Commerce's finding that the Emirates statements were complete. The court remands to Commerce for reconsideration or further explanation.

A.    *The Record Supports Commerce's Determination that Emirates's Business Operations Are Sufficiently Similar to Those of Best Mattresses*

Plaintiffs' first challenge is that "Commerce overlooked significant discrepancies between Emirates and Best Mattresses that did not exist between GTI and Best Mattresses." Pls.' Br. at 44. Although it "is not a producer of mattresses," Plaintiffs advocated the use of GTI, a "Cambodian producer of apparel and garment products" that are "similar to the inputs used to produce mattresses." Id. Alternatively, Defendant-Intervenors preferred Emirates, which "is an India-

*PUBLIC VERSION*

based manufacturing company" that produces "all types and kinds of mattresses, bases and other sleep related products and systems." Id. Commerce reasoned that "both the preferred and alternative methods [of calculating profit and selling expenses] show a preference [for] . . . (1) production and sales in the foreign country; and (2) the foreign like product," but the agency "may not be able to find a source that reflects both factors. . . . Consequently, [Commerce] must weigh the quality of the data against these factors." Id. Commerce concluded that "[w]hile GTI is a Cambodian producer which would expose it to similar business conditions as those of Cambodian mattress producers, it is not a mattress producer; Emirates Sleep is a mattress producer which would expose it to similar production and industry-specific conditions as those of Cambodian mattress producers." Id.

Substantial evidence supports Commerce's conclusion. "The goal in calculating [constructed value] profit is to approximate the home market profit experience of the respondents." Mid Continent Steel & Wire, Inc. v. United States, 941 F.3d 530 (Fed. Cir. 2019) (internal quotation marks and citation omitted). Confronted with two imperfect options, Commerce's tradeoff was choosing financial statements that reflected either the country under investigation, Cambodia, or the merchandise under consideration, mattresses. See IDM at 17. The fact that Emirates was a mattress manufacturer, whereas GTI was not, is surely "more than a mere scintilla of evidence" and was "relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion" that Emirates' financial statements best reflect the production experience of a respondent that manufactures mattresses. Nippon Steel, 337 F.3d at 1379.

Plaintiffs raise two factual arguments in opposition, but neither establishes that Commerce's conclusion was unreasonable. First, they insist that Emirates appears to be a minor

player in the mattress industry and the magnitude of GTI's revenues are more comparable to those

of Best Mattresses.  See Pls.' Br. at 45–46.  But Commerce's explanation that the size of a company

is not instructive without relative data about the entire industry is consistent with prior

investigations.  See IDM at 17 ("Commerce does not typically use relative production quantities

or sales as a criterion because the information to judge relative data to the overall industries is not

available."); see also Dorbest Ltd. v. United States, 604 F.3d 1363, 1374 (Fed. Cir. 2010)

("Commerce can rely on certain financial surrogate companies' financial statements even where

distortions based on economies of scale exist . . . .");  Wooden Bedroom Furniture from the

People's Republic of China: Final Results of Antidumping Duty Administrative Review and New

Shipper Reviews, 74 Fed. Reg. 41,374 (Dep't Com. Aug. 17, 2009), and accompanying IDM cmt.

14 ("[T]he Department's practice is to disregard company size as a basis upon which to determine

the representative nature of a company's financial statements . . . .").  Next, Plaintiffs argue that

Emirates is an unsuitable comparison because it derived 23.29 percent of its revenues from

marketing, as opposed to manufacturing, activities.  See Pls.' Br. at 46.  But Commerce considered

this adverse fact and ultimately concluded that "the marketing, promotion, and trading activities

related to mattresses and sleep systems are completely appropriate activities for a company

engaged in the manufacturing and sale of mattresses."  IDM at 18.  In addition, Commerce did not

include the retail, marketing, and advertising service or commission costs in calculating selling

expenses.   See id.   The decision to compare the financial statements of Emirates's business

operations to those of Best Mattresses was, therefore, supported by substantial evidence.

*PUBLIC VERSION*

> **B.**     ***The Record Supports Commerce's Determination that Emirates's***
> ***Financial Statements Are Sufficiently Contemporaneous with the POI***

Next, Plaintiffs argue that the GTI statement better represent Best Mattresses because the GTI statement represents company performance during the entire POI, whereas the Emirates statement overlaps the POI for only three months. The POI is January 1, 2019, through December 31, 2019. IDM at 2. Indeed, the dates of GTI's 2019 statements are entirely coextensive with the POI, whereas the Emirates 2019 statements report the fiscal year ended March 31, 2019 and overlap only three months with the POI. <u>See</u> Pls.' Br. at 42. Commerce acknowledged the difference in overlap and reasoned that "[b]ecause our periods of investigation and review do not normally coincide with the calendar year or other fiscal years typically adopted by companies, Commerce regularly accepts as contemporaneous a financial statement that overlaps the POI by some amount." IDM at 18–19.

Commerce's decision to use the Emirates statement, notwithstanding the different fiscal year, was reasonable. "It is well-established that Commerce considers data that overlap any portion of the POR to be contemporaneous." <u>Golden Dragon Precise Copper Tube Grp., Inc. v. United States</u>, 38 CIT __, __, 2016 WL 4442163, at *5 (2016) (internal quotation marks and citation omitted) (using a financial statement with a ten-month overlap); <u>see also, e.g.</u>, <u>Stainless Steel Plate in Coils from Belgium: Final Results of Antidumping Duty Administrative Review; 2011-2012</u>, 78 Fed. Reg. 79,662 (Dep't Com. Dec. 31, 2012), and accompanying IDM cmt. 3 (using a financial statement with an eight-month overlap); <u>Utility Scale Wind Towers From the Socialist Republic of Vietnam</u>, 80 Fed. Reg. 55,333 (Dep't Com. Sept. 15, 2015), and accompanying IDM cmt. 4.B (using a financial statement with one-half-month overlap). To the extent that Plaintiffs argue that the availability of a fully contemporaneous statement requires

Commerce to preference that statement over its alternatives, citing <u>Certain Frozen Fish Fillets</u>

<u>From the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative</u>

<u>Review and Final Determination of No Shipments; 2017–2018</u>, 85 Fed. Reg. 23,756 (Dep't Com.

Apr. 29, 2020), and accompanying IDM cmt. 2, such a rule has no basis in law.  Commerce was

confronted with a different choice in <u>Certain Frozen Fish Fillets</u>, where not all statements were

contemporaneous with the POI, <u>id.</u>, whereas here Commerce reasonably found both the Emirates

and GTI statements to be contemporaneous.   Holding otherwise would not only disrupt

Commerce's practice, but also arbitrarily disadvantage the financial statements of companies

whose fiscal years do not align with the periods of investigation.  Furthermore, "[w]hile [one]

statement may be more contemporaneous than [another], the selection of a financial statement

requires balancing of several factors, of which more overlap with the [POI] is one."   <u>Golden</u>

<u>Dragon</u>, 2016 WL 4442163, at *5.  Because Commerce reasonably considered Emirates's financial

statements to be contemporaneous, and because the selection of Emirates's statements was

otherwise justified by the balancing of other factors, Commerce's decision is supported by

substantial evidence.

### C.      *Commerce Did Not Adequately Explain Its Determination that Emirates's Financial Statements Were Publicly Available*

Plaintiffs also contend that the Emirates statements were not publicly available and, in not

choosing the publicly available GTI statements, Commerce deviated from a longstanding practice

in NME investigations of preferring publicly available information.  They argue that "publicly

available information addresses the concern that a lack of transparency about the source of the data

could lead to proposed data sources that lack integrity or reliability."   <u>Since Hardware</u>

<u>(Guangzhou) Co., Ltd. v. United States</u>, 37 CIT at 807, 911 F. Supp. 2d at 1367; <u>see also</u> <u>Home</u>

Prod. Int'l, Inc. v. United States, 32 CIT 337, 341–42, 556 F. Supp. 2d 1338, 1343 (2008)

("Commerce's choice of a complete, publicly available financial statement consistent with its

regulatory preference is . . . correct."). Notably, the Since Hardware court remanded to Commerce

for "a detailed step-by-step explanation" by the submitter "of how they obtained [the] . . . financial

statements." 37 CIT at 809, 911 F. Supp. 2d at 1369 (citation omitted). And while Plaintiffs

acknowledge that Commerce's regulatory preference for publicly available data is codified only

with respect to NME proceedings, see 19 C.F.R. § 351.408(c)(1)–(4), and both Since Hardware

and Home Products International cases involve NME investigations, they argue that Commerce

should be held to the same standard here because "the benefits to using . . . publicly available

information is both obvious and universally applicable across antidumping proceedings. . . . Put

simply, public availability allows for public accountability." Pls.' Br. at 48–49.

The publicly available requirement has diminished force under this case's unique

circumstances. Because "Commerce is not performing an NME investigation in this case nor is it

following a NME methodology," IDM at 19, the policy considerations underpinning, as well as

the cases relying on, 19 C.F.R. § 351.408(c) are less persuasive. See Since Hardware, 37 CIT at

805, 911 F. Supp. 2d at 1366 (deriving Commerce's "general regulatory preference" from 19

C.F.R. § 351.408(c)); Home Prod. Int'l, 32 CIT at 341, 556 F. Supp. 2d at 1342 (same). Moreover,

the circumstances of this investigation appear to satisfy the policy that motivates the publicly

available requirement. Commerce's "primary purpose for obtaining publicly available

information for financial statements is to ensure that all interested parties have access to such

information, and are able to comment on the reliability and relevance of such information in the

particular case, and not as much for purposes of obtaining broader information that reflects

Consol. Court No. 21-00281                                                    Page 70
*PUBLIC VERSION*

numerous transactions as is the case for material inputs." Since Hardware (Guangzhou) Co. v.

United States, 977 F. Supp. 2d 1347, 1352 (2014), order vacated in part on denial of

reconsideration on alternative grounds, 37 F. Supp. 3d 1354 (2014), aff'd, 636 F. App'x 800 (Fed.

Cir. 2016) (internal quotation marks and citation omitted).  Here, Commerce requested the

financial statements from interested parties and placed them on its record, allowing Best

Mattresses the opportunity to comment on the reliability and relevance of both the GTI and

Emirates statements.  See IDM at 20.  And while statements that are easily accessible to the public

bear a marker of reliability, Commerce found comparable markers here.  See id. (finding that

Emirates Sleep was a private company registered in India and that the accompanying audit was

conducted "in accordance with the standards on auditing specified under section 143 (10) of the

Companies Act, 2013").

But despite the requirement's diminished force, Commerce did not adequately explain its

finding that the financial statements were publicly available.  Plaintiffs have insisted that the source

of the statements is unclear despite its independent research: Emirates Sleep is not publicly listed

and does not maintain a website, and the statements are unavailable on the Indian Ministry of

Corporate Affairs website.  See IDM at 19; Pls.' Br. at 49.  Commerce reasonably rebutted each

argument, noting that Commerce does not require financial statements to be from a corporate

registry, government securities website, public website of the company in order to be considered

publicly listed; nor does Commerce require that publicly available statements come only from

publicly listed companies.  See IDM at 19–20.  It concluded that "[w]hile the respondent was

unable to locate Emirates Sleep themselves there is no record evidence that the statements are not

Consol. Court No. 21-00281                                                                    Page 71
**PUBLIC VERSION**

publicly available, as indicated by the petitioners." Id. at 20.[13]   Where Commerce acted

unreasonably, however, was premising its finding that Emirates's financial statement was publicly

available on an inference that the statement was from a "fee-based subscription service." Id. at 20.

Specifically, Commerce concluded:

> The petitioners argue that "a financial statement need not be free of charge for it to
> be publicly available" and their statement suggests that they obtained the financial
> statements from a public fee-based subscription service.  We agree that a financial
> statement from a fee-based service would constitute a publicly available source.

IDM at 20.  Defendant-Intervenors have represented to Commerce that the financial statements

are publicly available, see Letter from J. Levy to W. Ross, Sec'y of Com., re: Mattress Petitioners'

Submission Concerning CV Profit and Selling Expenses at 2 (Aug. 17, 2020), but have not

introduced evidence on the record of how the statements were obtained, see Hr'g Tr. at 53 (J.

Levy) (Mar. 5, 2021) (Prelim), P.R. 299 ("[T]o tell you where it came from I think would be new

information on the factual record, but I will say this: We've represented it as a publicly available

financial statement.").  Commerce's inference that Emirates was obtained from a "public fee-based

subscription service" derives solely, it appears, from Defendant-Intervenor's legal argument that

a financial statement need not be free of charge.  That is no more than a "mere scintilla" of

evidence, even under our deferential standard.  For instance, Defendant-Intervenor's reasoning is

also consistent with a hypothetical private payment to Emirates for use of its financial statements,

---

[13] Defendant-Intervenors also argue, and the court agrees, that Plaintiffs did not exhaust all
reasonable methods of testing public availability; Plaintiffs did not, for example, contact the email
address on Emirates's statements to ask whether the financial statements would be made available
to them.  See Emirates Fin. Stmts. at 1; cf. Since Hardware, 37 CIT at 809–810, 911 F. Supp. 2d
at 1369 (remanding Commerce's determination that statements were publicly available despite
respondents' rebuffed attempt to obtain the statements by contacting the company).

Consol. Court No. 21-00281                                                                 Page 72
**PUBLIC VERSION**

which would not qualify as a subscription service and possibly render the financial statements not

"publicly available."   Because Commerce has not grounded the specific finding of using a

subscription service in any part of the factual record before the court,[14] its determination that

Emirates's financial statements were publicly available cannot be sustained.

> **D.**      **The Record Supports Commerce's Determination that Emirates's**
> **Financial Statements Were Legible, but Not Commerce's Determination**
> **that the Statements Were Complete**

        Plaintiffs next argue that the last three pages of the Emirates financial statements are

illegible at the highest zoom level and that other pages' text is hard to read.  See Pls.' Br. at 49–

50.  Substantial evidence does not support Commerce's reliance on a financial statement when the

"illegible portions . . . prevent a full and accurate analysis of the statements and prevent their use

in calculating financial ratios for the final determination."  Welded Stainless Pressure Pipe from

the Socialist Republic of Vietnam: Final Determination of Sales at Less Than Fair Value, 79 Fed.

Reg. 31,092 (Dep't Com. May 30, 2014), and accompanying IDM cmt. 1.  But notwithstanding

the fact that the three pages of the statement were shrunk down to fit onto individual pages,

Commerce stated that it was still able to read them when calculating the financial ratios.  See IDM

---

[14] During oral argument, Defendant-Intervenors referenced facts about the source of Emirates's
financial statements that were available on the record of Commerce's investigation into mattress
imports from Vietnam.  See Ashley Furniture Indus., 2022 WL 17489243, at *13–14.  But because
"[t]hat administrative record is not . . . before us," Citizens to Preserve Overton Park v. Volpe, 401
U.S. 402, 419 (1971), neither the court nor Commerce may rely on it.  "Each investigation has its
own unique and separate administrative record," Yama Ribbons & Bows Co., Ltd. v. United States,
36 CIT 1250, 1256, 865 F. Supp. 2d 1294, 1300 (2012) (citing 19 C.F.R. § 351.306), and  "[t]he
task of the reviewing court is to apply the appropriate . . . standard of review to the agency decision
based on the record the agency presents to the reviewing court," Fla. Power & Light Co. v. Lorion,
470 U.S. 729, 744 (1985) (citation omitted) (citing Citizens to Preserve Overton Park, 401 U.S.
402)).

Consol. Court No. 21-00281                                                    Page 73
**PUBLIC VERSION**

at 19–20.  Commerce's adequately explained its decision not to discard the Emirates statements

for illegibility.

Plaintiffs more substantially argue that the Emirates statements were incomplete because

they were missing five "annexures" that were expressly referenced in the independent auditor's

report.  Commerce is not compelled to reject incomplete financial statements unless the "missing

information" is "vital . . . and of critical importance."  CP Kelco, 949 F.3d at 1359; see also Ashley

Furniture Indus., 2022 WL 17489243, at *10 ("Commerce does not invariably reject incomplete

financial statements, but instead looks to whether the missing information is vitally important or

key." (internal quotation marks and citation omitted)).   Plaintiffs' main argument focuses on the

omission of the fifth annexure.[15]  One of the entries under the "Current Assets" listed on Emirates's

balance sheet is titled "Short-term loans and advances."  Emirates Fin. Stmts. at 41.  Note 13 of

---

[15] The five annexures, which Plaintiffs argue were "integrated parts of the audit report," were as
follows:

> Note 6 -- Trade Payables: "a) Sundry Creditors - Expenses (Refer Annexure - 1)"

> Note 8 -- Short Term Provisions: "b) Other Provisions: Salaries Payable (Refer
> Annexure - 2)"

> Note 12 -- Cash and Bank Balances: "Cash in Hand (Refer Annexure - 3)" [and]
> "Fixed Deposits (Refer Annexure - 4)"

> Note 13 -- Short-term loans and advances: "(b) Balances with government
> authorities (Refer Annexure - 5)"

Pls.' Br. at 50 (quoting Emirates Fin. Stmts. at 48–50).  Regarding the first four missing annexures,
Commerce's reasoning that "[n]one of these appear to affect profit or selling expenses" is
supported by the titles and contents of each note they append.  IDM at 21.  Because the missing
information is irrelevant to the profit or selling expenses, remand to the agency would be
unwarranted.  See CP Kelco, 949 F.3d at 1359.

the auditor's report organizes the component assets within "Short-term loans and advances" into

three broad categories: "(a) Security deposits . . . [;] (b) Balances with government authorities

(Refer Annexure - 5)[;] (c) Others: Advances to Sundry Creditors - Expenses." Id. at 50.  Notably,

category (b) accounted for approximately 56.6 percent of "Short-term loans and advances" and

approximately 11.5 percent of all assets at fiscal year's end.  See id. at 41.  Plaintiffs argue that

this large balance "provides Commerce with a reason to believe or suspect that Emirates received

an amount of government support that would be significantly distortive," Pls.' Br. at 51, and the

lack of Annexure 5 would deprive Commerce of key information.   Commerce rejected this

argument:

> To the contrary, Note 13 of the Emirates Sleep financial statements provides details
> on short-term loans and advances to other parties, not from other parties.  These are
> assets, not liabilities.   The annexure clearly refers to additional details that are
> supplementary to the significant details already shown in Note 13 on deposits or
> advances (i.e., assets of Emirates Sleep) held by government authorities.  Moreover,
> it provides no evidence for the respondent's theory that Emirates Sleep received
> "massive" subsidies associated with its advances to other parties.

IDM at 21.

The record does not support Commerce's reasoning.  As an initial matter, Commerce is

correct in rebuffing a component of Plaintiffs' argument made before the agency, that the entry

reflects "loan balances and payments from the Government of India," Pls.' Case Br. at 50

(emphasis added), because a loan owed by Emirates to the Indian Government would appear as a

liability.  But Commerce erred in summarily stating that any asset plausibly qualifying as a

"[b]alance with government authorities" cannot be an indicator of government subsidies.  For

example, if Annexure 5 revealed that Emirates had an Indian tax credit receivable on its books,

that would potentially be evidence of a "financial contribution" required to establish the existence

Consol. Court No. 21-00281                                                      Page 75
**PUBLIC VERSION**

of a countervailable subsidy.  See 19 U.S.C. § 1677(5)(D) ("The term 'financial contribution'

means . . . foregoing or not collecting revenue that is otherwise due, such as granting tax credits

. . . .").  The missing annexure may have deprived Commerce of key information regarding the

viability of Emirates's financial statements -- specifically, the existence of government subsidies

recorded as assets -- and Commerce does not appear to dispute that such government subsidies

would impact the profit and selling expense calculations.   Commerce's conclusion that the

Emirates statements are complete is, therefore, unsupported by substantial evidence.

       Because Commerce did not "sufficiently explain[] its reason for choosing between two

flawed financial statements," CP Kelco, 949 F.3d at 1359, the Final Determination is remanded.

See id. (affirming Commerce's choice of an alternative financial statement where "missing

information" in the other "was vital . . . and of critical importance"); Dongguan Sunrise Furniture

Co., Ltd. v. United States, 37 CIT 489, 497–98, 904 F. Supp. 2d 1359, 1367 (2013) (remanding

for lack of a tax line item that "may affect a company's profit and thus, distort the resulting

financial ratio").  In remanding the publicly available and completeness issues, "the court does not

require Commerce to choose any particular financial statement . . . . Commerce must, however,

fairly weigh the available options and explain its decision in light of its selection criteria,

addressing any shortcomings." Carbon Activated Tianjin Co. v. United States, 46 CIT __, __, 586

F. Supp. 3d 1360, 1381 (2022).

## CONCLUSION

       The Final Determination is in accordance with law and supported by substantial evidence,

with four exceptions: (1) Commerce's determination of the market price under the Transactions

Disregarded Rule using Trademap data is not in accordance with law because it relies on an

Consol. Court No. 21-00281                                                                 Page 76
**PUBLIC VERSION**

unreasonable interpretation of "market under consideration" to mean only the country under

investigation; (2) Commerce's inclusion of imports from NME and export-subsidizing countries

is unreasonable because Commerce did not justify why its presumption of NME unreliability

applies in the affiliated supplier context but not in the unaffiliated supplier context; (3) Commerce

did not adequately explain its determination that Emirates's financial statements are publicly

available; and (4) Commerce's determination that Emirates's financial statements are sufficiently

complete is unreasonable.   For the foregoing reasons, the court remands to Commerce for

reconsideration or further explanation consistent with this opinion.   Commerce shall file with this

court and provide to the parties its remand results within 90 days of the date of this order.   The

parties shall have 30 days to submit briefs addressing Commerce's redetermination to the court,

and the parties shall have 15 days thereafter to file reply briefs with the court.

     **SO ORDERED.**

/s/    *Gary S. Katzmann*
Judge

Dated: <u>February 17, 2023</u>
     New York, New York