A-555-001
Remand
Slip Op. 23-19
POI: 01/01/2019 – 12/31/2019
**Public Document**
E&C/OVI: PNC

***Best Mattresses International Company Limited and***
***Rose Lion Furniture International Company Limited v. United States***,
**Court No. 21-00281, Slip Op. 23-19 (CIT February 17, 2023)**
**Mattresses from Cambodia**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I. SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the *Remand Order* by the U.S. Court of International Trade (the

Court or CIT), issued on February 17, 2023.[1] These final results of redetermination concern

Commerce's final determination in the less-than-fair-value investigation of mattresses from

Cambodia.[2] Commerce examined two mandatory respondents, Best Mattresses International

Company Limited (Best Mattresses) and Rose Lion Furniture International Company Limited

(Rose Lion), for the period of investigation (POI) January 1, 2019, through December 31, 2019.[3]

Commerce determined that Best Mattresses and Rose Lion should be collapsed and treated as a

single entity, Best Mattresses/Rose Lion.[4] In the *Remand Order*, the Court remanded

---

[1] *See Best Mattresses International Company Limited v. United States*, Court. No. 21-00281, Slip Op. 23-19 (CIT February 17, 2023) (*Remand Order*).
[2] *See Mattresses from Cambodia: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 86 FR 15894 (March 25, 2021) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM); *see also Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Antidumping Duty Orders and Amended Final Affirmative Antidumping Determination for Cambodia*, 86 FR 26460 (May 14, 2021) (*Order*).
[3] *See Final Determination.*
[4] *See Final Determination* IDM at 1; *see also* Memorandum, "Less-Than-Fair-Value Investigation of Mattresses from Cambodia: Affiliation and Collapsing Analysis for Best Mattresses International Company Limited and Rose Lion Furniture International Company Limited," dated October 27, 2020.

Commerce's *Final Determination* for further explanation or reconsideration of Commerce's: (1) use of Cambodian Trademap data under the Transactions Disregarded Rule;[5] (2) inclusion of imports from non-market economy (NME) and export-subsidizing countries;[6] and (3) conclusions that the financial statements used in the *Final Determination*, *i.e.*, those of Emirates Sleep Systems Private Limited (Emirates Sleep), were complete and publicly available.[7]

In accordance with the *Remand Order*, Commerce has reexamined the facts on the record, including the petitioners'[8] further explanation of how they retrieved Emirates Sleep's financial statements and how this retrieval process establishes that the financial statements are publicly available.[9] In these final results of redetermination, for the reasons explained below, Commerce finds that: (1) Cambodia continues to be the appropriate "market under consideration" in this case;[10] (2) the continued use of Cambodian Trademap data, excluding data from NME countries and countries with export subsidies, is warranted; and (3) while Emirates Sleep's 2018-2019 audited financial statements are publicly available, an average of Emirates Sleep's financial statements and Grand Twins International (Cambodia) Plc's (GTI) financial statements constitutes the best proxy of constructed value (CV) profit and selling expense data on the record of this proceeding. Consequently, for purposes of these final results of redetermination, we recalculated the estimated weighted-average dumping margin for Best

---

[5] *See Remand Order* at 75-76; *see also* section 773(f)(2) of the Tariff Act of 1930, as amended (the Act).
[6] *See Remand Order* at 76.
[7] *Id.*
[8] The petitioners are: Brooklyn Bedding; Corsicana Mattress Company; Elite Comfort Solutions; FXI, Inc.; Innocor, Inc.; Kolcraft Enterprises, Inc. Leggett & Platt, Incorporated; The International Brotherhood of Teamsters, and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO.
[9] *See* Petitioners' Letter, "Mattress Petitioners' Response to the Department's Supplemental Questionnaire," dated April 6, 2023 (Remand Supplemental Response).
[10] *See* section 773(f)(2) of the Act.

Mattresses/Rose Lion. The revised weighted-average dumping margin for Best Mattresses/Rose Lion is 103.79 percent. Further, the revised rate for all other companies is 103.79 percent.

## II.     BACKGROUND

On March 25, 2021, Commerce published the *Final Determination*. Subsequently, Commerce amended the *Final Determination* to correct ministerial errors.[11] As part of its *Final Determination*, Commerce selected Cambodia as the "market under consideration" and used the Cambodian Trademap data for market price under the Transactions Disregarded Rule.[12] Commerce found that "the Cambodian Trademap data best reflect fair market prices for the market under consideration in those instances where market prices from an unaffiliated supplier are not available."[13] Additionally, in the *Final Determination*, Commerce relied on the average Global Trade Atlas (GTA) data from Brazil, Malaysia, Mexico, Romania, Russia, and Turkey as a surrogate for the cost of production (COP) of Best Mattresses/Rose Lion's affiliated NME-based suppliers under the Major Input Rule.[14] In addition, for the market price component of the major input analysis, Commerce relied on the Cambodian Trademap data if there was no market price for the input available. In using the GTA data for the proxy COP of the affiliated suppliers and the Cambodian Trademap data for market value, we included data from NME countries and countries with broadly available export subsidies.[15] However, we excluded the country of the affiliated supplier (*i.e.*, China) from the Cambodian Trademap data.[16] Finally, Commerce used the financial statements of Emirates Sleep, an Indian producer of mattresses, to calculate

---

[11] *See Order*; *see also* Memorandum, "Antidumping Duty Investigation of Mattresses from Cambodia: Allegations of Ministerial Errors in Final Determination," dated April 19, 2021.
[12] *See Final Determination* IDM at Comment 1; *see also* section 773A(f)(2) of the Act.
[13] *See Final Determination* IDM at Comment 1.
[14] *See* section 773(f)(3) of the Act.
[15] *See Final Determination* IDM at Comment 1.
[16] *Id.* ("We have good cause to exclude the specific NME country export data included in the Cambodia Trademap data, to avoid the obvious circularity of using the same affiliated transactions to test the affiliated transfer prices.").

surrogate financial ratios for the respondents.[17]  Commerce used Emirates Sleep's financial statements as a basis for surrogate financial ratios because they reflected a profit from the production and sale of identical merchandise, were publicly available, represented a manufacturer of all types and kinds of mattresses (*i.e.*, subject merchandise), and showed no evidence of receipt of subsidies from Indian programs we have found to be countervailable.[18]

Best Mattresses/Rose Lion filed a complaint before the Court seeking judicial review of Commerce's *Final Determination*.  On February 17, 2023, the Court sustained in part, and remanded, in part Commerce's *Final Determination*.[19]  On March 30, 2023, we reopened the record and issued a supplemental questionnaire to the petitioners, requesting further explanation of the source and process by which they retrieved Emirates Sleep's financial statements and how this process, as well as the financial statements themselves, constituted publicly available information.[20]  On April 6, 2023, the petitioners submitted their response to the supplemental questionnaire,[21] and on April 13, 2023, Best Mattresses/Rose Lion submitted comments rebutting the petitioners' response.[22]  On June 5, 2023, Commerce released to interested parties the Draft Remand and established June 12, 2023, as the deadline for interested parties to submit comments on the Draft Remand.[23]  On June 6, 2023, at the request of Best Mattresses/Rose Lion, we extended the deadline for all interested parties to submit comments on the Draft Remand until

---

[17] *Id.* at Comment 2.
[18] *Id.*
[19] *See Remand Order*.
[20] *See* Commerce's Letter, "Remand Redetermination," dated March 30, 2023 (Remand SQ).
[21] *See* Remand Supplemental Response.
[22] *See* Best Mattresses/Rose Lion's Letter, "Rebuttal Comments to Petitioners' Supplemental Questionnaire Response," dated April 13, 2023 (Best Mattresses/Rose Lion's Rebuttal).
[23] *See* Draft Results of Remand Redetermination, *Best Mattresses International Company Limited v. United States*, Court. No. 21-00281, Slip Op. 23-19 (CIT February 17, 2023), dated June 5, 2023 (Draft Remand).

June 16, 2023.[24]  On June 16, 2023, Commerce received comments on the Draft Remand from the petitioners[25] and from Best Mattresses/Rose Lion.[26]

These final results of redetermination respond to the Court's orders by further explaining Commerce's determinations regarding:  (1) the selection of Cambodia as the market under consideration; (2) the inclusion of imports from NME and export-subsidizing countries in the average GTA data and the Cambodian Trademap data, for major inputs and minor inputs under the Major Input Rule and the Transactions Disregarded Rule, respectively; and (3) whether Emirates Sleep's financial statements are publicly available and sufficiently complete.  As discussed below, upon reconsideration, Commerce has relied on both Emirates Sleep and GTI's financial statements in determining appropriate CV profit and selling expense ratios.  In addition, we continue to find that the market under consideration under the transactions disregarded rule is Cambodia in this case.  Finally, we have excluded from the GTA and Trademap data imports from NME and export-subsidizing countries.

## III.    ANALYSIS

In accordance with the *Remand Order*, we analyzed the following issues remanded by the Court.

### A.  Cambodian Trademap Data

As summarized above, the Court found that Commerce's determination of the market price under the transactions disregarded rule using Trademap data is not in accordance with law,

---

[24] *See* Memorandum, "Extension of Deadline for Submission of Comments on Draft Results of Redetermination," dated June 7, 2023.
[25] *See* Petitioners' Letter, "Mattress Petitioners' Comments on the Department's Draft Results of Redetermination Pursuant to Court Remand," dated June 16, 2023 (Petitioners' Comments).
[26] *See* Best Mattresses/Rose Lion's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated June 16, 2023 (Best Mattresses/Rose Lion's Comments).

because it relies on an unreasonable interpretation of "market under consideration" to mean only the country under investigation. However, in its opinion, the Court also stated:

> To be clear, today's holding does not prevent Commerce from selecting Cambodia as the "market under consideration" for purposes of the Transactions Disregarded Rule on remand. Where Commerce erred is that it hinged its reasoning on a faulty reading of the statute that presumed that "market under consideration" referred to the country subject to investigation … .[27]

The purpose of the transactions disregarded exercise is to ensure that the respondent's costs reflect a market value to the extent it is available on the record.[28] Under the transactions disregarded rule, the statute allows Commerce to "disregard the transfer price of an input between the respondent and an affiliated supplier and instead use the input's market price in its normal value calculation."[29] Use of affiliated transaction prices that are not at arm's length would distort the dumping calculation results.[30] As the Court noted, Commerce's preference is to determine a market value based on the respondent's own purchases of the input from unaffiliated suppliers.[31] When market prices are not available to test affiliated party transactions, Commerce looks to the affiliated supplier's sales of the input to unaffiliated parties, and, lacking that, to the COP of the affiliated supplier.[32] In this case, because these transactions were between Best Mattresses/Rose Lion and NME-based affiliated suppliers, Commerce was unable to use the NME-based affiliated suppliers' sales or COP as a substitute for market price. Therefore, Commerce sought to obtain market-based surrogate price information that would allow it to fulfill the requirements of section 773(f)(2) of the Act based on the record. Indeed, there is a preference for the respondent's actual purchases from unaffiliated companies, but as

---

[27] *See Remand Order* at 52.
[28] *See* section 773(f)(2) of the Act; *see also Final Determination* IDM at Comment 1.
[29] *See Remand Order* at 47; *see also* section 773(f)(2) of the Act.
[30] *See Remand Order* at 6-7.
[31] *Id.* at 50 and 57.
[32] *See Remand Order* at 57; *see also Final Determination* IDM at 10-11.

the above test indicates and this case demonstrates, in the absence of the respondent's actual purchases from unaffiliated companies, Commerce may use other sources including data from other countries to fill in any gaps.

The Court limited its holding, in that Commerce cannot presume that "market under consideration" always means the country under investigation or review.[33]  The Court stated that, rather than presume the market under consideration is Cambodia, Commerce "should have explained why the selection of Cambodia constituted a 'reasonable method' to confirm that the affiliated prices reflect arm's length transactions … ."[34]  Accordingly, we are providing further explanation for our finding that Cambodia is the appropriate market under consideration here.  In this case, the goal of the transactions disregarded analysis is to arrive at a market price for the inputs which would be available to the respondents to the extent the record contains such information.[35]  It is less reflective of the respondents' experience to use prices and/or costs in other countries which are not necessarily available to the respondents.  However, record data limitations may require use of such data.  In other words, we are using the information available in the record that best approximates the market price that the respondents would pay for the inputs it is using to produce mattresses in Cambodia.  Therefore, we find that the market under consideration is Cambodia because, if the respondents were not sourcing the inputs from their affiliated suppliers, they would, instead, be paying the market price for such inputs in Cambodia.

As explained above, the value of the inputs under the transactions disregarded rule shall be based on the information available.  In this case, we have available on the record Cambodian Trademap data, which include imports into Cambodia from market economy countries of the

---

[33] *See Remand Order* at 52.
[34] *Id.*
[35] *Id.* at 58-62.

relevant inputs which could reasonably be expected to be available to the respondent. In contrast, import prices into other countries may not necessarily be available to our Cambodian respondent; actual market import prices into Cambodia are more likely to be available. In addition, the Trademap data for Cambodia are robust, include prices for all the necessary affiliated inputs and, while they are aggregated differently from GTA data, there is no evidence that they are faulty or inaccurate.[36] Therefore, Commerce finds Cambodia to be a reasonable source for determining whether the affiliated prices reflect arm's-length transactions between the respondents and their suppliers. Accordingly, we continue to find it appropriate to use Cambodian Trademap data for the relevant inputs into Cambodia.

## B. Imports from NME and Export-subsidizing Countries

As discussed above, Commerce explained that it "cannot rely on the affiliated suppliers' actual cost of production because the affiliates are based in an NME country."[37] The Court found that Commerce failed to justify why its presumption of NME unreliability applies in the affiliated supplier context but not in the unaffiliated supplier context. Pursuant to the Court's *Remand Order*, we have reconsidered our decision in the *Final Determination*. Consistent with our longstanding practice,[38] we have excluded NME countries and countries with broadly available export subsidies from the GTA data used as a surrogate for the affiliated suppliers' COP for purposes of our major input analysis and from the Cambodian Trademap data to calculate a market price for the major and minor inputs. In addition, on remand, we have also modified the adjustments we made in the *Final Determination* to the company's reported

---

[36] *See Final Determination* IDM at 10.
[37] *See Remand Order* at 53 (citing *Final Determination* IDM at 10).
[38] *See Utility Scale Wind Towers from the Socialist Republic Vietnam: Final Results of Antidumping Administrative Review 2013-2014*, 80 FR 55333 (September 15, 2015), and accompanying IDM at Comment 3; *see also Certain Cut-To-Length Carbon Steel Plate from Romania: Notice of Final Results and Final Partial Rescission of Antidumping Duty Administrative Review*, 70 FR 12651 (March 15, 2005), and accompanying IDM at Comment 3.

depreciation expenses, general and administrative (G&A) expenses, and packing expenses. In the *Final Determination*, we adjusted the depreciation expenses related to fixed assets obtained from affiliates that were included in the cost of manufacturing and G&A expenses and packing expenses in the sales database based on the minor input adjustment we computed under the transactions disregarded rule. For purposes of these final results of redetermination, we have incorporated our updated minor input adjustment rate in calculating those particular adjustments.[39]

## C. Emirates Sleep's Financial Statements

We have reconsidered our decision on remand on the use of surrogate financial statements from the *Final Determination*.[40] The Court determined that the record supports Commerce's determination that Emirates Sleep's business operations are sufficiently similar to those of Best Mattresses and that its financial statements are sufficiently contemporaneous with the POI.[41] We also determined that the Emirates Sleep financial statements are publicly available. However, because we cannot determine whether the "balance with government authorities" constitutes a government subsidy, we cannot sufficiently conclude that Emirates Sleep's financial statements are complete.

### *Publicly Available*

We continue to find that Emirates Sleep's financial statements are publicly available. We reopened the record for the petitioners to demonstrate that Emirates Sleep's financial statements were publicly available.[42] The petitioners responded by providing explanations and screenshot

---

[39] *See* Memorandum, "Cost of Production and Constructed Value Calculation Adjustments for the Court Remand," dated June 5, 2023, at Attachments 2A and 2B.
[40] *Id.*
[41] *See Remand Order* at 64-68.
[42] *See* Remand SQ.

evidence for its retrieval of Emirates Sleep's financial statements.[43]  According to the petitioners, they obtained Emirates Sleep's financial statements from an Indian consultant, who, in turn, obtained them from the Indian Ministry of Corporate Affairs (MCA).[44]  In addition to the MCA website, the petitioners stated that Emirates Sleep's financial statements can also be retrieved from Zauba Corp.[45]

Pursuant to 19 CFR 351.408(c)(4), Commerce relies on publicly available information for its calculations to afford interested parties the ability to comment on the reliability and relevance of such information in the particular case.  In this case, we find that all interested parties are capable of obtaining the financial statements and commenting on the reliability and the relevance of the information.

In their response to our supplemental questionnaire, the petitioners explained how to obtain the data from MCA using the following steps.  First, enter "MCA company ROC documents" in the search bar of a preferred search engine.  The first result that will appear is "View Public Documents – MCA Services."  Click on that link to navigate to the MCA sign-in portal.  After signing in, hover the mouse over the MCA Services and select "View Public Documents."  Then select the "Company-DIN/FCRN" button and enter the company CIN.  Enter the CIN for Emirates Sleep, "U51909MH2005PTC156771," then click "Submit."  The CIN of Emirates Sleep is readily available by performing a Google search for "Emirates Sleep CIN Number."  Alternatively, a user can search Public Documents on the MCA website by searching by Company Name.  After clicking "Submit," the website will return one result with the company name "Emirates Sleep Systems Private Limited" and CIN

---

[43] *See* Remand Supplemental Response at 1-2.
[44] *Id*.
[45] *Id.* at 2.

"U51909MH2005PTC156771."  Click the CIN number in the search results.  The result will show the next page where the portal will ask the user to select a Document Category and Year of Filing.  Under Document Category, select "Other Attachments" and enter the year under the Year of Filing, then click "Submit."  The result will return a list of all the "Other Attachments" filed with the MCA, including a document titled "Copy of the Financial Statements duly authenticated as per section 134 (including Boards report, auditors' report and other documents)-16120019."  Click on "Add the Company to Cart."  The user can then view and download the selected documents by paying the requisite fees.

In addition, the petitioners explained that to access the documents from the Zauba Corp. website, the following steps are necessary.  First, navigate to https://www.zaubacorp.com and select "Sign In" in the upper right corner.  If the user does not already have an account, they may select "Sign Up" to create one for free by entering their name, organization, designation, and email address and selecting a username and password.  Once logged in to the account, type "Emirates Sleep" in the search box.  Select "Emirates Sleep Systems Private Limited" from the dropdown menu from the result of the search.  The user will enter the page for Emirates Sleep and click on the "Documents" link.  Then, the user will select the documents they want to purchase.  On this page, the user can either purchase all available documents for 499.00 Indian rupees (INR) plus taxes by selecting "Add to Cart" under the "Buy All Documents" section on the right side of the page, or purchase only the Emirates Sleep financial statements and audit report for the period in question for 149.00 INR plus taxes by selecting "Other Documents Attachment" document type and locating the file with the date "2019-12-16" and title "Copy of Financial Statements duly authenticated as per section 134 (including Board report, auditors' report and other documents) -16122019," and selecting the "Add to Cart" button.  Then, navigate

to the cart and select "Checkout," which will show the total amount due.  Enter the applicable contact information and click "Continue to Next Step."  Then enter the payment information and click "Continue to Next Step."  The user will then receive confirmation that the order was placed, and an email will be sent to the account holder's email address indicating that the purchase is complete and that documents are normally uploaded within 24 hours or less.  When the documents are uploaded, the user will receive an email indicating that the order is complete and providing a link to access the documents.  Click on the link indicated to view the purchased documents.  The user can access the purchased documents by clicking "View Documents" or by logging in to their Zauba Corp. account and selecting "My Documents."  To locate the relevant Emirates Sleeps financial statements, scroll down to "Other Documents Attachment," and locate the document dated "2019-12-16" and titled "Copy of Financial Statements duly authenticated as per section 134 (Including Boards report, auditors report and other documents) -16122019."  Once the correct document has been identified, select the "Download" button to download it as PDF.

Best Mattresses/Rose Lion argued in their rebuttal comments to the petitioners' submission that the petitioners did not provide steps that the respondents could replicate.  The respondents argued that they could not obtain a complete copy of Emirates Sleep's 2018-2019 financial statements.  They argued that the petitioners neglected to explain that any business user must provide an Indian "Income Tax PAN," an identification credential that non-Indian nationals do not possess.  We disagree with the respondents, because the PAN is not a requirement for registration.  In the screenshot provided by the respondents,[46] when applying for a new user account, the applicant must first select between "Registered User" or "Business User."  Whether

---

[46] *See* Best Mattresses/Rose Lion's Rebuttal at Exhibit 1.

the PAN is mandatory depends on the selected category, *i.e.*, an asterisk (*) appears next to the "Income Tax PAN" field when the "Business User" category is selected, but no asterisk appears next to the "Income Tax PAN" field when the "Registered User" category is selected.[47] As the website notes, "{a}ll fields marked in * are to be mandatorily filled."[48] Because the PAN is not a requirement for registration as a "Registered User," the MCA website is not "only reserved for Indian citizens or residents and not the public," as the respondents claim.[49] Instead, the MCA website is "a registry of records, relating to the companies registered with them, which are available for inspection by members of {the} public on payment of the prescribed fee."[50] The information contained on the MCA website is retrieved by selecting "View Public Documents."[51] Because the Government of India denotes the information as "public documents" that are "available for inspection by members of the public on payment of the prescribed fee,"[52] and because the public can access this information with or without a PAN, Commerce considers the MCA website to be public.

The respondents also argued that the petitioners did not provide the MCA user information for their Indian consultant, and neither provided information about the Indian consultant that purportedly downloaded the financial statements from the MCA, nor showed that they or their consultant purchased the Emirates Sleep financial statements.[53] We disagree with the respondents that this information is necessary to prove the public availability of the Emirates Sleep financial statements. Although this information was provided or the steps were performed at the time the petitioners provided the financial statements of Emirates Sleep, we did not

---

[47] *Id.*
[48] *Id.*
[49] *Id.* at 5-6.
[50] *See* Remand Supplemental Response at 3.
[51] *Id.*
[52] *Id.*
[53] *See* Best Mattresses/Rose Lion's Rebuttal at 6-7.

specifically request this information and the instructions provided by the petitioners are sufficient to demonstrate the public availability of the financial statements.

The respondents also argue that the Zauba Corp. information was improperly filed new factual information unresponsive to Commerce's questionnaire. We disagree. Commerce reopened the record to obtain new factual information to be submitted regarding the source and the process of obtaining the Emirates Sleep financial statements.

Lastly, the respondents argued that the copy of Emirates Sleep's financial statements from MCA or Zauba Corp. continues to be incomplete and not publicly available in a complete form. The respondents provided the financial statements of two Indian companies, NDPL Infra Limited and Radysis India Limited, both with details pertaining to "balances with government authorities."[54] The respondents contend that the financial statements of these other Indian companies establish that Commerce should be concerned by the petitioners' inability to obtain the complete Emirates Sleep's financial statements publicly, and directly rebut the petitioners' claims that the Emirates Sleep financial statements were publicly available. We disagree. Absence of the annexures does not necessarily mean that financial statements are not publicly available. The issues of completeness and public availability are different, and we address the completeness of the financial statements below.

Based on the information submitted by the petitioners, we find that Emirates Sleep's financial statements are available from both the MCA and Zauba Corp. websites. Per the petitioners' instructions, the documents indicated for download were filed on December 16, 2019.[55] In Emirates Sleep's financial statements on the record, the independent auditor's report

---

[54] *See* Best Mattresses/Rose Lion's Rebuttal at Exhibits 4.A and 4.B.
[55] *See* Remand Supplemental Response at Exhibit 3.

is dated September 29, 2019.[56]  In the Board's report, the Chairperson's digital signature is dated

December 12, 2019.[57]  Thus, it is reasonable to conclude that the Emirates Sleep financial audit

for the year ending March 31, 2019, was completed no later than September 29, 2019, presented

to the company's board of directors no later than December 12, 2019, and then submitted to the

appropriate tax authorities.  Therefore, the documents that the petitioners obtained from the

MCA website[58] and also identified on Zauba Corp.'s website, dated December 16, 2019,[59] are,

indeed, the financial statements covering the year ending March 31, 2019.

Based on our analysis in the *Final Determination*,[60] and further supplemented here, we

continue to find that Emirates Sleep's financial statements are publicly available.

*Completeness*

The Court stated that Commerce's conclusion that the Emirates Sleep financial

statements are complete is not supported by substantial evidence.  Specifically, the Court

referred to Note 13 - Short-term loans and advances, in which one of the items in that account is

"balances with government authorities" and refers to Annexure 5, which is missing from the

submission.[61]  In the *Final Determination*,[62] we disagreed that this amount pertains to

government subsidies, because these are assets in Emirates Sleep's books, and not liabilities.

However, the Court stated that Commerce erred in summarily stating that any asset plausibly

qualifying as a "balance with government authorities" cannot be an indicator or government

subsidies.[63]  For example, if Annexure 5 revealed that Emirates Sleep had an Indian tax credit

---

[56] *Id.* at Exhibit 7; *see also* Petitioners' Letter, "Mattresses from Cambodia:  Mattress Petitioners' Submission Concerning CV Profit and Selling Expenses," dated August 17, 2020 (CV Profit Submission), at Attachment 2.
[57] *See* Remand Supplemental Response at Exhibit 3; *see also* CV Profit Submission at Attachment 2.
[58] *See* CV Profit Submission at Attachment 2.
[59] *See* Remand Supplemental Response at Exhibit 6.
[60] *See Final Determination* IDM at Comment 2.
[61] *See Remand Order* at 74-75.
[62] *Id.*
[63] *Id.* at 74.

receivable on its books, that would potentially be evidence of a "financial contribution" required to establish the existence of a countervailable subsidy.[64] The Court stated that the missing annexure may have deprived Commerce of key information regarding the viability of Emirates Sleep's financial statements, specifically the existence of government subsidies recorded as assets.[65]

Based on the Court's statements, we find that, without Annexure 5 on the record, we cannot definitively determine the nature of the "balances with government authorities" and whether or not they pertain to government subsidies. Those balances may not pertain to subsidies, but because we do not have a copy of Annexure 5, we cannot with certainty determine what those balances represent. Therefore, we cannot determine that the financial statements are not likewise flawed.

In the underlying investigation, Commerce was faced with two possible sources for determining CV profit and selling expenses: GTI (a producer of apparel and garments) and Emirates Sleep. As discussed in the *Final Determination*, the GTI financial statements represent profit information for production and sales in the preferred foreign country (*i.e.*, Cambodia), but of merchandise that is similar, but not comparable, to the subject merchandise.[66] Based on our analysis in the *Final Determination* and further supplemented here, because we recognize that both sets of financial statements on the record have flaws, we have decided to use an average of Emirates Sleep and GTI's CV profit and selling expense ratios for Best Mattresses/Rose Lion's profit and selling expenses on remand.

---

[64] *Id.*
[65] *Id*.
[66] *See Final Determination* IDM at Comment 2.

## IV.     INTERESTED PARTIES' COMMENTS ON THE DRAFT RESULTS OF REDETERMINATION

As noted above, on June 5, 2023, Commerce released the Draft Remand and invited interested parties to comment.  The petitioners and Best Mattresses/Rose Lion submitted comments on the Draft Remand.  These comments are addressed below.

**Issue 1:  Cambodian Trademap Data**

*Petitioners' Comments*[67]

- In its *Remand Order*, the Court instructed Commerce to explain why using Cambodia as the market under consideration and, thus, relying on Cambodian import values as a proxy for market value, was a reasonable way of evaluating the arm's-length nature of the relevant transactions when the Cambodian respondents did not purchase those inputs in Cambodia but sourced them from affiliated parties in the NME country.[68]  Commerce's Draft Remand is not responsive to the Court's *Remand Order*.

- Commerce's Draft Remand:  (1) abandons its practice of defining the market under consideration as the market where the affiliated supplier is located; (2) erroneously asserts that use of Cambodian import values is more reflective of the respondents' experience; and (3) speculates that, absent affiliates in an NME country, the Cambodian respondents would source those inputs domestically.  Commerce cites no record evidence in support because none exists.  Commerce's failure to address the flaws in its original analysis identified by the Court renders its Draft Remand contrary to law and otherwise unsupported by substantial evidence.

---

[67] *See* Petitioners' Comments at 3-11.
[68] *Id.* at 3 (citing *Remand Order* at 52).

- Commerce has grafted an "availability" consideration to its transaction disregarded methodology. This availability requirement is inconsistent with Commerce's previous explanation that the "purpose of the transactions disregarded rule is to ensure that the affiliated purchases of inputs are made at arm's length (*i.e.*, market prices) to prevent cost shifting between affiliated parties."[69]

- Commerce does not look for any market price "available to the respondent" as part of its arm's-length analysis. In a globalized economy "a market price for the inputs which would be available to the respondent" includes prices in dozens of market economies around the world. Rather, Commerce seeks to identify ***a market price that is comparable to the transfer price*** being evaluated under the arm's-length test. That is why Commerce's longstanding practice under the transactions disregarded rule is to select as the "market under consideration" the market where the affiliated supplier resides.

- The Court recognized in its *Remand Order*, "when resorting to a 'reasonable source for market value'…Commerce has developed a consistent and predictable approach whereby it may use an affiliate's total cost of providing the {good or service} as information available for a market price."

- Commerce's "general practice" under the transactions disregarded rule is to "define the market under consideration as the entire home market ***or third country***," depending on where the affiliated supplier is located.[70]

---

[69] *See* Petitioner's Comments at 5 (citing *Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2019-2020*, 87 FR 12660 (March 7, 2022), and accompanying IDM at Comment 4).

[70] *See* Petitioner's Comments at 6 (citing *Notice of Final Results of Antidumping Duty Administrative Review: Certain Softwood Lumber Products from Canada*, 70 FR 73437 (December 12, 2005) (*Softwood Lumber from Canada*), and accompanying IDM at Comment 32 (emphasis added)).

- In *Softwood Lumber from Canada*, the respondent sourced an input from an affiliate in Canada, confirming that the location of the affiliated input supplier is the proper "market under consideration" under the transactions disregarded rule. Similarly, in *BMRF from Mexico*, each respondent sourced certain inputs from their third country affiliates; thus, Commerce used their respective affiliates' COP as a surrogate market price.[71]

- Commerce's "general practice" when resorting to a "reasonable source for market value," when a respondent and its affiliated supplier are both located in the same country (*i.e.*, "home market") is that Commerce will establish a market price or the COP of the input in that market; if, however, a respondent and its affiliated supplier are not located in the same country (*i.e.*, the supplier is in a "third country") Commerce will establish a market price or COP of the input in the third country (*i.e.*, where "the sales occurred"). And yet, Commerce's Draft Remand departs from this well-established practice and relies on Cambodian import values as a surrogate market price for sales that occurred in an NME country. This alone renders Commerce's Draft Remand not in accordance with law.

- Commerce's fundamental error in reasoning is its failure to recognize that the Cambodian respondents sourced their inputs from outside of Cambodia. "Commerce's arm's-length test is qualitative in nature, not quantitative, in that it seeks to find the market value that ***best represents the company's own experience in the specific markets in which it operates*** … ."[72] Accordingly, ***in this case*** using prices and/or costs from countries other than Cambodia is ***more reflective of the Cambodian respondents' experience*** than

---

[71] *Id.* at 6 and 7 (citing *Notice of Final Determination of Sales at Less Than Fair value and Affirmative Critical Circumstances Determination: Bottom Mount Combination Refrigerator-Freezers from Mexico*, 77 FR 17422 (March 26, 2012) (*BMRF from Mexico*), and accompanying IDM at Comment 29).
[72] *See* Best Mattresses' Comments at 9 (citing S*oftwood Lumber from Canada* IDM at Comment 12).

relying on Cambodian import values for inputs that the Cambodian respondents did not purchase in Cambodia.

- Commerce's assertion that, absent affiliates in an NME country, the Cambodian respondents would "be paying the market price for such inputs in Cambodia" rests entirely on speculation, not record evidence. In fact, as noted above, record evidence indicates that the opposite conclusion is more likely (*i.e.*, insofar as the Cambodian respondents sourced the inputs in question from suppliers outside of Cambodia, they are likely to continue to do so even without affiliates in the NME country). In any event, the U.S. Court of Appeals for the Federal Circuit makes clear that "'{m}ere speculation' is not substantial evidence."[73]

- Commerce should amend its analysis in the final remand redetermination and should follow the transactions disregarded methodology adopted in the *Preliminary Determination* in the underlying investigation. Specifically, Commerce can construct a surrogate COP as a market value by using the average of the GTA import data on the record for the six countries that Commerce considers economically comparable to the NME country.

**Commerce Position:** In its *Remand Order*, the Court stated that, rather than presume the market under consideration is Cambodia, Commerce "should have explained why the selection of Cambodia constituted a 'reasonable method' to confirm that the affiliated prices reflect arm's length transactions…."[74] In the Draft Remand, Commerce provided further explanation on why

---

[73] *Id*. at 10 (citing *OSI Pharmaceuticals, LLC v. Apotex Inc*., 939 F.3d 1375, 1382 (Fed. Cir. 2019)); *see also Government of Argentina v. United States*, 542 F. Supp. 3d 1380, 1396 (CIT 2021) (noting "there are limits to Commerce's discretion in evaluating record evidence—namely, Commerce may not base its conclusions on speculation").
[74] *See Remand Order* at 52.

it was reasonable to select Cambodia as the appropriate market under consideration and therefore use Cambodian Trademap data to value relevant inputs into Cambodia.[75]

We disagree with the petitioners that Commerce's longstanding practice under the transactions disregarded rule is to select as the "market under consideration" the market where the affiliated supplier resides. The petitioners argue that Commerce is inconsistent with its prior explanation that the purpose of the transactions disregarded rule is to ensure that affiliated purchases of inputs are made at arm's length to prevent cost shifting between affiliated parties. Commerce disagrees that we are inconsistent as that is the purpose of the transactions disregarded rule. That explanation does not define what Commerce should consider as the appropriate "market under consideration" nor does it negate our decision to use data from the market we reasonably determine best reflects the respondents' production experience. The petitioners failed to cite to any authority that would require Commerce to select the "market under consideration" as the market where the affiliated supplier resides. The petitioners cited *Softwood Lumber from Canada*; in that case Commerce "defined the market under consideration for wood chips as the province in which the sales occurred," thereby confirming that the location of the affiliated input supplier is the proper "market under consideration."[76] The petitioners' assumption that this case supports its position is incorrect because both the production and sales of the wood chip by-products produced (*i.e.*, not the purchases of inputs) in the *Softwood Lumber from Canada* case occurred within the same province. Thus, it was reasonable to consider that province the appropriate market.[77] The petitioners also cite *BMRF from Mexico*,[78] where Commerce used the Korean affiliates' COP as a surrogate market price when analyzing the

---

[75] *Id.*
[76] *See* Petitioners' Comments at 6.
[77] *See Softwood Lumber from Canada* IDM at Comment 32.
[78] *See* Petitioners' Comments at 7 (citing *BMRF from Mexico* IDM at Comment 29).

Mexican respondent's purchase of the minor input. Likewise, with LG Electronics Monterrey Mexico, S.A. de CV, the other respondent in that case, Commerce resorted to the affiliate's COP data as best available evidence of whether the transactions reflected arm's-length values.[79] In that case, the respondents' suppliers' COP was the only available data for determining the market price. We do not consider these cases to support the petitioners' assertion that Commerce's practice is to consider the market under consideration to be the market where the affiliated supplier is located. Commerce determines the market under consideration on a case-by-case basis, analyzing the factors involved and examining the available data. In cases where a market price under Commerce's normal preferences is not available, we will evaluate other possible options as needed.[80] Contrary to the petitioners' characterization, it is not Commerce's general practice to define the market under consideration based on where the supplier is located.

The petitioners argue that Commerce's fundamental error in reasoning is its failure to recognize that the Cambodian respondents source their inputs from outside Cambodia. They assert that in this case, using prices and/or costs from countries other than Cambodia is more reflective of the Cambodian respondents' experience than relying on Cambodian import values for inputs that Cambodian respondents did not purchase in Cambodia. The petitioners also argue that it is speculative of Commerce to assert that absent affiliates in the NME country, the Cambodian respondents would "be paying the market price for such inputs in Cambodia."[81]

As an initial matter, this argument misunderstands Commerce's rationale and the nature of the Cambodian Trademap data. The petitioners assert that the Cambodian respondents are

---

[79] *Id.* (citing *BMRF from Mexico* IDM at Comment 16).
[80] *See Certain Uncoated Paper from Portugal: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 81 FR 3105 (January 20, 2016), and accompanying IDM at Comment 2.
[81] *See* Petitioners' Comments at 9.

likely to continue sourcing inputs from outside Cambodia even absent their affiliation with input suppliers in the NME country. But this is exactly what the Cambodian Trademap data represent – exports *from* other foreign countries *into* Cambodia. When Commerce explained that the respondents would "be paying the market price for such inputs in Cambodia," we meant that, because the respondents are producing the merchandise in Cambodia, they would need to pay what a party in Cambodia would pay to obtain such inputs – whether by importing them into Cambodia or otherwise. We were not assuming, contrary to the petitioners' characterization, that absent the affiliated supplier relationship the respondents would necessarily source the inputs from other Cambodian firms.

Moreover, in selecting the Cambodian Trademap data as a market value benchmark, we accounted for both the respondents' potential purchasing experience in the Cambodian market and our practice. The petitioners fail to recognize that record evidence shows that the respondents also source minor inputs and fixed assets locally in Cambodia.[82] As noted above, the goal of the major input and transactions analysis is to arrive at a market price for the inputs which would be available to the respondent. Commerce acknowledges that there are circumstances under which it may be appropriate to use data from a different market from the market where the subject merchandise is produced, or where it is preferable to calculate an average price from several countries as the petitioners suggest. However, Commerce's preference under sections 773(f)(2) and 773(f)(3) of the Act, is first to determine a market value for the relevant inputs, based on data available, to the respondent in the country in which its

---

[82] *See* Best Mattresses' Letter, 1st Supplemental Questionnaire Response, dated September 22, 2020, at Exhibits SD1-1.1 and t SD1-3; *see also* Rose Lion's Letter, 1st Supplemental Questionnaire Response, dated September 22, 2020, at Exhibit SD1-3.

production is located.  As such, we consider it reasonable to rely on the Cambodian Trademap data from Cambodia to fill the gaps where market prices were not available.[83]

## Issue 2:  Imports from NME and Export Subsidizing Countries

*Best Mattresses/Rose Lion's Comments*

- In its Draft Remand, Commerce ignores that the CIT faulted its level of explanation for its original determination to keep the allegedly problematic data in its calculation, and instead, reverses course without explanation.

- Commerce provided a mere two conclusory sentences:  "Pursuant to the Court's *Remand Order*, we have reconsidered our decision in the *Final Determination*.  Consistent with our longstanding practice, we have excluded NME countries and countries with broadly available export subsidies from the GTA data used as a surrogate for the affiliated suppliers' COP for purposes of our major input analysis and from the Cambodian Trademap data to calculate a market price for the major and minor inputs."

- This level of analysis is severely deficient and cannot be sustained by the CIT.  The CIT will again review Commerce's determination under the substantial evidence standard, which requires Commerce to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."[84]

- Commerce must, at minimum, reconcile its original determination with its opposite remand redetermination and provide an explanation.

---

[83] *See Final Determination* IDM at Comment 1.
[84] *See* Best Mattresses at 3 (citing *Tianjin Magnesium Int'l Co. v. United States*, 722 F. Supp. 2d 1322, 1328 (CIT 2010)).

- Commerce's implementation of the surrogate value methodology by removing the NME and export subsidizing countries is unlawful and unreasonable because this is an investigation on products from a market economy country, Cambodia.

- By failing to make a reasoned connection between the factual record in this case and its determination to exclude certain countries' import data from its market price calculations, Commerce acted arbitrarily and capriciously.[85]

- Commerce correctly kept the NME and export subsidizing countries in its GTA dataset and provided a thorough explanation. Notably, Commerce stated that excluding these countries' data "would be inconsistent with the law and our practice to exclude imports from these countries when using the GTA data as a proxy for market prices and COP." Commerce now would have us accept, without any further discussion, that the law and past practice that it originally relied on is no longer relevant.

- Commerce should also take note that parties have submitted many rounds of briefs on this very topic at the agency and the CIT. Commerce's conclusory determination gives no indication that it considered any of that past briefing, including that of its own counsel that was submitted to the CIT in support of Commerce's original determination.

- For the reasons articulated by Commerce's own counsel at the CIT, Commerce was correct in its original determination to include the NME and export-subsidizing country data and acts unreasonably by reversing course here. Commerce provides no explanation of why its own counsel was wrong or to reconcile its new position.

---

[85] *See* Best Mattresses' Comments at 5 (citing *Celanese Chems., Ltd. v. United States*, 32 CIT 1250, 1254 (CIT 2008)).

- If Commerce continues to exclude NME and export subsidizing countries' data, it should amend the per-unit cost calculation of its surrogate values for its major inputs and transactions disregarded methodology.

- Commerce's calculation unreasonably distorted the bottom-line costs of the surrogate values for its major inputs and transactions disregarded methodology by failing to account for import volume differences across the five surrogate countries.

- Commerce must revise its per-unit cost calculation consistent with the methodology followed by Commerce for calculating each individual country's per-unit cost.[86]

**Commerce Position:**  For the final remand redetermination, we have continued to exclude the import data from NME countries and countries with broadly available export subsidies in the GTA and Cambodian Trademap data for purposes of conducting the major and minor input analysis.  According to Best Mattresses/ Rose Lion, Commerce's policy of removing such data applies only to NME cases where Commerce employs its surrogate methodology.  We disagree with the respondents that the removal of NME data is applicable only to NME proceedings.  For purposes of constructing a normal value for comparison to U.S. price in the context of evaluating an antidumping petition in market economy cases, Commerce values the production inputs using import data that excludes NME countries and countries with broadly available export subsidies.[87]  In market economy investigations and reviews where normal value is based on CV, Commerce may rely on the financial statements of a surrogate producer to determine amounts for CV profit

---

[86] *See* Best Mattresses' Comments at 10 (citing Memorandum, "Cost of Production and Constructed Value Calculation Adjustments for the Final Determination - Best Mattresses International Company Limited and Rose Lion Furniture International Company Limited," dated March 18, 2021).

[87] *See* Petitioners' Letter, "Antidumping and Countervailing Duty Petitions Volume II:  Dumping from Cambodia," dated March 31, 2020, at Exhibits II-3 and II-5 (showing that the rates derived did not include exports from NME countries).

and selling expenses.[88]   However, the surrogate financial statements of NME entities are

excluded from consideration for purposes of this exercise.  In the respondents' view, Commerce

has "implement{ed} … the surrogate value methodology by removing the NME and export

subsidizing countries," and its decision is "unlawful and unreasonable."[89]   However, Commerce

explained in the *Final Determination* that it was not in this instance employing an NME

methodology.  Further, in its *Remand Order*, the Court stated that "the agency neither formally

invoked, nor functionally replicated, its NME surrogate value methodology in this case."[90]

    The Court explained in the *Remand Order* that there is a general presumption of NME

unreliability which is derived from the statute as a whole and affirmed by Commerce practice.[91]

In *Diamond Sawblades from Korea*, Commerce stated that the Act generally assumes that prices

for goods produced in NMEs cannot be relied upon for purposes of a price-based analysis.[92]

Section 773(c) of the Act states that if the subject merchandise is exported from an NME

country, and the administering authority finds that available information does not permit the

normal value of the subject merchandise to be determined on the basis of prices and costs of that

merchandise, then normal value shall be determined using a factors of production methodology.

Thus, Commerce does not use a price-based methodology under section 773(a) of the Act when

the producer is located in an NME country, unless the record evidence demonstrates that a

---

[88] *See* Commerce's Letter, "Mattresses from Cambodia:  Antidumping Duty Investigation of Mattresses from Cambodia:  Request for Constructed Value Profit and Selling Expense Comments and Information," dated July 23, 2020 (where Commerce requested interested parties for surrogate financial statements where the producer is in the same general category of products as the subject merchandise, which is construed to be also from a market economy country).
[89] *See* Best Mattresses' Comments at 4.
[90] *See Remand Order* at 40.
[91] *Id*.
[92] *See Notice of Final Determination of Sales at Less than Fair Value and Final Determination of Critical Circumstances:  Diamond Sawblades and Parts Thereof from the Republic of Korea*, 71 FR 29310 (May 22, 2006) (*Diamond Sawblades from Korea*), and accompanying IDM at Comment 12.

market-oriented industry exists.[93]  Similarly, in *CTL Plate from Romania*,[94] Commerce stated

that, consistent with our practice, we do not use export prices from a market economy for the

valuation of surrogate values when we have a reasonable basis to believe or suspect that the

product benefits from broadly available export subsidies.  The general assumption is that

Commerce will normally exclude the data from NME countries and countries with broadly

available export subsidies unless a party can rebut the presumption that those prices are

subsidized.[95]  In light of our past practice, in the Draft Remand, we reconsidered our inclusion of

such data in both the GTA and the Cambodian Trademap data and revised our major input and

transactions disregarded analysis to exclude the imports from NME countries and countries with

broadly available export subsidies.  We have continued to do so for this final remand

redetermination.

In the *Final Determination*, Commerce computed the surrogate COP for the major input

analysis based on the GTA data for Brazil, Malaysia, Mexico, Romania, Russia and Turkey, and

calculated a simple average of the per-unit import values of those six countries for each major

input.[96]  We have not revised our calculation as suggested by Best Mattresses/Rose Lion in

determining the surrogate COP for the major inputs because we consider it appropriate and

reasonable that each of the six countries carries equal weight in the calculation with no evidence

on the record leading to a contrary determination.

---

[93] *See* 19 CFR 351.408.
[94] *See Certain Cut-to-Length Carbon Steel Plate from Romania:  Notice of Final Results and Final Partial Recission of Antidumping Duty Administrative Review*, 70 FR 12651 (March 15, 2005) (*CTL Plate from Romania*), and accompanying IDM at Comment 4.
[95] *Id*.; *see also Peer Bearing Company–Changshan v. United States*, 298 F. Supp. 2d 1328, 1337 (CIT 2003) (explaining that once "a rebuttable presumption is established that the prices paid are distorted" the burden shifts to the challenging party "to present evidence demonstrating that its supplier did not benefit from such subsidies").
[96] *See Final Determination* IDM at Comment 1.

**Issue 3:  Public Availability of Emirates Sleep's Financial Statements**

*Petitioners' Comments*

- Commerce should continue to rely exclusively on the financial statements of Emirates Sleep to calculate surrogate financial ratios.  Commerce unreasonably averaged the financial ratios of Emirates Sleep and GTI after finding that "both sets of financial statements on the record have flaws."[97]

- The petitioners' questionnaire response demonstrates that Emirates Sleep's financial statements are available to the public *via* the MCA and from Zauba Corp.  The arguments raised by Best Mattresses/Rose Lion do not undermine Commerce's determination that Emirates Sleep's financial statements are publicly available.[98]

- Commerce reasonably rejected the argument by Best Mattresses/Rose Lion that the petitioners did not provide steps that they could replicate to retrieve Emirates Sleep's financial statements.[99]

- Commerce reasonably rejected the remaining arguments put forward by Best Mattresses/Rose Lion in determining that Emirates Sleep's financial statements are publicly available.[100]

- Commerce demonstrated how Emirates Sleep's financial statements are publicly available from the MCA website and from Zauba Corp.[101]

- Commerce's decision to average the financial ratios of Emirates Sleep and GTI is inconsistent with three, but interrelated, agency practices.

---

[97] *See* Petitioners' Comments at 17-19 (citing Draft Remand at 16).
[98] *Id.* at 17-18.
[99] *Id.* at 18 (citing Draft Remand at 12-13).
[100] *Id.* at 18-19 (citing Draft Remand at 13).
[101] *Id.* at 19 (citing Draft Remand at 10-12).

*Best Mattresses/Rose Lion's Comments*

- The limited reason that the CIT remanded the public availability of Emirates Sleep's financial statements was because "Commerce did not adequately explain its determination that Emirates Sleep's financial statements are publicly available."[102]  In the Draft Remand, Commerce acted contrary to the Court's order by failing to adequately explain its original determination that Emirates Sleep's financial statements are publicly available.[103]

- In remanding this issue to Commerce, the Court did not instruct Commerce to gather new factual information or ask supplemental questions, nor did the Court find that the petitioners should be granted an additional opportunity to support its CV financial ratios submission.[104]  Commerce acted contrary to its own past practice of requiring interested parties to build the record and otherwise had no reasonable grounds to reopen the record for the purpose of collecting information about the public availability of Emirates Sleep's financial statements.[105]

- The petitioners submitted factual information from two sources in their Remand Supplemental Response:  (1) the MCA; and (2) Zauba Corp.  The petitioners failed to demonstrate, through either source, how they obtained the complete, publicly available financial statements of Emirates Sleep put on the record on August 17, 2020.[106]

- The petitioners did not provide information about the Indian consultant who purportedly downloaded Emirates Sleep's financial statements from the MCA, nor did they provide

---

[102] Best Mattresses/Rose Lion's Comments at 11 (citing *Remand Order* at 76).
[103] *Id.* at 12.
[104] *Id.*
[105] *Id.* at 13 (citing *e.g.*, *Carbon Activated Tianjin Co. v. United States*, 586 F. Supp. 3d 1360, 1370 (CIT 2016); and *QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)).
[106] *Id.* at 14.

evidence of the MCA user information for their Indian consultant. Additionally, the petitioners did not show that they, or their consultant, purchased the Emirates Sleep financial statements.[107]

- The Zauba Corp. information submitted by the petitioners did not support Commerce's original determination that the financial statements put on the record were publicly available to the petitioners when they put them on the record on August 17, 2020.[108]

- Commerce must find that the Zauba Corp. information submitted by the petitioners was unlawful new factual information and remove it from the record.[109]

**Commerce Position:** We disagree with Best Mattresses/Rose Lion and agree with the petitioners, in part. The petitioners provided a clear and adequate, step-by-step demonstration of how they retrieved the financial statements from the MCA website. Record evidence indicates that the MCA website is a publicly available source, because parties may independently access it. Moreover, in previous investigations, we have determined that the MCA website constitutes a publicly available source of information.[110]

Emirates Sleep's financial statements meet the threshold of being considered "publicly available" for our purposes. In *Certain Lined Paper Products from China*,[111] and *Certain Activated Carbon from China*,[112] Commerce determined that financial statements from the Indian Registrar of Companies are in the public realm. In *OCTG from Vietnam*, we determined that

---

[107] *Id.* at 14-15.
[108] *Id.* at 16-17.
[109] *Id.* at 17-19.
[110] *See Notice of Final Determination of Sales at Less Than Fair Value, and Affirmative Critical Circumstances, In Part: Certain Lined Paper Products from the People's Republic of China*, 71 FR 53079 (September 8, 2006) (*Certain Lined Paper Products from China*), and accompanying IDM at Comment 1; *see also First Administrative Review of Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 74 FR 57995 (November 10, 2009) (*Certain Activated Carbon from China*), and accompanying IDM at Comment 2.
[111] *See Certain Lined Paper Products from China* IDM at Comment 1.
[112] *See Certain Activated Carbon from China* IDM at Comment 2.

financial statements were publicly available because the record contained adequate information regarding how the financial statements could be obtained from sources that were publicly available and contained no evidence that the financial statements were not publicly available.[113] Here, we requested that the petitioners provide Commerce with step-by-step instructions of how and from where they retrieved Emirates Sleep's financial statements. The petitioners provided clear narrative instructions and screenshots of how to access and retrieve Emirates Sleep's financial data from two separate sources.[114] The first source, the MCA, is an official website of the Government of India, containing the Indian Registrar of Companies.[115] As a company headquartered in India, Emirates Sleep is registered with the Registrar of Companies available on the MCA website.[116] The second source, Zauba Corp., is a private provider of commercial information that is all "a matter of public record, and is sourced from the official registers, and from published government data."[117] Therefore, similar to the circumstances in *OCTG from Vietnam*,[118] we find the record contains clear and complete information regarding how to access and retrieve Emirates Sleep's financial statements from publicly available sources.

The respondents argue that the petitioners did not provide the MCA user information for their Indian consultant, and neither provided information about the Indian consultant that purportedly downloaded the financial statements from the MCA, nor showed that they or their consultant purchased the Emirates Sleep financial statements.[119] We disagree with the respondents that this information is necessary to prove the public availability of Emirates Sleep's

---

[113] *See Certain Oil Country Tubular Goods from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 FR 18611 (April 20, 2017) (*OCTG from Vietnam*), and accompanying IDM at Comment 1.
[114] *See* Remand Supplemental Response.
[115] *Id.* at 1-2 and Exhibits 1-3.
[116] *Id.* at 1-2 and Exhibits 1-2.
[117] *Id.* at Exhibit 5.
[118] *See OCTG from Vietnam* IDM at Comment 1.
[119] *See* Best Mattresses/Rose Lion's Comments at 14-16.

financial statements.  Although this information was provided or this information search was performed at the time the petitioners provided the financial statements of Emirates Sleep, we did not specifically request this information from the petitioners, and the instructions provided by the petitioners are sufficient to demonstrate the public availability of the financial statements.

Regarding Best Mattresses/Rose Lion's allegation that the record still lacks evidence that the financial statements were publicly available at the time of the investigation, we disagree. The record provides adequate evidence to reasonably conclude that the financial statements were publicly available during the investigation.  In the petitioners' instructions for how to obtain Emirates Sleep's financial statements, Zauba Corp.'s records indicate that Emirates Sleep's financial statements were obtainable from Zauba Corp.'s website since December 16, 2019, meaning the financial statements were available throughout the duration of the investigation, which itself occurred from April 2020 to May 2021.[120]  Thus, Emirates Sleep's financial statements were available on Zauba Corp.'s website for approximately eight months before the petitioners submitted the financial statements on the record on August 17, 2020.

Considering that Commerce has previously found that the MCA website is publicly available, there is no evidence demonstrating otherwise on the record, and that Zauba Corp.'s information is "sourced from the official registers, and from published government data," *i.e.*, sources like the MCA, we can reasonably conclude that Emirates Sleep's financial data were also retrievable from the MCA platform during the investigation.  Therefore, it is reasonable to conclude that, considering the above information, Emirates Sleep's 2018-2019 financial statements were available on public sources for information throughout the duration of the investigation and rise to the level of "publicly available" for our purposes.

---

[120] *See* Remand Supplemental Response at Exhibit 6.

Best Mattresses/Rose Lion contends that Commerce acted contrary to its own practice of requiring interested parties to build the record and had no reasonable basis to reopen the record for the purpose of collecting information about the public availability of Emirates Sleep's financial statements.[121] Best Mattresses/Rose Lion also argue that Commerce must find that the Zauba Corp. information submitted by the petitioners was unlawful new factual information that must be removed.[122] Contrary to Best Mattresses/Rose Lion's argument, the burden is squarely on interested parties, and not Commerce, to build the record. However, pursuant to 19 CFR 351.302(a), Commerce has the authority to open the record to request factual information from parties at any time during a proceeding. In this proceeding, Commerce reopened the administrative record for the limited purpose of requesting information from the petitioners on the source and process of obtaining Emirates Sleep's financial statements.[123] Such reopening of the record does not shift the burden of building the record away from interested parties. Additionally, Commerce provided interested parties an opportunity to submit factual information to rebut, clarify, or correct the petitioners' response.[124] Given that Commerce has the authority, pursuant to 19 CFR 351.302(a), to reopen the administrative record at any time to request new factual information, we do not find that the relevant factual information submitted by the petitioners in response to our questionnaire was untimely and, therefore, unlawful.

The petitioners argue that Commerce should exclusively rely on Emirates Sleep's financial statements. Further, the petitioners argue that Commerce's decision to average the financial ratios of Emirates Sleep and GTI is inconsistent with three Commerce practices: 1) selecting financial statements from companies that produce identical or comparable merchandise,

---

[121] *See* Best Mattresses/Rose Lion's Comments at 12-13.
[122] *Id.* at 17-19.
[123] *See* Remand SQ.
[124] *See* Remand SQ at 1.

as opposed to the production of non-comparable merchandise;[125] 2) relying on incomplete financial statements from producers of comparable merchandise as long as the missing information is not "vital" to calculating financial ratios;[126] and 3) relying on financial statements that may benefit from subsidies, as long as those subsidies have not previously been found to be countervailable.[127] However, as noted above, Commerce was faced with two possible sources for determining CV profit and selling expenses: GTI (a producer of apparel and garments); and Emirates Sleep.

With respect to Emirates Sleep, based on the Court's statements, we find that without Annexure 5 on the record, we cannot definitively determine the nature of the "balances with government authorities" and whether or not they pertain to government subsidies. Regarding GTI, in the *Final Determination*, Commerce explained that the GTI financial statements represent profit information for production and sales in the preferred foreign country (*i.e.*, Cambodia), but of merchandise that is similar, but not comparable, to the subject merchandise.[128] Accordingly, based on our analysis in the *Final Determination* and further supplemented here, we recognize that both sets of financial statements on the record have flaws; thus, we have decided to use an average of Emirates Sleep and GTI's CV profit and selling expense ratios for Best Mattresses/Rose Lion's profit and selling expenses on remand.

---

[125] *See* Petitioners' Comments at 14 (citing *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2014-2016*, 82 FR 32170 (July 12, 2017), and accompanying IDM at Comment 11; *see also Certain Steel Nails from Taiwan: Final Determination of Sales at Less Than Fair Value*, 80 FR 28959 (May 20, 2005), and accompanying IDM at Comment 1).
[126] *See* Petitioners' Comments at 15 (citing *CP Kelco US, Inc. v. United States*, Slip Op. 16-36 at *5 (CIT 2016)).
[127] *Id.* (citing *Shenzhen Xinboda Industrial Co., Ltd. v. United States*, 494 F. Supp. 3d 1347, 1352 (CIT 2021)).
[128] *See Final Determination* IDM at Comment 2.

## V. FINAL RESULTS OF REDETERMINATION

Pursuant to the Court's *Remand Order*, Commerce has, as discussed above, revised certain aspects of its dumping analysis. Based on these changes, Commerce determines that the following weighted-average dumping margins exist for the period January 1, 2019, through December 31, 2019:

| Company | Final Results of Redetermination Weighted-Average Dumping Margin (percent) |
|---|---|
| Best Mattresses International Company Limited/Rose Lion Furniture International Company Limited | 103.79 |
| All Others | 103.79 |

7/17/2023

X 

Signed by: LISA WANG
Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance