**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| _____ ) | |
| BEST MATTRESSES INTERNATIONAL ) COMPANY LIMITED AND ROSE LION ) FURNITURE INTERNATIONAL COMPANY ) LIMITED, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v.                              ) | Consol. Court No. 21-00281 |
| ) | |
| THE UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and                            ) | |
| ) | |
| BROOKLYN BEDDING, LLC, CORSICANA ) MATTRESS COMPANY, ELITE COMFORT ) SOLUTIONS; FXI, INC., INNOCOR, INC., ) KOLCRAFT ENTERPRISES INC., LEGGETT & ) PLATT, INCORPORATED, THE ) INTERNATIONAL BROTHERHOOD OF ) TEAMSTERS, and UNITED STEEL, PAPER AND) FORESTRY, RUBBER, MANUFACTURING, ) ENERGY, ALLIED INDUSTRIAL AND ) SERVICE WORKERS INTERNATIONAL ) UNION, AFL-CIO, ) | |
| ) | |
| Defendant-Intervenors. ) | |
| _____ ) | |

**DEFENDANT'S RESPONSE TO**
**PLAINTIFFS' COMMENTS ON COMMERCE'S REMAND REDETERMINATION**

BRIAN M. BOYNTON
Principal Deputy
Assistant Attorney General

PATRICIA McCARTHY
Director

OF COUNSEL:

ASHLANDE LEGIN
Attorney
Office of Chief Counsel for
Enforcement and Compliance
U.S. Department of Commerce

L. MISHA PREHEIM
Assistant Director

KARA M. WESTERCAMP
Trial Attorney
U.S. Department of Justice
Trade Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-7571

September 29, 2023

*Attorneys for Defendant*

**<u>TABLE OF CONTENTS</u>**

**<u>PAGES</u>**

BACKGROUND ...................................................................................................2

    I.      Commerce's Final Determination And the Court's Remand Order ...........2

    II.     Remand Redetermination..............................................................................5

ARGUMENT ......................................................................................................9

    I.      Standard Of Review......................................................................................9

    II.     Commerce's Remand Redetermination Complies With The Remand Order
           And Is Supported By Substantial Evidence And In Accordance With
           Law ...............................................................................................................9

          A.     Commerce's Decision To Select Cambodia As The "Market Under
              Consideration" Is Supported By Substantial Evidence And In Accordance
              With Law ....................................................................................................10

          B.     Commerce's Exclusion Of Imports From Non-Market Economy
              Countries And Countries With Broadly Available Export Subsidies From
              The GTA Data Is Supported By Substantial Evidence And In Accordance
              With Law ....................................................................................................11

          C.     Commerce's Decision To Use A Simple Average Rather Than A
              Weighted Average For The Per-Unit Cost Calculation Was In Accordance
               With Law ....................................................................................................16

          D.     Substantial Evidence Supports Commerce's Determination To
               Average Emirates Sleep And GTI's Financial Statements .......................19

              1.     To Comply With The Remand Order, Commerce Reopened
                    The Record  ...............................................................................20

              2.     Substantial Evidence Supports Commerce's Determination
                    That Emirates Sleep's Financial Statements Are Publicly
                    Available   ...............................................................................22

              3.     Substantial Evidence Supports Commerce's Continued
                    Reliance On Emirates Sleep's Financial Statements  .................26

CONCLUSION....................................................................................................30

# **TABLE OF AUTHORITIES**

**CASES**                                                                                 **PAGES**

*Ass'n of Am. Sch. Paper Suppliers v. United States,*
  791 F. Supp. 2d 1292 (Ct. Int'l Trade 2011) ..................................................... 28

*Best Mattresses International Co. Ltd. v. United States,*
  622 F. Supp. 3d 1347 (Ct. Int'l Trade 2023) ........................................... *passim*

*Catfish Farmers of Am. v. United States,*
  641 F. Supp. 2d 1362 (Ct. Int'l Trade 2009) .......................................... 26-27

*Consol. Edison Co. v. NLRB,*
  305 U.S. 197 (1938) ................................................................................ 9, 10

*CP Kelco U.S., Inc. v. United States,*
  949 F.3d 1348 (Fed. Cir. 2020) .............................................................. 28, 29

*Fla. Citrus Mut. v. United States,*
  550 F.3d 1105 (Fed. Cir. 2008) ................................................................... 18

*Fresh Garlic Producers Ass'n v. United States,*
  190 F. Supp. 3d 1302 (Ct. Int'l Trade 2016) ................................................ 22

*Gleason Industrial Products, Inc. v. United States,*
  559 F. Supp. 2d 1364 (Ct. Int'l Trade 2008) .......................................... 19, 20

*Gold E. Paper (Jiangsu) Co. v. United States,*
  991 F. Supp. 2d 1357 (Ct. Int'l Trade 2014) ............................................... 21

*Habas Sinai v. Tibbi Gazlar Istihsal Endustrisi, A.S.,*
  439 F. Supp. 3d 1342 (Ct. Int'l Trade 2020) ............................................... 18

*Hussey Copper, Ltd. v. United States,*
  834 F. Supp. 413 (Ct. Int'l Trade 1993) ...................................................... 18

*MacLean-Fogg Co. v. United States,*
  100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015)(i) ............................................. 9

*Maverick Tube Corp. v. United States,*
  163 F. Supp. 3d 1345 (Ct. Int'l Trade 2016) ............................................... 14

*Peer Bearing Company–Changshan v. United States,*
  298 F. Supp. 2d 1328 (Ct. Int'l Trade 2003) .......................................... 11, 12

*Pro-Team Coil Nail Enter., Inc. v. United States,*
  587 F. Supp. 3d 1364 (Ct. Int'l Trade 2022) ............................................... 20

*Shandong Rongxin Imp. & Exp. Co. v. United States*,
    203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017) ............................................................ 21-22

*Tianjin Wanhua Co. v. United States*,
    179 F. Supp. 3d 1062 (Ct. Int'l Trade 2016) ................................................................ 28

*Tianjin Wanhua Co., Ltd. v. United States*,
    253 F. Supp. 3d 1318 (Ct. Int'l Trade 2017) ................................................................ 28

*Tr. Chem Co. v. United States*,
    791 F. Supp. 2d 1257 (Ct. Int'l Trade 2011) ........................................................... 27-28

*Yantai Xinke Steel Structure Co. v. United States, Ct. No. 10-00240*,
    2014 Ct. Intl. Trade LEXIS 39 (Ct. Int'l Trade 2014) ....................................... 22, 23, 24

## **STATUTES**

19 U.S.C § 1516a ....................................................................................................... 21

19 U.S.C. § 1677 ....................................................................................................... 14

19 U.S.C. § 1677b ............................................................................. 5, 6, 10, 11, 12, 14

## **ADMINISTRATIVE DETERMINATIONS**

*Certain Cut-to-Length Carbon Steel Plate from Romania*,
    70 Fed. Reg. 12,651 (Dep't of Commerce Mar. 15, 2005) ...................................... 15

*Diamond Sawblades from the Republic of Korea*,
    71 Fed. Reg. 29,310 (Dep't of Commerce May 22, 2006) ...................................... 14

*Certain Lined Paper Products from the People's Republic of China*,
    71 Fed. Reg. 53,079 (Dep't of Commerce Sept. 8, 2006) ....................................... 24

*Certain Activated Carbon from the People's Republic of China*,
    74 Fed. Reg. 57,995 (Dep't of Commerce Nov. 10, 2009)....................................... 24

*Certain Polyethylene Terephthalate Resin From the People's Republic of China*,
    81 Fed. Reg. 13,331 (Dep't of Commerce Mar. 14, 2016), .................................... 20

*Certain Polyethylene Terephthalate Resin From the People's Republic of China*,
    82 Fed. Reg. 18,611 (Dep't of Commerce Mar. 14, 2016)....................................... 25

*Mattresses from Cambodia*,
    86 Fed. Reg. 15,894 (Dep't of Commerce Mar. 25, 2021) ........................................ 2

*Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam*,
86 Fed. Reg. 26,460 (Dep't of Commerce May 14, 2021) ........................................ 2

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| _____ ) | |
| BEST MATTRESSES INTERNATIONAL ) | |
| COMPANY LIMITED AND ROSE LION ) | |
| FURNITURE INTERNATIONAL COMPANY ) | |
| LIMITED, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Consol. Court No. 21-00281 |
| ) | |
| THE UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| BROOKLYN BEDDING, LLC, CORSICANA ) | |
| MATTRESS COMPANY, ELITE COMFORT ) | |
| SOLUTIONS; FXI, INC., INNOCOR, INC., ) | |
| KOLCRAFT ENTERPRISES INC., LEGGETT & ) | |
| PLATT, INCORPORATED, THE ) | |
| INTERNATIONAL BROTHERHOOD OF ) | |
| TEAMSTERS, and UNITED STEEL, PAPER AND) | |
| FORESTRY, RUBBER, MANUFACTURING, ) | |
| ENERGY, ALLIED INDUSTRIAL AND ) | |
| SERVICE WORKERS INTERNATIONAL ) | |
| UNION, AFL-CIO, ) | |
| ) | |
| Defendant-Intervenors. ) | |
| _____ ) | |

**DEFENDANT'S RESPONSE TO**
**PLAINTIFFS' COMMENTS ON COMMERCE'S REMAND REDETERMINATION**

Defendant, the United States, respectfully responds to the comments filed by plaintiffs

Best Mattresses International Company Limited and Rose Lion Furniture International Company

Limited (collectively, Best Mattresses), Best Mattresses Comments, ECF Nos. 109-10,

concerning the Department of Commerce's remand redetermination filed in accordance with this

Court's decision and remand order in *Best Mattresses International Co. Ltd. v. United States*, 622 F. Supp. 3d 1347 (Ct. Int'l Trade 2023). *See* Final Results of Redetermination Pursuant to Court Remand, July 17, 2023 (Remand Redetermination), ECF No. 105.[1]  For the reasons explained below, we respectfully request that the Court sustain Commerce's remand redetermination.

## **BACKGROUND**

### I.  **Commerce's Final Determination And The Court's Remand Order**

In the underlying review, Commerce made certain adjustments to Best Mattresses's cost of production and constructed value information. *See Mattresses from Cambodia*, 86 Fed. Reg. 15,894 (Dep't of Commerce Mar. 25, 2021) (final LTFV determ.) (P.R. 309), and accompanying Issues and Decision Memorandum (IDM) (P.R. 301), as amended by *Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam*, 86 Fed. Reg. 26,460 (Dep't of Commerce May 14, 2021) (amended final LTFV determ.) (P.R. 325).  Specifically, because Best Mattresses purchased certain major inputs from affiliated parties located in a non-market economy country, Commerce determined the cost of production for the affiliates by using GTA data for imports into Cambodia from six countries when applying the major input rule. *See* IDM at 10-11.  Moreover, in comparing affiliated party purchases for various minor inputs to a market price, where a market price based on unaffiliated party purchases was unavailable, Commerce relied on Cambodian Trademap data as a proxy for

---

[1] Defendant-intervenors and consolidated plaintiffs, Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO (collectively, Brooklyn Bedding) commented on Commerce's draft remand redetermination, but did not file remand comments with the Court.

the transactions disregarded rule.  *Id.* at 15-22.  Finally, to determine the constructed value profit, Commerce used the financial statements of Emirates Sleep.  *Id.* at 17-22.

Best Mattresses and Brooklyn Bedding each filed actions challenging Commerce's final determination in the antidumping duty investigation covering mattresses from Cambodia. Specifically, Best Mattresses challenged Commerce's use of surrogate data to value the cost of major inputs purchased from affiliated suppliers located in a non-market economy country and Commerce's selection of Emirates Sleep Systems Private Limited's (Emirates Sleeps) financial statements for calculating surrogate financial ratios.  Moreover, Brooklyn Bedding challenged Commerce's selection of Cambodia as the "market under consideration" under the transactions disregarded rule, Commerce's use of Cambodian Trademap data to determine market price in applying the transactions disregarded rule, and Commerce's inclusion of imports from non-market economy countries and countries with broadly available export subsidies when applying the transactions disregarded and major input rules.

On February 17, 2023, the Court issued its remand order.  The remand order sustained, in part, and remanded, in part certain aspects of Commerce's final determination.  *See Best Mattresses*, 622 F. Supp. 3d at 1347.

With respect to the remanded issues, first, the Court ordered Commerce to further explain its selection of Cambodia as the "market under consideration" under the transactions disregarded rule.  *Id*.  The Court held that the phrase "market under consideration" is purposefully broad to ensure that whatever market Commerce selects allows for a reasonable source to confirm that the affiliated prices reflect arm's length transactions—whether that market is the investigated country or where the supplier resides.  *Id*. at 1384.  The Court also held that Commerce failed to explain why the selection of the investigated country (*i.e*., Cambodia) constituted a reasonable

method to confirm that the affiliated prices reflect arm's length transactions between the respondents and suppliers.  *Id*.

Second, the Court ordered Commerce to further explain or reconsider its decision to include non-market economy countries and countries with broadly available export subsidies in the GTA and Cambodian Trademap data when applying the major input rule and the transactions disregarded rule, respectively.  *Id*. at 1385.  Commerce had explained that it was unable to rely on the affiliated suppliers' cost of production because the affiliates were based in a non-market economy country.  *Id*.  However, Commerce included imports from non-market economy countries and countries with broadly available export subsidies to determine market value where prices from an unaffiliated supplier were unavailable.  *Id*.  Commerce reasoned that, in market economy cases, it relies on purchase prices paid to unaffiliated suppliers based in non-market economy countries.  *Id*.  However, the Court held that Commerce failed to justify why the "presumption of {non-market economy} unreliability applie{d} in the affiliated supplier context, but not in the unaffiliated supplier context."  *Id*.

Finally, the Court ordered Commerce to further explain or reconsider its reliance on Emirates Sleep's financial statements over Grand Twins International Plc (GTI)'s financial statements to calculate constructed value profit and selling expenses for Best Mattresses.  *Id*. at 1390.  The Court held that Commerce did not adequately explain its conclusion that Emirates Sleep's financial statements are publicly available and complete because Commerce did not address how Emirates Sleep's financial statements were obtained nor did Commerce have a basis for determining how one of the missing annexures – Annexure 5 (*i.e.*, "(b) Balances with

government authorities"), itemized under Note 13 – "Short-term loans and advances," could not

be an indicator of government subsidies.  *Id.*

## II.    <u>Remand Redetermination</u>

On March 30, 2023, Commerce re-opened the record and issued a questionnaire to

Brooklyn Bedding, requesting information on how it had obtained Emirates Sleep's financial

statements and how the process, as well as the financial statements themselves, showed that the

information was publicly available.  *See* Remand Supp. Questionnaire, P.R.R. 1.  On April 6,

2023, Brooklyn Bedding timely submitted its response, and on April 13, 2023, Best Mattresses

filed rebuttal comments and information.  *See* Remand Supp. Resp., P.R.R. 2-3; Best Mattresses

Rebuttal, P.R.R. 4-7.

On July 17, 2023, Commerce issued its final remand redetermination, in which it:

(1) continued to treat Cambodia as the "market under consideration" for purposes of the

transactions disregarded rule, but further explained why Cambodia was a reasonable source to

test whether the affiliated prices reflect arm's-length transactions between the respondents and

their suppliers; (2) excluded imports from non-market economy countries and countries with

broadly available export subsidies from the GTA and Cambodian Trademap data used in

applying the transactions disregarded and major input rules; and (3) averaged both Emirates

Sleep and GTI's financial statements in calculating constructed value profit and selling expenses

for Best Mattresses pursuant to 19 U.S.C. § 1677b(e)(2)(B)(iii).  Remand Redetermination at 2.

In relevant part, Commerce excluded imports from non-market economy countries and

countries with broadly available export subsidies from the GTA data (*i.e.*, the surrogate for the

affiliated suppliers' cost of production for purposes of the major input analysis) and from the

Cambodian Trademap data (*i.e.*, the surrogate used to calculate market price for the major and

minor inputs). *Id.* at 8-9. In reaching this determination, Commerce acknowledged the Court's holding that there is a general presumption of unreliability with non-market economy data that is derived from the statute as a whole and affirmed by Commerce's practice. *See Best Mattresses*, 622 F. Supp. 3d at 1385. Thus, on remand, Commerce further explained that when considering this general presumption of unreliability, Commerce will normally exclude data from non-market economy countries and countries with broadly available export subsidies unless a party can rebut the presumption that those prices are subsidized. *See* Remand Redetermination at 28.

Furthermore, Commerce did not revise its calculations as suggested by Best Mattresses in determining the surrogate cost of production for the major inputs because Commerce determined to follow its normal methodology of calculating simple averages for per-unit import values. *Id*. In light of Commerce's past practice and the Court's remand order, Commerce revised its major input and transactions disregarded analysis to exclude the imports from non-market economy countries and countries with broadly available export subsidies. *Id*.

Finally, Commerce reconsidered its determination to only select Emirates Sleep's financial statements for purposes of calculating constructed value profit and selling expenses. *See id.* at 9-16. On remand, Commerce provided further analysis to support its determination that Emirates Sleep's financial statements are publicly available. *Id.* at 9-15. However, because Commerce could not determine whether the missing Annexure 5 within Emirates Sleep's financial statements (*i.e.*, "balance with government authorities") relates to government subsidies, Commerce found that it could no longer conclude that Emirates Sleep's financial statements are complete. *Id*. at 16.

With respect to public availability, Commerce explained that Brooklyn Bedding provided sufficient evidentiary support for its retrieval of Emirates Sleep's financial statements. *Id.* at 9-

15.  Brooklyn Bedding explained that it had obtained Emirates Sleep's financial statements from an Indian consultant, who, in turn, obtained them from the Indian Ministry of Corporate Affairs (MCA).  *Id*.  Commerce determined that Brooklyn Bedding also provided sufficient evidence indicating that Emirates Sleep's financial statements can be retrieved from Zauba Corp.'s website.  *Id*.  In particular, Zauba Corp is a private provider of commercial information that is all "a matter of public record, and is sourced from the official registers, and from published government data."  *Id*.  In its supplemental questionnaire response, Brooklyn Bedding provided step-by-step instructions on how to obtain the data from MCA and Zauba Corp.  For example, once signed into the MCA website, Brooklyn Bedding provided several ways for a user to publicly identify Emirates Sleep's company identification number (CIN), which is "U51909MH2005PTC156771."  *Id*. at 10-13.  The CIN number then directs the user to download documents and access the financial statements by paying the requisite fees.  *Id*.

Commerce rejected Best Mattresses's assertion that an applicant must provide an Indian "Income Tax PAN" – an identification credential that non-Indian nationals do not possess.  *Id*.  Brooklyn Bedding provided screenshots indicating that the PAN is not a requirement for registration as a "Registered User."  *Id*.  Commerce also explained that because "{t}he information contained on the MCA website is retrieved by selecting 'View Public Documents,'" the public documents are "available for inspection by members of the public" with or without a PAN.  *Id*.  Therefore, Commerce continued to consider the MCA website and the financial statements retrieved from the MCA website as publicly available.  *Id*. at 9-11; *id.* at 31 ("The petitioners provided a clear and adequate, step-by-step demonstration of how they retrieved the financial statements from the MCA website.").

Commerce also rejected Best Mattresses's assertion that the Zauba Corp. information was improperly filed new factual information.  *Id.* at 15-16.  Commerce explained that it specifically reopened the record to obtain new factual information regarding the source and the process of obtaining Emirates Sleep's financial statements.  *Id.*  Based on the information timely submitted by Brooklyn Bedding, Commerce determined that Emirates Sleep's financial statements are publicly available from both MCA and Zauba Corp. websites.  *Id.*

On the issue of completeness, the Court held that Commerce did not adequately support its selection of Emirates Sleep's financial statements instead of GTI's financial statements.  *See Best Mattresses*, 622 F. Supp. 3d at 1396 (holding that Commerce must "sufficiently explain {} its reason for choosing between two flawed financial statements {*i.e.*, Emirates Sleep and GTI}…").  Specifically, the Court referred to the possibility that the missing annexures could account for "government subsidies recorded as assets."  *Id.* at 1396.

Based on the Court's direction, Commerce reevaluated the record and determined that "without Annexure 5 on the record, it could not definitively determine the nature of the 'balances with government authorities' and whether or not they pertain to government subsidies.  Remand Redetermination at 35.  Although the balances may not pertain to subsidies, because Commerce did not have a copy of Annexure 5, it could not determine with certainty that the financial statements are not likewise flawed.  *Id.*

After reevaluating the supplemented record, Commerce was then faced with two possible sources for determining financial ratios: GTI (a producer of apparel and garments) and Emirates Sleep (a producer of mattresses).  *Id.* at 16.  Based on Commerce's analysis in the final determination and reevaluation of the record, Commerce recognized that both sets of financial statements have flaws.  *Id.* at 35.  Therefore, Commerce decided to use an average of Emirates

Sleep and GTI's financial ratios for Best Mattresses's surrogate financial ratio calculations on remand. *Id.*

## ARGUMENT

## I.    Standard Of Review

In remand proceedings, the Court will sustain Commerce's determinations if they are "in accordance with the remand order, are supported by substantial evidence, and are otherwise in accordance with law." *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

## II.   Commerce's Remand Redetermination Complies With The Remand Order And Is Supported By Substantial Evidence And In Accordance With Law

Commerce's remand redetermination complies with the Court's remand order by (1) further explaining why Cambodia continues to be the appropriate "market under consideration" under the transactions disregarded rule; (2) adhering to the statute and Commerce's practice to exclude imports from non-market economy countries and countries with broadly available export subsidies; and (3) reevaluating record evidence regarding Emirates Sleep's financial statements and determining that although they are publicly available, averaging Emirates Sleep's financial statements along with GTI's financial statements will account for the potential flaws in both financial statements.  *See generally* Remand Redetermination.  Also, Commerce reasonably used a simple average of per-unit import values from each of the remaining countries reflected in the GTA and Trademap data when deriving surrogate costs for purposes of the major input and transactions disregarded analysis.  *See id.*  As explained below, Best Mattresses's arguments to the contrary lack merit.

9

A.    **Commerce's Decision To Select Cambodia As The "Market Under Consideration" Is Supported by Substantial Evidence And In Accordance With Law**

Commerce's decision to select Cambodia as the "market under consideration," is supported by substantial evidence and in accordance with law.  *See id.* at 7-8.  In its remand order, the Court held that, rather than presume the market under consideration is Cambodia, Commerce "should have explained why the selection of Cambodia constituted a 'reasonable method' to confirm that the affiliated prices reflect arm's length transactions{.]"  *Best Mattresses*, 622 F. Supp. 3d at 1384.

On remand, Commerce further explained that it "determines the market under consideration on a case-by-case basis, analyzing the factors involved and examining the available data."  Remand Redetermination at 22.  First, Commerce acknowledged that there are circumstances under which it may be appropriate to use data from a different market from the market where the subject merchandise is produced.  *Id*.  Commerce explained that its statement that Best Mattresses "would 'be paying the market price for such inputs in Cambodia,' {it} meant that, because {Best Mattresses} {is} producing the merchandise in Cambodia, {it} would need to pay what a party in Cambodia would pay to obtain such inputs—whether by importing them into Cambodia or otherwise."  *Id*. at 23.  Also, Commerce explained that its selection of the Cambodian Trademap data was meant to "account{ } for both the respondents' potential purchasing experience in the Cambodian market and {its} practice," because "record evidence shows that the respondents also source minor inputs and fixed assets locally in Cambodia."  *Id.* Moreover, Commerce's preference, under sections 19 U.S.C. § 1677b(f)(2)-(3), is first to determine a market value for the relevant inputs, based on data available, to the respondent in the country in which its production is located.  *Id.*

Accordingly, Commerce reasonably relied on "Cambodian Trademap data from Cambodia to fill the gaps where market prices were not available." *Id.* at 24. Because neither party contested the "market under consideration" issue and Commerce has further explained this issue in accordance with the remand order, the Court should sustain Commerce's determination regarding this issue. *See id.*; *Best Mattresses*, 622 F. Supp. 3d at 1384.

**B.      Commerce's Exclusion Of Imports From Non-Market Economy Countries And Countries With Broadly Available Export Subsidies From The GTA Data Is Supported by Substantial Evidence And In Accordance With Law**

Commerce's decision to exclude imports from non-market economy countries and countries with broadly available export subsidies from the GTA data (*i.e.*, for purposes of the major input analysis) and from the Cambodian Trademap data (*i.e.*, for purposes of the major input and transactions disregarded rule analysis) is consistent with the remand order, supported by substantial evidence, and in accordance with law. *See* Remand Redetermination at 26-28. After revisiting its practice and the statute as a whole, Commerce explained that it normally will exclude data from non-market economy countries and countries with broadly available export subsidies unless a party can rebut the presumption of unreliability. *Id.*; *see also Peer Bearing Company–Changshan v. United States*, 298 F. Supp. 2d 1328, 1337 (Ct. Int'l Trade 2003) (explaining that once "a rebuttable presumption is established that the prices paid are distorted" the burden shifts to the challenging party "to present evidence demonstrating that its supplier did not benefit from such subsidies"). Therefore, Commerce reasonably found that it was consistent with Commerce's normal practice to exclude imports from non-market economy countries and countries with broadly available export subsidies from the GTA and Cambodian Trademap data. *See* Remand Redetermination at 26-28.

In the final determination, Commerce applied both the transactions disregarded and major input rules because Best Mattresses reported that it purchased many items from its affiliated suppliers, that are located in a non-market economy. *See* IDM at 8-13. Because Best Mattresses did not purchase these items from unaffiliated suppliers, nor did the affiliated suppliers sell the items to unaffiliated customers, Commerce was without a market price against which to test the affiliated party's purchases. *Id*. Commerce also found that it could not rely on the affiliated supplier's costs to perform the major input and transactions disregarded analyses because the affiliate was based in a non-market economy. Instead, Commerce used GTA and Cambodian Trademap data as a proxy for the missing market price and cost information. In so doing, Commerce explained that,

> In market economy cases, Commerce relies on the purchase prices paid to unaffiliated suppliers based in {non-market economy countries and countries maintaining broadly available export subsidies}. It would be inconsistent with the law and {Commerce's} practice to exclude imports from these countries when using the GTA data as a proxy for market prices and {cost of production}.

*Id*. at 11.

The Court could not discern from Commerce's explanation "why its presumption of {non-market economy} unreliability applie{d} in the affiliated supplier context, but not in the unaffiliated supplier context." *Best Mattresses*, 622 F. Supp. 3d at 1385. The Court further explained that "while it is true that Commerce was not subject to the methodological obligations of 19 U.S.C. § 1677b(c) because Plaintiffs are not {non-market economy}-based respondents {} the lack of § 1677b(c)'s formal application does not exempt Commerce's obligation to address the unreliability of {non-market economy} data, which is derived from the Tariff Act as a whole and affirmed by Commerce's prior practice." *Id*. (internal citations omitted) (("{T}he Act

generally assumes that prices for goods produced in {non-market economies} cannot be relied upon for purposes of a price-based analysis.").  Therefore, the Court remanded this issue to Commerce for reconsideration or further explanation.

Best Mattresses argues that the Court provided Commerce with limited instructions to explain its original determination to include data from non-market economy countries and countries with broadly available export subsidies, and cannot now reverse course in the remand redetermination without providing compelling reasons.  *See* Best Mattresses Cmts. at 3-8.  As an initial matter, the Court did not provide Commerce with "limited instructions" to explain its original determination nor did Commerce "simply reverse{} its original determination without providing compelling reasoning."  *Id.* at 3-4.  Rather, the Court instructed Commerce that "{i}f the presumption does not apply with equal force in the unaffiliated supplier versus affiliated supplier contexts, then the agency must provide affirmative reasons to explain why that is so."  *Best Mattresses*, 622 F. Supp. 3d at 1386.  Further, Best Mattresses's argument that Commerce "has no legal basis to exclude import data from {non-market economy} countries or from {} subsidized market economy countries," Best Mattresses Cmts. at 5, also ignores the Court's directive "to address the unreliability of {non-market economy} data. . . ."  *Best Mattresses*, 622 F. Supp. 3d at 1385 (holding that "the lack of § 1677b(c)'s formal application does not exempt Commerce's obligation to address the unreliability of {non-market economy} data, which is derived from the Tariff Act as a whole and affirmed by Commerce's prior practice").

Best Mattresses also erroneously argues that Commerce's reversal of its prior position was not supported by "compelling reasoning."  Best Mattresses Cmts. at 4.  However, the Court held that there is a general presumption of non-market economy unreliability, *Best Mattresses*, 622 F. Supp. 3d at 1385-86, and Commerce accordingly applied this general presumption in its

13

remand redetermination following its reconsideration of the statute and past cases.  Remand Redetermination at 28 (explaining that Commerce "reconsidered {its} inclusion of such data in both the GTA and the Cambodian Trademap data and revised our major input and transactions disregarded analysis to exclude the imports from {non-market economy} countries and countries with broadly available export subsidies.").

Best Mattresses cites no authority that would support including in Commerce's antidumping duty calculations imports from non-market economy countries and countries with broadly available export subsidies.  *See* Best Mattresses Cmts. at 6.  In contrast, Commerce explained that it is "allowed flexibility to change its position provided that it explains the basis for the change and provided that the explanation is in accordance with law and supported by substantial evidence."  *Maverick Tube Corp. v. United States*, 163 F. Supp. 3d 1345 (Ct. Int'l Trade 2016), *aff'd sub nom. Maverick Tube Corp. v. Toscelik Profil*, 861 F.3d 1269 (Fed. Cir. 2017).  In *Diamond Sawblades from Korea*, Commerce explained that the statute "generally assumes that prices for goods produced in {non-market economies} cannot be relied upon for purposes of a price-based analysis."  *Diamond Sawblades from the Republic of Korea*, 71 Fed. Reg. 29,310 (Dep't of Commerce May 22, 2006), and accompanying IDM cmt. 12.  In accordance with 19 U.S.C. § 1677b(c), Commerce does not use the price-based methodology under § 1677b(a) in instances when a producer is located in a non-market economy country, unless the record evidence demonstrates that a market-oriented industry exists.  *See* 19 U.S.C. § 1677(18)(A) ("nonmarket economy country" means any foreign country that the administering authority determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise").

Similarly, in *CTL Plate from Romania*, Commerce stated that, consistent with its practice, it does not use export prices from a market economy for the valuation of surrogate values when there is reasonable basis to believe or suspect that the product benefits from broadly available export subsidies. *See Certain Cut-to-Length Carbon Steel Plate from Romania*, 70 Fed. Reg. 12,651 (Dep't of Commerce Mar. 15, 2005), and accompanying IDM at Cmt 4. In other words, the general presumption is that Commerce will normally exclude such data unless a party can rebut the presumption that those prices are unreliable. Remand Redetermination at 28. Further, the remand opinion also sustained Commerce's reliance on § 1677b(f) to explain why Commerce could not "rely on the {respondents'} affiliated suppliers' actual cost of production {because} {} the affiliates {were} based in a{non-market economy} country." *Best Mattresses*, 622 F. Supp. 3d at 1385 ("{i}f substantial evidence supports the agency's finding that the records are not reasonably reflective of production and sale, then § 1677b(f)(1)(A) "does not require Commerce to accept {a respondent's} records.") (citations omitted).

Best Mattresses also argues that Commerce's authority to use surrogate data in market economy countries was only "to account for affiliated party transactions," Best Mattresses Cmts. at 6, but ignores Commerce's reasoning that it could not rely on the affiliated suppliers' data because the affiliates were based in a non-market economy country. *See* Remand Redetermination at 27-28.

Moreover, the Court has already considered this affiliated versus unaffiliated supplier distinction, and has held that "{t}he {non-market economy} distinction was dispositive because Commerce usually relies on the reported input {cost of production} values if the affiliated supplier is from a market economy," and "Commerce's decision to not consider the respondent data and to use surrogate data was sourced in its authority to determine the information available

regarding such cost of production." *Best Mattresses*, 622 F. Supp. 3d at 1385.  But the Court could *not* discern from the final determination why "Commerce {did} not apply the same presumption of {non-market economy} data unreliability" in the unaffiliated supplier context as it did in the affiliated supplier context.  *Id.*  Therefore, Best Mattresses's argument that "what would Commerce have done if the {non-market economy} inputs were from unaffiliated suppliers?" is irrelevant.  Best Mattresses Cmts. at 7.  That is because although the Court acknowledged that Commerce was not subject to the methodological obligations required for non-market economy proceedings, it still needed to address the unreliability of non-market economy data, including the statute and Commerce's own prior practice.  *See Best Mattresses*, 622 F. Supp. 3d at 1385.

Therefore, in the remand redetermination, Commerce complied with the remand order by providing authority for its interpretation of the statute to support the exclusion of non-market economy data.  *See* Remand Redetermination at 26-28.  Accordingly, Commerce reasonably excluded import data from non-market economy countries and countries with broadly available export subsidies for its major input rule and transactions disregarded rule analysis.  *Id.*

### C.  Commerce's Decision To Use A Simple Average Rather Than A Weighted Average For The Per-Unit Cost Calculation Was In Accordance With Law

As discussed above, in the final determination, "Commerce computed the surrogate {cost of production} for the major input analysis based on the GTA data for Brazil, Malaysia, Mexico, Romania, Russia and Turkey, and calculated a simple average of the per-unit import values of those six countries for each major input."  Remand Redetermination at 28.  In the remand redetermination, Commerce continued to determine that it is "appropriate and reasonable that each of the six countries carries equal weight in the calculation with no evidence on the record

leading to a contrary determination." *Id.*  Best Mattresses' arguments to the contrary are unclear and unpersuasive.

First, Best Mattresses alleges that Commerce departed from its original methodology when it calculated Best Mattresses's per-unit cost on remand; however, it is unclear what departure Best Mattresses refers to in its comparison of the two calculation memoranda.  *See* Best Mattresses Cmts. at 9 (comparing calculation memos that accompanied the final determination and the remand redetermination).  For example, although the data in the calculation memoranda are arranged differently in comparison, the sole substantive difference between the two memoranda is that, on remand, Commerce removed imports from non-market economy countries and countries with broadly available export subsidies from the GTA data tab. *Compare* Final Cost Mem. (C.R. 276), *with* Remand Cost Mem. (C.R.R. 5).  Commerce explained that "{i}n the {f}inal {d}etermination, Commerce computed the surrogate {cost of production} for the major input analysis based on the GTA data for Brazil, Malaysia, Mexico, Romania, Russia and Turkey, and calculated a simple average of the per-unit import values of those six countries for each major input."  Remand Redetermination at 28.  Commerce further explained that it had not revised its calculations from the final determination.  *Id.*  Therefore, it remains unclear from Best Mattresses's arguments how Commerce supposedly departed from its original methodology beyond removing imports from certain countries.

Best Mattresses also argues that Commerce should have applied a weighted average methodology, "to calculate surrogate {cost of production} values in its major inputs and transactions disregarded analysis."  Best Mattresses Cmts. at 8.  According to Best Mattresses, this alternative methodology would remedy the bottom-line costs it claims were distorted by Commerce's failure to account for import volume differences across the five surrogate countries.

*See id.* at 9.  However, Best Mattresses points to no evidence on the record to support its weighted-average methodology nor does it explain why its methodology is more accurate and representative than Commerce's determination to give each country equal weight in its calculations.  *See* Remand Redetermination at 28; *see also Fla. Citrus Mut. v. United States*, 550 F.3d 1105, 1111 (Fed. Cir. 2008) ("Commerce's methodologies for calculating dumping margin are presumptively correct"); *Habas Sinai v. Tibbi Gazlar Istihsal Endustrisi, A.S.*, 439 F. Supp. 3d 1342, 1349-50 (Ct. Int'l Trade 2020) (holding that a proposed methodology by an interested party was unsupported by statute or regulation).  Moreover, Best Mattresses fails to elaborate on its argument that there is evidence on the record that each country does *not* carry equal weight, other than citing Commerce's cost memorandum, Best Mattresses Cmts. at 10, and the Court should reject this thinly-veiled attempt to reweigh the evidence.  *See Jiaxing Brother Fastener Co., Ltd. v. United States*, 428 F. Supp. 3d 1364, 1375 (Ct. Int'l Trade 2020) ("Commerce addressed Jiaxing's arguments in the underlying proceeding concerning these reports, and it is not the court's role to reweigh or itself reassess the credibility of that evidence.").

Furthermore, the cases Best Mattresses cites in support are inapposite.  Specifically, in *Rhodia, Inc. v. United States*, the Court considered whether Commerce's determination to derive overhead, SG&A and profit through weighted averages was appropriate given the limited data points.  25 C.I.T. 1278 (2001) (citing *Hussey Copper, Ltd. v. United States*, 834 F. Supp. 413, 418 (Ct. Int'l Trade 1993)).  The Court acknowledged that Commerce's normal practice is to apply a simple average and that "{i}n order to depart from this practice Commerce needs to "explain the reasons for its departure," but that "barring evidence to the contrary, we assume that all of these surrogate values are equally representative of the surrogate experience."  *Id.* at 1350. Akin to *Rhodia*, Commerce made "no such findings concerning representativeness" here.  *Id.*

Likewise, in *Gleason Industrial Products, Inc. v. United States*, 559 F. Supp. 2d 1364, 1367 (Ct. Int'l Trade 2008), Commerce expressly found that certain bearing sizes were "more instructive" and determined to use a weighted-average surrogate value. But Commerce also made no finding in this case that any one country out of the six countries' GTA data were more "instructive" than any other. *See* Remand Redetermination at 28.

Although Best Mattresses continues to argue that "there is evidence that the surrogate values are not equally representative of the surrogate experience," the evidence it refers to are the calculation memos mentioned above. *See* Best Mattresses Cmts. at 11 (alleging that "Commerce itself accounted for such finding concerning representativeness in its original determination {} when calculating each individual country's per unit cost {in the final determination}). However, Commerce explained in its remand redetermination that it did not revise its calculations from the final determination and that it continued to apply a simple average methodology. Remand Redetermination at 28.

Therefore, substantial evidence supports Commerce's determination to continue to afford equal weight to each of the countries in the GTA data (*i.e.*, apply a simple average methodology) in its calculations for the major input analysis. *See id.*

### D.    Substantial Evidence Supports Commerce's Determination To Average Emirates Sleep And GTI's Financial Statements

Commerce's determination to average the Emirates Sleep and GTI financial statements to calculate constructed value profit and selling expenses is supported by substantial evidence and in accordance with law. *Id.* at 31-35. On remand, Commerce continued to find that Emirates Sleep's financial statements were publicly available. *Id.* at 9-15. However, Commerce determined that substantial evidence supported averaging Emirates Sleep's financial statements along with GTI's financial statements to account for potential flaws in both financial statements.

19

*Id.*  Best Mattresses disagrees, arguing that Commerce: 1) unreasonably reopened the record;
2) incorrectly continued to find that the Emirates Sleep's financial statements were publicly
available; and 3) wrongly averaged Emirates Sleep and GTI's financial statements.  Best
Mattresses Cmts. at 12.  Best Mattresses' arguments are meritless, as we explain below.

### 1.      To Comply With The Court's Remand Order, Commerce Reopened The Record

The Court held that "Commerce did not adequately explain its finding that the Emirates
statements were publicly available, and the record did not support Commerce's finding that the
Emirates statements were complete." *Best Mattresses*, 622 F. Supp. 3d at 1390.  As an initial
matter, "Commerce retains significant discretion to determine whether to reopen the record on
remand." *Pro-Team Coil Nail Enter., Inc. v. United States*, 587 F. Supp. 3d 1364, 1374 (Ct. Int'l
Trade 2022).  Thus, on remand, Commerce exercised its discretion to reopen the record and
requested further explanation from Brooklyn Bedding on how Emirates Sleep's financial
statements constituted publicly available information.  Remand Redetermination at 34.

Best Mattresses now argues that Commerce's decision to reopen the record was
unreasonable because "the burden of building the record {lies} squarely on interested parties,"
and there was another available source on the record to calculate financial ratios (*i.e.*, GTI's
financial statements).  Best Mattresses Cmts. at 14.  To support this argument Best Mattresses
cites *PET Resin from China*, where Commerce explained that "{it} typically does not depart
from {the} principle {that it is the interested parties' responsibility to build a record…} when
usable surrogate value information is already available on the record. . . ." *Certain Polyethylene
Terephthalate Resin From the People's Republic of China*, 81 Fed. Reg. 13,331 (Dep't of
Commerce Mar. 14, 2016), and accompanying IDM at Cmt. 2.

However, Commerce reopened the administrative record for the limited purpose of requesting information from Brooklyn Bedding on how it obtained Emirates Sleep's financial statements, as the Court held that "Commerce did not adequately explain its finding that the financial statements were publicly available." *Best Mattresses*, 622 F. Supp. 3d at 1395; *see also Gold E. Paper (Jiangsu) Co. v. United States*, 991 F. Supp. 2d 1357, 1362 (Ct. Int'l Trade 2014) ("{t}he intention of the order of remand was only, if not more, to point out that reopening the record was one of two apparent consequences of a record that lacked the substantial evidence necessary to support the legal viability of {Commerce's determination}.").

Contrary to Best Mattresses's assertions, Commerce's reopening of the remand record does not shift the burden of building the record away from interested parties. *Gold*, 991 F. Supp. 2d at 1362. Indeed, pursuant to 19 U.S.C § 1516a(a)(2), Commerce has the inherent authority to open the record and request new factual information, a fact that Best Mattresses also does not contest. *See also* Best Mattresses Cmts. at 14 ("Best Mattresses does not contest the statutory authority given to Commerce to open the record."). Commerce also provided interested parties an opportunity to submit factual information to rebut, clarify, or correct Brooklyn Bedding's response. *See* Remand Supp. Questionnaire at 1. Given that Commerce has the authority to reopen the administrative record, Commerce did not find that the relevant factual information submitted by the Brooklyn Bedding in response to Commerce's questionnaire was untimely or unlawful. *See* Remand Redetermination at 34.

Finally, Best Mattresses argues that Commerce went beyond the Court's instructions to "fairly weigh the available options" by reopening the record. *See* Best Mattresses Cmts. at 15. However, the Court remanded this issue to Commerce "for reconsideration or further explanation." *Best Mattresses*, 622 F. Supp. 3d at 1397; *see also Shandong Rongxin Imp. & Exp.*

*Co. v. United States*, 203 F. Supp. 3d 1327, 1338 (Ct. Int'l Trade 2017) (explaining how the Court's remand order did not bar reopening the record, but rather remanded with instructions to Commerce "for further explanation or reconsideration as may be appropriate.").  Moreover, this Court has held that Commerce does not need specific language in a remand order in order to open the record, given Commerce's discretion.  *See Fresh Garlic Producers Ass'n v. United States*, 190 F. Supp. 3d 1302, 1306 (Ct. Int'l Trade 2016) (citing *NTN Bearing Corp. of Am. v. United States*, 25 C.I.T. 118, 123 (2001), *aff'd*, 295 F.3d 1263 (Fed. Cir. 2002) ("{a}s long as the Court does not forbid Commerce from considering new information, it remains within Commerce's discretion to request and evaluate new data" on remand.").

Accordingly, Commerce was within its discretion to reopen the record to address the Court's remand order to determine whether Emirates Sleep's financial statements are publicly available.  *See* Remand Redetermination at 34; *Fresh Garlic*, 190 F. Supp. 3d at 1306.

> **2.      Substantial Evidence Supports Commerce's Determination That Emirates Sleep's Financial Statements Are Publicly Available**

Commerce's determination that Emirates Sleep's financial statements are publicly available is supported by substantial evidence.  *See* Remand Redetermination at 9-15, 31-35.  As this Court has explained, the bar for public availability is that interested parties may independently access the information.  *Yantai Xinke Steel Structure Co. v. United States*, Ct. No. 10-00240, 2014 Ct. Intl. Trade LEXIS 39, at *45-46 (Ct. Int'l Trade 2014) ("Commerce's concern is that other interested parties may not be able to independently access the information, and this is the bar that Commerce has reasonably set for public availability.")

Here, Commerce re-opened the record on remand and requested step-by-step instructions from Brooklyn Bedding as to its process of retrieving Emirates Sleep's financial statements from the two different sources, the MCA and Zauba websites.  *See* Remand Redetermination at 9-15,

31-35.  The first source, the MCA, is an official website of the Government of India, containing the Indian Registrar of Companies.  *Id*. at 10.  The second source, Zauba Corp., is a provider of commercial information that is all "a matter of public record, and is sourced from the official registers, and from published government data."  *Id*.  In the remand redetermination and after reviewing the information that Brooklyn Bedding had submitted on the remand record, Commerce explained how Emirates Sleep's financial statements could be accessed on the MCA and Zauba websites, albeit by paying the requisite fees.  *Id*. at 10-13.  Based on this timely submitted new factual information, Commerce determined Emirates Sleep's financial statements were publicly available.  *Id.*

The Court should reject Best Mattresses's meritless arguments opposing Commerce's determination.  *See* Best Mattresses Cmts. at 15-21.  First, Best Mattresses argues that "{p}etitioners failed to demonstrate, through either source, how they obtained the complete financial statements of Emirates Sleep put on the record on August 17, 2020." Best Mattresses Cmts. at 16.  However, Commerce explained that Zauba Corp.'s records indicate that Emirates Sleep's financial statements were obtainable from Zauba Corp.'s website since December 16, 2019 – meaning that Emirates Sleep's financial statements were also available on Zauba Corp.'s website for approximately eight months before the petitioners submitted the financial statements on the record on August 17, 2020.  Remand Redetermination at 32-33.  Considering that there is no evidence demonstrating otherwise on the record, and that Zauba Corp.'s information is "sourced from the official registers, and from published government data," (*i.e.*, sources like the MCA), Commerce reasonably concluded that Emirates Sleep's financial statements were also retrievable from the MCA platform during the investigation.  *Id*. at 33.

23

Second, Best Mattresses argues that petitioners did not provide evidence of their Indian consultant who downloaded the financial statements from the MCA. *See* Best Mattresses Cmts. at 17. However, Commerce explained that it did not specifically request this information and that the instructions provided by the petitioners were sufficient to demonstrate the public availability of Emirates Sleep's financial statements. Remand Redetermination at 33. Based on the petitioners' step-by-step instructions to retrieve Emirates Sleep's financial statements, Commerce determined that the Indian consultant's information was not necessary to prove the public availability of the Emirates Sleep's financial statement and Best Mattresses did not provide evidence to the contrary. *Id.*

Next, Best Mattresses argues that the cases Commerce cites in the remand redetermination are inapposite because in those cases interested parties provided sufficient information to demonstrate public availability at the time of submission. *See* Best Mattresses Cmts. at 18. Best Mattresses misunderstood Commerce's analysis. Commerce relied on cases to support the finding that financial statements from the Indian Registrar of Companies are considered in the public realm. *See* Remand Redetermination at 31 (citing *Certain Lined Paper Products from the People's Republic of China*, 71 Fed. Reg. 53079 (Dep't of Commerce Sept. 8, 2006), and accompanying IDM at Comment 1; *Certain Activated Carbon from the People's Republic of China*, 74 Fed. Reg. 57995 (Dep't of Commerce Nov. 10, 2009), and accompanying IDM at Comment 2). While this evidence may have been placed on the record at different points in the other proceedings, any such difference was not material to Commerce's analysis.

Commerce also appropriately relied on *OCTG from Vietnam*, where Commerce determined that financial statements were publicly available because the record contained adequate information regarding how the financial statements could be obtained from sources that

were publicly available and contained no evidence otherwise. *See Certain Oil Country Tubular Goods from the Socialist Republic of Vietnam*, 82 Fed. Reg. 18611 (Dep't of Commerce Apr. 20, 2017), and accompanying IDM at Comment 1. Here, Best Mattresses provided no evidence to demonstrate that Emirates Sleep's financial statements were not publicly available nor cases to support the requirements it believes are necessary to assess the public availability of the financial statements.

Finally, Best Mattresses argues that Zauba information was placed on the record for the first time in the petitioners' remand questionnaire response and should be considered unlawful new factual information. *See* Best Mattresses Cmts. at 18. But as mentioned above, it was within Commerce's discretion and authority to reopen the record on remand and obtain new factual information necessary to determine whether Emirates Sleep's financial statements are publicly available. Best Mattresses argues that the Zauba information "only demonstrates, if anything, how someone could download the Emirates Sleep financial statements today." *Id*. However, Commerce explained that the record indicates that the financial statements have been retrievable since December 16, 2019, by any member of the public from the website of Zauba Corp. Remand Redetermination at 33. Therefore, substantial evidence supports Commerce's conclusion that Emirates Sleep's financial statements were available on public sources throughout the duration of the investigation.

In sum, Commerce's reliance on the petitioners' submission was reasonable and substantial evidence supported Commerce's determination that Emirates Sleep's financial statements are publicly available.

### 3. Substantial Evidence Supports Commerce's Continued Reliance On Emirates Sleep's Financial Statements

Substantial evidence supports Commerce's continued reliance on Emirates Sleep's financial statements. *See* Remand Redetermination at 35. Best Mattresses's arguments to the contrary are meritless.

In the remand order, the Court explained that the "record supported Commerce's conclusions that the Emirates Sleep's statements were representative of Best Mattresses's business operations, sufficiently contemporaneous with the POI, and sufficiently legible." *See Best Mattresses*, 622 F. Supp. 3d at 1390. However, the Court remanded Commerce's determination that Emirates Sleep's financial statements are publicly available and complete. *Id.* As discussed above, Commerce determined based on the supplemental record that Emirates Sleep's financial statements are publicly available. Remand Redetermination at 15. On remand, Commerce also reevaluated Emirates Sleep's financial statements and determined that based on the Court's statements, without Annexure 5 on the record, it could not definitively determine the nature of the account "balances with government authorities" and whether it pertains to government subsidies. *Id.* at 16. Therefore, Commerce determined that it could not "sufficiently conclude that Emirates Sleep's financial statements are complete." *Id.* at 9.

Commerce likewise found that the only other financial statement on the record was similarly flawed. Commerce explained on remand that GTI, unlike Best Mattresses, was a producer of non-comparable merchandise (*i.e.*, apparel and garments). *See id.* at 16.

Because both financial statements were flawed, Commerce determined that averaging both Emirates Sleep and GTI's financial statements provided the best available information to calculate Best Mattresses's financial ratios. *See Catfish Farmers of Am. v. United States*, 641 F. Supp. 2d 1362, 1377 (Ct. Int'l Trade 2009) ("{w}here Commerce is faced with the choice of

selecting from among imperfect alternatives, it has the discretion to select the best available information for a surrogate value so long as its decision is reasonable.").

Best Mattresses argues that Commerce mischaracterizes "its decision {} as an acceptance of two equally flawed sources" because it "identified no internal flaws with the GTI statements calling into question their veracity or completeness."  Best Mattresses Cmts. at 22.  However, contrary to Best Mattresses's arguments, Commerce's continued reliance on Emirates Sleep's financial statements was not based on the remanded issues alone.  Commerce was faced with two possible sources for determining financial ratios: GTI (*i.e.*, a producer of non-comparable merchandise) and Emirates Sleep (*i.e.*, a producer of comparable merchandise).  Remand Redetermination at 35.  In the remand redetermination, Commerce explained that it continued to rely on its analysis in the final determination, which addressed the business operations between the two sources and concluded that unlike GTI, "Emirates Sleep is a mattress producer which would expose it to similar production and industry-specific conditions as those of Cambodian mattress producers."  IDM at 17-18.  The Court also agreed that "{t}he fact that Emirates was a mattress manufacturer, whereas GTI was not, is surely 'more than a mere scintilla of evidence' and was 'relevant evidence as a reasonable mind might accept as adequate to support {the} conclusion' that Emirates' financial statements best reflect the production experience of a respondent that manufactures mattresses."  *Best Mattresses*, 622 F. Supp. 3d at 1391.  Therefore, Commerce continued to rely on Emirates Sleep's financial statements and used a simple average of both imperfect data sources on the record to calculate the financial ratios.  Remand Redetermination at 35; *see Tr. Chem Co. v. United States*, 791 F. Supp. 2d 1257, 1263 (Ct. Int'l Trade 2011) ("As long as Commerce reasonably explains its choice between two appropriate but imperfect alternatives, the court will not reject the agency's determination, even if the court

would have made a different one.").

Although Best Mattresses continues to argue that GTI's financial statements were the only available source on the record, it cites to no authority or directive that would require Commerce to rely solely on GTI's financial statements. *See* Best Mattresses Cmts. at 21-22. Indeed, Best Mattresses has failed to establish that the requested values, or in this case, the GTI financial statements, were "*the one and only reasonable surrogate selection on {the} administrative record*." *Tianjin Wanhua Co., Ltd. v. United States*, 253 F. Supp. 3d 1318, 1324 (Ct. Int'l Trade 2017) (emphasis in original).

Furthermore, incompleteness alone is not a sufficient reason to reject a financial statement. *Ass'n of Am. Sch. Paper Suppliers v. United States*, 791 F. Supp. 2d 1292, 1303-04 (Ct. Int'l Trade 2011). Rather, when Commerce rejects incomplete financial statements, it "has often explicitly focused on the importance of the missing information{.}" *Id.* at 1303; *see also Tianjin Wanhua Co. v. United States*, 179 F. Supp. 3d 1062, 1069 (Ct. Int'l Trade 2016) (acknowledging the distinction for when a "financial statement contains all the data necessary for calculating financial ratios" and when Commerce rejects incomplete financial statements). Best Mattresses even acknowledges that "{i}n choosing to reject incomplete financial statements, Commerce must 'look{} to whether the missing information is 'vitally important' or 'key.'" Best Mattresses Cmts. at 22 (quoting *Ashley Furniture Indus., LLC v. United States*, 607 F. Supp. 3d 1210, 1228 (Ct. Int'l Trade 2022)); *see also id.* at 23 (citing *CP Kelco U.S., Inc. v. United States*, 949 F.3d 1348, 1359 (Fed. Cir. 2020)).

However, Commerce is not rejecting any financial statements on the record. Therefore, Best Mattresses's reliance on *Ashley Furniture* and *CP Kelco* is misplaced. *See* Best Mattresses at 22-23. In *CP Kelco*, before Commerce was permitted to reject incomplete financial statements

on the record, the Court explained that Commerce must determine whether the missing

information was vital information and of "critical importance."  949 F.3d at 1359.  Here,

however, it is Best Mattresses who is now seeking to reject Emirates Sleep's financial

statements.  *See Best Mattresses Cmts.* at 21-22; *see also NTN Bearing Corp. of Am. v. United*

*States*, 24 C.I.T. 385, 435 (2000) ("…the burden of proof {is} with the party who intends to

benefit from the claim made.").  Commerce explained on remand that based on the Court's

statements regarding the missing annexure, Commerce could not definitively conclude that

Emirates Sleep's financial statements are complete.  *See* Remand Redetermination at 16 ("Those

balances may not pertain to subsidies, but because we do not have a copy of Annexure 5, we

cannot with certainty determine what those balances represent.")

Furthermore, the Federal Circuit affirmed in *CP Kelco* that Commerce adequately

explained the reasons underlying its decision to use the Thai Ajinomoto financial statements –

which showed evidence of receipt of countervailable subsidies – rather than the Thai

Fermentation financial statements which were determined incomplete and missing vital

information.  *CP Kelco*, 949 F.3d at 1359.  Although Best Mattresses argues that Emirates

Sleep's financial statements are missing vital information, it provides no further explanation or

reasoning to support this alleged claim.  *See* Best Mattresses Cmts. at 23; *see e.g., Dorbest Ltd. v.*

*United States*, 30 C.I.T. 1671, 1718 (2006) ("Respondents provide no evidence to support their

{} theory and offer no reason why their theory is the only possible explanation for the..." alleged

claim).  Accordingly, substantial evidence supports Commerce's determination to average

Emirates Sleep's financial statements with GTI's financial statements to account for flaws in

both datasets.  Remand Redetermination at 34-35.

## **CONCLUSION**

For these reasons, we respectfully request that the Court sustain Commerce's remand

redetermination and enter judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

s/L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

OF COUNSEL:                          s/Kara M. Westercamp
ASHLANDE GELIN                       KARA M. WESTERCAMP
Attorney                             Trial Attorney
Department of Commerce               U.S. Department of Justice
Office of the Chief Counsel          Civil Division
  for Trade Enforcement & Compliance   Commercial Litigation Branch
                                     P.O. Box 480
                                     Ben Franklin Station
                                     Washington, D.C.  20044
                                     Tel: (202) 305-7571

September 29, 2023                   Attorneys for Defendant

**<u>CERTIFICATE OF COMPLIANCE</u>**

Pursuant to Standard Chambers Procedure ¶ 2(B)(2), I hereby certify that this brief contains 8,140 words.  In making this certification, I have relied upon the word count function of the Microsoft Word processing system used to prepare this brief.

*/s/Kara M. Westercamp*

KARA M. WESTERCAMP

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE**
_____  _____

|  |  |  |
|---|---|---|
| BEST MATTRESSES INTERNATIONAL COMPANY LIMITED AND ROSE LION FURNITURE INTERNATIONAL COMPANY LIMITED, | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Consol. Court No. 21-00281 |
| THE UNITED STATES, | ) ) | |
| Defendant, | ) ) ) | |
| and | ) ) ) | |
| BROOKLYN BEDDING, LLC, CORSICANA MATTRESS COMPANY, ELITE COMFORT SOLUTIONS; FXI, INC., INNOCOR, INC., KOLCRAFT ENTERPRISES INC., LEGGETT & PLATT, INCORPORATED, THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, and UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendant-Intervenors. | ) ) | |

_____  )

**<u>ORDER</u>**

Upon consideration of plaintiffs' comments regarding the remand redetermination, defendant's response thereto, and all other pertinent papers, it is hereby

ORDERED that the remand redetermination is sustained.

.

Date:_____
    New York, NY                                                                    _____
                                                                                      Judge