# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| BEST MATTRESSES INTERNATIONAL COMPANY LIMITED AND ROSE LION FURNITURE INTERNTIONAL COMPANY LIMITED,<br><br>*Plaintiffs and Consolidated Defendant-Intervenors,*<br><br>v.<br><br>UNITED STATES,<br><br>*Defendant,*<br><br>BROOKLYN BEDDING, LLC ET AL.,<br><br>*Defendant-Intervenors and Consolidated Plaintiffs.* | Consol. Court. No. 21-00281<br><br>**NON-CONFIDENTIAL VERSION**<br><br>Business Proprietary Information Removed from Brackets on Pages 5 and 12. |

## MATTRESS PETITIONERS' COMMENTS IN SUPPORT OF REMAND REDETERMINATION

Yohai Baisburd
Chase J. Dunn

CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
(202) 567-2300

*Counsel to Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO*

Date: September 29, 2023

i

<h1 style="text-align:center">**Table of Contents**</h1>

**Page**

I.  INTRODUCTION AND SUMMARY ................................................................................. 2

II. STANDARD OF REVIEW ........................................................................................... 3

III. ARGUMENT ............................................................................................................. 4

    A.  The Department's Determination to Exclude Imports from Non-Market
        Economy and Export Subsidizing Countries from the Trademap and GTA Data
        is Supported by Substantial Evidence and is in Accordance with Law ........................... 4

        1.  The Department's Investigation and the Court's Remand Order .............................. 4

        2.  The Department's Remand Redetermination Reasonably Applied its
            Presumption of Unreliability with Respect to NME and Export
            Subsidizing Countries to Affiliated and Unaffiliated Parties .................................... 7

        3.  The Department Reasonably Determined to Remove NME and
            Distorted Data from Its Constructed Value Calculation ........................................... 9

    B.  The Department's Use of a Simple Average To Calculate a Per Unit Cost of
        Production is Supported by Substantial Evidence and in Accordance With Law .......... 11

    C.  The Department's Continued Reliance on Emirates Sleep's Financial Statements
        in Calculating Constructed Value Profit is Supported by Substantial Evidence
        and in Accordance With law ......................................................................................... 14

        1.  The Department's Determination that Emirates Sleep's Financial
            Statements are Publicly Available is Supported by Substantial
            Evidence ..................................................................................................................... 16

        2.  Best Mattresses's Arguments Concerning Public Availability Are
            Without Merit And Do Not Undermine the Department's
            Determination that Emirates Sleep's Financial Statements are Publicly
            Available .................................................................................................................... 18

            a)  The Department's Decision to Reopen the Record Was Lawful .................... 19
            b)  Best Mattresses Arguments Concerning Public Availability Are Without Merit
                  ............................................................................................................................ 21

        3.  The Department's Determination to Average the Financial Ratios of
            Emirates Sleep and GTI was Reasonable and In Accordance With Law ................ 25

        4.  Best Mattresses' Arguments Concerning the Department's
            Determination to Average the Financial Ratios of Emirates Sleep and

GTI Are Without Merit .................................................................. 27

IV.  CONCLUSION ..................................................................................... 30

# Table of Authorities

Page(s)

## Statutes

19 USC § 1516a(b)(1)(B)(i) ...........................................................................................3

19 USC § 1677b(f)(1)(A) .........................................................................................9, 10

19 USC §§ 1677b(f)(2) ....................................................................................4, 5, 8, 11, 13

19 USC §§ 1677b(f)(3) ....................................................................................4, 5, 8, 11, 13

28 USC § 2637(d) ..................................................................................................13

19 USC § 1677b(e)(2)(B)(iii) .......................................................................................28

## Regulations

19 CFR § 351.309(c)(2) .............................................................................................12

19 CFR 351.302(a) ..................................................................................................20

## Court Decisions

*Al Ghurair Iron & Steel LLC, v. United States*, 536 F. Supp. 3d 1357
(Ct. Int'l Trade 2021) ...............................................................................................7

*Catfish Farmers of Am. v United States*, 33 CIT 1258, 1273 (2009) ...........................................26

*Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc.*, 467
U.S 837 (1984) ......................................................................................................3

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ...........................................................3

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966) ........................................................3

*Corus Staal BV v. United States*, 502 F.3d 1370 (Fed. Cir. 2007) ...........................................13

*Cultivos Miramonte S.A. v. United States*, 7 F. Supp. 2d 989 (Ct. Int'l
Trade 1998) ........................................................................................................24

*Dongkuk S&C Co., Ltd. v. United States*, 600 F. Supp. 3d 1331 (Ct. Int'l
Trade 2022) ........................................................................................................28

*Dorbest Ltd. v. United States*, 604 F.3d 1363 (Fed. Cir. 2010) ...........................................12

*DuPont Teijin Films USA v. United States*, 407 F.3d 1211 (Fed. Cir.

2005) .................................................................................................................3

*Dupont Teijin Films v. United States*, 997 F. Supp. 2d 1338 (Ct. Int'l
Trade 2014) ...................................................................................................26

*Essar Steel Ltd. v. United States*, 678 F.3d 1268 (Fed. Cir. 2012) .............19

*Fine Furniture (Shanghai) Limited v. United States*, 353 F. Supp. 3d
1323 (Ct. Int'l Trade 2018) .....................................................................13, 14

*Fresh Garlic Producers Association v. United States*, 2017 WL 4158383
(Sept. 19, 2017) ............................................................................................19

*IPSCO, Inc. v. United States*, 965 F.2d 1056 (Fed. Cir. 1992) ......................4

*JA Solar International Limited v. United States*, 606 F. Supp. 3d 1370
(Ct. Int'l Trade 2022). .....................................................................................3

*Laclede Steel Co. v. United States*, 19 C.I.T. 1076 (1995) ...........................19

*Luoyang Bearing Corporation (Group) v. United States*, 450 F. Supp. 3d
1402 (Ct. Int'l Trade 2020) ...........................................................................13

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.
29 (1983) .......................................................................................................10

*NTN Bearing Corp. of Am. v. United States*, 132 F. Supp. 2d 1102 (Ct.
Int'l Trade 2001) .......................................................................................19, 24

*NTSF Seafoods Joint Stock Company v. United States*, 487 F. Supp. 3d
1310 (Ct. Int'l Trade 2020) ...........................................................................26

*Peer Bearing Co.-Changshan v. United States*, 853 F. Supp. 2d 1365
(Ct. Int'l Trade 2012) .....................................................................................24

*Shenzhen Xinboda Industrial Co., Ltd. v. United States*, 494 F. Supp. 3d
1347 (Ct. Int'l Trade 2021) ...........................................................................29

*Timex V.I., Inc. v. United States*, 157 F.3d 879 (Fed. Cir. 1998) ...................4

*Torrington Co. v. United States*, 68 F.3d 1347 (Fed. Cir. 1995) ....................4

*Unicatch Indus. Co. v. United States*, 539 F. Supp. 3d 1229 (Ct. Int'l
Trade 2021) .....................................................................................................8

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009) .......................................4

*Viraj Group v. United States*, 476 F.3d 1349 (Fed. Cir. 2007) ......................9

*Yantai Xinke Steel Structure Co., Ltd. v. United States*, Slip Op. 14-38
(Ct. Int'l Trade 2014).............................................................................................29

*Zenith Radio Corp. v. United States*, 437 U.S. 443 (1978)...........................................4

**Administrative Determinations**

*Certain Crystalline Silicon Photovoltaic Products from the People's
Republic of China: Final Results of Antidumping Duty Administrative
Review and Final Determination of No Shipments; 2014-2016*, 82 Fed.
Reg. 32170 (July 12, 2017)......................................................................................28

*Certain Cut-to-Length Carbon Steel Plate from Romania: Notice of
Final Results and Final Partial Rescission of Antidumping Duty
Administrative Review*, 70 Fed. Reg. 12651 (Mar. 15, 2005).........................................7

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:
Final Results of the Second Administrative Review*, 72 Fed. Reg. 13242
(Mar. 21, 2007) ....................................................................................................29

*Certain New Pneumatic Off-The-Road Tires from the People's Republic
of China: Final Affirmative Determination of Sales at Less Than Fair
Value and Partial Affirmative Determination of Critical Circumstances*,
73 Fed. Reg. 40485 (July 25, 2008)...........................................................................30

*Certain Steel Nails from Taiwan: Final Determination of Sales at Less
Than Fair Value*, 80 Fed. Reg. 28959 (May 20, 2005) ...................................................28

*Mattresses from Cambodia: Final Affirmative Determination of Sales at
Less Than Fair Value and Final Negative Determination of Critical
Circumstances*, 86 Fed. Reg. 15894 (Mar. 25, 2021).................................................2,3

*Notice of Final Determination of Sales at Less Than Fair Value: Pure
Magnesium from Israel*, 66 Fed. Reg. 49349 (Sept. 27, 2001)........................................28

*Utility Scale Wind Towners from the Socialist Republic Vietnam: Final
Results of Antidumping Duty Administrative Review; 2013-2014*, 80
Fed. Reg. 55333 (Sept. 15, 2015) ................................................................................7

*Wire Decking from the People's Republic of China: Final
Determination of Sales at Less Than Fair Value*, 75 Fed. Reg. 32905
(June 10, 2010).................................................................................................29, 30

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE**

|  |  |  |
|---|---|---|
| BEST MATTRESSES INTERNATIONAL COMPANY LIMITED AND ROSE LION FURNITURE INTERNTIONAL COMPANY LIMITED,<br><br>    *Plaintiffs and Consolidated Defendant-Intervenors,*<br><br>        v.<br><br>UNITED STATES,<br><br>    *Defendant,*<br><br>BROOKLYN BEDDING, LLC ET AL.,<br><br>    *Defendant-Intervenors and Consolidated Plaintiffs.* | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Consol. Court. No. 20-00281<br><br>**NON-CONFIDENTIAL VERSION**<br><br>Business Proprietary Information Removed from Brackets on Pages 5 and 12. |

## MATTRESS PETITIONERS' COMMENTS IN SUPPORT OF FINAL RESULTS OF REDETERMINATION

In accordance with U.S. Court of International Trade Rule 56.2(h)(3), Brooklyn

Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc.,

Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of

Teamsters, United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial

and Service Workers International Union, AFL-CIO (collectively, "Mattress Petitioners"),

defendant-intervenors and plaintiffs in the companion case *Brooklyn Bedding, LLC, et al. v.*

*United States*, Court No. 21-00282, respectfully submit these comments in support of the Final

Results of Redetermination Pursuant to Court Remand filed by the Department of Commerce

("the Department") on July 17, 2023. *See* Final Results of Redetermination Pursuant to Court

Remand (July 17, 2023), ECF No. 105-1 ("*Remand Redetermination*"); *see also Best Mattresses Int'l Co. Ltd. v. United States*, 622 F. Supp. 3d 1347 (Feb. 17, 2023) ("*Remand Order*").

## I. INTRODUCTION AND SUMMARY

In its *Remand Order*, the Court instructed the Department to explain why it was reasonable to apply a presumption that data from non-market economies ("NME") and export-subsidizing countries is unreliable when evaluating an affiliated supplier in an NME or export-subsidizing country, but to not apply the same presumption to unaffiliated suppliers. *Remand Order* at 53-55. The Court also instructed the Department to further explain its conclusion that the financial statements of Emirates Sleep Private Limited ("Emirates Sleep") were complete and publicly available. *Id.* at 68-75.

As discussed below, the Department's *Remand Redetermination* reasonably explains that there is a general presumption, applicable to affiliated and unaffiliated parties alike, that data from NMEs and export-subsidizing countries are unreliable and/or distortive. *Remand Redetermination* at 8-9 and Issue 2. The Department also explains that Emirates Sleep's financial statements were publicly available and appropriately included in the calculation of constructed value profit. *Id.* at 9-17 and Issue 3. Finally, the Department explains that although Emirates Sleep's financial statements are incomplete, GTI's financial statements are likewise flawed in that GTI does not produce identical or comparable merchandise. Therefore, the Department reasonably determined to average the financial ratios of both financial statements. *See id.* As also explained below, Best Mattresses' opposition comments do not undermine the reasonableness or lawfulness of the Department's conclusions. *See* "Plaintiffs Best Mattresses International Company Limited and Rose Lion Furniture International Company Limited Comments on Final Results of Redetermination" (Aug. 30, 2023) ("Best Mattresses' Cmts"); *see also Mattresses*

*from Cambodia: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 86 Fed. Reg. 15894 (Mar. 25, 2021) ("*Final Determination*") (P.R. 309) and accompanying Issues and Decision Memorandum ("IDM") (P.R. 301).[1]

## II.  STANDARD OF REVIEW

In reviews of the Department's determinations in an antidumping duty proceeding, the Court will sustain the Department's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 USC § 1516a(b)(1)(B)(i). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Critically, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Rather, when addressing a substantial evidence issue raised by a party, the Court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." *JA Solar International Limited v. United States*, 606 F. Supp. 3d 1370, 1373 (Ct. Int'l Trade 2022).

In reviewing the Department's construction of a statute, the Court uses the two-part test articulated in *Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S 837 (1984). First, the Court determines "whether Congress has directly spoken to the precise question

---

[1] All citations to the administrative record take the form "P.R.__" or "C.R.__". All citations to the administrative record for this remand proceeding take the form "REM P.R.__" or "REM C.R.__."

at issue" and clearly expressed its purpose and intent in the statute. *See id.* at 842-43. The Court looks at the plain meaning of the text, *id.* at 843 & n.9, and may consider the statute's structure and legislative history, *Timex V.I., Inc. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998). Second, if the statute does not answer the question, the Court assesses whether the Department's interpretation is "sufficiently reasonable." *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450-51 (1978) (citation omitted). The Department's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (citation omitted). "{The Court} accord{s} substantial deference to Commerce's statutory interpretation, as {Commerce} is the 'master' of the antidumping laws." *Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995) (citation omitted); *see also IPSCO, Inc. v. United States*, 965 F.2d 1056, 1061 (Fed. Cir. 1992) (the Court errs by substituting "its own construction of a statutory provision for a reasonable interpretation made by {Commerce}") (quoting *Chevron*, 467 U.S. at 844).

## III.  ARGUMENT

### A.  The Department's Determination to Exclude Imports from Non-Market Economy and Export Subsidizing Countries from the Trademap and GTA Data is Supported by Substantial Evidence and is in Accordance with Law

#### 1.  *The Department's Investigation and the Court's Remand Order*

In the *Final Determination*, the Department found that Best Mattresses obtained major inputs and a significant number of minor inputs, packing materials, and fixed assets from their NME-based affiliated suppliers. *See* IDM at Comment 1. Following well-established practice, the Department analyzed whether these transactions were made at arm's length by conducting a major input and transactions disregarded analysis pursuant to 19 USC §§ 1677b(f)(2) and (3). *Id.* However,

Best Mattresses/Rose Lion reported that it did not purchase many of these items from unaffiliated suppliers and that their unaffiliated suppliers did not sell the same items to unaffiliated customers. Thus, for many items, Commerce was without a market price against which to test the affiliated party purchases. Furthermore, *because these transactions were between Best Mattresses/Rose Lion and NME-based affiliated suppliers, Commerce was unable to rely on the affiliated suppliers' cost of production for use in applying the major input rule or as a substitute for a market price as Commerce often does when market prices of minor inputs are not available*.

*Id.* Consequently, the Department "sought to obtain surrogate information that would allow it to fulfill the requirements of" 19 USC §§ 1677b(f)(2) and (3). *Id.*

Under the "transactions disregarded" (19 USC § 1677b(f)(2)) and "major input" (19 USC § 1677b(f)(3)) rules, the Department compares the respondent's purchase price of the relevant input from its affiliate (*i.e.*, the transfer price) to a market price. If the record lacks a usable market price, the Department typically relies on the affiliate's cost of production ("COP") as a surrogate for a market price. In determining a surrogate market price to apply in its transactions disregarded and major input analyses, the Department held that Cambodian Trademap data (*i.e.*, country-specific export data into Cambodia) "best reflect fair market prices for the market under consideration in those instances where market prices from an unaffiliated supplier are not available." IDM at 10. Therefore, the Department "determined the market price by the HTS cost of the specific input using the Cambodian Trademap data (including all NME countries and countries receiving government subsidies except [          ])." Memorandum from the Department "Cost of Production and Constructed Value Calculation Adjustments for the Final Determination" (Mar. 18, 2021) ("Final COP Memo") (P.R. 307) (C.R. 276) at 2. Similarly, in determining a surrogate COP the Department "derived the surrogate COP amounts by using HTS number specific inputs from the average of the GTA data for the six countries Brazil, Malaysia, Mexico, Romania, Russia and Turkey (including all NME countries and countries with export

subsidies)." *Id.*

In its *Remand Order*, the Court observed that although the Department held that it "cannot rely on the affiliated suppliers' actual cost of production because the affiliates are based in an NME country," the agency did not apply the same presumption to unaffiliated suppliers based in an NME country or countries with broadly available export subsidies (*i.e.*, the GTA and Cambodian Trademap data). Specifically, the Department stated that in

> market economy cases, Commerce is required under section 773(f)(1)(A) of the Act to calculate costs based on the records of the exporter or producer of the merchandise which are kept in accordance with generally accepted accounting principles and reasonably reflect costs associated with production. In market economy cases, Commerce relies on the purchase prices paid to unaffiliated suppliers based in these countries. It would be inconsistent with the law and our practice to exclude imports from these countries when using the GTA data as a proxy for market prices and COP. However, because we are testing transactions from the respondent's affiliated NME-based suppliers, whose exports to Rose Lion and Best Mattresses are necessarily included in the Cambodia Trademap data, we have good cause to exclude the specific NME country export data included in the Cambodia Trademap data, to avoid the obvious circularity….

IDM at 11. The Court held that this disparate treatment, without explanation, rendered the Department's analysis unsupported by substantial evidence, explaining that

> Commerce fails to justify why its presumption of NME unreliability applies in the affiliated supplier context, but not in the unaffiliated supplier context. Put simply, when Commerce must determine whether surrogate data that includes NME and countries with broadly available export subsidies may 'reasonably reflect the costs associated with the production and sale of the merchandise'…Commerce does not apply the same presumption of NME data unreliability and instead argues that it must rely on purchase prices paid to unaffiliated NME-based suppliers.

*Remand Order* at 54. The Court thus held that if "the presumption does not apply with equal force in the unaffiliated supplier versus affiliated supplier contexts, then the agency must provide affirmative reasons to explain why that is so." *Id.* at 55.

       2. *The Department's Remand Redetermination Reasonably Applied its Presumption of Unreliability with Respect to NME and Export Subsidizing Countries to Affiliated and Unaffiliated Parties*

In its *Remand Redetermination*, the Department "reconsidered our decision in the Final Determination" and, consistent "with our longstanding practice, we have excluded NME countries and countries with broadly available export subsidies from the GTA data used as a surrogate for the affiliated suppliers' COP for purposes of our major input analysis and from the Cambodian Trademap data to calculate a market price for the major and minor inputs." *Remand Redetermination* at 8. As discussed below, the Department's decision to exclude data from NME and export-subsidizing countries is reasonable and in accordance with law.

*First*, the Department's *Remand Redetermination* is consistent with longstanding practice. The Department's practice of excluding surrogate value data from NMEs is based on the recognition that costs and prices in NMEs do not reflect fair market value. *See Al Ghurair Iron & Steel LLC v United States*, 536 F. Supp. 3d 1357 (Ct. Int'l Trade 2021) (quoting the Department's understanding that the statute "presumes that NME costs and prices are inherently unreliable"). Similarly, the Department has a well-established practice of excluding data from countries with broadly available export subsidies. This practice is based on the Department's general inference that all exporters in countries with broadly available export subsidies benefit from such subsidies. *See Utility Scale Wind Towers from the Socialist Republic Vietnam: Final Results of Antidumping Duty Administrative Review; 2013-2014*, 80 Fed. Reg. 55,333 (Sept. 15, 2015), IDM at Comment 3; *Certain Cut-to-Length Carbon Steel Plate from Romania: Notice of Final Results and Final Partial Rescission of Antidumping Duty Administrative Review*, 70 Fed. Reg. 12,651 (Mar. 15, 2005), IDM at Comment 3 ("Consistent with our practice, we do not use export prices from a market economy for the valuation of surrogate values when we have a

reasonable basis to believe or suspect that the product benefits from broadly available export subsidies."). Thus, by excluding import data from NMEs and countries with broadly available export subsidies from the GTA and Trademap data, the Department adhered to its longstanding practice.

*Second*, the Department reasonably explained that excluding import data from NME countries and countries with broadly available export subsidies is not "applicable only to NME proceedings." *Remand Redetermination* at 26. The Department noted, for example, that for "purposes of constructing a normal value for comparison to U.S. price in the context of evaluating an antidumping petition in market economy cases, Commerce values the production inputs using import data that excludes NME countries and countries with broadly available export subsidies." *Id.* Likewise, in "market economy investigations and reviews where normal value is based on CV, Commerce may rely on the financial statements of a surrogate producer to determine amounts for CV profit and selling expenses" and "the surrogate financial statements of NME entities are excluded from consideration." *Id.* at 26-27.

*Third*, the Department's decision to exclude import data from NME countries and countries with broadly available export subsidies is a reasonable exercise of the discretion afforded to the agency by statute. Under the transactions disregarded rule, the Department may determine a market price "based on the information available." 19 USC § 1677b(f)(2); *see also Unicatch Indus. Co. v. United States*, 539 F. Supp. 3d 1229, 1248 (Ct. Int'l Trade 2021) (noting that the "statute vests Commerce with discretion to determine how best to apply the transactions disregarded rule"). Likewise, under the major input rule the Department "may determine the value of the major input on the basis of the information available." 19 USC § 1677b(f)(3); *see*

*also Viraj Group v. United States*, 476 F.3d 1349, 1356 (Fed. Cir. 2007) ("The major input rule…provides Commerce discretion in valuing one company's production input…").

In summary, the Department addressed the Court's concerns by explaining that the "general assumption is that Commerce will normally exclude the data from NME countries and countries with broadly available export subsidies unless a party can rebut the presumption that those prices are subsidized" or distorted. *Remand Redetermination* at 28. This assumption applies equally to affiliated and unaffiliated parties. Put differently, the Department's determination makes clear that data from NMEs and export-subsidizing countries do not "reasonably reflect the cost associated with the production and sale of the merchandise.'"19 USC § 1677b(f)(1)(A) (emphasis supplied). As discussed above, the Department's determination to exclude data from NMEs and countries with broadly available export subsidies is consistent with past practice, applies equally in NME and market economy cases when using surrogate values, and is a reasonable exercise of the Department's discretion in conducting its analyses under the transactions disregarded and major input rules. Accordingly, the Department's decision to exclude data from NMEs and export subsidizing countries is supported by substantial evidence and is otherwise in accordance with law.

### 3. The Department Reasonably Determined to Remove NME and Distorted Data from Its Constructed Value Calculation

Best Mattresses raises two objections to the Department's analysis. *First*, Best Mattresses asserts that the Department failed to explain its original determination and reversed its determination without providing compelling reasons. *See* Best Mattresses' Cmts at 4. *Second*, Best Mattresses asserts that the Department's "implementation of the surrogate value methodology by removing the NME and export subsidizing countries is unlawful and unreasonable because this investigation concerns products from a market economy country" and

"Commerce has no legal basis to exclude import data from NME countries or from allegedly subsidized market economy countries." *Id.* at 5. As discussed below, Best Mattresses is wrong.

As discussed above in Section III.A.2, the Department reasonably decided to exclude data from NME and export-subsidizing countries from the surrogate data used in its transactions disregarded and major input rule analyses. The Department explained, citing the Court's *Remand Order*, "that there is a general presumption of NME unreliability which is derived from the statute as a whole and affirmed by Commerce practice." *Remand Redetermination* at 27. Likewise, the Department explained that it "do{es} not use export prices from a market economy for the valuation of surrogate values when we have a reasonable basis to believe or suspect that the product benefits from broadly available export subsidies" *Id.* at 28. Thus, by excluding data from NMEs and export-subsidizing countries, the Department followed longstanding practice.

Best Mattresses' assertion that "Commerce has no legal basis to exclude import data from NME countries or from allegedly subsidized market economy countries" because "Commerce's policy of removing such data is rooted in, and only applicable to, NME cases where Commerce employs its surrogate value methodology" is without merit. Best Mattresses' Cmts at 5. The statute requires that, for purposes of constructed value, costs "shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records…reasonably reflect the costs associated with the production and sale of merchandise." 19 USC § 1677b(f)(1)(A); *see also Remand Order* at 53. It is reasonably discernible that the Department's decision to remove data from NME and export-subsidizing countries was based on its finding that data from NMEs and export-subsidizing countries do not "reasonably reflect the costs associated with the production and sale of merchandise." *Cf. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("We will…'uphold a decision of less than

ideal clarity if the agency's path may reasonably be discerned.'") (citations omitted). The Department's decision to exclude such data is also rooted in the discretion provided by statute to use "information available" in conducting its analysis. *See* 19 USC §§ 1677b(f)(2)-(3). Accordingly, Best Mattresses fails to undermine the Department's reasoned analysis and the Court should affirm the Department's decision to exclude data from NMEs and export-subsidizing countries for purposes of establishing a surrogate market price or COP.

### B. The Department's Use of a Simple Average To Calculate a Per Unit Cost of Production is Supported by Substantial Evidence and in Accordance With Law

Best Mattresses contends that "Commerce's determination to use a simple average methodology instead of a weighted average methodology to calculate surrogate COP values in its major inputs and transactions disregarded analysis is unsupported by substantial evidence and not in accordance with law because Commerce does not meet the underlying burden to calculate an antidumping margin as accurately as possible." Best Mattresses' Cmts at 8. In other words, Best Mattresses argues that the Department must account for import volume when averaging the surrogate COP across countries. *See id.* (arguing that the Department "act{ed} contrary to past decision where the Court found that a weighted average methodology is more accurate {when} the surrogate values are 'not equally representative of the surrogate experience"). As discussed below, Best Mattresses failed to raise this argument in its opening brief and therefore it failed to exhaust its administrative remedies. In any event, its arguments are also without merit.

As an initial matter, Best Mattresses is simply wrong that the Department changed its calculation methodology for establishing the surrogate COP in its *Remand Redetermination*. *See id.* at 9. As the Department explained, in "the *Final Determination,* Commerce computed the surrogate COP for the major input analysis based on the GTA data for Brazil, Malaysia, Mexico, Romania, Russia and Turkey, and calculated a simple average of the per-unit import values of

those six countries for each major input." *Remand Redetermination* at 28. Specifically, the Department calculated the surrogate COP [

                                    ]. *See* Final COP Memo at [                    ]. The Department then [                                            ]. *See id.* at [                    ]. In its *Remand Redetermination*, the Department conducted the same analysis. That is, the Department calculated the surrogate COP [

                                    ]. *Compare* Final Cost Memo at Attachments [                    ], *with* Memorandum from the Department, "Cost of Production and Constructed Value Calculation Adjustments for the Court Remand" (June 5, 2023) ("Remand COP Memo") (REM C.R. 5) and Attachments at [                    ]. The only difference in the Department's calculations is that on remand it appropriately [

                                    ]. *See id.*

    Moreover, Best Mattresses failed to raise any objection to the Department's methodology of using a simple average in its case brief before the agency or in its opening brief before this Court. *See, e.g., Final Determination* at IDM; *Memorandum of Points and Authorities in Support of Rule 56.2 Motion for Judgment Upon the Agency Record of Plaintiffs Best Mattresses International Company Limited and Rose Lion Furniture International Company Limited* (Dec. 9, 2021) at 11-56. The Department's regulations "require the presentation of all issues and arguments in a party's administrative case brief." *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010) (citing 19 CFR § 351.309(c)(2)). Moreover, this Court "shall, where

appropriate, require the exhaustion of administrative remedies." 28 USC § 2637(d). The "exhaustion requirement in this context is therefore not simply a creature of court decision, as is sometimes the case, but is a requirement explicitly imposed by the agency as a prerequisite to judicial review." *Luoyang Bearing Corporation (Group) v. United States*, 450 F. Supp. 3d 1402, 1410 (Ct. Int'l Trade 2020) (quoting *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007)). Accordingly, Best Mattresses failed to exhaust its administrative remedies and, therefore, the Court should not permit Best Mattresses to raise this issue in its response to the Departments *Remand Redetermination*.

Nevertheless, the Department also reasonably rejected Best Mattresses' request to use a weighted average methodology, explaining that "{w}e have not revised our calculation as suggested by Best Mattresses/Rose Lion in determining the surrogate COP for the major inputs because we consider it appropriate and reasonable that each of the six countries carries equal weight in the calculation with no evidence on the record leading to a contrary determination." *Remand Redetermination* at 28. The Department's decision to use a simple average is consistent with its methodology in the *Final Determination*, a methodology that Best Mattress did not appeal or challenge, and is a reasonable exercise of the discretion provided by statute to use "information available" when conducting an analysis under the transactions disregarded and major input rules. *See* 19 USC §§ 1677b(2)-(3).

Additionally, the Department's determination to use a simple average is reasonable and consistent with past practice. For example, in *Fine Furniture (Shanghai) Limited v. United States*, the plaintiff argued that the Department should have calculated a surrogate value for its input using a weighted average, rather than a simple average, because "a weighted average based on the import data quantities will more accurately estimate the true commercial reality in

Romania for these imports." *Fine Furniture (Shanghai) Limited v. United States*, 353 F. Supp. 3d 1323, 1354 (Ct. Int'l Trade 2018). The Department disagreed, explaining that "quantities used in calculation of the {average unit values} based on the Romanian import statistics have no relation to Fine Furniture's own consumption," and therefore "a weight-averaged {GTA}-based {surrogate value} is not a match to Fine Furniture's purchasing experience." *Id.* at 1355. In short, "without any evidence tending to support the argument that Fine Furniture's purchasing history is similar to the import data on the record for Romania, Commerce reasonably determined that a simple average was the better calculation method." *Id.*

The same reasoning applies here. The Department is calculating a surrogate COP because it cannot rely on the market prices and/or cost of production of Best Mattresses' affiliated suppliers in the relevant NME. *See* IDM at Comment 1. Best Mattresses points to no record evidence that its purchasing history is similar to the import data on the record for the six countries the Department used to calculate a surrogate per unit cost. *See, e.g.,* Best Mattresses Cmts at 8-11. Accordingly, the Department reasonably rejected Best Mattresses' request to change its methodology on remand and use a weighted-average methodology to establish a per-unit cost. Accordingly, the Department's use of a simple average to calculate the surrogate COP values is supported by substantial evidence, accurately establishes Best Mattresses' dumping margin, and is otherwise in accordance with law.

### C. The Department's Continued Reliance on Emirates Sleep's Financial Statements in Calculating Constructed Value Profit is Supported by Substantial Evidence and in Accordance With law

In the *Final Determination*, the Department relied on the financial statements of Emirates Sleep to calculate surrogate financial ratios. IDM at Comment 2. In its *Remand Order*, the Court held that the Department appropriately found the "Emirates statements were representative of

Best Mattresses' business operations, sufficiently contemporaneous with the POI, and sufficiently legible." *Remand Order* at 64. The Court further held, however, that the Department "did not adequately explain its finding that the Emirates {financial} statements were publicly available, and the record did not support Commerce's finding that Emirates statements were complete." *Id.* Specifically, the Court found the Department "acted unreasonably" in "premising its finding that Emirates's financial statement was publicly available on an inference that the statement was from a 'fee-based subscription service.'" *Id.* at 71. With respect to completeness, the Court held that a missing annexure in Emirates Sleep's financial statement "may have deprived Commerce of key information regarding the viability of Emirate's financial statements" and, therefore, "Commerce's conclusion that the Emirates statements are complete is…unsupported by substantial evidence." *Id.* at 75. The Court, therefore, "remand{ed} to Commerce for reconsideration or further explanation." *Id.* at 64.

The Department's *Remand Redetermination* addresses the Court's concerns and demonstrate that Emirates Sleep's financial statements are publicly available because they were, and are, available on the Indian MCA website as a public document. Although the Department continues to find Emirates Sleep's financial statements are incomplete, it reasonably "recognize{d} that both sets of financial statements on the record have flaws" and therefore it "use{d} an average of Emirates Sleep and GTI's CV profit and selling expense ratios for Best Mattresses/Rose Lion's profit and selling expenses on remand." *Remand Redetermination* at 16. As discussed below, the Department's determination that Emirates Sleep's financial statements are publicly available, and its determination to average the financial statements of Emirates Sleep and GTI, are supported by substantial evidence and in accordance with law.

### 1. The Department's Determination that Emirates Sleep's Financial Statements are Publicly Available is Supported by Substantial Evidence

As noted above, the Court found the Department "acted unreasonably" in "premising its finding that Emirates's financial statement was publicly available on an inference that the statement was from a 'fee-based subscription service.'" *Remand Order* at 71. Accordingly, on remand the Department "reopened the administrative record for the limited purpose of requesting information from the petitioners on the source and process of obtaining Emirates Sleep's financial statements" from the subscription service. *Remand Redetermination* at 34. In response, Mattress Petitioners "provided clear narrative instructions and screenshots of how to access and retrieve Emirates Sleep's financial data from two separate sources." *Id.* at 32. Specifically, Mattress Petitioners "provided a clear and adequate, step-by-step demonstration of how they retrieved the financial statements from the MCA website" as well as "from the Zauba Corp. website." *Id.* at 31. Based "on the information submitted by the petitioners, {the Department} found that Emirates Sleep's financial statements are available from both the MCA and Zauba Corp. websites" and thus "Emirates Sleep's financial statements are publicly available." *Id.* at 14-15. The Department's reasoning and conclusion are sound.

*First*, the Department requested "that the petitioners provide Commerce with step-by-step instructions of how and from where they retrieved Emirates Sleep's financial statements." *Remand Redetermination* at 32. In response, Mattress Petitioners provided a step-by-step explanation of how to obtain Emirates Sleep's financial statement from the Indian MCA website. *See Remand Redetermination* at 10-11. By following the steps outlined by Mattress Petitioners, the Department was able to verify that Emirates Sleep's financial statements are publicly available from the Indian MCA website by paying the requisite fees. *See id.* at 11. The Department further noted that it "considers the MCA website to be public" because the

"Government of India denotes the information {on the MCA website} as 'public documents'"
that are "available for inspection by members of the public on payment of the prescribed fee." *Id.*
at 13. The Department also noted that, 'in previous investigations, we have determined that the
MCA website constitutes a publicly available source of information." *Id.* at 31. Accordingly,
"Emirates Sleep's financial statements meet the threshold of being considered 'publicly
available.'" *Id.*

 *Second*, Mattress Petitioners also provided a step-by-step explanation of how to obtain
Emirates Sleep's financial statements from the Zauba Corp. website. *See Remand*
*Redetermination* at 11-12. By following the steps outlined by Mattress Petitioners, the
Department was able to verify that Emirates Sleep's financial statements are publicly available
from the Zauba Corp. website. *See id.* at 14. The Department explained that "Zauba Corp.'s
information is 'sourced from the official registers, and from published government data,' *i.e.,*
sources like the MCA." *Id.* at 33. The Department further noted that in "the petitioners'
instructions for how to obtain Emirates Sleep's financial statements, Zauba Corp.'s records
indicate that Emirates Sleep's financial statements were obtainable from Zauba Corp.'s website
since December 16, 2019, meaning the financial statements were available throughout the
duration of the investigation, which itself occurred from April 2020 to May 2021." *Id.*
Accordingly, "Emirates Sleep's financial statements meet the threshold of being considered
'publicly available.'" *Id.*

 In its *Remand Order*, the Court recognized that the "publicly available requirement has
diminished force under this case's unique circumstances" (*i.e.*, the Department is not conducting
an NME investigation). *Id.* at 70. As such, the Court noted that it did "not require Commerce to
choose any particular financial statement" but held that the Department must "fairly weigh the

available options and explain its decision in light of its selection criteria, addressing any shortcomings." *Id.* at 75. As shown above, the Department's *Remand Redetermination* does just that. The Department requested, and Mattress Petitioners provided, detailed step-by-step instructions on how to retrieve Emirates Sleep's financial statements for a fee from both the Indian MCA and Zauba Corp. websites, which the Department was able to follow and verify. *See Remand Redetermination* at 10-11 (Indian MCA) and 11-12 (Zauba Corp.). Accordingly, the Department's conclusion that, "{b}ased on the information submitted by the petitioners, we find that Emirates Sleep's financial statements are available from both the MCA and Zauba Corp. websites," is reasonable and supported by substantial evidence and confirms that "Emirates Sleep's financial statements are publicly available." *Id.* at 14-15.

### 2. Best Mattresses's Arguments Concerning Public Availability Are Without Merit And Do Not Undermine the Department's Determination that Emirates Sleep's Financial Statements are Publicly Available

Best Mattresses contests the Department's reasoning and conclusion that Emirates Sleep's financial statements are publicly available. With respect to the MCA, Best Mattresses contends that (1) the Department's decision to reopen the record to collect information about the MCA website and the steps necessary to retrieve financial statements was unlawful, and (2) the Department's finding is unsupported by substantial evidence because Mattress Petitioners did not provide information about the Indian consultant who acquired the financial statements. *See* Best Mattresses' Cmts at 12-19. With respect to Zauba Corp., Best Mattresses contends that (1) the Department unlawfully accepted new factual information regarding whether Emirates Sleep's financial statements were publicly available on the Zauba Corp. website, and (2) the information provided does not demonstrate that Emirates Sleep's financial statements were publicly available before or during the underlying investigation. *See id.* at 19-21. As discussed below, Best

Mattresses' arguments are once again without merit.

### a)  The Department's Decision to Reopen the Record Was Lawful

As an initial matter, Best Mattresses' contention that "Commerce's determination to reopen the record was unreasonable and contrary to its own past practice" is incorrect. *Id.* at 12. The US Court of Appeals for the Federal Circuit makes clear that the "decision to reopen the record is best left to the agency, in this case Commerce." *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir. 2012). Likewise, this Court has appropriately recognized that "{r}eopening the record on remand is a matter largely left up to Commerce's discretion." *Fresh Garlic Producers Association v. United States*, 2017 WL 4158383 (Sept. 19, 2017). Indeed, as "long as the Court does not forbid Commerce from considering new information, it remains within Commerce's discretion to request and evaluate new data." *NTN Bearing Corp. of Am. v. United States*, 132 F. Supp. 2d 1102, 1107 (Ct. Int'l Trade 2001); *see also Laclede Steel Co. v. United States*, 19 C.I.T. 1076, 1078 (1995) ("Any decision to expand the administrative record upon remand is well with {Commerce's} discretion, absent express language from the court barring such action.").

In its *Remand Order*, this Court did not expressly bar the Department from reopening the record. Rather, this Court held that because "Commerce did not 'sufficiently explain{} its reason for choosing between two flawed financial statements…the Final Determination is remanded." *Remand Order* at 75. The Court made clear, however, that in "remanding the publicly available and completeness issues, 'the court does not require Commerce to choose any particular financial statement.'" *Id.* Rather, the Court only instructed Commerce to "fairly weigh the available options and explain its decision in light of its selection criteria, addressing any shortcomings." *Id.* In order to evaluate Emirates Sleep's financial statement "in light of its selection criteria," the

Department exercised its discretion to reopen the record and collect additional information on how to obtain a public copy of Emirates Sleep's financial statement, consistent with the Court's instructions.

Moreover, the Department's decision to reopen the record was consistent with its practice of requiring interested parties to build the record, contrary to Best Mattresses' contentions. *See* Best Mattresses' Cmts at 13. The Department reiterated that "the burden is squarely on interested parties, and not Commerce to build the record." *Remand Redetermination* at 34. The Department noted, however, that it "has the authority to open the record to request factual information form parties at any time during a proceeding." *Id.* (citing 19 CFR 351.302(a)). The Department then explained that it "reopened the administrative record for the limited purpose of requesting information from the Petitioners on the source and process of obtaining Emirates Sleep's financial statements." *Remand Redetermination* at 34. In other words, the Department did not reopen the record and allow for new financial statements to be placed on the record; rather, the Department requested additional information concerning how Mattress Petitioners ***acquired information already on the record***. Moreover, the Department also "provided interested parties an opportunity to submit factual information to rebut, clarify, or correct the petitioners' response," thus providing Best Mattresses with an opportunity to evaluate and rebut the information provided by Mattress Petitioners. *Remand Redetermination* at 34.

In summary, the Department has the discretion to reopen the record on remand unless the court expressly prohibits such action. It is undisputed that this Court did not expressly prohibit the Department from reopening the record. Additionally, the Department reopened the record for the limited purpose of collecting information about the process by which Mattress Petitioners acquired information already on the record, and provided Best Mattresses with the opportunity to

provide rebuttal comments and factual information. Accordingly, the Department's reopening of the record was reasonable and in accordance with law.

      b) <u>Best Mattresses Arguments Concerning Public Availability Are Without Merit</u>

As noted *supra*, Best Mattresses asserts the Department's determination that Emirates Sleep's financial statements are publicly available on the Indian MCA and Zauba Corp. websites is not supported by substantial evidence. *See* Best Mattresses' Cmts at 16-21. As discussed below, however, Best Mattresses provides no argument that undermines the Department's reasonable conclusion that Emirates Sleep's financial statements were publicly available during the investigation, and remain publicly available today, on both the Indian MCA and Zauba Corp. websites.

### **MCA**

Best Mattresses asserts that the Department's determination that Emirates Sleep's financial statements are publicly available is unsupported by substantial evidence because Mattress Petitioners (1) did not provide information about the Indian consultant that downloaded Emirates Sleep's financial statements from the MCA website, (2) did not provide the Indian consultant's MCA user information, and (3) did not provide evidence that either the Indian consultant or Mattress Petitioners purchased the Emirates Sleep financial statements. *See* Best Mattresses' Cmts at 16-19. In essence, Best Mattresses contends that Mattress Petitioners "failed to substantiate the public source <u>of their August 17, 2020 submission</u>" (*i.e.*, that Emirates Sleep's financial statements were publicly available at the time of the investigation). *Id.* at 18. But as the Department explained, "this information is {not} necessary to prove the public availability of Emirates Sleep's financial statements." *Remand Redetermination* at 32-33.

*First*, although Best Mattresses faults Mattress Petitioners for not providing information

21

about the Indian consultant that acquired Emirates Sleep's financial statements (including its MCA user information or receipts evidencing purchase of the financial statements), the Department notes that it "did not specifically request this information from the petitioners." *Id.* at 33. More importantly, however, is that the step-by-step "instructions provided by the petitioners are sufficient to demonstrate the public availability of the financial statements." *Id.* As noted *supra*, Mattress Petitioners provided a step-by-step explanation of how to obtain Emirates Sleep's financial statement from the Indian MCA website. *See id.* at 10-11. By following the steps outlined by Mattress Petitioners, the Department was able to verify that Emirates Sleep's financial statements are publicly available from the Indian MCA website for a fee. *See id.* at 11.

*Second*, the Department explained that the "record provides adequate evidence to reasonably conclude that the financial statements were publicly available during the investigation." *Id.* at 33. Specifically,

> In the petitioners' instructions for how to obtain Emirates Sleep's financial statements, Zauba Corp.'s records indicate that ***Emirates Sleep's financial statements were obtainable from Zauba Corp.'s website since December 16, 2019***, meaning ***the financial statements were available throughout the duration of the investigation, which itself occurred from April 2020 to May 2021***.[120] Thus, Emirates Sleep's financial statements were available on Zauba Corp.'s website for approximately eight months before the petitioners submitted the financial statements on the record on August 17, 2020. Considering that Commerce has previously found that the MCA website is publicly available, there is no evidence demonstrating otherwise on the record, and that ***Zauba Corp.'s information is "sourced from the official registers, and from published government data," i.e., sources like the MCA, we can reasonably conclude that Emirates Sleep's financial data were also retrievable from the MCA platform during the investigation***. Therefore, it is reasonable to conclude that, considering the above information, Emirates Sleep's 2018-2019 financial statements were available on public sources for information throughout the duration of the investigation and rise to the level of "publicly available" for our purposes.

*Id.* Put differently, insofar as Emirates Sleep's financial statements were available on the Zauba Corp. website as of December 16, 2019, and insofar as Zauba Corp. obtained Emirates Sleep's

financial statements from "the official registers, and from published government data," it is reasonable to conclude that Emirates Sleep's financial statements were available on public sources (including the MCA) before and during the pendency of the underlying investigation. Notably, Best Mattresses does not contest the Department's reasoning. *See* Best Mattresses' Cmts at 16-21 (discussing MCA and Zauba Corp., but not contesting that Emirates Sleep's financial statements were available on Zauba Corp. as of December 16, 2019). Accordingly, the Department's determination that Emirates Sleep's financial statements were publicly available during the investigation is supported by substantial evidence.

**Zauba Corp.**

Best Mattresses further argues that "the Zauba information was unlawful new factual information under Commerce's regulations." Best Mattresses' Cmts at 20-21. Specifically, Best Mattresses contends that although the Department "reopened the record to obtain new factual information to be submitted regarding the source and the process of obtaining the Emirates Sleep financial statements," the "Zauba evidence is not evidence of 'the source and the process of obtaining the Emirates Sleep financial statements.'" *Id.* at 20. Best Mattresses' arguments improperly seek to limit the Department's discretion and, in any event, are wrong.

Mattress Petitioners submission of information about the Zauba Corp. was related to the source and process of obtaining the Emirates Sleep financial statements from the Indian MCA website. Specifically, Mattress Petitioners obtained Emirates Sleep's financial statements from an Indian consultant who acquired them from the Indian MCA website (*i.e.*, the "source" of Emirates Sleep's financial statements). As explained in Mattress Petitioners' remand supplemental questionnaire, "Indian companies—including private companies—are required to register with and submit annual financial information to the Registrar of Companies ("RoC"),

which is part of the MCA." Letter from Mattress Petitioners, "Mattress Petitioners' Response to the Department's Supplemental Questionnaire" (Apr. 6, 2023) (REM P.R. 2-3) at 2. Zauba Corp. "provides officially sourced information on businesses incorporated in India" and states that the "information on Zauba Corp is all a matter of public record, and is sourced from the official registers, and from published government data." *Id.* at 4. In addition, evidence indicates that Emirates Sleep's financial statements were available on Zauba Corp. as of December 16, 2019. *See id.* at 2. Accordingly, insofar as the Zauba Corp. sources its financial statements from "official registers," which are part of the MCA, this evidence corroborates Mattress Petitioners statement that Emirates Sleep's financial statements were available for purchase on the Indian MCA website no later than December 16, 2019, and is relevant to the "source and the process of obtaining the Emirates Sleep financial statements."

Furthermore, Best Mattresses' argument that the Zauba Corp. information was unlawful new factual information is simply an attempt to limit the Department's discretion to reopen the record and to collect additional information. But as discussed *supra*, as "long as the Court does not forbid Commerce from considering new information, it remains within Commerce's discretion to request and evaluate new data." *NTN Bearing Corp. of Am. v. United States*, 132 F. Supp. 2d 1102, 1107 (Ct. Int'l Trade 2001). Indeed, it is "within Commerce's discretion either to accept or reject" new factual information on remand. *Cultivos Miramonte S.A. v. United States*, 7 F. Supp. 2d 989, 993 (Ct. Int'l Trade 1998). In prior remand proceedings, the Department has reopened the record and collected additional information from the parties in order to conduct its analysis and evaluate evidence already on the record. *See, e.g., Peer Bearing Co.-Changshan v. United States*, 853 F. Supp. 2d 1365, 1376 (Ct. Int'l Trade 2012) ("Commerce sent a second questionnaire during the remand proceeding…In the second questionnaire, Commerce requested

'{e}vidence regarding price or contract negotiations…' and '{a}dditional evidence supporting the establishment, communication, and acceptance of prices {the importer} paid to CPZ.").

Accordingly, the Department's decision to reopen the record and collect additional evidence, including information about Zauba Corp., was within its discretion and a reasonable attempt to evaluate and validate whether Emirates Sleep's financial statements were publicly available during the investigation.

### 3. The Department's Determination to Average the Financial Ratios of Emirates Sleep and GTI was Reasonable and In Accordance With Law

In the underlying investigation, the Department observed that Emirates Sleep's financial statement did not contain Annexure 5, which referenced "balances with government authorities," but nevertheless disagreed that these balances "pertain to government subsidies, because these are assets in Emirates Sleep's books, and not liabilities." *Remand Redetermination* at 15. In its *Remand Order*, the Court held that "Commerce erred in summarily stating that any asset plausibly qualifying as a '{b}alance with government authorities' cannot be an indicator of government subsidies…" and therefore remanded for further consideration or explanation. *Remand Order* at 74. On remand, the Department found that "without Annexure 5 on the record, we cannot definitively determine the nature of the 'balances with government authorities' and whether or not they pertain to government subsidies." *Remand Redetermination* at 16. Accordingly, the Department "decided to use an average of Emirates Sleep and GTI's CV profit and selling expense ratios" because "both sets of financial statements on the record have flaws." *Id.* As discussed below, the Department's decision to average the financial statements of Emirates Sleep and GTI is reasonable and in accordance with law.[2]

---

[2] In comments on the draft of the Department's Remand Redetermination, Mattress Petitioners argued that the Department should rely on Emirates Sleep's financial statements alone and should not average Emirates Sleep's and GTI's financial statements. Insofar as the Department disagreed and intends to consider both Emirates Sleep and

In its *Remand Redetermination*, the Department explained that it is "faced with two possible sources for determining CV profit and selling expenses: GTI (a producer of apparel and garments) and Emirates Sleep" (a producer of mattresses). *Remand Redetermination* at 16. Thus, the "GTI financial statements represent profit information for production and sales in the preferred foreign country (*i.e.*, Cambodia), but of merchandise that is similar, but not comparable, to the subject merchandise." *Id.* In contrast, Emirates Sleep's financial statements reflect production and sales of identical merchandise, but are incomplete." *Id.* Because "both sets of financial statements on the record have flaws," the Department reasonably "decided to use an average of the Emirates Sleep and GTI's CV profit and selling expense ratios." *Id.*

The Department's decision to average the profit and selling expense ratios of GTI and Emirates Sleep was reasonable and in accordance with longstanding practice. "Commerce's standard practice is to use multiple financial statements to calculate surrogate financial ratios when possible." *NTSF Seafoods Joint Stock Company v. United States*, 487 F. Supp. 3d 1310, 1318 (Ct. Int'l Trade 2020). Indeed, "{w}hen the record contains multiple contemporaneous financial statements from different producers, Commerce's practice is to average the financial statements to eliminate any potential distortions that may arise from any one producers' statements." *Dupont Teijin Films v. United States*, 997 F. Supp. 2d 1338, 1346 (Ct. Int'l Trade 2014).

Moreover, this Court recognized in its *Remand Order* that "{w}here Commerce is faced with the choice of selecting among imperfect alternatives, it has the discretion to select the best available information for a surrogate value so long as its decision is reasonable." *Remand Order* at 64 (citing *Catfish Farmers of Am. v United States*, 33 CIT 1258, 1273, 641 F. Supp. 2d 1362,

---

GTI's financial statements, Mattress Petitioners support its determination to average the two statements.

1377 (2009)). That GTI's and Emirates Sleep's financial statements are imperfect is not in dispute. No party has contested that GTI does not produce identical or comparable merchandise or that Emirates Sleep's financial statements are incomplete. Accordingly, the Department reasonably concluded that "both sets of financial statements on the record have flaws" and followed its longstanding practice of averaging financial ratios when the record contains more than one contemporaneous financial statement from different producers. The Department's decision to exercise its discretion and average the two financial statements addresses the Court's concerns about the incomplete nature of Emirates Sleep's financial statements, is consistent with longstanding practice, and is therefore supported by substantial evidence and in accordance with law.

### 4. *Best Mattresses' Arguments Concerning the Department's Determination to Average the Financial Ratios of Emirates Sleep and GTI Are Without Merit*

Best Mattresses contends that "Commerce's determination is still inconsistent with the Court's Remand Order in that Commerce wrongly averaged the GTI and Emirates Sleep financial statements." Best Mattresses' Cmts at 21. Specifically, Best Mattresses disputes that GTI's financial statements are "flawed" and contends that GTI's financial statements "were the only reasonable source" for calculating CV profit because the Department "cannot determine the {missing} balances {in Emirates Sleep's financial statements} and whether or not the statements 'pertain to government subsidies.'" *Id.* at 23. Best Mattresses is wrong.

*First*, the Department explained that "the GTI financial statements represent profit information for production and sales in the preferred foreign country (*i.e.*, Cambodia), but of merchandise that is similar, but not comparable, to the subject merchandise." *Remand Redetermination* at 35. Consequently, GTI's financial statement is "flaw{ed}" because it does not reflect production and sales of identical or comparable merchandise. The Department's

determination is consistent with longstanding practice. *See, e.g., Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2014-2016*, 82 Fed. Reg. 32170 (July 12, 2017), IDM at Comment 11 ("{a}s a rule, we prefer to select financial statements from a producer that primarily produced comparable merchandise instead of a producer that primarily produced non-comparable merchandise"); *Certain Steel Nails from Taiwan: Final Determination of Sales at Less Than Fair Value*, 80 Fed. Reg. 28959 (May 20, 2005), IDM at Comment 1 ("we prefer to use the financial statements of a company that primarily produces and sells either identical or comparable products"). Indeed, when calculating constructed value using "any other reasonable method" pursuant to 19 USC § 1677b(e)(2)(B)(iii), as the Department is here, the first factor the Department considers in selecting surrogate financial data to calculate profit and selling expenses is "the similarity of the potential surrogate companies' business operations and products to the respondent's business operations and products." *Dongkuk S&C Co., Ltd. v. United States*, 600 F. Supp. 3d 1331, 1339 (Ct. Int'l Trade 2022) (citing *Notice of Final Determination of Sales at Less Than Fair Value: Pure Magnesium from Israel*, 66 Fed. Reg. 49,349 (Sept. 27, 2001), IDM at Comment 8).

*Second*, the Department reasonably included Emirates Sleep's financial statements in its calculation because there is no affirmative evidence that Emirates Sleep's financial statements reflect receipt of subsidies previously countervailed by the Department. *See Remand Redetermination* at 16 (noting that the relevant "balances ***may not pertain to subsidies***, but because we do not have a copy of Annexure 5, we cannot with certainty determine what those balances represents") (emphasis supplied). Critically, the Department's "practice is, and has been, to rely on the financial statement of a company that is ***or may be the beneficiary of***

***subsidies***, so long as those subsidies have not previously been found to be countervailable."

*Shenzhen Xinboda Industrial Co., Ltd. v. United States*, 494 F. Supp. 3d 1347, 1352 (Ct. Int'l

Trade 2021) (emphasis supplied). More specifically, if the "financial statements or other

documents refer to 'a specific subsidy program found to be countervailable in a formal CVD

determination,' only then will Commerce exclude the company's financial statements from

consideration." *Id.* The Department further explains that

> its practice of only rejecting financial statements that evidence a previously
> determined countervailed subsidy is reasonable because, if Commerce had
> to reject every financial statement which mentioned a subsidy—as opposed
> to only rejecting those with explicit evidence of a previously determined
> countervailable subsidy—some circumstances might require Commerce to
> resort to less appropriate financial statements, leading to inaccuracies.

*Id.* at 1353. Put simply, the Department's practice is "***not to reject financials containing***

***evidence of subsidies of an unknown character*** unless there is evidence that the subsidies were

distortive with respect to the subject merchandise." *Yantai Xinke Steel Structure Co., Ltd. v.*

*United States*, Slip Op. 14-38 at *20 (Ct. Int'l Trade 2014) (emphasis supplied).

Indeed, the Department has previously relied on financial statements that contained

evidence of subsidies that were not previously countervailed by the Department. For example, in

*Wire Decking from China*, the Department explained that it

> has used financial statements with some evidence of subsidies when the
> circumstances of the particular case warranted. For example, the
> Department determined *Fish/Vietnam* (March 21, 2007) that it was
> appropriate to use a financial statement which indicated that the company
> received a subsidy where there was insufficient information on the record
> regarding the subsidy program to warrant disregarding the financial
> statement.

*Wire Decking from the People's Republic of China: Final Determination of Sales at Less Than*

*Fair Value*, 75 Fed. Reg. 32905 (June 10, 2010) ("*Wire Decking from China*"), IDM at Comment

2 (citing *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of the*

*Second Administrative Review*, 72 Fed. Reg. 13242 (Mar. 21, 2007), IDM at Comment 9). In *Wire Decking from China*, the Department relied on a financial statement even though "this company may have received one or more subsidies" because there was no "evidence that the company received subsidies which the Department has previously found to be countervailable." *Wire Decking from China*, IDM at Comment 2; *see also Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 Fed. Reg. 40485 (July 25, 2008), IDM at Comment 17A ("{w}hile these companies may have received subsidies, we find that there is no evidence that these companies received actionable subsidies during the period…Accordingly, we have continued to use these two financial statements").

In summary, record evidence demonstrates that GTI is not a producer of identical or comparable merchandise, and therefore its financial statement does not meet all of the Department's selection criteria (*i.e.*, it is "flawed"). The record also demonstrates that Emirates Sleep is a producer of identical merchandise (*i.e.*, mattresses), but its financial statements are incomplete. Accordingly, the Department reasonably "recognized that both sets of financial statements on the record have flaws" and therefore "decided to use an average of Emirates Sleep and GTI's CV profit and selling expense ratios for Best Mattresses/Rose Lion's profit and selling expenses on remand." *Remand Redetermination* at 16. The Department's averaging of GTI's and Emirates Sleep's financial statements is in accordance with longstanding practice, is supported by substantial evidence, and is otherwise in accordance with law.

## IV.    CONCLUSION

For the reasons discussed above, this Court should affirm the Department's Remand Redetermination in its entirety.

Respectfully submitted,

/s/ Yohai Baisburd

Yohai Baisburd
Chase J. Dunn

CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
(202) 567-2300

*Counsel to Brooklyn Bedding, LLC,
Corsicana Mattress Company, Elite
Comfort Solutions, FXI, Inc., Innocor, Inc.,
Kolcraft Enterprises Inc., Leggett & Platt,
Incorporated, International Brotherhood
of Teamsters, United Steel Paper and
Forestry, Rubber, Manufacturing, Energy,
Allied Industrial and Service Workers
International Union, AFL-CIO*

Date:   September 29, 2023

### Certificate of Compliance

The undersigned hereby certifies that the forgoing submission of "Mattress Petitioners'
Comments in Support of Remand Redetermination," filed by Defendant-Intervenor and
Consolidated Plaintiff, Mattress Petitioners, on September 29, 2023, contains 8978 words,
including footnotes, and excluding the table of contents, table of authorities, and signature block,
and therefore, complies with the maximum 10,000 word limitation set forth in the Standard
Chambers Procedures at Paragraph 2.

BY: /s/ Yohai Baisburd